## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| CONGHUA YAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. [4:23-cv-00758-P-BJ] |
| | ) |
| The State Bar of Texas et al, | ) |
| | ) |
| Defendants. | ) |

## JUDICIAL NOTICE OF ADJUDICATIVE FACTS

TO THE HONORABLE JUDGE OF NORTHERN DISTRICT OF TEXAS:

This matter is before the Court on Pro Se Plaintiff's judicial notice of adjudicative facts, pursuant to Federal Rule of Evidence 201(b). Hereby, Plaintiff presents to this Court with following adjudicative facts:

## I. INTRODUCTION AND ADJUDICATIVE FACTS

1. On September 26th, 2023, Defendants Tarrant County and Lori L. DeAngelis submitted notice of advisory to this Court, [ECF No. 78].

2. In the notice, Defendants emphasized "Defendants **Tarrant County** and **Judge** DeAngelis **present this Advisory** to the Court" and made interpretation of Tex. Fam. Code Ann. § 201.001(c).

3. In the notice, the Defendants did not specify under which provision of the Federal Rules of Civil Procedure they are entitled to present an advisory to a federal court, especially considering that one Defendant holds a role in the State Executive Branch, while another serves in the State Judicial Branch.

4. Library of Congress has coverage of "Advisory Opinion Doctrine", which can be found at https://constitution.congress.gov/browse/essay/artIII-S2-C1-4-2/ALDE_00013564/ , SCOTUS has held that "Court also made clear that was not the sole relevant factor, as the

Judiciary had "early and wisely determined that it would not give advisory opinions even when asked", attached herein as EXHIBIT 1.

5. Supreme Court of Texas has held that "Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 444 (Tex. 1993) (explaining that "we have construed our separation of powers article to **prohibit courts** from **issuing advisory** opinions because such is the function of the executive rather than the judicial department");" *Patterson v. Planned Parenthood of Houston*, 971 S.W.2d 439, 443 (Tex. 1998), attached herein as EXHIBIT 2.

## II. LEGAL STANDARD AND AUTHORITIES

6. Rule 201. Judicial Notice of Adjudicative Facts

**(a) Scope.** This rule governs judicial notice of an adjudicative fact only, not a legislative fact.
**(b) Kinds of Facts That May Be Judicially Noticed.** The court may judicially notice a fact that is not subject to reasonable dispute because it:
  **(1)** is generally known within the trial court's territorial jurisdiction; or
  **(2)** can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.
**(c) Taking Notice.** The court:
  **(1)** may take judicial notice on its own; or
  **(2) must take judicial notice if a party requests it** and the court is supplied with the necessary information.
**(d) Timing.** The court may take judicial notice **at any stage of the proceeding**.
**(e) Opportunity to Be Heard.** On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.
**(f) Instructing the Jury.** In a civil case, the court must instruct the jury to accept the noticed fact as conclusive. In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.

## III. Brief in Support

*7.* Attachments as EXHIBIT 1 and 2 are presented to this Court as Adjudicative Facts.

8. Both facts are "generally known within the trial court's territorial jurisdiction" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

9. A joint advisory from Tarrant County and the Judge towards Federal Court is not warranted by any law. It appears that some licensed attorneys believe they are above the law, thereby

undermining checks and balances. Pro Se Plaintiff presents these adjudicative facts to ensure proper check.

## V. Prayer for Relief

10. WHEREFORE, premises considered, Plaintiff does file this Judicial Notice of Adjudicative Faces, and does move the Honorable Court to make such a matter of record this this litigation, pursuant to Ruel 201(b) and (d) of Federal Rule of Evidence:

Respectfully submitted,

_____/s/ Conghua Yan_____

[Conghua Yan] [2140 E Southlake Blvd, Suite L-439] [Southlake, Texas 76092] [214-228-1886]

[arnold200@gmail.com]

<u>CERTIFICATE OF
SERVICE</u>

I, Conghua Yan, hereby certify that I have served the forgoing document on all counsels and/or pro se parties of record in a manner authorized by Federal Rule of Civil Procedure 5(b)(2) On (October 23th, 2023).


/s/ Conghua Yan

Conghua Yan, Pro Se Plaintiff

[Conghua Yan] [2140 E Southlake Blvd, Suite L-439] [Southlake, Texas 76092] [214-228-1886]

[arnold200@gmail.com]

# EXHIBIT 1



# ArtIII.S2.C1.4.2 Advisory Opinion Doctrine

Article III, Section 2, Clause 1:

> *The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction; to Controversies to which the United States shall be a Party;—to Controversies between two or more States; between a State and Citizens of another State, between Citizens of different States, —between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.*

At the time of the Founding, both English law[1] and existing state constitutions[2] allowed courts to issue advisory opinions. Nonetheless, the Framers declined to include explicit language in the Constitution that would have imposed an advisory role for the Supreme Court or other federal courts.[3] The final version of Article III states only that the "judicial power shall extend to" certain categories of "Cases" and "Controversies."[4] Although that language does not conclusively resolve the question of whether courts have the power to issue advisory opinions,[5] the Supreme Court resolved the issue early in the nation's history in two key cases.

The Supreme Court first issued a decision related to advisory

opinions (albeit without using the term) in 1792, in *Hayburn's Case*.[6] In that case, the Supreme Court considered a petition for a writ of mandamus to direct a federal circuit court to proceed on a claim seeking a federal pension. The petitioner argued that the courts had failed to give effect to an act of Congress. The Court noted, however, that "the reasons assigned by the judges," including Supreme Court Justices sitting on the circuit courts, "for declining to execute the . . . act of Congress, involve a great constitutional question."[7] Specifically, those judges contended that pension decisions under the Act were not judicial duties that Congress could constitutionally assign to the courts because the Act subjected such decisions to "revision and control" by the legislature and an officer in the Executive department.[8] They determined that such control was "radically inconsistent with the independence of that judicial power which is vested in the courts" by the Constitution.[9] While *Hayburn's Case* remained pending, Congress enacted legislation providing an alternative means of relief for the pensioners; the Court then dismissed the mandamus petition without deciding the underlying constitutional question.[10] However, the circuit court opinions declining to issue non-final pension decisions have become an accepted part of the Court's justiciability jurisprudence. The Court has since confirmed that it has no jurisdiction where an opinion would be subject to later review and revision, as such a ruling can amount to no more than advice.[11]

The Supreme Court produced the second early precedent against advisory opinions in 1793. In that year, President George Washington, seeking to determine the United States' legal rights and obligations in

relation to ongoing conflicts between the European powers of France and Britain, sent a letter through his Secretary of State, Thomas Jefferson, to the Justices of the Supreme Court.[12] The letter asked if the Justices would be willing to render opinions on a number of legal questions of "considerable difficulty" that "do not give a cognizance of them to the tribunals of the country."[13] The Justices declined to provide an answer. Chief Justice John Jay drafted a response to the President explaining that "[t]he lines of separation drawn by the Constitution between the three departments of government . . . and our being judges of a court in the last resort . . . are considerations which afford strong arguments against the propriety of our extrajudicially deciding the questions alluded to."[14] Although the letter was not an official opinion of the Court, the Court has since cited it as a major source of the rule against advisory opinions.[15]

Subsequent precedents and practice have reaffirmed the prohibition on advisory opinions but raised some questions about its scope. In the 1948 case *Chicago & Southern Air Lines v. Waterman S. S. Corp.*, the Court refused a private party's request for review of an order of the Civil Aeronautics Board that was, in effect, merely a recommendation to the President for his final action.[16] The Court explained that a judicial decision on the matter would be "an advisory opinion in its most obnoxious form—advice that the President has not asked, tendered at the demand of a private litigant, on a subject concededly within the President's exclusive, ultimate control."[17] While the Court's refusal to act was based in part on the risk of intruding on the President's authority, the Court also made clear that was not the sole relevant factor, as the Judiciary had "early and wisely

determined that it would not give advisory opinions even when asked by the Chief Executive."[18]

The majority opinion in *Chicago & Southern Air Lines* stated that it has been "the firm and unvarying practice of Constitutional Courts to render no judgments not binding and conclusive on the parties and none that are subject to later review or alteration by administrative action."[19] However, while the Court has declined to issue advisory opinions via formal judicial decisions, Supreme Court Justices have at times offered their thoughts on the law in an informal capacity. For instance, in response to a letter calling for suggestions to improve in the operation of the courts, Supreme Court Justices drafted a letter suggesting that the requirement that Justices ride circuit was unconstitutional, though apparently they never sent it.[20] Justice William Johnson communicated to President James Monroe, apparently with the knowledge and approval of the other Justices, the views of the Justices on the constitutionality of internal improvements legislation.[21] In addition, Chief Justice Charles Evans Hughes sent a letter to Senator Burton K. Wheeler questioning the constitutionality of a proposal from President Franklin Delano Roosevelt's administration to increase the membership of the Supreme Court and have the Court sit in divisions.[22] Other Justices have individually served as advisers and confidants of Presidents to one degree or another.[23]

Some commentators also contend that the precise meaning of the ban on advisory opinions became blurred in the twentieth century, as the Court has used the phrase to refer to a number of different distinct limitations on federal courts.[24] Primarily, the Court has used the term

in reference to the Article III justiciability limitations on federal courts' jurisdiction, such as mootness or standing.[25] However, the Court has also linked the ban on advisory opinions to modern prudential doctrines, such as the Supreme Court's practice of not deciding questions in state court cases that have been resolved on a separate and independent state law ground,[26] and the practices of courts to avoid reaching constitutional issues or questions not necessary to the determination of the case.[27] These varying uses of the term "advisory opinion," combined with the fact that the Court has referenced it less frequently than any other justiciability rule,[28] have created confusion among scholars or practitioners about the precise meaning of the prohibition.

Beyond its constitutional role, the Court's rule against advisory opinions has repeatedly been recognized or applied in other, non-constitutional contexts. For instance, as noted, the Court has invoked the ban on advisory opinions to justify its practice of not deciding questions in state court cases that have been decided on a separate and independent state law ground.[29] The Court has also suggested that the advisory opinion ban might be relevant to other legal questions, such as whether the Court should issue purely prospective decisions,[30] whether a federal court should render alternative holdings or issue dicta,[31] and whether individual Justices should "engage[ ] in extrajudicial expression of their legal views."[32] As these references show, although the ban on advisory opinions is only rarely invoked by the Supreme Court, its implications are felt throughout the Court's jurisprudence and throughout the law.[33]

## Footnotes

1. ⌃ Flast v. Cohen, 392 U.S. 83, 96 (1968)⧉ ("[T]he power of English judges to delivery advisory opinions was well established [at the Founding].") (citing 3 K. DAVIS, ADMINISTRATIVE LAW TREATISE 127–128 (1958)). *See also* 1 WILLIAM BLACKSTONE, COMMENTARIES 162 (1765) (noting that Members of the House of Lords "have a right to be attended, and constantly are, by the judges of the court of king's bench and commonpleas, and such of the barons of the exchequer as are of the degree of the coif, or have been made serjeants at law; as likewise by the masters of the court of chancery; for their advice in point of law, and for the greater dignity of their proceedings."). *But see* Sackville's Case (1760), 28 Eng. Rep. 940, 2 Eden, 371 (issuing a formal, written extrajudicial opinion to the King as to whether an army officer could be tried by court martial, but noting that, according to Lord Mansfield, the judges are "very averse to giving extra-judicial opinions, especially where they affect a particular case").

2. ⌃ MASS. CONST. ch. III, art. II. ("Each branch of the legislature, as well as the governor or the council, shall have authority to require the opinions of the justices of the supreme judicial court, upon important questions of law, and upon solemn occasions."). *See also* N.H. CONST. art. 74 ("Each branch of the legislature as well as the governor and council shall have authority to require the opinions of the justices of the supreme court upon important questions of law and upon solemn occasions.").

3. ⌃ *See* JAMES MADISON, JAMES MADISON'S NOTES OF THE CONSTITUTIONAL CONVENTION, MAX FARRAND, 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 17–23 (1911) (providing for "a convenient number of the National Judiciary, ought to compose a council of revision with authority to examine every act of the National Legislature before it shall operate"); Virginia (Randolph) Plan as Amended (providing that "the jurisdiction of the national Judiciary shall extend to . . . questions which involve the national peace and harmony."); JAMES MADISON, JAMES MADISON'S NOTES OF THE CONSTITUTIONAL CONVENTION, MAX FARRAND, 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 334 ("Each branch of the Legislature, as well as the Supreme Executive shall have authority to require the opinions of the supreme Judicial Court upon important questions of law, and upon solemn occasions."). *See also* JAMES MADISON, JAMES MADISON'S NOTES OF THE

CONSTITUTIONAL CONVENTION, MAX FARRAND, 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 96–105 (1911) ("It was quite foreign from the nature of [the judicial] office to make them judges of the policy of public measures.") (quoting Elbridge Gerry, a delegate from Massachusetts).

4. ⌃ U.S. CONST. art. III, § 2.

5. ⌃ *Compare with* U.S. CONST. art. II, § 2 ("The President . . . may require the Opinion, in writing, of the principal Officer in each of the *executive* Departments.") (emphasis added).

6. ⌃ 2 U.S. (2 Dall.) 409 (1792) ⤢.

7. ⌃ *Id.* at 410, footnote.

8. ⌃ *Id.*.

9. ⌃ *Id. See also* Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 219 (1995) ⤢ (holding that congressional statute that "retroactively command[ed] the federal courts" to reopen final judgments was unconstitutional). *But see* Patchak v. Zinke, 138 S. Ct. 897, 905 (2018) ⤢ (plurality) ("The separation of powers, among other things, prevents Congress from exercising the judicial power . . . At the same time, the legislative power is the power to make law, and Congress can make laws that apply retroactively to pending lawsuits, even when it effectively ensures that one side wins."); Bank Markazi v. Peterson, 136 S. Ct. 1310, 1325 (2016) ⤢ ("Congress may indeed direct courts to apply new enacted, outcome-altering legislation in pending civil cases."). *See also Constitution Annotated* III.3.2.2.3.

10. ⌃ *Id.*

11. ⌃ *See, e.g.*, Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 346–48 (1936) ⤢ (Brandeis, J., concurring) (citing Hayburn's Case ⤢ for the proposition that "the jurisdiction of federal courts is limited to actual cases and controversies; and that they have no power to give advisory opinions"). *See also* Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp. 333 U.S. 103, 113–14 (1948) ⤢ ("To revise or review an administrative decision which has only the force of a recommendation . . . would be to render an advisory opinion in its most obnoxious form."); United States v. Ferreira, 54 U.S. (13 How.) 40, 48 (1852) ⤢ (noting that the powers of a commissioner to "adjust claims to lands or money" is not "judicial . . . in the sense in which judicial power is granted by

the Constitution to the courts of the United States").

12. ⌃ Letter from Thomas Jefferson, Sec. of State, to Chief Justice Jay and Associate Justices (July 18, 1793), *reprinted in* RICHARD H. FALLON, JR., ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 50–51 (7th ed. 2015).

13. ⌃ *Id.*

14. ⌃ Letter from Chief Justice Jay and Associate Justices to President George Washington (August 8, 1793) *reprinted in* RICHARD H. FALLON, JR., ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 52 (7th ed. 2015).

15. ⌃ Vieth v. Jubelirer, 541 U.S. 267, 302 (2004) ⬀ (plurality) (noting that 1793 correspondence involved "categorical" statement by the Court that the "giving of advisory opinions" was beyond the judiciary's power); Flast v. Cohen, 392 U.S. 83, 96 n.14 (1968) ⬀ (noting that "[t]he rule against advisory opinions was established as early as 1793 . . . and the rule has been adhered to without deviation."). *See also* Muskrat v. United States, 219 U.S. 346, 354 (1911) ⬀ (citing the 1793 correspondence in refusing to take jurisdiction over a case brought under a statute creating a lawsuit devised to test the constitutionality of a different statute).

16. ⌃ 333 U.S. 103 (1948) ⬀.

17. ⌃ *Id.* at 113.

18. ⌃ *Id.*

19. ⌃ *Id.*

20. ⌃ 2 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789–1800: THE JUSTICES ON CIRCUIT: 1790–1794, at 89–91 (Maeva Marcus ed., 1985).

21. ⌃ 1 C. WARREN, THE SUPREME COURT IN UNITED STATES HISTORY 595–597 (1926).

22. ⌃ *Reorganization of the Judiciary: Hearings on S. 1392 Before the Senate Judiciary Committee*, 75th Congress, 1st Sess. (1937), pt. 3, 491. *See also* Chief Justice Roger B. Taney's private advisory opinion to the Secretary of the

Treasury that a tax levied on the salaries of federal judges violated the Constitution. S. Tyler, Memoirs of Roger B. Taney 432–435 (1876).

23. ⌃ *E.g.*, Acheson, *Removing the Shadow Cast on the Courts*, 55 A.B.A.J. 919 (1969); Jaffe, *Professors and Judges as Advisors to Government: Reflections on the Roosevelt-Frankfurter Relationship*, 83 Harv. L. Rev. 366 (1969). The issue earned the attention of the Supreme Court when it upheld the congressionally authorized service of federal judges on the Sentencing Commission. Mistretta v. United States, 488 U.S. 361, 397–408 (1989) [↗] (citing examples and detailed secondary sources).

24. ⌃ *See* Evan Tsen Lee, *Deconstitutionalizing Justiciability: The Example of Mootness*, 105 Harv. L. Rev. 603, 648 (1992); *see also* Wright, Miller, & Cooper, 13 Fed. Prac. & Proc. Juris. § 3529.1 (3d ed.) (discussing different uses of the term).

25. ⌃ *See, e.g.*, Preiser v. Newkirk, 422 U.S. 395, 401 (1975) [↗] (noting that "[t]he exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy" and that this is tied to the lack of power to issue advisory opinions); North Carolina v. Rice, 404 U.S. 244, 246 (1971) [↗] (dismissing case on grounds of mootness, noting that "this Court [has] no power to issue advisory opinions"); Hall v. Beals, 396 U.S. 45, 48 (1969) [↗] (in holding that recent amendment by Colorado Legislature rendered case moot, observing that "The case has therefore lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law"); Pub. Workers v. Mitchell, 330 U.S. 75, 89 (1947) [↗] (in finding that plaintiffs' claims not a justiciable "case or controversy" under Article III, noting that "[a]s is well known, the federal courts established pursuant to Article III of the Constitution do not render advisory opinions"); St. Pierre v. United States, 319 U.S. 41, 42 (1943) [↗] ("A federal court is without power to decide moot questions or to give advisory opinions which cannot affect the rights of the litigants in the case before it.").

26. ⌃ *See* Herb v. Pitcairn, 324 U.S. 117, 126 (1945) [↗] ("We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion."). *See also* Lambrix v. Singletary, 520 U.S. 518, 522–23 (1997) [↗] ("We in fact lack jurisdiction to review such

independently supported judgments on direct appeal: since the state-law determination is sufficient to sustain the decree, any opinion of this Court on the federal question would be purely advisory.").

27. ⌃ *See* Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 346–48 (1936) ⧉ (Brandeis, J., concurring) (noting that the federal courts "have no power to give advisory opinions" and discussing rules by which the Court has "avoiding passing upon a large part of all the constitutional questions pressed upon it for decision"). *See also* Lee, *supra* note 24, at 648–49 (discussing application of "advisory opinion" label to dicta).

28. ⌃ Erwin Chemerinsky, Federal Jurisdiction § 2.2 (6th ed. 2012) (noting that "the Supreme Court expressly refers to the ban on advisory opinions less frequently than the other justiciability doctrines").

29. ⌃ *See Herb*, 324 U.S. at 126 ("We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion."). *See also Lambrix*, 520 U.S. at 522–23 ("We in fact lack jurisdiction to review such independently supported judgments on direct appeal: since the state-law determination is sufficient to sustain the decree, any opinion of this Court on the federal question would be purely advisory."). *But see* 16B Charles A. Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 4021 (3d ed. 2018) (explanation that adequate-state-ground rule rests on prohibition against rendering advisory opinions is "circular"; in addition, "advisory opinion doctrine is [ ] inadequate to describe the full range of practice with respect to state law questions.").

30. ⌃ Stovall v. Denno, 388 U.S. 293, 301 (1967) ⧉ (refusing to make a criminal procedure rule generally retroactive, holding it applied only to future cases plus the case announcing the rule, despite the resulting inequality to other pending cases, noting that the rule could not be purely prospective because of "[s]ound policies of decision-making, rooted in the command of Article III of the Constitution that we resolve issues solely in concrete cases or controversies"). *See also* Richard H. Fallon, Jr., et al., Hart and Wechsler's The Federal Courts and the Federal System 54 (7th ed. 2015) (evaluating arguments about whether purely prospective decision would constitute an advisory opinion forbidden by Article III).

31. ⌃ *See, e.g.*, Fallon, *supra* note 30, at 55 (asking whether "[w]hen a Court renders alternative holdings, has it violated constitutional norms?").

32. ⌃ *Id.* at 56 (citing examples of extrajudicial expressions of Justices' views).

33. ⌃ In a few other areas, courts issue opinions that might be considered "advisory," insofar as they do not directly affect the parties before the court. *See* Thomas Healy, *The Rise of Unnecessary Constitutional Rulings*, 83 N.C. L. Rev. 847 (2005) (considering the Court's examination of "unnecessary" constitutional issues in four contexts, qualified immunity, habeas corpus, harmless error, and Fourth Amendment good faith, and considering whether and when this practice can be consistent with the ban on advisory opinions). However, the Supreme Court has not addressed whether this practice can be reconciled with the ban on advisory opinions.

# EXHIBIT 2

No. 97-0889
Supreme Court of Texas

# Patterson v. Planned Parenthood of Houston

971 S.W.2d 439 (Tex. 1998)
Decided Jun 23, 1998

No. 97-0889.

Argued on February 4, 1998.

Decided June 23, 1998.

Appeal from the 250th Judicial District Court, Travis County.

Edward P. Watt, Daniel R. Castro, Austin, Kelly J. Shackelford, Dallas, Debra L. Wilburn, Dan Morales, Toni Hunter, Laquita A. Hamilton, Austin, for Appellants.

Martha S. Dickie, David C. Duggins, Charles R Burton, Austin, for Appellee.

HANKINSON, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HECHT, ENOCH, SPECTOR, OWENS, and BAKER, Justice, joined.

On direct appeal, the Texas Commissioner of Health asks us to reverse the judgment of \*440 the 440 trial court declaring rider 14 to the 1997-1999 Department of Health family planning appropriation to be unconstitutional. The rider forbids the use of state funds to dispense prescription drugs to minors without parental consent. Planned Parenthood challenged rider 14 on the grounds that it conflicts with federal law and violates the unity-in-subject clause of the Texas Constitution. Because we determine that the challenge to rider 14 is not ripe, we vacate the trial court's judgment and dismiss this case for want of jurisdiction.

The State of Texas voluntarily participates in four federal programs that provide funds for family planning services: (1) Title X of the Public Health Service Act, 42 U.S.C. § 300, which provides project grants to public and private agencies for family planning services; (2) Temporary Assistance to Needy Families, 42 U.S.C. § 701 (TANF, also known as the Welfare Reform Act), which provides grants to the states to assist needy families; (3) Title XIX of the Social Security Act, 42 U.S.C. § 1396 (Medicaid), which provides medical care to the needy through a cooperative federal-state program; and (4) Title XX of the Social Security Act, 42 U.S.C. § 1397, which provides block grants to the states for social services, including family planning. The funds from these four programs compose the state's family planning appropriation, identified in the General Appropriations Act as Department of Health Strategy D.1.2. See General Appropriations Act, 75th Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 5663. The federal government is the sole source of funds for all the programs except Medicaid. As a voluntary participant in the Medicaid program, the state agrees to match every nine dollars of federal funds with one dollar of state funds. See 42 U.S.C. § 1396b(a)(5). In 1997 the legislature appropriated approximately $93 million for family planning services for each year of the coming biennium, with approximately $5.4 million per year representing the state's required matching funds for Medicaid. In 1997 the legislature also attached rider 14 to the family planning appropriation, declaring that "no state funds may be used to dispense prescription drugs

to minors without parental consent." General Appropriations Act, 75th Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 5675.

As part of its family planning services, plaintiff Planned Parenthood of Houston and Southeast Texas, Inc., provides prescription medication, including contraceptives and drugs for treating sexually transmitted diseases, to minors without requiring parental consent. Planned Parenthood contracts with the state to receive funds for these services under Title X, Title XX, and TANF. Planned Parenthood is also an enrolled Medicaid provider, and is reimbursed on a fee-for-service basis by the Department of Health (through an insurance program) for the family planning services it provides to Medicaid-eligible individuals. The federal regulations governing these programs have been interpreted to proscribe the imposition of a parental notification or consent requirement. See New York v. Heckler, 719 F.2d 1191, 1196 (2d Cir. 1983) (invalidating federal regulation requiring parental notification of prescription contraceptives as unauthorized by Title X); Planned Parenthood Ass'n v. Schweiker, 700 F.2d 710, 722 (D.C. Cir. 1983) (explaining that federal regulations forbid state from denying Title X services to minors who lack parental consent); T_____ H_____ v. Jones, 425 F. Supp. 873, 878 (D. Utah 1975), aff'd in part, 425 U.S. 986 (1976) (invalidating state parental consent requirement for family planning services as conflicting with federal welfare and Medicaid requirements).

Concerned about what it perceived to be a conflict between the federal program rules' forbidding a parental consent requirement and rider 14's explicit parental consent requirement, Planned Parenthood asked defendant Texas Department of Health about the Commissioner of Health's opinion on the effect of rider 14 on family planning funds. The Department of Health and its commissioner are charged with administering and distributing funds the legislature appropriates for family planning services. The Commissioner in

turn requested an opinion from the United States Department of Health and Human Services (DHHS). A regional health administrator for DHHS replied by letter that, in his view, rider 14 "is, on its face, inconsistent with the applicable Title X *441 family planning legislative authority and implementing regulations. Because the Title X Family Planning Program operates under total budgeting principles, if this Rider is fully implemented, the Texas Department of Health would be ineligible to receive Title X funding." The concept of "total budgeting principles" means that if a family planning program receives any money through Title X, Title X regulations apply to all of the funds in that program, "including but not limited to grant funds, grant-related income or matching funds." 42 C.F.R. § 59.2 (1997).

In light of this express suggestion that Texas might lose its federal family planning funds, Planned Parenthood filed this action against the Department and its commissioner seeking a declaration that rider 14 is unconstitutional. It alleged that the rider violates the Supremacy Clause, Article 6, Clause 2, of the United States Constitution by imposing a parental consent requirement in conflict with federal law, and violates the unity-in-subject clause, article III, section 35, of the Texas Constitution by amending or repealing certain provisions of the general law in an appropriations act.

At trial before the court, the parties stipulated to a number of facts, including that "[e]ffective September 1, 1997, Planned Parenthood will no longer be eligible to receive Medicaid funds for providing prescription medication to minors without consent." Planned Parenthood called as its sole witness Carol Pavlica, the director of the family planning program for the Department of Health. She explained that although the Department had not yet made any final or official decisions, it was considering two plans in its efforts to implement rider 14. Under the first plan (identified by the parties as "Plan A"), the state would simply require all minors receiving

prescription drugs from family planning programs to have parental consent. She acknowledged that in her opinion this plan would jeopardize all federal family planning funds.

To avoid potentially jeopardizing federal family planning funds, the Department was considering a second plan ("Plan B"). Under Plan B, the state would continue to pay for prescriptions to minors without parental consent, but would pay for those prescriptions with federal funds other than Medicaid funds (Medicaid being the only program with a matching state component), including prescriptions for Medicaid-eligible minors. Thus under this plan, in Pavlica's opinion, the state could comply with the legislature's dictate that no state funds be used to dispense prescription drugs to minors lacking parental consent, without violating the federal rules that receipt of family planning services cannot be conditioned on parental consent, or jeopardizing other federal family planning funds. She made clear that under Plan B, neither Planned Parenthood nor its minor clients (including those eligible for Medicaid) would suffer any change in requirements, services, or funding; in other words, the state does and will continue to pay for prescriptions for minors even if they lack parental consent, but from federal funds without a state matching fund component. She also testified she believed the state would not be jeopardizing its federal funds by implementing Plan B because the state would not in fact be imposing a parental consent requirement.

The trial court declared rider 14 unconstitutional on the bases that (1) it conflicts with the federal laws governing the four federal programs in the family planning appropriation, and (2) it violates article III, section 35, of the Texas Constitution by attempting to repeal or amend certain provisions of Chapter 32 of the Texas Human Resources Code. The court rendered judgment enjoining the Commissioner from implementing rider 14. It also issued detailed findings of fact and conclusions of law.

Under federal law, the trial court concluded that the rules governing the federal family planning programs in which the state participates forbid imposition of parental consent requirements, and preempt any state law to the contrary that would affect programs drawing on those federal funds. Although the trial court termed it "an admirable effort" to comply with both federal law and rider 14, the court concluded that the Department's proposed plan to track prescriptions and payments (Plan B) and use federal funds without a state matching component to pay for prescriptions without parental consent would not avoid the conflict with federal law: "While a state can restrict the use of state money appropriated solely for state purposes, a state cannot restrict the use of state money appropriated to match federal money. Under federal law, matching money must come without restrictions or it is not matching money."

Under Texas law, the trial court rejected Planned Parenthood's assertion that the rider amended or repealed Chapter 32 of the Family Code (permitting consent by a nonparent to treatment of a minor under certain circumstances), but ruled that it did amend or repeal certain provisions of Chapter 32 of the Human Resources Code (governing the state's medical assistance program for needy individuals). It determined that section 32.024(a) of the Human Resources Code requires the Department of Health to provide medical services to the needy in accordance with federal law, and section 32.031(b) authorizes the Department to spend state funds to do so. Thus the trial court concluded that the rider unconstitutionally amended general law by bringing the state out of compliance with the federal rules governing family planning funds: "Texas has chosen in its own general law to spend its funds consistent with federal law, and a rider cannot amend or repeal that general law." The trial court also concluded that Planned Parenthood had standing to bring its claims because it receives part of the funds that the state is placing at risk by enforcing a rider in conflict with federal law, and

that even the Department's proposed plan to use federal funds without a state matching component did not resolve that conflict. Based on the letter from DHHS, the court concluded that "[t]his threatened cut-off of federal funds — which directly threatens Planned Parenthood — is sufficient to give Planned Parenthood standing to force compliance with the law." The court also premised standing on its finding that the administrative costs of implementing Plan B would be paid for with funds that would otherwise be available to Planned Parenthood to assist needy individuals.

While the trial court framed this issue as one of standing, we view it more precisely as one of ripeness. Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction, *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998), and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented. *See* DAVIS PIERCE, II ADMINISTRATIVE LAW TREATISE, § 15.12, at 361 (3d ed. 1994) ("In many cases the two problems of standing and ripeness are merged; a party may lack standing because what has happened to him is not far enough developed, but the lack of development may be the essence of unripeness."). But if standing focuses on the question of who may bring an action, *see Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 626-627 (Tex. 1996), ripeness examines when that action may be brought. At the time a lawsuit is filed, ripeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote. *See* Nichol, *Ripeness and the Constitution*, 54 U. CHI. L.Rev. 153, 169 (1987); 13A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 3532.1, at 130 (2d ed. 1984). Ripeness thus focuses on whether the case involves "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." WRIGHT, *supra*, § 3532, at 112.

By maintaining this focus, the ripeness doctrine serves to avoid premature adjudication. While the standing doctrine has been much criticized, ripeness, especially in its pragmatic focus, has found the approval of commentators. *See, e.g.,* Mansfield, *Standing and Ripeness Revisited: The Supreme Court's "Hypothetical" Barriers*, 68 N.D. L. Rev. 1, 19-20 (1992); WRIGHT, *supra*, § 3532, at 112 ("As compared to standing, ripeness decisions have developed a generally satisfactory method for resolving the problems of prematurity.").

The constitutional roots of justiciability doctrines such as ripeness, as well as standing and mootness, lie in the prohibition on advisory opinions, which in turn stems from the separation of powers doctrine. *See* TEX. CONST. art. II, § 1 (separation of powers), art. IV, §§ 1, 22 (attorney general is part of the executive department, and is empowered to issue advisory opinions to the governor *443 and other officials), art. V, § 8 (district court jurisdiction); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993) (explaining that "we have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department"); *Morrow v. Corbin*, 122 Tex. 553 62 S.W.2d 641, 646 (1933) (explaining that under the constitution, appellate court jurisdiction does not extend to issuing advisory opinions); *see also Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (reviewing justiciability principles in light of 1985 constitutional amendment to district court jurisdiction).

The courts of this state are not empowered to give advisory opinions. *Wessely Energy Corp. v. Jennings*, 736 S.W.2d 624, 628 (Tex. 1987); *United Servs. Life Ins. Co. v. Delaney*, 396 S.W.2d 855, 859 (Tex. 1965); *Alamo Express v. Union City Transfer*, 158 Tex. 234, 309 S.W.2d 815, 827 (1958). This prohibition extends to cases that are not yet ripe. *See Camarena v. Texas Employment*

Planned Parenthood v. Suehs, 692 F. Supp. 2d 623 (N.D. Tex. 2010)

*Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988); *Public Util. Comm'n v. Houston Lighting Power Co.*, 748 S.W.2d 439, 442 (Tex. 1987); *City of Garland v. Louton*, 691 S.W.2d 603, 605 (Tex. 1985); *California Prod., Inc. v. Puretex Lemon Juice*, 160 Tex. 586, 334 S.W.2d 780, 783 (1960). A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. *See Camarena*, 754 S.W.2d at 151 (holding trial court could not grant relief based on "a hypothetical situation which might or might not arise at a later date. District courts, under our Constitution, do not give advice or decide cases upon speculative, hypothetical or contingent situations").

The concerns addressed by the ripeness doctrine encompass more than a question of constitutional prohibition. The doctrine has a pragmatic, prudential aspect that is directed toward "[conserving] judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Mayhew*, 964 S.W.2d at 928; *see also* Nichol, *supra*, at 174 ("ripeness analysis carries the banner of prudence rather than power"). Refraining from issuing advisory opinions and waiting for cases' timely factual development is also essential to the proper development of the state's jurisprudence. *See* Entman, *Flawed Activism: The Tennessee Supreme Court's Advisory Opinions on Joint Tort Liability and Summary Judgment*, 24 MEM. ST. U.L. REV. 193, 199 (1994); Frankfurter, *A Note on Advisory Opinions*, 37 HARV. L. Rev. 1002, 1002-03 (1924). "Litigation based upon hypothetical possibility rather than concrete fact is apt to be poor litigation. The demand for specificity, therefore, stems from a judicial desire for better lawmaking." Nichol, *supra*, at 177; WRIGHT, *supra*, § 3532.3, at 147 ("adjudication may be postponed until a better factual record is available, '[e]ven though the challenged statute is sure to work the injury alleged.'") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 300, 99 S.Ct. 2301, 60 L.Ed.2d (1979)). Moreover,

avoiding premature litigation prevents courts from "entangling themselves in abstract disagreements over administrative policies" while at the same time serving to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *City of El Paso v. Madero Dev. Constr. Co.*, 803 S.W.2d 396, 398-99 (Tex.App.-El Paso 1991, writ denied) (citing *Abbott Lab. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); *see also* DAVIS PIERCE, *supra*, § 15.12, at 360 (explaining that ripeness law "limits the ability of courts to intrude excessively on the policymaking domains of the politically accountable [branches of government]"); Nichol, *supra*, at 178 (similarly noting that ripeness doctrine "allows the courts to postpone interfering when necessary so that other branches of government . . . may perform their functions unimpeded").

We examine the ripeness of Planned Parenthood's claims in light of these principles. Planned Parenthood argues that any implementation of rider 14 will result in it losing federal funds, at the very least those provided through Title X. Thus Planned Parenthood urges that it is in immediate danger *444 of sustaining some direct injury because of the Department's planned implementation of rider 14. Planned Parenthood further argues that it is unclear whether the Department can legitimately separate federal and state funds, and that even if the Department can lawfully implement such a plan, Planned Parenthood is harmed by the administrative costs of implementation.

The record does not support Planned Parenthood's assertions. Pavlica, the sole witness, explained that the Department had not finalized its plans, but was leaning to Plan B, and had only just begun investigating what automation demands Plan B might require. She emphasized that Planned Parenthood and its clients would experience no change in actual services provided or paid for under Plan B, but that only the funding source for

some of the prescriptions would change. She testified that the Department would not in fact require parental consent before paying for prescriptions to minors under Plan B: "We would not change the parental consent requirements so minors would continue to be served." The letter from DHHS does not specifically address Plan B, but refers to rider 14 " *on its face*," states that Texas may be ineligible to receive Title X funds " *if* [rider 14] is fully implemented," and clearly assumes that parental consent will be required before any drugs are prescribed. (Emphasis added.) Nothing in the record demonstrates that the federal government has actually considered Plan B, much less suggested revoking or withdrawing funding based on it. Likewise, no evidence supports the trial court's conclusion that the administrative costs of implementing Plan B would come from family planning program funds that would otherwise have gone to Planned Parenthood, or even the actual amount of what those administrative costs would be. Pavlica testified that although she was "not exactly sure" what the administrative costs might be, based on her experience, she "would guess . . . [that] it would be several hundreds of thousands of dollars" to segregate the funds. She did not suggest or even speculate about where the administrative funds would come from. This testimony is not specific enough to support the conclusion that harm to Planned Parenthood is imminent.

This is precisely the kind of case in which resolution of the claim presented depends on the occurrence of contingent future events that may not occur as anticipated or may not occur at all. We simply do not know what the federal government will do if the state carries out its plan to segregate the funds, and the record does not even demonstrate what exactly the state will do. Without knowing what the federal government will do, Planned Parenthood cannot show a conflict between federal and state demands or that the state's proposed action will cause it any injury.

While Planned Parenthood does not have to wait until its funds are actually revoked or cut off, its potential injury must be more certain; the threat must be established by something more definite than the DHHS letter presented in this case, which does not address whatever final action the Department of Health may take to meet its statutory obligations to the legislature and Congress. Because its alleged injury remains contingent, Planned Parenthood's claim is not yet ripe for review.

The essence of the ripeness doctrine is to avoid premature adjudication of just such a situation; to hold otherwise would be the essence of an advisory opinion, advising what the law would be on a hypothetical set of facts. Neither this Court nor the trial court has the power to do so. Accordingly, we vacate the trial court's judgment and dismiss this case for want of jurisdiction.

GONZALEZ, Justice, filed a concurring opinion, in which ABBOTT, Justice, joined.

---

GONZALEZ, Justice joined by ABBOTT, Justice, concurring in the judgment.

I concur with the Court that the challenge to rider 14 is not ripe. I write separately to address the threshold issue the Court leaves open — whether Planned Parenthood has standing to challenge rider 14, even assuming the case is ripe. I would dismiss the case because Planned Parenthood lacks standing either in its own right or on behalf of the minors of the State of Texas. *445

In Texas, "[a] two-part test governs whether a plaintiff has standing to challenge a statute." *Barshop v. Medina Underground Water Conservation Dist.*, 925 S.W.2d 618, 626 (Tex. 1996). First, the "plaintiff must . . . suffer some actual or threatened restriction under that statute." *Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex. 1995). "Second, the plaintiff must contend that the statute unconstitutionally restricts the plaintiff's rights, not somebody else's." Id.

Planned Parenthood maintains that rider 14 "unconstitutionally restricts its own rights" in two ways. First, if the United States Department of Health and Human Services (DHHS) determines that Texas Department of Health's implementation of rider 14 will result in a loss of federal family planning funds, then Planned Parenthood "will not be able to subsidize all the costs of providing expensive prescription drugs to minor patients who cannot obtain parental consent." Second, even if the DHHS is satisfied that "Plan B" does not violate federal regulations, Planned Parenthood claims it is harmed by the administrative costs expended to implement Plan B. However, Planned Parenthood fails to identify the source of its "right" or "entitlement" to Texas tax revenues or to the most efficient and cost-effective administration of those tax revenues.

In *Texas Association of Business v. Texas Air Control Board*, 852 S.W.2d 440 (Tex. 1993), we held that "[t]he standing requirement stems from two *limitations* on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision." *Id.* at 443 (emphasis added). The open courts provision provides:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

TEX. CONST. art. I, § 13. We held that this provision "contemplates access to the courts *only for those litigants suffering an injury*." 852 S.W.2d at 444 (emphasis added). This provision, which authorizes the courts to remedy injuries done in one's "lands, goods, person or reputation," implicitly defines the bounds of potentially justiciable injury. *Cf. Baptist Mem'l Hosp. Sys. v. Arredondo*, 922 S.W.2d 120, 121 (Tex. 1996) (recognizing that under the open courts provision, the legislature may limit a cause of action unless it unreasonably restricts "a well-recognized common law cause of action"). For a plaintiff to have standing, it must demonstrate that it at least

arguably has some legal or liberty interest grounded in the constitution, a statute, or the common law. *See Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 561 (Tex. 1985) ("A property or liberty interest must find its origin in some aspect of state law.").

Planned Parenthood, therefore, must have some arguable basis for asserting that rider 14 abrogates some legal or liberty interest of its own. Planned Parenthood has not alleged that rider 14 abridges any common law right arising under property, tort, or contract law. It has not identified any fundamental right to state subsidization, *see Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, indeed, have a legitimate claim of entitlement to it."), or to the most efficient and least wasteful administration of the state's health care resources. *Cf. Flast v. Cohen*, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ("[To establish Article III standing] [i]t will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute."). Generally, a state's choice of whether to fund a particular program or the efficiency of its administration is not actionable. Furthermore, Planned Parenthood does not identify any implicit right or entitlement owing it under the Texas Constitution or the Texas Human Resources Code abridged by rider 14, even if federal funds are cut off.

The unity-in-subject clause of the Texas Constitution does not, by itself, provide Planned Parenthood any legal or liberty interest. *See* TEX. CONST. art. III, § 35. This Court has previously invalidated riders as void under Section 35 of Article III of the Texas Constitution, but only where the plaintiff asserted an otherwise protected interest. *446 In *LeCroy v. Hanlon*, 713 S.W.2d 335, 338 (Tex. 1986), for example, this Court held that sections of an omnibus fee bill increasing

filing fees violated the "caption requirement" of Article III, Section 35. However, the plaintiff's standing to raise this claim was not in doubt because he claimed that the filing fees burdened his personal, constitutional right to open courts. *See id.* at 337. In *Moore v. Sheppard*, 144 Tex. 537, 192 S.W.2d 559, 562 (1946), this Court held that an amendment to an appropriation bill directing that fees paid to clerks for either official or unofficial documents be deposited with the State Treasury violated the unity-in-subject clause. There, the plaintiffs' standing was also not in question, because they had an arguable property interest in the compensation they received "for [services] that they [had] no obligation, under the law, to perform." *Id.* at 560.

Planned Parenthood asserts that rider 14 conflicts with the purposes of Section 32 of the Human Resources Code. That section provides, in pertinent part, that:

> (a) This chapter shall be liberally construed and applied in relation to applicable federal laws and regulations so that adequate and high quality health care may be made available to all children and adults who need the care and are not financially able to pay for it.

> (b) If a provision of this chapter conflicts with a provision of the Social Security Act or any other federal act and renders the state program out of conformity with federal law to the extent that federal matching money is not available to the state, the conflicting provision of state law shall be inoperative to the extent of the conflict but shall not affect the remainder of this chapter.

TEX. HUM. RES. CODE § 32.002. This section provides indigent children and adults with a statutory interest in maintaining the flow of federal health care funds, but it does not give Planned Parenthood, a conduit for these taxpayer-supported services, a similar statutory interest. The

statute's purposes are directed to the beneficiaries of the state and federal funds, not to fund Planned Parenthood's budget.

What the Legislature gives the Legislature can take away. The adults and children deprived of further entitlements may have a remedy if the process by which the Legislature terminates them does not accord with due process. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 263-64, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (holding that procedural due process requires that evidentiary hearing be held before public assistance payments to welfare recipients are terminated); *Goldsmith v. United States Bd. of Tax Appeals*, 270 U.S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494 (1926) (holding that Board's refusal to admit petitioner to the practice of law without a prior hearing or statement of reasons for denial violated due process). Planned Parenthood has no standing in its own right to challenge rider 14's alleged conflict with the provisions of the Texas Human Resources Code.

In its Original and First Amended Original Petition, Planned Parenthood argued that it has standing to represent the interests of the minors of the State of Texas. Under Texas law, however, only the parents or guardians of a minor may represent their legal interests. *See* TEX. FAM. CODE § 151.003(a)(7). Planned Parenthood is not the surrogate parent of Texas's minor children. Its status as an advocacy organization for certain rights of minors (e.g., access to contraceptives without parental consent) does not confer it standing. *See, e.g., Texas Dep't of Mental Health and Mental Retardation v. Petty*, 778 S.W.2d 156, 163-66 (Tex.App.-Austin 1989, writ dism'd w.o.j.) (holding that Advocacy, Inc., a non-profit advocacy organization for the rights of the mentally disabled, lacked standing to sue on behalf of the rights of the mentally disabled).

The question of Planned Parenthood's standing to represent the minors of the state of Texas obscures the larger issue underlying this case — parental

rights. The purpose of rider 14 was to withhold state funds from a program that, as currently implemented, interferes with parental supervision over the health care and sexual behavior of minor children. Indeed, Planned Parenthood's policy of providing minors prescription drugs without parental consent, for which it seeks this state's subsidies, is inconsistent with Texas law. Section 151.003(a)(6) of the Texas Family Code provides, 447 in pertinent part: *447

> (a) A parent of a child has the following rights and duties: . . .

> (6) *the right to consent* to the child's marriage, enlistment in the armed forces of the United States, *medical* and dental care, and psychiatric, psychological and surgical treatment. . . .

TEX. FAM. CODE § 151.003(a)(6) (emphasis added).

The importance of parental involvement in minors' decisions to avail themselves of contraceptive or abortion services is aptly illustrated in the amicus brief of several families supporting rider 14 who unsuccessfully attempted to intervene at the trial level. The daughter of one of the individuals filing the amicus brief was impregnated on two separate occasions by her mother's boyfriend while she was living with her mother. Both times, the live-in boyfriend took the daughter — once when she was twelve and once when she was thirteen — to an abortion clinic in order to conceal his criminal deeds. A parental consent requirement would have prevented the live-in boyfriend from being able to continue his abuse. The irony of Planned Parenthood's argument that it represents the state's minors is that when some of those minors sought to intervene to speak for themselves — through their lawful representatives — Planned Parenthood opposed their intervention.

Unlike the federal authorities the Court cites early in its opinion, other courts, including our own, have strongly affirmed the ancient and well-

established right of parents to guide and direct the decisions of their minor children. "The natural right which exists between parents and their children is one of constitutional dimensions." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). "The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Only a generation ago, this Court recognized the fundamental importance of parental rights in reaffirming the doctrine of parental immunity:

> We trust that it is not out of date for the state and its courts to be concerned with the welfare of the family as the most vital unit in our society. We recognize that peace, tranquility and discipline in the home are endowed and inspired by higher authority than statutory enactments and court decisions. Harmonious family relationships depend on filial and parental love and respect which can neither be created nor preserved by legislatures or courts. The most we can do is to prevent the judicial system from being used to disrupt the wide sphere of reasonable discretion which is necessary in order for parents to properly exercise their responsibility to provide nurture, care, and discipline for their children.

*Felderhoff v. Felderhoff*, 473 S.W.2d 928, 933 (Tex. 1971). These principles cannot be reiterated often enough, especially in the context of a minor's health and sex-related decisions. To grant Planned Parenthood standing to represent the state's minors would usurp this vital parental role.

Accordingly, I would hold not only that the case is not ripe, but also that Planned Parenthood has failed to otherwise establish standing to challenge rider 14.

Ramon v. Bluenergy Renewables of H Field m 10/23/23 W.2 498 (27 x 278)

