**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| CONGHUA YAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. [4:23-cv-00758-P-BJ] |
| | ) |
| The State Bar of Texas et al, | ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |

**JUDICIAL NOTICE OF ADJUDICATIVE FACTS**

TO THE HONORABLE JUDGE OF NORTHERN DISTRICT OF TEXAS:

This matter is before the Court on Pro Se Plaintiff's judicial notice of adjudicative facts, pursuant to Federal Rule of Evidence 201(b).

This notice is associated with, including but not limited to, third amended complaint, [ECF No. 60], Motion to Dismiss [ECF No. 70], response [ECF No. 88], reply [ECF No. 92], FCR [ECF No. 121], objection, [ECF No. 122], response [ECF No. 124], supplemental objection, [ECF No. 125] and Motion for More Definite Statement [ECF No. 135].

This notice serves as a preserved judicial evidential record that every party on the record of this case, has been notified about the evidences.

Hereby, Plaintiff presents to this Court with following adjudicative facts:

**I. INTRODUCTION AND ADJUDICATIVE FACTS**

1. In July 2023, Yan initiated a lawsuit under the RICO Act, Antitrust Act, and § 1983, accusing several defendants of racketeering and embezzling ERISA Act preserved assets from Texas consumers via the family court system.

2. One of the Defendant is the associate judge of 325th family court, Lori L. DeAngelis, a Tarrant County employee.

## II. LEGAL STANDARD AND AUTHORITIES

3. Rule 201. Judicial Notice of Adjudicative Facts

**(a) Scope.** This rule governs judicial notice of an adjudicative fact only, not a legislative fact.
**(b) Kinds of Facts That May Be Judicially Noticed.** The court may judicially notice a fact that is not subject to reasonable dispute because it:
    **(1)** is generally known within the trial court's territorial jurisdiction; or
    **(2)** can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.
**(c) Taking Notice.** The court:
    **(1)** may take judicial notice on its own; or
    **(2) must take judicial notice if a party requests it** and the court is supplied with the necessary information.
**(d) Timing.** The court may take judicial notice **at any stage of the proceeding**.
**(e) Opportunity to Be Heard.** On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.
**(f) Instructing the Jury.** In a civil case, the court must instruct the jury to accept the noticed fact as conclusive. In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.

## III. Brief in Support

4. Attachments including three factual precedent case options ruled by the Supreme Court of the United States: Exhibit 1 - *Bradley v. Fisher*, 80 U.S. 335 (1871); Exhibit 2 - *Stump v. Sparkman*, 435 U.S. 349 (1978); and Exhibit 3 - *Mireles v. Waco*, 502 U.S. 9 (1991).

5. The fourth attachment is a factual precedent case option ruled by the Supreme Court of the State of Texas: Exhibit 4 - *Taylor v. Tolbert*, 644 S.W.3d 637 (Tex. 2022).

6. The facts are "generally known within the trial court's territorial jurisdiction" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

7. In Exhibit 1, it is indisputable that the following words are contained:

> Thus, if a **probate court**, invested **only** with **authority** over **wills** and the **settlement of estates of deceased persons**, should proceed to try **parties** for **public offences**, jurisdiction over the subject of offences being entirely wanting in the court, and this

being necessarily known to its judge, his commission would afford **no protection** to him in the exercise of the **usurped authority**.

*Bradley v. Fisher*, 80 U.S. 335, 352 (1871)

## V. Prayer for Relief

8.   WHEREFORE, premises considered, Plaintiff does file this Judicial Notice of Adjudicative Faces, and does move the Honorable Court to make such a matter of record this this litigation, pursuant to Ruel 201(b) and (d) of Federal Rule of Evidence:

Respectfully submitted,

_____/s/ Conghua Yan_____

[Conghua Yan] [2140 E Southlake Blvd, Suite L-439] [Southlake, Texas 76092] [214-228-1886]

[arnold200@gmail.com]

<u>CERTIFICATE OF</u>
<u>SERVICE</u>

I, Conghua Yan, hereby certify that I have served the forgoing document on all counsels and/or pro se parties of record in a manner authorized by Federal Rule of Civil Procedure 5(b)(2) On (January 18th, 2024).

/s/ Conghua Yan

Conghua Yan, Pro Se Plaintiff

[Conghua Yan] [2140 E Southlake Blvd, Suite L-439] [Southlake, Texas 76092] [214-228-1886]

[arnold200@gmail.com]

# EXHIBIT 1

U.S.

# Bradley v. Fisher

80 U.S. 335 (1871)
Decided Jan 1, 1871

DECEMBER TERM, 1871.

1. An order of the Criminal Court of the District of Columbia, made in 1867, striking the name of an attorney from its roll, did not remove the attorney from the bar of the Supreme Court of the District, the Criminal Court being at that time a separate and independent court; and in an action by the attorney against the judge of the Criminal Court, that order was inadmissible to show a removal by order of the defendant, or by order of the court held by him, from the Supreme Court, notwithstanding that an act of Congress, passed in 1870, changed the independent character of the Criminal Court, and declared that its judgments, decrees, and orders should be deemed the judgments, decrees, and orders of the Supreme Court of the District. The act of Congress, in enlarging the operation of the order, did not alter its original character. *336 2. Judges of courts of record of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly. A distinction as to their liability made between acts done by them in excess of their jurisdiction and acts done by them in the clear absence of all jurisdiction over the subject-matter. 3. The power to remove attorneys from the bar is possessed by all courts which have authority to admit attorneys to practice; but, except where the matters constituting the grounds of its action occur in open court in the presence of its judges, the power of the court should not be exercised without notice to the offending party of the grounds of complaint against him, and affording him ample opportunity of explanation and defence. 4. The obligation which attorneys assume when they are admitted to the bar is not simply to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but includes abstaining out of court from insulting language and offensive conduct towards the judges personally for their judicial acts. A threat of personal chastisement, made by an attorney to a judge out of court for his conduct during the trial of a cause pending, is good ground for striking the name of the attorney from the rolls of attorneys practicing in the court. Such an order is a judicial act for which the judge is not liable to the attorney in a civil action.

*Messrs. J.M. Harris and R.T. Merrick, for the plaintiff in error:*

1. By the act of Congress of June, 1870, the judgments, decrees, and orders of the Criminal Court of the District are to be deemed the judgments, decrees, and orders of the Supreme Court. All the effects, therefore, of the decision by this court of the case *Ex parte Bradley*, and argument that the order of the Criminal Court is not an order removing or disbarring the plaintiff from the Supreme Court, fall to the ground, in virtue of this act, and irrespectively of other reasons which might be adduced.

2. The judge relies in effect upon the order of court made by him. The plaintiff in reply alleges that the judge has himself fabricated the statement of facts set forth in that order — made it falsely and fraudulently — and by such fabrication, and by a false and fraudulent statement that certain

things which never took place at all, did take place, corruptly sought to give himself jurisdiction in the case where he has acted. Now, the evidence which the plaintiff offered and which the court refused, tended directly to prove that the whole statement ordered by the judge to be put on record, was false and fabricated; and that it was made but to give color to a usurped jurisdiction; in other words, that the statement was fraudulently made. Certainly the plaintiff had a right to show *such* facts; for the judge had no power or jurisdiction to make the order complained of, if the matters recited never occurred. Under such circumstances, a judge, knowing the facts, is liable, even though he did not act corruptly;– and *à fortiori* is liable in

343  a case where he did so act. *343

– Houlden *v*. Smith, 14 Queen's Bench, 841.

3. The courts of the District are, of course, courts of the United States; and whether the proceeding for which this action is brought, be regarded as a punishment for contempt, or as a punishment for alleged misbehavior in office — a matter which the form of the order leaves quite uncertain — it was in the face of the statute of March 2d 1831. This is undoubtedly so if it was for contempt; and even if it was for misbehavior in office the statute would still seem to apply; for it prohibits a summary proceeding except in the cases which the act specifies; cases which all look to misconduct that interferes with the administration of justice. But for a man who may have been once admitted to the bar, to threaten out of court, with assault, another man who happens to be a judge, and so occasionally in court, is neither misbehavior in office nor a contempt of court.

4. But if the offence for which Mr. Bradley was disbarred was misbehavior in office, and if that be not within the statute of March 2d 1831, still, undoubtedly, he should have had notice and an opportunity of defending himself. Admit that the court may proceed summarily, still summary jurisdiction is not arbitrary power; and a summons and opportunity of being heard is a fundamental

principle of all justice.– The principle has been declared by this court in *Ex parte Garland*,[†] to be specifically applicable to the case of disbarring an attorney; and so declared for obvious reasons. Without then having summoned Mr. Bradley, and having given to him an opportunity to be heard, the court had no jurisdiction of Mr. Bradley's person or of any case relating to *him*. It is not enough that it have jurisdiction over the subject-matter of the complainant generally; it must have jurisdiction over the particular case, and if it have not, the judgment is void *ab initio*.[‡] The whole subject is set forth in Smith's Leading Cases,[§]

344  where the authorities are collected *344 and the principle deduced, that when the record shows that the court has proceeded without notice to the party condemned, the judgment will be void, and may be disregarded in any collateral proceeding.

– Rex *v*. Chancellor of Cambridge, 2 Lord Raymond, 1348.

[†] Page 343 4 Wallace, 378.

[‡] Mitchell *v*. Foster, 12 Adolphus Ellis, 472; United States *v*. Arredondo, 6 Peters, 709; Walden *v*. Craig's Heirs, 14 Id. 154.

[§] Vol. 1, p. 1023, edition of 1866, Crepps *v*. Durden.

*Mr. A.G. Riddle and W.A. Cook, contra.*

ERROR to the Supreme Court of the District of Columbia.

This was an action brought by Joseph H. Bradley, who was, in 1867, an attorney-at-law, practicing in the Supreme Court of the District of Columbia, against George P. Fisher, who was then one of the justices of that court, to recover damages alleged to have been sustained by the plaintiff, "by reason of the wilful, malicious, oppressive, and tyrannical acts and conduct" of the defendant, whereby the plaintiff was deprived of his right to practice as an attorney in that court. The case was thus:

On the 10th of June, 1867, the trial of John H. Suratt, for the murder of the late President Lincoln, was begun in the Criminal Court of the District and continued until the 10th of August, when the jury, failing to agree on a verdict, was discharged. The defendant was the presiding judge in the court during the progress of the trial, and 337 until its termination, *337 and the plaintiff was one of the attorneys who defended the prisoner. Immediately on the discharge of the jury, the court thus held by the defendant made the following order, which with its recitals was entered of record:

"On the 2d day of July last, during the progress of the trial of John H. Suratt for the murder of Abraham Lincoln, immediately after the court had taken a recess until the following morning, as the presiding justice was descending from the bench, Joseph H. Bradley, Esq., accosted him in a rude and insulting manner, charging the judge with having offered him (Mr. Bradley) a series of insults from the bench from the commencement of the trial. The judge disclaimed any intention of passing any insult whatever, and assured Mr. Bradley that he entertained for him no other feelings than those of respect. Mr. Bradley, so far from accepting this explanation or disclaimer, threatened the judge with personal chastisement. No court can administer justice or live if its judges are to be threatened with personal chastisement on all occasions whenever the irascibility of counsel may be excited by imaginary insult. The offence of Mr. Bradley is one which even his years will not palliate. It cannot be overlooked or go unpunished.

"It is, therefore, ordered that his name be stricken from the roll of attorneys practicing in this court.

"GEORGE P. FISHER, "Justice of the Supreme Court, D.C."

The present suit was founded upon this order, which was treated in the declaration as an order striking the name of the plaintiff from the roll of attorneys of the *Supreme Court of the District*, and

not as an order merely striking his name from the roll of attorneys practicing in the *Criminal Court of the District*. The declaration had two counts, and was entitled and filed in the Supreme Court of the District.

The *first* count alleged that the defendant caused the order (which was set out at length) to be recorded "on the minutes of the Criminal Court, *being one of the branches of the said Supreme Court;*" that the several statements contained in the order were untrue, and were specifically denied; and that the defendant "falsely, 338 fraudulently, corruptly, and maliciously *338 intended thereby to give a color of jurisdiction" for making the order that the name of the plaintiff " *be stricken from the roll of attorneys practicing in this court,*" whereby the plaintiff had been injured, and claimed damages, $20,000.

The *second* count alleged that the defendant "wantonly, corruptly, arbitrarily, and oppressively intending to remove the plaintiff" from his office as an attorney-at-law, "caused to be entered *on the records of the Supreme Court of the District of Columbia, Criminal Court*, March Term, 1867," the order in question, which was set forth at length, " *the same being an order removing the plaintiff from the office of an attorney-at-law in the said Supreme Court of the District of Columbia,*" whereby he was greatly disturbed in the enjoyment of his office and prevented from having the use and benefit thereof, in so full and ample a manner as he otherwise might and would have had.

The declaration also averred that the order was made without notice of any kind to the plaintiff, and was summary, that there was no complaint made by him to the justice, and that he did not accost him while the court was in session, nor immediately on the court's taking a recess and as the presiding judge was descending from the bench, as was stated in the order, nor did he, the plaintiff, at the time and place mentioned in the order, address the justice at all after the court had

taken the recess, until the judge had passed some time in a private room, and had left the same and gone out of the court-house; and the great body of auditors, jurors, witnesses, clerks, and officers of the court, and the jury impanelled, and the prisoner on trial had left the court-house; and so the declaration proceeded to say, "the said judge *wilfully, maliciously, corruptly, and unlawfully fabricated the said order to give color and pretence to his jurisdiction in the premises*."

By reason of which unlawful, wrongful, unjust, and oppressive acts of the defendant, the plaintiff alleged that he had been deprived of emoluments, and had lost sums of money which would 339 otherwise have accrued to him from *339 the enjoyment of his office and from his practice as an attorney in the courts of the county and district, c., c., and therefore he claimed $20,000 damages.

*Pleas:* 1st, the general issue, "not guilty;" and 2d, a special plea, that before and at the time of the alleged commission, c., the defendant was one of the justices of the Supreme Court of the District of Columbia, *and, as such justice, was regularly and lawfully holding, by appointment of said Supreme Court of the District of Columbia*, in general term, at the city of Washington, in said District, a court of record, to wit, the Criminal Court of said District, created by authority of the United States of America, and having general jurisdiction for the trial of crimes and offences arising within said District, and that the said supposed trespass consisted of an order and decree of said Criminal Court, made by said defendant in the lawful exercise and performance of his authority and duty, as the presiding justice of said Criminal Court, for official misconduct and misbehavior of said plaintiff (he being one of the attorneys of said Criminal Court), occurring in the presence of the said defendant as the justice of said Criminal Court holding the same as aforesaid and not otherwise; as appears from the record of said Criminal Court and the order or decree of the defendant so made as aforesaid.

Wherefore he prayed judgment, if the plaintiff ought to have or maintain his aforesaid action against him, c.

The defendant joined issue on this plea.

On the trial the plaintiff produced the order entered by the Criminal Court, which was admitted to be in the hand-writing of the defendant, and offered to read it in evidence, but upon objection of the defendant's counsel to its admissibility, it was excluded, and the plaintiff excepted. Subsequently the plaintiff read in evidence the order, as entered, from the records of the Criminal Court, and offered to show that the order was prepared, written, and published by the defendant with express malice against the plaintiff, to defame and injure him, and without the defendant having any jurisdiction to make the 340 order; and that there was no altercation *340 on the 2d July, 1867, between him and the judge, and that no words passed between them; and that they were not near each other when the Criminal Court took its recess, until the next day or immediately thereafter, and as the presiding justice thereof was descending from the bench; but upon objection of the defendant's counsel the proof was excluded, and the plaintiff excepted.

The plaintiff also offered to prove that the only interview between him and the judge, which occurred on the 2d of July, 1867, after the Criminal Court had taken a recess, began after the court had adjourned, and the judge had left the court-room and the building and returned to the court-room, and in that interview he did not address the judge in a rude and insulting manner; that he did not charge him with having offered him, the plaintiff, a series of insults from the bench from the commencement of the trial; that the judge did not disclaim any intention of passing any insult whatever, nor assure the plaintiff that he entertained for him no other feelings but those of respect; that the plaintiff did not threaten the judge with personal chastisement, but to the contrary thereof, the said judge was from the opening of the

interview violent, abusive, threatening, and quarrelsome; but upon objection the proof was excluded, and the plaintiff excepted.

The plaintiff thereupon asked a witness to state what passed between the plaintiff and defendant on the said 2d of July, 1867, the time when the parties met, and whether it was before the adjournment of the court on that day, or after it had adjourned, and how long after it had adjourned, and to state all he knew relating to that matter; the object of the evidence being to contradict the recitals in the order, and show that the justice had no jurisdiction in the premises, and had acted with malice and corruptly. But upon objection the evidence was excluded, and the plaintiff excepted. And the court ruled that, on the face of the record given in evidence, the defendant had jurisdiction and discretion to make the order, and he could not be held responsible in this private action for so doing, and instructed the jury that 341  *341  the plaintiff was not entitled to recover. The jury accordingly gave a verdict for the defendant, and judgment being entered thereon, the plaintiff brought the case to this court on a writ of error.

To understand one point of the case the better, it may be mentioned that in *Ex parte Bradley*,– this court granted a peremptory mandamus to the Supreme Court of the District to restore Mr. Bradley to his office of attorney and counsellor in *that* court, from which in consequence of the matter with Judge Fisher in the Criminal Court, he had been removed; this court, that is to say the Supreme Court of the United States, holding that the Criminal Court of the District was, at the time the order in question was made, a different and separate court from the Supreme Court of the District of Columbia, as organized by the act of March 3d 1863.

– Page 341 7 Wallace, 364.

It may also be stated that on the 21st of June, 1870, after the decision just mentioned, Congress passed an act entitled, "An act relating to the Supreme Court of the District of Columbia," [†]

which declared "that the several general terms and special terms of the circuit courts, district courts, and criminal courts authorized by the act approved March 3d 1863, entitled `An act to reorganize the courts in the District of Columbia, and for other purposes,' which have been or may be held, shall be, and are declared to be severally, terms of the Supreme Court of the District of Columbia; and the judgments, decrees, sentences, orders, proceedings, and acts of said general terms, special terms, circuit courts, district courts, and criminal courts heretofore rendered, made, or had, shall be deemed judgments, decrees, sentences, orders, proceedings, and acts of said Supreme Court."

[†] Page 341 16 Stat. at Large, 160.

It may be well also, as counsel in argument refer to it, to state that an act of Congress of March 2d 1831,[‡] enacted:

[‡] Page 341 4 Id. 487.

"That the power of the several courts of the United States to issue attachments and *inflict summary punishments for contempt of court*, shall not be 342  construed to extend to any cases except  *342  the misbehavior of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice; the misbehavior of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts."

Mr. Justice FIELD delivered the opinion of the court.

In 1867, the plaintiff was a member of the bar of the Supreme Court of the District of Columbia, and the defendant was one of the justices of that court. In June, of that year, the trial of one John H. Suratt, for the murder of Abraham Lincoln, was

commenced in the Criminal Court of the District, and was continued until the tenth of the following August, when the jury were discharged in consequence of their inability to agree upon a verdict. The defendant held that court, presiding at the trial of Suratt from its commencement to its close, and the plaintiff was one of the attorneys who defended the prisoner. Immediately upon the discharge of the jury, the court, thus held by the defendant, directed an order to be entered on its records striking the name of the plaintiff from the roll of attorneys practicing in that court. The order was accompanied by a recital that on the second of July preceding, during the progress of the trial of Suratt, immediately after the court had taken a recess for the day, as the presiding judge was descending from the bench, he had been accosted in a rude and insulting manner by the plaintiff, charging him with having offered the plaintiff a series of insults from the bench from the commencement of the trial; that the judge had then disclaimed any intention of passing any insult whatever, and had assured the plaintiff that he entertained for him no other feelings than those of respect, but that the plaintiff, so far from accepting this explanation, or disclaimer, had threatened the judge with personal chastisement.

The plaintiff appears to have regarded this order of the Criminal Court as an order disbarring him from the Supreme Court of the District; and the whole theory of the *345 present action proceeds upon that hypothesis. The declaration in one count describes the Criminal Court as one of the branches of the Supreme Court, and in the other count represents the order of the Criminal Court as an order removing the plaintiff from the office of an attorney-at-law in the Supreme Court of the District. And it is for the supposed removal from that court, and the assumed damages consequent thereon, that the action is brought.

Yet the Criminal Court of the District was at that time a separate and independent court, and as distinct from the Supreme Court of the District as the Circuit Court is distinct from the Supreme

Court of the United States. Its distinct and independent character was urged by the plaintiff, and successfully urged, in this court, as ground for relief against the subsequent action of the Supreme Court of the District, based upon what had occurred in the Criminal Court. And because of its distinct and independent character, this court held that the Supreme Court of the District possessed no power to punish the plaintiff on account of contemptuous conduct and language before the Criminal Court, or in the presence of its judge. By this decision, which was rendered at the December Term of 1868,- the groundwork of the present action of the plaintiff is removed. The law which he successfully invoked, and which protected him when he complained of the action of the Supreme Court of the District, must now equally avail for the protection of the defendant, when it is attempted to give to the Criminal Court a position and power which were then denied. The order of the Criminal Court, as it was then constituted, was not an order of the Supreme Court of the District, nor of one of the branches of that court. It did not, for we know that in law it could not, remove the plaintiff from the office of an attorney of that court, nor affect his right to practice therein.

– Ex parte Bradley, 7 Wallace, 364.

This point is distinctly raised by the special plea of the defendant, in which he sets up that at the time the order *346 complained of was made, he was regularly and lawfully holding the Criminal Court of the District, a court of record, having general jurisdiction for the trial of crimes and offences arising within the District, and that the order complained of was an order of the Criminal Court, made by him in the lawful exercise and performance of his authority and duty as its presiding justice, for official misconduct of the plaintiff, as one of its attorneys, in his presence; and upon this plea the plaintiff joined issue.

The court below, therefore, did not err in excluding the order of removal as evidence in the cause, for the obvious reason that it did not establish, nor tend to establish, the removal of the plaintiff by any order of the defendant, or of the court held by him, from the bar of the Supreme Court of the District. And the refusal of the court below to admit evidence contradicting the recitals in that order, could not be the ground of any just exception, when the order itself was not pertinent to any issue presented. Nor is this conclusion affected by the act of Congress passed in June, 1870, nearly three years after the order of removal was made, and nearly two years after the present action was commenced, changing the independent character of the Criminal Court and declaring that its judgments, decrees, and orders should be deemed the judgments, decrees, and orders of the Supreme Court of the District.– If the order of removal acquired from this legislation a wider scope and operation than it possessed when made, the defendant is not responsible for it. The original act was not altered. It was still an order disbarring the plaintiff only from the Criminal Court, and any other consequences are attributable to the action of Congress, and not to any action of the defendant.

– Page 346 16 Stat. at Large, 160.

But this is not all. The plea, as will be seen from our statement of it, not only sets up that the order of which the plaintiff complains, was an order of the Criminal Court, but that it was made by the defendant in the lawful exercise and performance 347 of his authority and duty as its presiding *347 justice. In other words, it sets up that the order for the entry of which the suit is brought, was a judicial act, done by the defendant as the presiding justice of a court of general criminal jurisdiction. If such were the character of the act, and the jurisdiction of the court, the defendant cannot be subjected to responsibility for it in a civil action, however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff. For it is a general principle of the highest importance to the proper

administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful. As observed by a distinguished English judge, it would establish the weakness of judicial authority in a degrading responsibility.–

– Justice Mayne, in Taaffe *v.* Downes, reported in a note to 3d Moore's Privy Council, 41.

The principle, therefore, which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries where there is any well-ordered system of jurisprudence. It has been the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country. It has, as Chancellor Kent observes, "a deep root in the common law."†

† Yates *v.* Lansing, 5 Johnson, 291.

Nor can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry. This was adjudged in the case of *Floyd and Barker*, reported by Coke, in 1608, ‡ where it was laid down that the judges of the realm could not be drawn in question for any supposed corruption impeaching *348 the verity of their records, except before the king himself, and it was observed that if they were required to answer otherwise, it would "tend to the scandal and subversion of all justice, and those who are the most sincere, would not be free from continual calumniations."

‡ Page 347 12 Coke, 25.

The truth of this latter observation is manifest to all persons having much experience with judicial proceedings in the superior courts. Controversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings, are being constantly determined in those courts, in which there is great conflict in the evidence and great doubt as to the law which should govern their decision. It is this class of cases which impose upon the judge the severest labor, and often create in his mind a painful sense of responsibility. Yet it is precisely in this class of cases that the losing party feels most keenly the decision against him, and most readily accepts anything but the soundness of the decision in explanation of the action of the judge. Just in proportion to the strength of his convictions of the correctness of his own view of the case is he apt to complain of the judgment against him, and from complaints of the judgment to pass to the ascription of improper motives to the judge. When the controversy involves questions affecting large amounts of property or relates to a matter of general public concern, or touches the interests of numerous parties, the disappointment occasioned by an adverse decision, often finds vent in imputations of this character, and from the imperfection of human nature this is hardly a subject of wonder. If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away. Few persons sufficiently irritated to institute an action against a judge for his judicial acts would hesitate to ascribe any character to the acts which would be essential to the maintenance of the action. *349

349

If upon such allegations a judge could be compelled to answer in a civil action for his judicial acts, not only would his office be

degraded and his usefulness destroyed, but he would be subjected for his protection to the necessity of preserving a complete record of all the evidence produced before him in every litigated case, and of the authorities cited and arguments presented, in order that he might be able to show to the judge before whom he might be summoned by the losing party — and that judge perhaps one of an inferior jurisdiction — that he had decided as he did with judicial integrity; and the second judge would be subjected to a similar burden, as he in his turn might also be held amenable by the losing party.

Some just observations on this head by the late Chief Justice Shaw, will be found in *Pratt* v. *Gardner*,– and the point here was adjudged in the recent case of *Fray* v. *Blackburn*,[†] by the Queen's Bench of England. One of the judges of that bench was sued for a judicial act, and on demurrer one of the objections taken to the declaration was, that it was bad in not alleging malice. Judgment on the demurrer having passed for the defendant, the plaintiff applied for leave to amend his declaration by introducing an allegation of malice and corruption; but Mr. Justice Compton replied: "It is a principle of our law that no action will lie against a judge of one of the superior courts for a judicial act, though it be alleged to have been done maliciously and corruptly; therefore the proposed allegation would not make the declaration good. The public are deeply interested in this rule, which indeed exists for their benefit, and was established in order to secure the independence of the judges, and prevent them being harassed by vexatious actions;" — and the leave was refused.‡ *350

350

– Page 349 2 Cushing, 68.

† Page 349 3 Best Smith, 576.

‡ In Scott *v.* Stansfield (3 Law Reports, Exchequer, 220), a judge of a county court was sued for slander, and he put in a plea that the words complained of were spoken by him in his capacity as such judge, while sitting in his court, and trying a cause in

which the plaintiff was defendant. To this plea a replication was filed, that the words were spoken falsely and maliciously, Page 350 and without any reasonable, probable, or justifiable cause, and without any foundation whatever, and not *bonâ fide* in the discharge of the defendant's duty as judge, and were wholly irrelevant to the matter before him. To the replication the defendant demurred; and the Court of Exchequer held the demurrer well taken. "I am of opinion," said the Chief Baron, "that our judgment must be for the defendant. The question raised upon this record is whether an action is maintainable against the judge of a county court, which is a court of record, for words spoken by him in his judicial character, and in the exercise of his functions as judge in the court over which he presides, where such words would as against an ordinary individual constitute a cause of action, and where they are alleged to have been spoken maliciously and without probable cause, and to have been irrelevant to the matter before him. The question arises, perhaps, for the first time, with reference to a county court judge, but a series of decisions uniformly to the same effect, extending from the time of Lord Coke to the present time, establish the general proposition that no action will lie against a judge for any acts done or words spoken in his judicial capacity in a court of justice. This doctrine has been applied not only to the superior courts, but to the court of a coroner, and to a court martial, which is not a court of record. It is essential in all courts that the judges who are appointed to administer the law should be permitted to administer it under the protection of the law, independently and freely, without favor and without fear. *This provision of the law is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is*

*that the judges should be at liberty to exercise their functions with independence, and without fear of consequences."*

In this country the judges of the superior courts of record are only responsible to the people, or the authorities constituted by the people, from whom they receive their commissions, for the manner in which they discharge the great trusts of their office. If in the exercise of the powers with which they are clothed as ministers of justice, they act with partiality, or maliciously, or corruptly, or arbitrarily, or oppressively, they may be called to an account by impeachment and suspended or removed from office. In some States they may be thus suspended or removed without impeachment, by a vote of the two houses of the legislature.

In the case of *Randall* v. *Brigham*,– decided by this court, at the December Term of 1868, we had occasion to consider at some length the liability of judicial officers to answer in a civil action for their judicial acts. In that case the plaintiff *351 had been removed by the defendant, who was one of the justices of the Superior Court of Massachusetts, from the bar of that State, and the action was brought for such removal, which was alleged in the declaration to have been made without lawful authority, and wantonly, arbitrarily, and oppressively. In considering the questions presented the court observed that it was a general principle, applicable to all judicial officers, that they were not liable to a civil action for any judicial act done by them within their jurisdiction; that with reference to judges of limited and inferior authority it had been held that they were protected only when they acted within their jurisdiction; that if this were the case with respect to them, no such limitation existed with respect to judges of superior or general authority; that they were not liable in civil actions for their judicial acts, even when such acts were in excess of their jurisdiction, "unless, perhaps, when the acts in excess of jurisdiction are done maliciously or corruptly." The qualifying words were inserted upon the suggestion that the previous language

laid down the doctrine of judicial exemption from liability to civil actions in terms broader than was necessary for the case under consideration, and that if the language remained unqualified it would require an explanation of some apparently conflicting adjudications found in the reports. They were not intended as an expression of opinion that in the cases supposed such liability would exist, but to avoid the expression of a contrary doctrine.

– Page 350 7 Wallace, 523.

In the present case we have looked into the authorities and are clear, from them, as well as from the principle on which any exemption is maintained, that the qualifying words used were not necessary to a correct statement of the law, and that judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly. A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no 352 jurisdiction over *352 the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend. Thus, if a probate court, invested only with authority over wills and the settlement of estates of deceased persons, should proceed to try parties for public offences, jurisdiction over the subject of offences being entirely wanting in the court, and this being necessarily known to its judge, his commission would afford no protection to him in the exercise of the usurped authority. But

if on the other hand a judge of a criminal court, invested with general criminal jurisdiction over offences committed within a certain district, should hold a particular act to be a public offence, which is not by the law made an offence, and proceed to the arrest and trial of a party charged with such act, or should sentence a party convicted to a greater punishment than that authorized by the law upon its proper construction, no personal liability to civil action for such acts would attach to the judge, although those acts would be in excess of his jurisdiction, or of the jurisdiction of the court held by him, for these are particulars for his judicial consideration, whenever his general jurisdiction over the subject-matter is invoked. Indeed some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction, or that of the court held by him, or the manner in which the jurisdiction shall be exercised. And the same principle of exemption from liability which obtains for errors committed in the ordinary prosecution of a suit where there is jurisdiction of both subject and person, applies in cases of this kind, and for the same reasons.

The distinction here made between acts done in 353 excess *353 of jurisdiction and acts where no jurisdiction whatever over the subject-matter exists, was taken by the Court of King's Bench, in *Ackerley* v. *Parkinson*.– In that case an action was brought against the vicar-general of the Bishop of Chester and his surrogate, who held the consistorial and episcopal court of the bishop, for excommunicating the plaintiff with the greater excommunication for contumacy, in not taking upon himself the administration of an intestate's effects, to whom the plaintiff was next of kin, the citation issued to him being void, and having been so adjudged. The question presented was, whether under these circumstances the action would lie. The citation being void, the plaintiff had not been legally brought before the court, and the subsequent proceedings were set aside, on appeal, on that ground. Lord Ellenborough observed that

it was his opinion that the action was not maintainable if the ecclesiastical court had a general jurisdiction over the subject-matter, although the citation was a nullity, and said, that "no authority had been cited to show that the judge would be liable to an action where he has jurisdiction, but has proceeded erroneously, or, as it is termed, *inverso ordine."* Mr. Justice Blanc said there was "a material distinction between a case where a party comes to an erroneous conclusion in a matter over which he has jurisdiction and a case where he acts wholly without jurisdiction;" and held that where the subject-matter was within the jurisdiction of the judge, and the conclusion was erroneous, although the party should by reason of the error be entitled to have the conclusion set aside, and to be restored to his former rights, yet he was not entitled to claim compensation in damages for the injury done by such erroneous conclusion, as if the court had proceeded without any jurisdiction.[†] *354

354

– Page 353 3 Maule Selwyn, 411.

[†] Calder *v.* Halket, decided by the Judicial Committee of the Privy Council (3 Moore's Privy Council Rep. 28), goes to the extent of holding that an action will not lie even against a judge of an inferior court of limited jurisdiction, for his judicial acts, when acting without jurisdiction, unless he knew or had the means of knowing of the defect of jurisdiction, and that it lies upon the plaintiff in every such case to prove that fact.

The exemption of judges of the superior courts of record from liability to civil suit for their judicial acts existing when there is jurisdiction of the subject-matter, though irregularity and error attend the exercise of the jurisdiction, the exemption cannot be affected by any consideration of the motives with which the acts are done. The allegation of malicious or corrupt motives could always be made, and if the motives could be inquired into judges would be subjected to the same vexatious litigation upon such allegations, whether the motives had or had not any real existence. Against the consequences of their erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort. But for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction, the judges of these courts can only be reached by public prosecution in the form of impeachment, or in such other form as may be specially prescribed.

If, now, we apply the principle thus stated, the question presented in this case is one of easy solution. The Criminal Court of the District, as a court of general criminal jurisdiction, possessed the power to strike the name of the plaintiff from its rolls as a practicing attorney. This power of removal from the bar is possessed by all courts which have authority to admit attorneys to practice. It is a power which should only be exercised for the most weighty reasons, such as would render the continuance of the attorney in practice incompatible with a proper respect of the court for itself, or a proper regard for the integrity of the profession. And, except where matters occurring in open court, in presence of the judges, constitute the grounds of its action, the power of the court should never be exercised without notice to the offending party of the grounds of complaint against him, and affording him ample opportunity of explanation and defence. This is a rule of natural justice, and is as applicable to cases where a proceeding is taken to reach the right of an attorney to practice his profession as *355 it is when the proceeding is taken to reach his real or personal property. And even where the matters constituting the grounds of complaint have occurred in open court, under the personal observation of the judges, the attorney should ordinarily be heard before the order of removal is made, for those matters may not be inconsistent with the absence of improper motives on his part, or may be susceptible of such explanation as

355

would mitigate their offensive character, or he may be ready to make all proper reparation and apology. Admission as an attorney is not obtained without years of labor and study. The office which the party thus acquires is one of value, and often becomes the source of great honor and emolument to its possessor. To most persons who enter the profession, it is the means of support to themselves and their families. To deprive one of an office of this character would often be to decree poverty to himself and destitution to his family. A removal from the bar should therefore never be decreed where any punishment less severe — such as reprimand, temporary suspension, or fine — would accomplish the end desired.

But on the other hand the obligation which attorneys impliedly assume, if they do not by express declaration take upon themselves, when they are admitted to the bar, is not merely to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts. "In matters collateral to official duty," said Chief Justice Gibson in the case of *Austin and others*, "the judge is on a level with the members of the bar as he is with his fellow-citizens, his title to distinction and respect resting on no other foundation than his virtues and qualities as a man. But it is nevertheless evident that professional fidelity may be violated by acts which fall without the lines of professional functions, and which may have been performed out of the pale of the court. Such would be the *356 consequences of beating or insulting a judge in the street for a judgment in court. No one would pretend that an attempt to control the deliberation of the bench, by the apprehension of violence, and subject the judges to the power of those who are, or ought to be, subordinate to them, is compatible with professional duty, or the

356

judicial independence so indispensable to the administration of justice. And an enormity of the sort, practiced but on a single judge, would be an offence as much against the court, which is bound to protect all its members, as if it had been repeated on the person of each of them, because the consequences to suitors and the public would be the same; and whatever may be thought in such a case of the power to punish for contempt, there can be no doubt of the existence of a power to strike the offending attorney from the roll."

The order of removal complained of in this case, recites that the plaintiff threatened the presiding justice of the Criminal Court, as he was descending from the bench, with personal chastisement for alleged conduct of the judge during the progress of a criminal trial then pending.

The matters thus recited are stated as the grounds for the exercise of the power possessed by the court to strike the name of the plaintiff from the roll of attorneys practicing therein. It is not necessary for us to determine in this case whether under any circumstances the verity of this record can be impeached. It is sufficient to observe that it cannot be impeached in this action or in any civil action against the defendant. And if the matters recited are taken as true there was ample ground for the action of the court. A greater indignity could hardly be offered to a judge than to threaten him with personal chastisement for his conduct on the trial of a cause. A judge who should pass over in silence an offence of such gravity would soon find himself a subject of pity rather than of respect.

The Criminal Court of the District erred in not citing the plaintiff, before making the order striking his name from the roll of its attorneys, to show cause why such order should not be made for the offensive language and conduct stated, *357 and affording him opportunity for explanation, or defence, or apology. But this erroneous manner in which its jurisdiction was exercised, however it

357

may have affected the validity of the act, did not make the act any less a judicial act; nor did it render the defendant liable to answer in damages for it at the suit of the plaintiff, as though the court had proceeded without having any jurisdiction whatever over its attorneys.

We find no error in the rulings of the court below, and its judgment must, therefore, be affirmed, and it is so ordered.

JUDGMENT AFFIRMED.

Mr. Justice DAVIS, with whom concurred Mr. Justice CLIFFORD, dissenting.

I agree that judicial officers are exempt from responsibility in a civil action for all their judicial acts in respect to matters of controversy within their jurisdiction. I agree, further, that judges of superior or general authority are equally exempt from liability, even when they have exceeded their jurisdiction, unless the acts complained of were done maliciously or corruptly. But I dissent from the rule laid down by the majority of the court, that a judge is exempt from liability in a case like the present, where it is alleged not only that his proceeding was in excess of jurisdiction, but that he acted maliciously and corruptly. If he did so, he is, in my opinion, subject to suit the same as a private person would be under like circumstances.

I also dissent from the opinion of the majority of the court for the reason that it discusses the merits of the controversy, which, in the state of the record, I do not consider open for examination.

358   *358

 casetext

# EXHIBIT 2

No. 76-1750

U.S.

# Stump v. Sparkman

435 U.S. 349 (1978)

Decided Mar 28, 1978

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 76-1750.

Argued January 10, 1978 Decided March 28, 1978

A mother filed a petition in affidavit form in an Indiana Circuit Court, a court of general jurisdiction under an Indiana statute, for authority to have her "somewhat retarded" 15-year-old daughter (a respondent here) sterilized, and petitioner Circuit Judge approved the petition the same day in an *ex parte* proceeding without a hearing and without notice to the daughter or appointment of a guardian *ad litem*. The operation was performed shortly thereafter, the daughter having been told that she was to have her appendix removed. About two years later she was married, and her inability to become pregnant led her to discover that she had been sterilized. As a result she and her husband (also a respondent here) filed suit in Federal District Court pursuant to 42 U.S.C. § 1983 against her mother, the mother's attorney, the Circuit Judge, the doctors who performed or assisted in the sterilization, and the hospital where it was performed, seeking damages for the alleged violation of her constitutional rights. Holding that the constitutional claims required a showing of state action and that the only state action alleged was the Circuit Judge's approval of the serialization petition, the District Court held that no federal action would lie against any of the defendants because the Circuit Judge, the only state agent, was absolutely immune from suit under the

350

doctrine of judicial immunity. The Court of Appeals reversed, holding that the "crucial issue" was whether the Circuit Judge acted within his jurisdiction, that he had not, that accordingly he was not immune from damages liability, and that in any event he had forfeited his immunity "because of his failure to comply with elementary principles of procedural due process." *Held:* The Indiana law vested in the Circuit Judge the power to entertain and act upon the petition for sterilization, and he is, therefore, immune from damages liability even if his approval of the petition was in error. Pp. 355-364.

(a) A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority, but rather he will be subject to liability only when he has acted in the "clear absence of all jurisdiction," *Bradley* v. *Fisher*, 13 Wall. 335, 351. Pp. 355-357.

*350

(b) Here there was not "clear absence of all jurisdiction" in the Circuit Court to consider the sterilization petition. That court had jurisdiction under the Indiana statute granting it broad general jurisdiction, it appearing that neither by statute nor by case law had such jurisdiction been circumscribed to foreclose consideration of the petition. Pp. 357-358.

(c) Because the Circuit Court is a court of general jurisdiction, neither the procedural errors the Circuit Judge may have committed nor the lack of a specific statute authorizing his approval of the petition in question rendered him liable in damages for the consequences of his actions. Pp. 358-360.

(d) The factors determining whether an act by a judge is "judicial" relate to the nature of the act itself (whether it is a function normally performed by a judge) and the expectation of the parties (whether they dealt with the judge in his judicial capacity), and here both of these elements indicate that the Circuit Judge's approval of the sterilization petition was a judicial act, even though he may have proceeded with informality. Pp. 360-363.

(e) Disagreement with the action taken by a judge does not justify depriving him of his immunity, and thus the fact that in this case tragic consequences ensued from the judge's action does not deprive him of his immunity; moreover, the fact that the issue before the judge is a controversial one, as here, is all the more reason that he should be able to act without fear of suit. Pp. 363-364.

552 F.2d 172, reversed and remanded.

WHITE, J., delivered the opinion of the Court, in which BURGER, C.J., and BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. STEWART, J., filed a dissenting opinion, in which MARSHALL and POWELL, JJ., joined, *post*, p. 364. POWELL, J., filed a dissenting opinion, *post*, p. 369. BRENNAN, J., took no part in the consideration or decision of the case.

*George E. Fruechtenicht* argued the cause and filed briefs for petitioners.

*Richard H. Finley* argued the cause for respondents. With him on the brief was *Eugene Gressman.*

Briefs of *amici curiae* urging affirmance were filed by *Robert L. Burgdorf, Jr.,* for the American Coalition of Citizens with Disabilities et al.; by *Bruce J. Ennis, Joel M. Gora, Paul Friedman,* and *Lawrence M. Page 351 Reuben* for the American Civil Liberties Union et al.; and by *Ronald M. Soskin* for the National Center for Law and the Handicapped, Inc.

351 *351

MR. JUSTICE WHITE delivered the opinion of the Court.

This case requires us to consider the scope of a judge's immunity from damages liability when sued under 42 U.S.C. § 1983.

I

The relevant facts underlying respondents' suit are not in dispute. On July 9, 1971, Ora Spitler McFarlin, the mother of respondent Linda Kay Spitler Sparkman, presented to Judge Harold D. Stump of the Circuit Court of DeKalb County, Ind., a document captioned "Petition To Have Tubal Ligation Performed On Minor and Indemnity Agreement." The document had been drafted by her attorney, a petitioner here. In this petition Mrs. McFarlin stated under oath that her daughter was 15 years of age and was "somewhat retarded," although she attended public school and had been promoted each year with her class. The petition further stated that Linda had been associating with "older youth or young men" and had stayed out overnight with them on several occasions. As a result of this behavior and Linda's mental capabilities, it was stated that it would be in the daughter's best interest if she underwent a tubal ligation in order "to prevent unfortunate circumstances. . . . " In the same document Mrs. McFarlin also undertook to indemnify and hold harmless Dr. John Hines, who was to perform the

Stump v. Sparkman, 435 U.S. 349 (1978)

operation, and the DeKalb Memorial Hospital, where the operation was to take place, against all causes of action that might arise as a result of the performance of the tubal ligation.[1] *352

352

[1] The full text of the petition presented to Judge Stump read as follows: "STATE OF INDIANA ss: COUNTY OF DEKALB "PETITION TO HAVE TUBAL LIGATION PERFORMED ON MINOR AND INDEMNITY AGREEMENT "Ora Spitler McFarlin, being duly sworn upon her oath states that she is the natural mother of and has custody of her daughter, Linda Spitler, age fifteen (15) being born January 24, 1956 and said daughter resides with her at 108 Iwo Street, Auburn, DeKalb County, Indiana. "Affiant states that her daughter's mentality is such that she is considered to be somewhat retarded although she is attending or has attended the public schools in DeKalb Central School System and has been passed along with other children in her age level even though she does not have what is considered normal mental capabilities and intelligence. Further, that said affiant has had problems in the home of said child as a result of said daughter leaving the home on several occasions to associate with older youth or young men and as a matter of fact having stayed overnight with said youth or men and about which incidents said affiant did not become aware of until after such incidents occurred. As a result of this behavior and the mental capabilities of said daughter, affiant believes that it is to the best interest of said child that a Tubal Ligation be performed on said minor daughter to prevent unfortunate circumstances to occur and since it is impossible for the affiant as mother of said minor child to maintain and control a continuous observation of the activities of said daughter each and every day. "Said affiant does hereby in consideration of the Court of the DeKalb Circuit Court approving the Tubal Ligation being

performed upon her minor daughter does hereby [ sic] covenant and agree to indemnify and keep indemnified and hold Dr. John Hines, Auburn, Indiana, who said affiant is requesting perform said operation and the DeKalb Memorial Hospital, Auburn, Indiana, whereas [ sic] said operation will be performed, harmless from and against all or any matters or causes of action that could or might arise as a result of the performing of said Tubal Ligation. "IN WITNESS WHEREOF, said affiant, Ora Spitler McFarlin, has hereunto subscribed her name this 9th day of July, 1971. "/s/ ORA SPITLER McFARLIN Ora Spitler McFarlin *Petitioner* "Subscribed and sworn to before me this 9th day of July, 1971. "/s/ WARREN G. SUNDAY Warren G. Sunday *Notary Public* "My commission expires January 4, 1975. "I, Harold D. Stump, Judge of the DeKalb Circuit Court, do hereby approve the above Petition by affidavit form on behalf of Ora Spitler McFarlin, to have Tubal Ligation performed upon her minor daughter, Linda Spitler, subject to said Ora Spitler McFarlin covenanting and agreeing to indemnify and keep indemnified Dr. John Hines and the DeKalb Memorial Hospital from any matters or causes of action arising therefrom. "/s/ HAROLD D. STUMP *Judge, DeKalb Circuit Court* "Dated July 9, 1971"

The petition was approved by Judge Stump on the same day. He affixed his signature as "Judge, DeKalb Circuit Court," to the statement that he did "hereby approve the *353 above Petition by affidavit form on behalf of Ora Spitler McFarlin, to have Tubal Ligation performed upon her minor daughter, Linda Spitler, subject to said Ora Spitler McFarlin covenanting and agreeing to indemnify and keep indemnified Dr. John Hines and the DeKalb Memorial Hospital from any matters or causes of action arising therefrom."

353

Stump v. Sparkman, 435 U.S. 349 (1978)

On July 15, 1971, Linda Spitler entered the DeKalb Memorial Hospital, having been told that she was to have her appendix removed. The following day a tubal ligation was performed upon her. She was released several days later, unaware of the true nature of her surgery.

Approximately two years after the operation, Linda Spitler was married to respondent Leo Sparkman. Her inability to become pregnant led her to discover that she had been sterilized during the 1971 operation. As a result of this revelation, the Sparkmans filed suit in the United States District Court for the Northern District of Indiana against Mrs. McFarlin, her attorney, Judge Stump, the doctors who had performed and assisted in the tubal ligation, and the DeKalb Memorial Hospital. respondents sought damages for the alleged violation of Linda Sparkman's constitutional rights;[2] also asserted were pendent state claims for *354 assault *354 and battery, medical malpractice, and loss of potential fatherhood.

> [2] The District Court gave the following summary of the constitutional claims asserted by the Sparkmans: "Whether laid under section 1331 or 1343(3) and whether asserted directly or via section 1983 and 1985, plaintiffs' grounds for recovery are asserted to rest on the violation of constitutional rights. Plaintiffs urge that defendants violated the following constitutional guarantees: "1. that the actions were arbitrary and thus in violation of the due process clause of the Fourteenth Amendment; "2. that Linda was denied procedural safeguards required by the Fourteenth Amendment; "3. that the sterilization was permitted without the promulgation of standards; "4. that the sterilization was an invasion of privacy; "5. that the sterilization violated Linda's right to procreate; "6. that the sterilization was cruel and unusual punishment; "7. that the use of sterilization as punishment for her alleged retardation or lack of self-discipline violated various constitutional guarantees; "8. that the defendants failed to follow certain Indiana statutes, thus depriving Linda of due process of law; and "9. that defendants violated the equal protection clause, because of the differential treatment accorded Linda on account of her sex, marital status, and allegedly low mental capacity." *Sparkman* v. *McFarlin*, Civ. No. F 75-129 (ND Ind., May 13, 1976).

Ruling upon the defendants' various motions to dismiss the complaint, the District Court concluded that each of the constitutional claims asserted by respondents required a showing of state action and that the only state action alleged in the complaint was the approval by Judge Stump, acting as Circuit Court Judge, of the petition presented to him by Mrs. McFarlin. The Sparkmans sought to hold the private defendants liable on a theory that they had conspired with Judge Stump to bring about the allegedly unconstitutional acts. The District Court, however, held that no federal action would lie against any of the defendants because Judge Stump, the only state agent, was absolutely immune from suit under the doctrine of judicial immunity. The court stated that "whether or not Judge Stump's `approval' of the petition may in retrospect appear *355 to have been premised on an erroneous *355 view of the law, Judge Stump surely had jurisdiction to consider the petition and to act thereon." *Sparkman* v. *McFarlin*, Civ. No. F 75-129 (ND Ind., May 13, 1976). Accordingly, under *Bradley* v. *Fisher*, 13 Wall. 335, 351 (1872), Judge Stump was entitled to judicial immunity.[3]

> [3] The District Court granted the defendants' motion to dismiss the federal claims for that reason and dismissed the remaining pendent state claims for lack of subject-matter jurisdiction.

On appeal, the Court of Appeals for the Seventh Circuit reversed the judgment of the District Court,[4] holding that the "crucial issue" was "whether Judge Stump acted within his jurisdiction" and concluding that he had not. 552 F.2d, at 174. He was accordingly not immune

from damages liability under the controlling authorities. The Court of Appeals also held that the judge had forfeited his immunity "because of his failure to comply with elementary principles of procedural due process." *Id.*, at 176.

4 *Sparkman* v. *McFarlin*, 552 F.2d 172 (CA7 1977).

We granted certiorari, 434 U.S. 815 (1977), to consider the correctness of this ruling. We reverse.

## II

The governing principle of law is well established and is not questioned by the parties. As early as 1872, the Court recognized that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley* v. *Fisher, supra*, at 347.[5] For
356 that reason the Court held that "judges *356 of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly."[6] 13 Wall., at 351. Later we held that this doctrine of judicial immunity was applicable in suits under § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, for the legislative record gave no indication that Congress intended to abolish this long-established principle. *Pierson* v. *Ray*, 386 U.S. 547 (1967).

5 Even earlier, in *Randall* v. *Brigham*, 7 Wall. 523 (1869), the Court stated that judges are not responsible "to private parties in civil actions for their judicial acts, however injurious may be those acts, and however much they may deserve condemnation, unless perhaps where the acts are palpably in excess of the jurisdiction of the judges, and are done maliciously or corruptly." *Id.*, at 537. In *Bradley* the Court reconsidered that earlier statement and concluded that "the

qualifying words used were not necessary to a correct statement of the law . . . ." 13 Wall., at 351.

6 In holding that a judge was immune for his judicial acts, even when such acts were performed in excess of his jurisdiction, the Court in *Bradley* stated: "A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend." *Id.*, at 351-352.

The Court of Appeals correctly recognized that the necessary inquiry in determining whether a defendant judge is immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him. Because "some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction . . .," *Bradley, supra*, at 352, the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only *357 when he has acted in the "clear absence of all jurisdiction."[7] 13 Wall., at 351.

7 In *Bradley*, the Court illustrated the distinction between lack of jurisdiction and excess of jurisdiction with the following examples: if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune. *Id.*, at 352.

We cannot agree that there was a "clear absence of all jurisdiction" in the DeKalb County Circuit Court to consider the petition presented by Mrs. McFarlin. As an Indiana Circuit Court Judge, Judge Stump had "original exclusive jurisdiction in all cases at law and in equity whatsoever . . .," jurisdiction over the settlement of estates and over guardianships, appellate jurisdiction as conferred by law, and jurisdiction over "all other causes, matters and proceedings where exclusive jurisdiction thereof is not conferred by law upon some other court, board or officer." Ind. Code § 33-4-4-3 (1975).[8] This is indeed a broad jurisdictional grant; yet the Court of Appeals concluded that Judge Stump did not have jurisdiction over the petition authorizing Linda 358 Sparkman's sterilization. *358

8 Indiana Code § 33-4-4-3 (1975) states as follows: "Jurisdiction. — Said court shall have original exclusive jurisdiction in all cases at law and in equity whatsoever, and in criminal cases and actions for divorce, except where exclusive or concurrent jurisdiction is, or may be conferred by law upon justices of the peace. It shall also have exclusive jurisdiction of the settlement of decedents' estates and of guardianships: Provided, however, That in counties in which criminal or superior courts exist or may be organized, nothing in this section shall be construed to deprive such courts of the jurisdiction conferred upon them by laws, and it shall have such

appellate jurisdiction as may be conferred by law, and it shall have jurisdiction of all other causes, matters and proceedings where exclusive jurisdiction thereof is not conferred by law upon some other court, board or officer."

In so doing, the Court of Appeals noted that the Indiana statutes provided for the sterilization of institutionalized persons under certain circumstances, see Ind. Code §§ 16-13-13-1 through 16-13-13-4 (1973), but otherwise contained no express authority for judicial approval of tubal ligations. It is true that the statutory grant of general jurisdiction to the Indiana circuit courts does not itemize types of cases those courts may hear and hence does not expressly mention sterilization petitions presented by the parents of a minor. But in our view, it is more significant that there was no Indiana statute and no case law in 1971 prohibiting a circuit court, a court of general jurisdiction, from considering a petition of the type presented to Judge Stump. The statutory authority for the sterilization of institutionalized persons in the custody of the State does not warrant the inference that a court of general jurisdiction has no power to act on a petition for sterilization of a minor in the custody of her parents, particularly where the parents have authority under the Indiana statutes to "consent to and contract for medical or hospital care or treatment of [the minor] including surgery." Ind. Code § 16-8-4-2 (1973). The District Court concluded that Judge Stump had jurisdiction under § 33-4-4-3 to entertain and act upon Mrs. McFarlin's petition. We agree with the District Court, it appearing that neither by statute nor by case law has the broad jurisdiction granted to the circuit courts of Indiana been circumscribed to foreclose consideration of a petition for authorization of a minor's sterilization.

The Court of Appeals also concluded that support for Judge Stump's actions could not be found in the common law of Indiana, relying in particular on the Indiana Court of Appeals' intervening

decision in *A. L.* v. *G. R. H.*, 163 Ind. App. 636, 325 N.E.2d 501 (1975). In that case the Indiana court held that a parent does not have a common-law right to have a minor child sterilized, even though the parent might "sincerely believe the child's adulthood would benefit therefrom." *Id.*, at 638, 325 N.E.2d, at 502. The opinion, however, 359 *359 speaks only of the rights of the parents to consent to the sterilization of their child and does not question the *jurisdiction* of a circuit judge who is presented with such a petition from a parent. Although under that case a circuit judge would err as a matter of law if he were to approve a parent's petition seeking the sterilization of a child, the opinion in *A. L.* v. *G. R. H.* does not indicate that a circuit judge is without jurisdiction to entertain the petition. Indeed, the clear implication of the opinion is that, when presented with such a petition, the circuit judge should deny it on its merits rather than dismiss it for lack of jurisdiction.

Perhaps realizing the broad scope of Judge Stump's jurisdiction, the Court of Appeals stated that, even if the action taken by him was not foreclosed under the Indiana Statutory scheme, it would still be "an illegitimate exercise of his common law power because of his failure to comply with elementary principles of procedural due process." 552 F.2d, at 176. This misconceives the doctrine of judicial immunity. A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors. The Court made this point clear in *Bradley*, 13 Wall., at 357, where it stated: "[T]his erroneous manner in which [the court's] jurisdiction was exercised, however it may have affected the validity of the act, did not make the act any less a judicial act; nor did it render the defendant liable to answer in damages for it at the suit of the plaintiff, as though the court had proceeded without having any jurisdiction whatever . . . ."

We conclude that the Court of Appeals, employing an unduly restrictive view of the scope of Judge Stump's jurisdiction, erred in holding that he was not entitled to judicial immunity. Because the court over which Judge Stump presides is one of general jurisdiction, neither the procedural errors he may have committed nor the lack of a specific statute authorizing his approval of the petition in question rendered *360 him liable in damages for the consequences of his actions.

The respondents argue that even if Judge Stump had jurisdiction to consider the petition presented to him by Mrs. McFarlin, he is still not entitled to judicial immunity because his approval of the petition did not constitute a "judicial" act. It is only for acts performed in his "judicial" capacity that a judge is absolutely immune, they say. We do not disagree with this statement of the law, but we cannot characterize the approval of the petition as a nonjudicial act.

Respondents themselves stated in their pleadings before the District Court that Judge Stump was "clothed with the authority of the state" at the time that he approved the petition and that "he was acting as a country circuit court judge." Plaintiffs' Reply Brief to Memorandum Filed on Behalf of Harold D. Stump in Support of his Motion to Dismiss in Civ. No. F 75-129, p. 6. They nevertheless now argue that Judge Stump's approval of the petition was not a judicial act because the petition was not given a docket number, was not placed on file with the clerk's office, and was approved in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian *ad litem*.

This Court has not had occasion to consider, for purposes of the judicial immunity doctrine, the necessary attributes of a judicial act; but it has previously rejected the argument, somewhat similar to the one raised here, that the lack of formality involved in the Illinois Supreme Court's consideration of a petitioner's application for

admission to the state bar prevented it from being a "judicial proceeding" and from presenting a case or controversy that could be reviewed by this Court. *In re Summers*, 325 U.S. 561 (1945). Of particular significance to the present case, the Court in *Summers* noted the following: "The record does not show that any process issued or that any appearance was made. . . . While no entry was placed by the Clerk in the file, on a docket, or in a judgment roll, the Court took cognizance of the petition and **\*361** passed an order which is validated by the signature of the presiding officer." *Id.*, at 567. Because the Illinois court took cognizance of the petition for admission and acted upon it, the Court held that a case or controversy was presented.

361

Similarly, the Court of Appeals for the Fifth Circuit has held that a state district judge was entitled to judicial immunity, even though "at the time of the altercation [giving rise to the suit] Judge Brown was not in his judge's robes, he was not in the courtroom itself, and he may well have violated state and/or federal procedural requirements regarding contempt citations." *McAlester* v. *Brown*, 469 F.2d 1280, 1282 (1972).[9]

Among the factors relied upon by the Court of Appeals in deciding that the judge was acting within his judicial capacity was the fact that "the confrontation arose directly and immediately out of a visit to the judge in his official capacity." *Ibid.*[10] **\*362**

362

---

[9] In *McAlester* the plaintiffs alleged that they had gone to the courthouse where their son was to be tried by the defendant in order to give the son a fresh set of clothes. When they went into the defendant judge's office, he allegedly ordered them out and had a deputy arrest one of them and place him in jail for the rest of the day. Several months later, the judge issued an order holding the plaintiff in contempt of court, *nunc pro tunc*.

[10] Other Courts of Appeals, presented with different fact situations, have concluded that the challenged actions of defendant judges were not performed as part of the judicial function and that the judges were thus not entitled to rely upon the doctrine of judicial immunity. The Court of Appeals for the Ninth Circuit, for example, has held that a justice of the peace who was accused of forcibly removing a man from his courtroom and physically assaulting him was not absolutely immune. *Gregory* v. *Thompson*, 500 F.2d 59 (1974). While the court recognized that a judge has the duty to maintain order in his courtroom, it concluded that the actual eviction of someone from the courtroom by use of physical force, a task normally performed by a sheriff or bailiff, was "simply not an act of a judicial nature." *Id.*, at 64. And the Court of Appeals for the Sixth Circuit held in *Lynch* v. *Johnson*, 420 F.2d 818 (1970), that the county judge sued in that case was not entitled to judicial immunity because his service on a board with only legislative and administrative powers did not constitute a judicial act.

The relevant cases demonstrate that the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, *i. e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i. e.*, whether they dealt with the judge in his judicial capacity. Here, both factors indicate that Judge Stump's approval of the sterilization petition was a judicial act.[11] State judges with general jurisdiction not infrequently are called upon in their official capacity to approve petitions relating to the affairs of minors, as for example, a petition to settle a minor's claim. Furthermore, as even respondents have admitted, at the time he approved the petition presented to him by Mrs. McFarlin, Judge Stump was "acting as a county circuit court judge." See *supra*, at 360. We may infer from the record that it was only because Judge Stump served in that position that Mrs.

McFarlin, on the advice of counsel, submitted the petition to him for his approval. Because Judge Stump performed the type of act normally performed only by judges and because he did so in his capacity as a Circuit Court Judge, we find no merit to respondents' argument that the informality with which he proceeded rendered his action nonjudicial and deprived him of his absolute immunity.[12]

363  *363

11   MR. JUSTICE STEWART, in dissent, complains that this statement is inaccurate because it nowhere appears that judges are normally asked to approve parents' decisions either with respect to surgical treatment in general or with respect to sterilizations in particular. Of course, the opinion makes neither assertion. Rather, it is said that Judge Stump was performing a "function" normally performed by judges and that he was taking "the type of action" judges normally perform. The dissent makes no effort to demonstrate that Judge Stump was without jurisdiction to entertain and act upon the specific petition presented to him. Nor does it dispute that judges normally entertain petitions with respect to the affairs of minors. Even if it is assumed that in a lifetime of judging, a judge has acted on only one petition of a particular kind, this would not indicate that his function in entertaining and acting on it is not the kind of function that a judge normally performs. If this is the case, it is also untenable to claim that in entertaining the petition and exercising the jurisdiction with which the statutes invested him, Judge Stump was nevertheless not performing a judicial act or was engaging in the kind of conduct not expected of a judge under the Indiana statutes governing the jurisdiction of its courts.

12   MR. JUSTICE STEWART'S dissent, *post*, at 369, suggests that Judge Stump's approval of Mrs. McFarlin's petition was not a judicial act because of the absence of what it considers the "normal attributes of a

judicial proceeding." These attributes are said to include a "case," with litigants and the opportunity to appeal, in which there is "principled decisionmaking." But under Indiana law, Judge Stump had jurisdiction to act as he did; the proceeding instituted by the petition placed before him was sufficiently a "case" under Indiana law to warrant the exercise of his jurisdiction, whether or not he then proceeded to act erroneously. That there were not two contending litigants did not make Judge Stump's act any less judicial. Courts and judges often act *ex parte*. They issue search warrants in this manner, for example, often without any "case" having been instituted, without any "case" ever being instituted, and without the issuance of the warrant being subject to appeal. Yet it would not destroy a judge's immunity if it is alleged and offer of proof is made that in issuing a warrant he acted erroneously and without principle.

Both the Court of Appeals and the respondents seem to suggest that, because of the tragic consequences of Judge Stump's actions, he should not be immune. For example, the Court of Appeals noted that "[t]here are actions of purported judicial character that a judge, even when exercising general jurisdiction, is not empowered to take," 552 F.2d, at 176, and respondents argue that Judge Stump's action was "so unfair" and "so totally devoid of judicial concern for the interests and well-being of the young girl involved" as to disqualify it as a judicial act. Brief for Respondents 18. Disagreement with the action taken by the judge, however, does not justify depriving that judge of his immunity. Despite the unfairness to litigants that sometimes results, the doctrine of judicial immunity is though to be in the best interests of "the proper administration of justice . . . [, for it allows] a judicial officer, in exercising the authority vested in him [to] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley* v.

Stump v. Sparkman, 435 U.S. 349 (1978)

364 *Fisher,* \*364 13 Wall., at 347. The fact that the issue before the judge is a controversial one is all the more reason that he should be able to act without fear of suit. As the Court pointed out in *Bradley:*

> "Controversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings, are being constantly determined in those courts, in which there is great conflict in the evidence and great doubt as to the law which should impose govern their decision. It is this class of cases which impose upon the judge the severest labor, and often create in his mind a painful sense of responsibility." *Id.,* at 348.

The Indiana law vested in Judge Stump the power to entertain and act upon the petition for sterilization. He is, therefore, under the controlling cases, immune from damages liability even if his approval of the petition was in error. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.[13] *It is so ordered.*

> 13 The issue is not presented and we do not decide whether the District Court correctly concluded that the federal claims against the other defendants were required to be dismissed if Judge Stump, the only state agent, was found to be absolutely immune. Compare *Kermit Constr. Corp.* v. *Banco Credito y Ahorro Ponceno,* 547 F.2d 1 (CA1 1976), with *Guedry* v. *Ford,* 431 F.2d 660 (CA5 1970).

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

---

MR. JUSTICE STEWART, with whom MR. JUSTICE MARSHALL and MR. JUSTICE POWELL join, dissenting.

It is established federal law that judges of general jurisdiction are absolutely immune from monetary 365 liability "for their \*365 judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Bradley* v. *Fisher,* 13 Wall. 335, 351. It is also established that this immunity is in no way diminished in a proceeding under 42 U.S.C. § 1983. *Pierson* v. *Ray,* 386 U.S. 547. But the scope of judicial immunity is limited to liability for "judicial acts," and I think that what Judge Stump did on July 9, 1971, was beyond the pale of anything that could sensibly be called a judicial act.

Neither in *Bradley* v. *Fisher* nor in *Pierson* v. *Ray* was there any claim that the conduct in question was not a judicial act, and the Court thus had no occasion in either case to discuss the meaning of that term.[1] Yet the proposition that judicial immunity extends only to liability for "judicial acts" was emphasized no less than seven times in Mr. Justice Field's opinion for the Court in the *Bradley* case.[2] Cf. *Imbler* v. *Pachtman,* 424 U.S. 409, 430. And if the limitations inherent in that concept have any realistic meaning at all, then I cannot believe that the action of Judge Stump in approving Mrs. McFarlin's petition is protected by judicial immunity.

> 1 In the *Bradley* case the plaintiff was a lawyer who had been disbarred; in the *Pierson* case the plaintiffs had been found guilty after a criminal trial.

> 2 See 13 Wall., at 347, 348, 349, 351, 354, 357.

The Court finds two reasons for holding that Judge Stump's approval of the sterilization petition was a judicial act. First, the Court says, it was "a function normally performed by a judge." Second, the Court says, the act was performed in Judge Stump's "judicial capacity." With all respect, I think that the first of these grounds is factually untrue and that the second is legally unsound.

Stump v. Sparkman, 435 U.S. 349 (1978)

When the Court says that what Judge Stump did was an act "normally performed by a judge," it is not clear to me whether the Court means that a judge "normally" is asked to approve a mother's decision to have her child given surgical *366 treatment generally, or that a judge "normally" is asked to approve a mother's wish to have her daughter sterilized. But whichever way the Court's statement is to be taken, it is factually inaccurate. In Indiana, as elsewhere in our country, a parent is authorized to arrange for and consent to medical and surgical treatment of his minor child. Ind. Code § 16-8-4-2 (1973). And when a parent decides to call a physician to care for his sick child or arranges to have a surgeon remove his child's tonsils, he does not, "normally" or otherwise, need to seek the approval of a judge.[3] On the other hand, Indiana did in 1971 have statutory procedures for the sterilization of certain people who were *institutionalized*. But these statutes provided for *administrative proceedings* before a board established by the superintendent of each public hospital. Only if, after notice and an evidentiary hearing, an order of sterilization was entered in these proceedings could there be review in a circuit court. See Ind. Code §§ 16-13-13-1 through 16-13-13-4 (1974).[4] *367

[3] This general authority of a parent was held by an Indiana Court of Appeals in 1975 not to include the power to authorize the sterilization of his minor child. *A. L.* v. *G. R. H.*, 163 Ind. App. 636, 325 N.E.2d 501. Contrary to the Court's conclusion, *ante*, at 359, that case does not in the least demonstrate that an Indiana judge is or ever was empowered to act on the merits of a petition like Mrs. McFarlin's. The parent in that case did not petition for judicial approval of her decision, but rather "filed a complaint for declaratory judgment seeking declaration of her right under the common-law attributes of the parent-child relationship to have her son . . . sterilized." 163 Ind. App., at 636-637, 325 N.E.2d, at 501. The Indiana Court of Appeals' decision simply established a limitation on

the parent's common-law rights. It neither sanctioned nor contemplated any procedure for judicial "approval" of the parent's decision. Indeed, the procedure followed in that case offers an instructive contrast to the judicial conduct at issue here: "At the outset, we thank counsel for their excellent efforts in representing a seriously concerned parent and in providing the guardian ad litem defense of the child's interest. *Id.*, at 638, 325 N.E.2d, at 502.

[4] These statutes were repealed in 1974.

In sum, what Judge Stump did on July 9, 1971, was in no way an act "normally performed by a judge." Indeed, there is no reason to believe that such an act has ever been performed by *any* other Indiana judge, either before or since.

When the Court says that Judge Stump was acting in "his judicial capacity" in approving Mrs. McFarlin's petition, it is not clear to me whether the Court means that Mrs. McFarlin submitted the petition to him only because he was a judge, or that, in approving it, he *said* that he was acting as a judge. But however the Court's test is to be understood, it is, I think, demonstrably unsound.

It can safely be assumed that the Court is correct in concluding that Mrs. McFarlin came to Judge Stump with her petition because he was a County Circuit Court Judge. But false illusions as to a judge's power can hardly convert a judge's response to those illusions into a judicial act. In short, a judge's approval of a mother's petition to lock her daughter in the attic would hardly be a judicial act simply because the mother had submitted her petition to the judge in his official capacity.

If, on the other hand, the Court's test depends upon the fact that Judge Stump *said* he was acting in his judicial capacity, it is equally invalid. It is true that Judge Stump affixed his signature to the approval of the petition as "Judge, De Kalb Circuit Court." But the conduct of a judge surely does not become a judicial act merely on his own say-so. A judge is

not free, like a loose cannon, to inflict indiscriminate damage whenever he announces that he is acting in his judicial capacity.[5] *368

> [5] Believing that the conduct of Judge Stump on July 9, 1971, was not a judicial act, I do not need to inquire whether he was acting in "the clear absence of all jurisdiction over the subject matter." *Bradley* v. *Fisher*, 13 Wall., at 351. "Jurisdiction" is a coat of many colors. I note only that the Court's finding that Judge Stump had jurisdiction to entertain Mrs. McFarlin's petition seems to me to be based upon dangerously broad criteria. Those criteria are simply that an Indiana statute conferred "jurisdiction of all . . . causes, matters and proceedings," and that there was not in 1971 any Indiana law specifically prohibiting what Judge Stump did.

If the standard adopted by the Court is invalid, then what is the proper measure of a judicial act? Contrary to implications in the Court's opinion, my conclusion that what Judge Stump did was not a judicial act is not based upon the fact that he acted with informality, or that he may not have been "in his judge's robes," or "in the courtroom itself." *Ante*, at 361. And I do not reach this conclusion simply "because the petition was not given a docket number, was not placed on file with the clerk's office, and was approved in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian *ad litem*." *Ante*, at 360.

It seems to me, rather, that the concept of what is a judicial act must take its content from a consideration of the factors that support immunity from liability for the performance of such an act. Those factors were accurately summarized by the Court in *Pierson* v. *Ray*, 386 U.S., at 554:

"[I]t `is . . . for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences.' . . . It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation."

Not one of the considerations thus summarized in the *Pierson* opinion was present here. There was no "case," controversial *369 or otherwise. There were no litigants. There was and could be no appeal. And there was not even the pretext of principled decisionmaking. The total absence of *any* of these normal attributes of a judicial proceeding convinces me that the conduct complained of in this case was not a judicial act.

The petitioners' brief speaks of "an aura of deism which surrounds the bench . . . essential to the maintenance of respect for the judicial institution." Though the rhetoric may be overblown, I do not quarrel with it. But if aura there be, it is hardly protected by exonerating from liability such lawless conduct as took place here. And if intimidation would serve to deter its recurrence, that would surely be in the public interest.[6]

> [6] The only question before us in this case is the scope of judicial immunity. How the absence of a "judicial act" might affect the issue of whether Judge Stump was acting "under color of" state law within the meaning of 42 U.S.C. § 1983, or the issue of whether his act was that of the State within the meaning of the Fourteenth Amendment that need not, therefore, be pursued here.

MR. JUSTICE POWELL, dissenting.

While I join the opinion of MR. JUSTICE STEWART, I wish to emphasize what I take to be the central feature of this case — Judge Stump's preclusion of any possibility for the vindication of respondents' rights elsewhere in the judicial system.

*Bradley* v. *Fisher*, 13 Wall. 335 (1872), which established the absolute judicial immunity at issue in this case, recognized that the immunity was designed to further the public interest in an independent judiciary, sometimes at the expense of legitimate individual grievances. *Id.*, at 349; accord, *Pierson* v. *Ray*, 386 U.S. 547, 554 (1967). The *Bradley* Court accepted those costs to aggrieved individuals because the judicial system itself provided other means for protecting individual rights:

> "Against the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law *370 has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." 13 Wall., at 354.

370

Underlying the *Bradley* immunity, then, is the notion that private rights can be sacrificed in some degree to the achievement of the greater public good deriving from a completely independent judiciary, because there exist alternative forums and methods for vindicating those rights.[1]

1 See Handler Klein, The Defense of Privilege in Defamation Suits Against Government Executive Officials, 74 Harv. L. Rev. 44, 53-55 (1960); Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv. L. Rev. 209, 233-235 (1963); Note, Federal Executive Immunity From Civil Liability in Damages: A Reevaluation of *Barr* v. *Mateo*, 77 Colum. L. Rev. 625, 647 (1977).

But where a judicial officer acts in a manner that precludes all resort to appellate or other judicial remedies that otherwise would be available, the underlying assumption of the *Bradley* doctrine is inoperative. See *Pierson* v. *Ray, supra*, at 554.[2] In this case, as MR. JUSTICE STEWART points out, *ante*, at 369, Judge Stump's unjudicial conduct insured that "[t]here was and could be no appeal." The complete absence of normal judicial process foreclosed resort to any of the "numerous remedies" that "the law has provided for private parties." *Bradley, supra*, at 354.

2 In both *Bradley* and *Pierson* any errors committed by the judges involved were open to correction on appeal.

In sum, I agree with MR. JUSTICE STEWART that petitioner judge's actions were not "judicial," and that he is entitled to no judicial immunity from suit under 42 U.S.C. § 1983.

371   *371

# EXHIBIT 3

No. 91-311

U.S.

# Mireles v. Waco

502 U.S. 9 (1991)

Decided Oct 21, 1991

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 91-311

Decided October 21, 1991

Respondent Waco, a public defender, filed this action under 42 U.S.C. § 1983, seeking damages from, *inter alios*, petitioner Mireles, a California Superior Court judge, for ordering the police, forcibly and with excessive force, to seize and bring him into the courtroom when he failed to appear for the calling of the calendar. The Federal District Court dismissed the complaint against the judge, for ordering the police, forcibly and with excessive force, to seize and bring him into the courtroom when he failed to appear for the calling of the calendar. The Federal District Court dismissed the complaint against the judge, pursuant to Federal Rule of Civil Procedure 54(b), on the grounds of complete judicial immunity. However, the Court of Appeals reversed, holding that the judge was not acting in his judicial capacity when he requested and authorized the use of excessive force.

*Held:* The Court of Appeals erred in ruling that Judge Mireles' alleged actions were not taken in his judicial capacity. Judicial immunity is an immunity from suit, not just from ultimate assessment of damages, and it can be overcome only if a judge's actions are nonjudicial or were taken in the complete absence of all jurisdiction. Here, the judge's function of directing police officers to bring counsel in a pending case before the court is a general function normally performed by a judge. That he may have made a mistake or acted in excess of his authority does not make the act nonjudicial. See, *e.g., Forrester v. White*, 484 U.S. 219, 227. His action was also taken in the very aid of his jurisdiction over the matter before him, and thus it cannot be said that the action was taken in the absence of jurisdiction.

Certiorari granted; reversed.

___

PER CURIAM.

A long line of this Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages. *See, e.g., Forrester v. White*, 484 U.S. 219 (1988); *Cleavinger v. Saxner*, 474 U.S. 193 (1985); *Dennis v. Sparks*, 449 U.S. 24 (1980); *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719 (1980); *Butz v. Economou*, 438 U.S. 478 (1978); *Stump v. Sparkman*, 435 U.S. 349 (1978); *Pierson* *10 v. Ray*, 386 U.S. 547 (1967).[1] Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. *Bradley v. Fisher*, 13 Wall. 335, 347 (1872).

___

[1] The Court, however, has recognized that a judge is not absolutely immune from criminal liability, *Ex Parte Virginia*, 100 U.S. 339, 348-349 (1880), or from a suit

10

for prospective injunctive relief, *Pulliam v. Allen*, 466 U.S. 522, 536-543 (1983), or from a suit for attorney's fees authorized by statute, *id.*, at 543-544.

In this case, respondent Howard Waco, a Los Angeles County public defender, filed suit in the United States District Court for the Central District of California under 42 U.S.C. § 1983 against petitioner, Raymond Mireles, a judge of the California Superior Court, and two police officers, for damages arising from an incident in November, 1989, at the Superior Court building in Van Nuys, Cal. Waco alleged that, after he failed to appear for the initial call of Judge Mireles' morning calendar, the judge, "angered by the absence of attorneys from his courtroom," ordered the police officer defendants "to forcibly and with excessive force seize and bring plaintiff into his courtroom." App. to Pet. for Cert. B-3, ¶ 7(a). The officers allegedly "by means of unreasonable force and violence seize[d] plaintiff and remove[d] him backwards" from another courtroom where he was waiting to appear, cursed him, and called him "vulgar and offensive names," then "without necessity, slammed" him through the doors and swinging gates into Judge Mireles' courtroom. *Id.*, at B-4, ¶ 7(c). Judge Mireles, it was alleged, "knowingly and deliberately approved and ratified each of the aforesaid acts" of the police officers. *Ibid.* Waco demanded general and punitive damages. *Id.*, at B-5 and B-6. *11

Judge Mireles moved to dismiss the complaint as to him, pursuant to Civil Rules 12(b)(1) and (6), for failure to state a claim upon which relief could be granted. The District Court dismissed the claim against the judge and entered final judgment as to him, pursuant to Civil Rule 54(b), on grounds of "complete judicial immunity." App. to Pet. for Cert. D-2. On Waco's appeal, the United States Court of Appeals for the Ninth Circuit reversed that judgment. *Waco v. Baltad*, 934 F.2d 214 (1991). The court determined that Judge Mireles was not immune from suit because his alleged actions were not taken in his judicial capacity. It

opined that Judge Mireles would have been acting in his judicial capacity if he had "merely directed the officers to bring Waco to his courtroom, without directing them to use excessive force." *Id.*, at 216. But "[i]f Judge Mireles requested and authorized the use of excessive force, then he would not be acting in his judicial capacity." *Ibid.*

Taking the allegations of the complaint as true, as we do upon a motion to dismiss, we grant the petition for certiorari and summarily reverse.

Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial. *Pierson v. Ray*, 386 U.S., at 554 ("[I]mmunity applies even when the judge is accused of acting maliciously and corruptly"). *See also Harlow v. Fitzgerald*, 457 U.S. 800, 815-819 (1982) (allegations of malice are insufficient to overcome qualified immunity).

Rather, our cases make clear that the immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. *Forrester v. White*, 484 U.S., at 227-229; *Stump v. Sparkman*, 435 U.S., at 360. *12 Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction. *Id.*, at 356-357; *Bradley v. Fisher*, 13 Wall., at 351.

We conclude that the Court of Appeals erred in ruling that Judge Mireles' alleged actions were not taken in his judicial capacity. This Court in *Stump* made clear that "whether an act by a judge is a "judicial" one relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." 435 U.S., at 362. *See also Forrester v. White*, 484 U.S., at 227-229. A judge's

direction to court officers to bring a person who is in the courthouse before him is a function normally performed by a judge. *See generally* Cal.Civ.Proc. Code Ann. §§ 128, 177, 187 (West 1982 and Supp. 1991) (setting forth broad powers of state judges in the conduct of proceedings).[2] Waco, who was called into the courtroom for purposes of a pending case, was dealing with Judge Mireles in the judge's judicial capacity.

> [2] California Civ.Proc. Code Ann. § 128 (West Supp. 1991) provides in pertinent part: Every court shall have the power to do all of the following: . . . (5) To control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto. *See Ligda v. Superior Court of Solano County,* 5 Cal.App.3d 811, 826, 85 Cal.Rptr. 744, 753 (1970) (public defender is "ministerial officer" and one of "all other persons in any manner connected with a judicial proceeding" within the meaning of § 128, and may be ordered to appear to assist criminal defendant).

Of course, a judge's direction to police officers to carry out a judicial order with excessive force is not a "function normally performed by a judge." *Stump v. Sparkman,* 435 U.S., at 362. But if only the particular act in question were to be scrutinized, then any mistake of a judge in excess of his authority would become a "nonjudicial" act, because an improper or erroneous act cannot be said to be normally performed by a judge. If judicial immunity means anything, it *13 means that a judge "will not be deprived of immunity because the action he took was in error . . . or was in excess of his authority." *Id.,* at 356. *See also Forrester v. White,* 484 U.S., at 227 (a judicial act "does not become less judicial by virtue of an allegation of malice or corruption of motive"). Accordingly, as the language in *Stump* indicates, the relevant inquiry is the "nature" and "function" of the act, not the "act itself." *Id.* 435 U.S., at 362. In other words, we look to the particular act's

relation to a general function normally performed by a judge, in this case the function of directing police officers to bring counsel in a pending case before the court.

Nor does the fact that Judge Mireles' order was carried out by police officers somehow transform his action from "judicial" to "executive" in character. As *Forrester* instructs, it is "the nature of the function performed, not the identity of the actor who performed it, that inform[s] our immunity analysis." 484 U.S., at 229. A judge's direction to an executive officer to bring counsel before the court is no more executive in character than a judge's issuance of a warrant for an executive officer to search a home. *See Burns v. Reed,* 500 U.S. 478 (1991) ("[T]he issuance of a search warrant is unquestionably a judicial act").

Because the Court of Appeals concluded that Judge Mireles did not act in his judicial capacity, the court did not reach the second part of the immunity inquiry: whether Judge Mireles' actions were taken in the complete absence of all jurisdiction. We have little trouble concluding that they were not. If Judge Mireles authorized and ratified the police officers' use of excessive force, he acted in excess of his authority. But such an action — taken in the very aid of the judge's jurisdiction over a matter before him — cannot be said to have been taken in the absence of jurisdiction.

The petition for certiorari is granted, and the judgment of the Court of Appeals is reversed.

*It is so ordered.*

14    *14

JUSTICE STEVENS, dissenting.

Judicial immunity attaches only to actions undertaken in a judicial capacity. *Forrester v. White,* 484 U.S. 219, 227-229 (1988). In determining whether an action is "judicial," we

consider the nature of the act and whether it is a "function normally performed by a judge." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978).–

> – Page 14 *See also Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719, 736-737 (1980) (judge not entitled to judicial immunity when acting in enforcement capacity); *cf. Mitchell v. Forsyth*, 472 U.S. 511, 520-524 (1985) (Attorney General not absolutely immune when performing "national security," rather than prosecutorial, function). Moreover, even if the act is "judicial," judicial immunity does not attach if the judge is acting in the "'clear absence of all jurisdiction.'" *Stump v. Sparkman*, 435 U.S., at 357 (quoting *Bradley v. Fisher*, 13 Wall. 335, 351 (1872)).

Respondent Howard Waco alleges that petitioner Judge Raymond Mireles ordered police officers "to forcibly and with excessive force seize and bring" respondent into petitioner's courtroom. App. to Pet. for Cert. B-3, ¶ 7(a). As the Court acknowledges, ordering police officers to use excessive force is "not a `function normally performed by a judge.'" *Ante*, at 12 (quoting *Stump v. Sparkman*, 435 U.S., at 362). The Court nevertheless finds that judicial immunity is applicable because of the action's "relation to a general function normally performed by a judge." *Ante*, at 13.

Accepting the allegations of the complaint as true, as we must in reviewing a motion to dismiss, petitioner issued two commands to the police officers. He ordered them to bring respondent into his courtroom, and he ordered them to commit a battery. The first order was an action taken in a judicial capacity; the second clearly was not.

Ordering a battery has no relation to a function normally performed by a judge. If an interval of a minute or two had separated the two orders, it would be undeniable that no immunity would attach to the latter order. The fact that both are alleged to *15 have occurred as part of the same communication does not enlarge the judge's immunity.

Accordingly, I respectfully dissent.

JUSTICE SCALIA, with whom JUSTICE KENNEDY joins, dissenting.

"A summary reversal . . . is a rare and exceptional disposition, `usually reserved by this Court for situations in which the law is well settled and stable, the facts are not in dispute, and the decision below is clearly in error.'" Stern, Gressman Shapiro, Supreme Court Practice 281 (6th ed. 1986) (quoting *Schweiker v. Hansen*, 450 U.S. 785, 791 (1981) (Marshall, J., dissenting)). As JUSTICE STEVENS' dissent amply demonstrates, the decision here reversed is, at a minimum, not clearly in error.

I frankly am unsure whether the Court's disposition or JUSTICE STEVENS' favored disposition is correct; but I am sure that, if we are to decide this case, we should not do so without briefing and argument. In my view, we should not decide it at all; the factual situation it presents is so extraordinary that it does not warrant the expenditure of our time. I would have denied the *16 petition for writ of certiorari. *16

# EXHIBIT 4

No. 20-0727

Supreme Court of Texas

# Taylor v. Tolbert

644 S.W.3d 637 (Tex. 2022)

Decided May 6, 2022

No. 20-0727

05-06-2022

Terisa TAYLOR, Petitioner, v. Carl TOLBERT, Nizzear Kimball and Vivian Robbins, Respondents

Greg B. Enos, for Respondents. Vivian Robbins, Pro Se. Alan B. Daughtry, Houston, for Petitioner Terisa Taylor. John Hays, Marlene C. Williams, Houston, for Petitioner Pathway Forensics, LLC. Richard Gardner Wilson, Pro Se.

Justice Devine delivered the opinion of the Court.

Greg B. Enos, for Respondents.

Vivian Robbins, Pro Se.

Alan B. Daughtry, Houston, for Petitioner Terisa Taylor.

John Hays, Marlene C. Williams, Houston, for Petitioner Pathway Forensics, LLC.

Richard Gardner Wilson, Pro Se.

Justice Devine delivered the opinion of the Court.

Under Texas law, attorneys are generally immune from civil liability to nonclients for actions taken within the scope of legal representation if those actions involve "the kind of conduct" attorneys engage in when discharging their professional duties to a client.[1] In recent years, we have had several occasions to consider the scope of this common-law immunity defense. When presented with the question, we have held that the immunity inquiry focuses on the function and role the lawyer was performing, not the alleged wrongfulness, or even asserted criminality, of the lawyer's conduct.[2] The nuance presented here is whether an exception exists for private-party civil suits asserting that a lawyer has engaged in conduct criminalized by statute.

[1] *See Landry's, Inc. v. Animal Legal Def. Fund* , 631 S.W.3d 40, 51 (Tex. 2021) ; *Cantey Hanger, LLP v. Byrd* , 467 S.W.3d 477, 482 (Tex. 2015).

[2] *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.* , 595 S.W.3d 651, 657-58 (Tex. 2020) ; *Youngkin v. Hines* , 546 S.W.3d 675, 681 (Tex. 2018) ; *Cantey Hanger* , 467 S.W.3d at 481 & 485.

We hold that, when conduct is prohibited by statute, the attorney-immunity defense is neither categorically inapplicable nor automatically available, even if the defense might otherwise cover the conduct at issue. In such cases, whether an attorney may claim the privilege depends on the particular statute in question. That being so, the attorney in this case is only entitled to partial immunity on civil claims alleging she violated state and federal wiretap statutes by "using" and "disclosing" electronic communications illegally "intercepted" by her client and others. Immunity attaches to the state claims because the Texas wiretap statute does not expressly, or by necessary implication, abrogate the immunity defense, and the attorney met her burden to establish its applicability to the conduct at issue. But immunity does not attach to the federal claims because the federal wiretap statute is worded differently, and

Taylor v. Tolbert 14 S.W.3d 713 (Tex. 2023)

informative federal authority (sparse as it is) persuades us that federal courts would not apply Texas's common-law attorney-immunity defense to a claim under that statute. We thus affirm the court of appeals' judgment that the attorney-immunity defense is inapplicable to the federal *643 wiretap claims but reverse and render *643 judgment for the attorney on the state wiretap claims.

## I. Background

The underlying dispute originates from a child-custody modification proceeding between Mark Broome and Vivian Robbins regarding their child, N.B. Attorney Terisa Taylor represented Broome in the highly acrimonious family-law case.

In the midst of the modification proceeding,[3] N.B. visited her aunt, Fiona McInally, in the summer of 2013. At some point, an iPad belonging to McInally began receiving text messages and emails between Robbins and at least thirty other individuals, all of whom were unaware this was happening and none of whom consented. How this happened remains something of a mystery, but there appears to be no dispute that N.B. had signed into her aunt's iPad using Robbins's email address and password to download an app. After discovering the text messages, McInally or her husband (Broome's brother) mailed the iPad to Broome, who obtained Robbins's text messages and emails from the iPad and shared them with Taylor for use in the modification proceeding.

[3] Although the allegations in this civil suit are disputed, the applicable standard of review requires us to accept the allegations as true. *City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, 533 S.W.3d 297, 301 (Tex. 2017). We relay them accordingly.

Robbins and several of her interlocutors, including Carl Tolbert and Nizzera Kimball,[4] sued Taylor and others for violating the federal and Texas wiretap statutes.[5] Wiretapping is a criminal offense under federal and state law,[6] but both statutory schemes permit private parties to pursue civil redress for violations of the penal statutes.[7] The federal statute provides a civil cause of action for "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter[.]"[8] Texas likewise grants a private right of action for "[a] person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of" certain statutes, including Chapter 16 of the Penal Code and Chapter 18A of the Code of Criminal Procedure.[9] Robbins, Tolbert, and Kimball (collectively, Robbins) alleged that Taylor had improperly "used" and "disclosed" illegally "intercepted" electronic communications in the following particulars:

[4] The other plaintiffs are not parties to this appeal.

[5] The other defendants, including Broome, have since settled, leaving Taylor the sole remaining defendant.

[6] 18 U.S.C. § 2511(1) ; Tex. Penal Code § 16.02.

[7] 18 U.S.C. § 2520(a) ; Tex. Code Crim. Proc. art. 18A.502.

[8] 18 U.S.C. § 2520(a).

[9] Tex. Code Crim. Proc. art. 18A.502(1). Chapter 18A and Chapter 16 of the Penal Code prohibit wiretapping.

• received the text messages and emails her client, Broome, shared with her;

• produced a CD containing data from the iPad to Robbins's attorney;

• told opposing counsel that "she and her client were in possession of everything Ms. Robbins had communicated to others, including a nude photograph that Ms. Robbins had sent via text message to her boyfriend";

• told opposing counsel that she intended to use the nude photograph as a poster-size demonstrative in the jury trial;

644  *644

• told opposing counsel to advise Robbins to "sign an agreed order resolving the custody case and agreeing to supervised visitation only or this evidence would be used against her";

• "filed an unusual pleading entitled 'Notice of Intent to Use Demonstrative Evidence'[,] which said that Mark Broome intended to use ... [a] 'Power Point presentation and large photo board' " at trial;

• for at least six months, "used information gleaned from the illegally intercepted communications in several family court hearings and to conduct discovery in the child custody modification case ... prior to Ms. Robbins becoming aware of the interception," which she learned about when Taylor produced 617 pages of Robbins's text messages to her attorney and when Broome filed a pleading referencing the content of Robbins's email messages;

• "[repeatedly] used and disclosed the contents of those intercepted electronic communications to the court and in [ ] pleadings in the modification case";

• "provided Fiona McInaly's [sic] iPad to Pathway Forensics, LLC for examination";[10] and

• used the illegally intercepted communications on McInally's iPad to obtain a court order authorizing Pathway Forensics to make a copy of Robbins's electronic devices.[11]

---

[10] Pathway Forensics is a computer forensics company that Broome had retained as an expert witness. Robbins sued Pathway, and the court of appeals ruled favorably to Robbins on those claims, but Pathway did

not file a petition for review in this Court. Taylor and Robbins report that the claims against Pathway have been settled.

11  The trial court ordered Pathway to "properly and noninvasively create backup images of all drives and media in the custody of [Robbins], via her I-phone/cell phones [sic], I-Pad [sic], Laptop and/or home computer, that may contain electronic data relevant to the issues in this matter, except any attorney client privilege matters."

Notably, the petition does not allege any facts suggesting that Taylor played a role in the alleged "interception" of Robbins's electronic communications or that she advised Broome or others to take these actions. Rather, the factual allegations against Taylor are limited to her "use" and "disclosure" of those communications in the modification proceeding.

Taylor moved for traditional summary judgment solely on the pleadings, arguing she is immune from liability as a matter of law because the plaintiffs' claims all stem from her role as an attorney in the modification proceeding.[12] The trial court agreed and rendered a take-nothing summary judgment for Taylor.

12  See Tex. R. Civ. P. 166a(c).

In a split decision, the court of appeals reversed and remanded.[13] After noting that our attorney-immunity decisions in *Cantey Hanger, LLP v. Byrd* [14] and *Youngkin v. Hines* [15] neither "involved alleged criminal conduct by an attorney" nor extended attorney immunity to criminal conduct, the majority summarily determined that "[a] criminal violation of either [the federal or state wiretap] statute would be 'foreign to the duties of an attorney' and thus precludes application of attorney[ ]immunity."[16] *645 Examining our attorney-immunity precedent in more detail, the dissent found the majority's holding to be directly adverse to *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.* ,[17] in which we rejected the

invitation to create a "criminal conduct" exception to the attorney-immunity defense and applied the defense to litigation conduct alleged to be criminal in nature.[18] The dissent then cited two independent reasons to affirm summary judgment for Taylor. First, the dissent declared Robbins's petition fatally deficient in failing to plead facts showing Taylor had engaged in conduct violating the wiretap statutes.[19] As to that matter, the dissent noted the absence of factual allegations showing (1) "contemporaneous acquisition of the communication when it was sent," as required to establish an "interception," and (2) that Taylor knew, should have known, or was reckless in disregarding that the communications had been "intercepted," as required to make "use" or "disclosure" of "intercepted" communications impermissible.[20] Second, even if Robbins had pleaded sufficient facts to state a claim under the wiretap statutes, Taylor's alleged conduct fell directly within the scope of her representation of Broome in the modification proceeding and was not "foreign to the duties of an attorney."[21] Applying *Bethel* , which the majority failed to discuss or cite, the dissent concluded that, as a matter of law, attorney immunity protects Taylor from civil liability because the conduct about which Robbins complains involved Taylor's rendition of legal services to a client in the course of litigation.[22]

13  629 S.W.3d 318, 327, 334 (Tex. App.—Houston [14th Dist.] 2020).

14  467 S.W.3d 477 (Tex. 2015).

15  546 S.W.3d 675 (Tex. 2018).

16  629 S.W.3d at 327.

17  595 S.W.3d 651 (Tex. 2020).

18  629 S.W.3d at 339-40 (Frost, C.J., dissenting).

19  *Id.* at 345. Taylor did not argue or brief that issue here or in the courts below, so we do not address it.

20  *Id.* at 341-45 & nn.64-78 ; *see, e.g., Babb v. Eagleton* , 616 F. Supp. 2d 1195, 1206 (N.D. Okla. 2007) ("[I]f no unlawful interception initially occurred, there can be no liability for subsequent use or disclosure of the interceptions by Attorney and Law Firm.").

21  629 S.W.3d at 345 (Frost, C.J., dissenting).

22  *Id.* at 345-46.

We granted Taylor's petition for review to further refine the boundaries of the attorney-immunity defense. The principal matter in dispute is whether the immunity defense applies to alleged conduct that, if proven, is criminalized by statute.

## II. Discussion

As the summary-judgment movant on an affirmative defense, Taylor bears the burden of conclusively establishing that attorney immunity bars the plaintiffs' recovery on the claims asserted.[23] "The only facts required to support an attorney-immunity defense are the type of conduct at issue and the existence of an attorney–client relationship at the time" the attorney engaged in the conduct.[24] We must then decide "the legal question of whether said conduct was within the scope of representation."[25] Because Taylor moved for summary judgment on the pleadings, we must take the allegations in Robbins's petition as true, and we will uphold summary judgment for Taylor only if she is entitled to judgment as a matter of law.[26]  646  *646  **A. Scope of Attorney-Immunity Defense**

23  *Cantey Hanger* , 467 S.W.3d at 481 ; *Provident Life & Accident Ins. Co. v. Knott* , 128 S.W.3d 211, 215-16 (Tex. 2003).

24  *Youngkin* , 546 S.W.3d at 683.

25  *Id.*

26  *Perry v. S.N.* , 973 S.W.2d 301, 303 (Tex. 1998) ; *see City of Magnolia 4A Econ. Dev. Corp.* , 533 S.W.3d at 301 ; Tex. R. Civ. P. 166a(c).

The common-law attorney-immunity defense applies to lawyerly work in "all adversarial contexts in which an attorney has a duty to zealously and loyally represent a client" but only when the claim against the attorney is based on "the kind of conduct" attorneys undertake while discharging their professional duties to a client.[27] Stated inversely, if an attorney engages in conduct that is not "lawyerly work" or is "entirely foreign to the duties of a lawyer" or falls outside the scope of client representation, the attorney-immunity defense is inapplicable.[28]

27  *Haynes & Boone, LLP v. NFTD, LLC* , 631 S.W.3d 65, 67 (Tex. 2021) ; *see, e.g., Landry's* , 631 S.W.3d at 47 ; *Cantey Hanger* , 467 S.W.3d at 481.

28  *Landry's* , 631 S.W.3d at 47, 51-53 ; *Youngkin* , 546 S.W.3d at 681.

In determining whether conduct is "the kind" immunity protects, the inquiry focuses on the *type* of conduct at issue rather than the alleged wrongfulness of that conduct.[29] But when the defense applies, counsel is shielded only from liability in a civil suit, not from "other mechanisms" that exist "to discourage and remedy" bad-faith or wrongful conduct, including sanctions, professional discipline, or criminal penalties, as appropriate.[30]

29  *Landry's* , 631 S.W.3d at 47.

30  *E.g., Bethel* , 595 S.W.3d at 657-58 ; *Youngkin* , 546 S.W.3d at 679, 682-83 ; *Cantey Hanger* , 467 S.W.3d at 482, 484-86 ; *Kruegel v. Murphy* , 126 S.W. 343, 344-45 (Tex. App.—Dallas 1910, writ ref'd).

Conduct is not the kind of conduct attorney immunity protects "simply because attorneys often engage in that activity" or because an attorney performed the activity on a client's behalf.[31] Rather, the conduct must involve "the uniquely lawyerly *capacity* " and the attorney's *skills as an attorney.* [32] For example, a lawyer who makes

publicity statements to the press and on social media on a client's behalf does "not partake of 'the office, professional training, skill, and authority of an attorney' " because "[a]nyone—including press agents, spokespersons, or someone with no particular training or authority at all—can publicize a client's allegations to the media."[33] Immunity attaches only if the attorney is discharging "lawyerly" duties to his or her client.[34]

31  *Landry's* , 631 S.W.3d at 52.

32  *See id.* at 51-53 (emphasis added) (quoting *Cantey Hanger* , 467 S.W.3d at 482 ).

33  *Id.* at 51-52 (quoting *Cantey Hanger* , 467 S.W.3d at 482 ).

34  *Cantey Hanger* , 467 S.W.3d at 481.

A corollary to this principle is that attorneys will not be entitled to civil immunity for conduct that is "entirely foreign to the duties of an attorney." "Foreign to the duties" does not mean something a good attorney should not do; it means that the attorney is acting outside his or her capacity and function as an attorney.[35] For that reason, whether 647 counsel *647 may claim the privilege turns on the task that was being performed, not whether the challenged conduct was meritorious.

35  *E.g., Youngkin* , 546 S.W.3d at 681 ; *Cantey Hanger* , 467 S.W.3d at 482, 487 ; *see Poole v. Hous. & T.C. Ry. Co.* , 58 Tex. 134, 137 (1882) (holding that an attorney who had assumed ownership of a third party's goods "with the intention of consummating [a] fraud" on a third party "will not be heard to deny his liability to [the third party]" for the loss sustained by reason of his wrongful acts, under the privileges of an attorney at law, for such acts are entirely foreign to the duties of an attorney"); *Dixon Fin. Servs., Ltd. v. Greenberg, Peden, Siegmyer & Oshman, P.C.* , No. 01-06-00696-CV, 2008 WL 746548, at *9 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) ("The signing and filing of an application for a temporary

restraining order to aid in the recovery of monies owed to a client under an arbitration award is not conduct 'foreign to the duties of an attorney' and is the kind of conduct protected from liability.").

This is so because the interests of clients demand that lawyers "competently, diligently, and zealously represent their clients' interests while avoiding any conflicting obligations or duties to themselves or others."[36] To prevent chilling an attorney's faithful discharge of this duty, lawyers must be able to pursue legal rights they deem necessary and proper for their clients without the menace of civil liability looming over them and influencing their actions.[37] Attorney immunity furthers "loyal, faithful, and aggressive representation" by "essentially ... removing the fear of personal liability,"[38] thus "alleviating in the mind of [an] attorney any fear that he or she may be sued by or held liable to a non-client for providing ... zealous representation."[39] In this way, the defense protects not only attorneys but also their clients, who can be assured that counsel is representing the client's best interests, not the lawyer's.

36  *Haynes & Boone* , 631 S.W.3d at 79.

37  *See Cantey Hanger* , 467 S.W.3d at 483.

38  *Youngkin* , 546 S.W.3d at 682.

39  *Haynes & Boone* , 631 S.W.3d at 79.

Because the wrongfulness of the attorney's conduct is not the focus of the immunity inquiry,[40] we held in *Cantey Hanger* that conduct alleged to be fraudulent does not necessarily fall outside the scope of the attorney-immunity defense.[41] We explained that a "general fraud exception" would "significantly undercut" the purposes of the defense[42] by allowing lawyers to be sued for discharging their lawyerly duties if the plaintiff characterizes the attorney's conduct as fraudulent.[43] But "[m]erely labeling an attorney's conduct 'fraudulent' does not and should not

casetext

remove it from the scope of client representation or render it 'foreign to the duties of an attorney.'"[44]

40  *Id.* at 78 ; *Bethel* , 595 S.W.3d at 658 ; *Youngkin* , 546 S.W.3d at 681 ; *Cantey Hanger* , 467 S.W.3d at 481.

41  467 S.W.3d at 484-86.

42  *Id.* at 483.

43  *Landry's* , 631 S.W.3d at 47 (quoting *Cantey Hanger* , 467 S.W.3d at 482 ).

44  *Bethel* , 595 S.W.3d at 657 (alteration in original) (quoting *Cantey Hanger* , 467 S.W.3d at 483-84 ).

In *Bethel* , we extended this principle to allegations of criminal conduct. There, the plaintiff had urged us "to recognize an exception" to attorney immunity "whe[n] a third party alleges that an attorney engaged in criminal conduct during the course of litigation."[45] We again rejected the invitation to adopt an exception or state a categorical rule because doing so would allow plaintiffs to avoid the attorney-immunity defense through artful pleading—"by merely alleging that an attorney's conduct was 'criminal.'"[46] Like the fraud exception that *Cantey Hanger* declined to embrace, *Bethel* eschews a categorical exception for criminal conduct because such an exception would defeat the purposes of the attorney-immunity defense.[47] Instead, we held that conduct alleged to be criminal in nature "is not categorically excepted from the protections of attorney civil immunity when the conduct alleged *648 is connected with representing a *648 client in litigation."[48] As we explained there, a lawyer who is doing his or her job is not more susceptible to civil liability just because a nonclient asserts that the lawyer's actions are fraudulent, wrongful, or even criminal.[49]

45  *Id.*

46  *Id.*

47  *Id.*

48  *Id.* (citations omitted).

49  *Id.* (quoting *Youngkin* , 546 S.W.3d at 681 ).

Even so, we acknowledged then, as we do now, that "there is a wide range of criminal conduct that is not within the 'scope of client representation' and [is] therefore 'foreign to the duties of an attorney.'"[50] But when that is the case, the circumstances do not give rise to an "exception" to the immunity defense; rather, such conduct simply fails to satisfy the requirements for invoking the defense in the first instance.[51] As *Bethel* makes clear, our approach to applying the attorney-immunity defense remains functional, not qualitative, and leaves an attorney's improper conduct addressable by public remedies.[52]

50  *Id.* at 658.

51  *Id.*

52  While the potential for sanctions, professional discipline, and criminal responsibility might be equally, if not more, concerning to an attorney than the potential for civil liability, the public oversight required to pursue such penalties helps ensure that attorneys discharging their duties are not subject to the threat of litigation by anyone who might take issue with the attorney's performance on behalf of his or her client in the course and scope of legal representation. If an attorney's conduct in his or her capacity as an attorney is wrongful, recourse is public, not private.

Robbins nonetheless campaigns for a "narrow exception" to immunity for civil liability that arises from a statute criminalizing conduct. As Robbins notes, none of our precedent has involved similar claims, and she contends that a common-law defense, like attorney immunity, cannot be engrafted onto a statutory scheme unless the statute expressly adopts the defense. Separately,

and in addition, Robbins asserts that Taylor's alleged conduct was "foreign to the duties of an attorney" because it is criminal in nature. We address these arguments below.

## B. Application to Taylor's Conduct

We first consider whether Taylor's conduct is encompassed by the attorney-immunity defense at all. This is a legal question we determine from the facts Robbins has alleged, which we take as true under the applicable standard of review.[53] Focusing only on "the kind" of conduct, as we must, the standard for attorney immunity is easily satisfied on the pleaded allegations because Taylor's conduct was (1) within the scope of her representation of Broome in the modification proceeding and (2) not foreign to the duties of a lawyer.

> [53] *See supra* n.3.

Acquiring materials from a client pertaining to a matter in dispute and reviewing, copying, retaining custody of, analyzing, and producing those materials are paradigmatically "the provision of 'legal' services involving the unique office, professional skill, training, and authority of an attorney."[54] So too is all the other conduct about which Robbins complains. Using information acquired from a client to conduct discovery, in pleadings, in communications with the court, and to obtain a court order; attempting to use that information as demonstrative evidence at trial; and providing materials to an expert witness all fall squarely within the scope of Taylor's representation of Broome in *649 the modification proceeding.[55] Likewise, making a demand on a client's behalf—such as Taylor's insistence that Robbins sign a proposed order resolving the dispute—is also within the realm of legal representation.[56] In engaging in these activities, Taylor acted on behalf of her client in a lawyerly capacity because conducting discovery, filing pleadings, obtaining court orders, and seeking the admission of evidence are the kinds of actions that lawyers undertake in representing a client. Taylor

engaged in this conduct in connection with her duties as a lawyer in the adversarial context of the modification proceeding where her client's objective was to secure enhanced custodial rights.[57]

> [54] *Haynes & Boone*, 631 S.W.3d at 78.
>
> [55] *Cf. Bethel*, 595 S.W.3d at 658 ("Thus, at bottom, Bethel takes issue with the manner in which Quilling examined and tested evidence during discovery in civil litigation while representing Bethel's opposing party. These are paradigmatic functions of an attorney representing a client in litigation.").
>
> [56] *See Youngkin*, 546 S.W.3d at 684 ("The conduct Hines complains of—negotiating and entering a settlement agreement ...—falls within the scope of Youngkin's representation ... and is not foreign to the duties of a lawyer."); *Highland Cap. Mgmt., LP v. Looper Reed & McGraw, P.C.*, No. 05-15-00055-CV, 2016 WL 164528, at *6 (Tex. App.—Dallas Jan. 14, 2016, pet. denied) (mem. op.) (holding that actions including "making demands on the client's behalf, advising a client to reject counter-demands, speaking about an opposing party in a negative light, advising a client on a course of action, and even threatening particular consequences" are within the scope of an attorney's legal representation of a client).
>
> [57] *Haynes & Boone*, 631 S.W.3d at 78.

Considering all the allegations in Robbins's petition, Taylor was, in all respects, engaging in "the office, professional training, skill, and authority of an attorney" in the ways that she allegedly used and disclosed the materials her client provided. Because Taylor's conduct falls squarely within the confines of attorney immunity, the alleged criminality or wrongfulness of the conduct does not perforce preclude its availability as an affirmative defense.[58]

58  *See Bethel* , 595 S.W.3d at 657.

This conclusion does not, however, terminate the analysis. We must also consider Robbins's argument that the common-law attorney-immunity defense is unavailable—either categorically or specifically—as a defense to her statutory claims. In *Bethel* , no statutory causes of action were pressed against the attorney—it is a spoliation case. But the source of the plaintiff's claim, whether under the common law or a statute, does not, alone, nullify the immunity defense. That being the case, if attorney immunity is unavailable here, it is only because the specific statutes at issue—the state and federal wiretap statutes—preclude it. On that score, we do not agree with Robbins that the defense is only available if a statute expressly adopts it, and we hold that the Texas wiretap statute does not abrogate the defense. However, for reasons we explain below, we conclude that Texas's common-law attorney-immunity defense is unavailable under the federal statute.

## C. Texas Wiretap Statute

Common-law defenses may be abrogated by statute,[59] but under Texas law, statutes purporting to abrogate common-law principles must do so either expressly or by necessary implication.[60] Texas's wiretap statute does not expressly repudiate the common law or the attorney-immunity defense. Robbins *650 nonetheless argues that because the Legislature enacted specific defenses to criminal prosecution and civil liability for wiretapping, the statute necessarily fences out all common-law defenses not explicitly articulated in the statute.[61] And because the wiretap statute does not expressly adopt the common-law attorney-immunity defense, Robbins contends Taylor may not rely on it.

59  *See Dugger v. Arredondo* , 408 S.W.3d 825, 836 (Tex. 2013).

60  *Forest Oil Corp. v. El Rucio Land & Cattle Co.* , 518 S.W.3d 422, 428 (Tex. 2017).

61  *E.g.* , Tex. Code Crim. Proc. art. 18A.504 ; Tex. Penal Code § 16.02(c).

Under Robbins's line of reasoning, the Legislature would be required to expressly enact or "opt into" each and every defense applicable to a given cause of action, including defenses that exist under common law. But that is not the law in this state. As a general proposition, we follow an "opt-out" approach that incorporates common-law principles absent the Legislature's clear repudiation.[62] Accordingly, the Legislature need not expressly adopt the attorney-immunity defense for it to apply to claims under the wiretap statute.

62  *Compare Forest Oil* , 518 S.W.3d at 428 ("Abrogation of a common-law right, as we have said, 'is disfavored and requires a clear repugnance' between the common-law cause of action and the statutory remedy. A statute's 'express terms or necessary implications' must indicate clearly the Legislature's intent to abrogate common-law rights." (quoting *Cash Am. Int'l Inc. v. Bennett* , 35 S.W.3d 12, 16 (Tex. 2000) )), *with Smith v. Baldwin* , 611 S.W.2d 611, 616-17 (Tex. 1980) ("In light of the facts that the DTPA was not designed to be a codification of the common law, the absence of a mental state element ... and [the element's] inclusion in other subdivisions, the legislative history of the 1979 amendments, and in keeping with the mandate of liberal construction, we hold [that a particular DTPA provision] does not require proof or a finding of intentional misrepresentation before the sanctions of the DTPA are imposed.").

As we have often said, courts presume that the Legislature acted with complete knowledge of existing law and with reference to it.[63] When the Legislature makes law, it does so against a backdrop in which common-law defenses abound, and those defenses are generally available unless the Legislature clearly indicates otherwise.[64] We will not presume the contrary, so we cannot conclude that the attorney-immunity defense is

inapplicable to a state wiretapping claim unless the Legislature explicitly abrogated the defense or the defense inherently conflicts with the statute.[65] Statutes "creat[ing] a liability unknown to the common law," like the Texas wiretap statute, are "strictly *651 construed in the sense that [the statute] will not be extended beyond its plain meaning or applied to cases not clearly within its purview."[66] That means courts "must look carefully to be sure" the Legislature intended to "modify common law rules."[67]

[63] *Amazon.com, Inc. v. McMillan* , 625 S.W.3d 101, 106-07 (Tex. 2021) ("Because we presume that the Legislature uses statutory language 'with complete knowledge of the existing law and with reference to it,' we have concluded that concepts included in the Legislature's 'seller' definition acquired particular meaning from our common-law products liability cases." (quoting *In re Allen* , 366 S.W.3d 696, 706 (Tex. 2012) ) (citations omitted)).

[64] *Cf., e.g., Dugger* , 408 S.W.3d at 832 ("When the Legislature intends an exception to Chapter 33's broad scheme, it creates specific exceptions for matters that are outside the scope of proportionate responsibility.... We find no such indication that the Legislature intended a plaintiff's unlawful conduct to be treated differently from the other common law defenses under the former contributory negligence scheme[.]").

[65] *See Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.* , 236 S.W.3d 190, 194 (Tex. 2007) ("Of course, statutes can modify common law rules, but before we construe one to do so, we must look carefully to be sure that was what the Legislature intended."); *cf. Gunn Infiniti, Inc. v. O'Byrne* , 996 S.W.2d 854, 856-57 (Tex. 1999) ("Nothing in the DTPA evidences a legislative intent to withdraw mitigation of damages as an affirmative

defense .... Nor does the concept of mitigation inherently conflict with the DTPA.").

[66] *Smith v. Sewell* , 858 S.W.2d 350, 354 (Tex. 1993).

[67] *Energy Serv. Co.* , 236 S.W.3d at 194 ; *Satterfield v. Satterfield* , 448 S.W.2d 456, 459 (Tex. 1969).

Robbins does not contend that the Texas wiretap statute expressly repudiates common-law defenses, but she suggests that it does so by necessary implication. Though she points out that the Code of Criminal Procedure codifies a good-faith defense to the private right of action for wiretapping[68] and the Penal Code provides specific affirmative defenses to criminal prosecution,[69] the Legislature did not make those defenses exclusive, and the statute cannot be fairly read as *clearly repudiating* civil-liability defenses otherwise available under the common law.

[68] Tex. Code Crim. Proc. art. 18A.504 (stating that "good faith reliance on a court order or legislative authorization constitutes a complete defense to an action brought under Article 18A.502").

[69] Tex. Penal Code § 16.02(c) ("It is an affirmative defense to prosecution under Subsection (b) that ....").

Robbins also cites the statute's language creating "a civil cause of action against *any person* who intercepts, discloses, or uses ... the communication[.]"[70] Although "any person" would inarguably include attorneys, we are not convinced that the breadth of the statutory language—which is not at all uncommon—clearly shows legislative intent to abrogate common-law defenses generally or attorney immunity specifically.[71] The attorney-immunity doctrine does not apply to all conduct by attorneys, so attorneys are not precluded from being the subject of a wiretap claim even though some of their conduct may give rise to an immunity defense. In

*Taylor v. Tolbert*, 644 S.W.3d 637 (Tex. 2022)

this regard, Robbins suggests a false dichotomy. In reality, attorneys can be persons to whom the statute applies and also immunized from civil liability for the kind of conduct the immunity defense protects.

> 70 Tex. Code Crim. Proc. art. 18A.502 (emphasis added).

> 71 *See Energy Serv. Co.* , 236 S.W.3d at 194 (before construing a statute to modify common-law rules, "we must look carefully to be sure that was what the Legislature intended").

Nor does the statute's evidentiary bar render Taylor's conduct foreign to the duties of an attorney or abrogate the attorney-immunity defense. The Texas wiretap statute precludes "[t]he contents of an intercepted communication and evidence derived from the communication" from being "received in evidence in any trial, hearing, or other proceeding in or before any court,"[72] but this limitation on *admissibility* of evidence is not repugnant to the attorney-immunity defense because the sum total of an attorney's legal duties does not begin and end with admissibility of evidence. First, inadmissibility of evidence does not foreclose all uses or disclosures of that evidence.[73] For example, relevant information that is reasonably calculated to lead to 652 admissible evidence at trial is discoverable *652 even though that information may later be ruled inadmissible.[74] Similarly, an attorney like Taylor who receives such evidence from a client may be under a duty to produce (i.e., use and disclose) such evidence if responsive to an appropriate request from an opposing party. More significantly, the evidentiary bar does not speak to an attorney's nonlitigation adversarial uses and disclosures at all.

> 72 Tex. Code Crim. Proc. art. 18A.357(a)(1). The federal wiretap statute contains a similar prohibition. 18 U.S.C. § 2515.

> 73 We emphasize, however, that the defense does not permit attorneys who, for example, make bad-faith arguments for admissibility or intentional misrepresentations to a court to escape sanction or disciplinary action if appropriate.

> 74 *See* Tex. R. Civ. P. 192.3(a).

Second, like other rules of evidence, this statute governs what a trial court may receive into evidence—*not* what an attorney may seek to have admitted.[75] In other words, it decrees what a court may do, not what an attorney may do. Declaring intercepted communications and evidence derived therefrom inadmissible is not clearly incompatible with the attorney-immunity defense because this evidentiary limitation does not comprehensively address the duties or conduct of a lawyer in the representation of a client and instead speaks only to a narrow type of attorney conduct.

> 75 *See* Tex. Code Crim. Proc. art. 18A.357(a)(1) ("The contents of an intercepted communication and evidence derived from the communication *may be received* in evidence in any trial, hearing, or other proceeding in or before any court ... *unless* ... the communication was intercepted in violation of this chapter, Section 16.02, Penal Code, or federal law[.]" (emphases added)).

Indeed, the statute includes no provision that is inherently adverse to immunizing attorneys from civil liability for their legal work on behalf of their clients. In *Troice v. Greenberg Traurig, L.L.P.* , the Fifth Circuit came to a similar conclusion in determining that the Texas Securities Act (TSA) did not abrogate the attorney-immunity defense.[76] The court explained that (1) the TSA "contains no explicit abrogation of immunity";[77] (2) attorney immunity has been applied to bar claims under other statutes;[78] and (3) the TSA's purposes would not be so clearly impeded if attorneys "are immunized while they work within the scope of their representation of clients" that courts could be

"*sure* that the Texas Legislature intended to abrogate attorney immunity in the context of TSA claims."[79] Each of these rationales supports application of the attorney-immunity defense to civil claims under the state wiretap statute. Because nothing in the Texas wiretap statute demonstrates clear legislative intent to preclude attorney immunity,[80] the common-law defense applies, and Taylor is immune from civil liability under that statute.

76  921 F.3d 501, 507-08 (5th Cir. 2019) (holding that the Texas Securities Act did not abrogate the attorney-immunity defense because the Act was not explicit in doing so and because giving effect to the defense would not impede the statute's purpose).

77  *Id.* at 508.

78  *Id.*

79  *Id.*

80  *See Forest Oil* , 518 S.W.3d at 428 ; *see also Energy Serv.* , 236 S.W.3d at 194.

That does not mean that all conduct criminalized by the wiretap statute is immunized from civil liability or free of consequences. As we explained in *Bethel* , while criminal conduct is not categorically excepted from the attorney-immunity defense, neither is it categorically immunized by that defense.[81] Criminal conduct may fall outside the scope of attorney immunity,[82] and even when it does not, "nothing in our attorney-immunity jurisprudence affects an attorney's potential criminal liability if the conduct constitutes *653 a criminal offense."[83] After all, "attorney immunity is not boundless."[84]

81  *Bethel* , 595 S.W.3d at 658 (citations omitted).

82  *Id.*

83  *Id.*

84  *Id.* at 657. As we have explained, attorney immunity applies only to lawyerly work that lawyers undertake to discharge their professional duties in connection with representation of a client. Our precedent identifies "several nonexhaustive examples of [wrongful] conduct that may fall outside the reach of the attorney-immunity defense," for failure to meet one or more of these requirements, including (1) "participat[ing] in a fraudulent business scheme with a client"; (2) "knowingly helping a client with a fraudulent transfer" so that client can "avoid paying a judgment"; (3) "theft of goods or services on a client's behalf"; and (4) "assaulting opposing counsel during trial." *Youngkin* , 546 S.W.3d at 682-83.

In that vein, we note that Robbins has not pleaded facts implicating Taylor in the alleged interception, either through action or advice. Our holding today does not foreclose the possibility that such conduct might fall outside the scope of attorney immunity. But as those facts are not before us, we need not and do not express any opinion on the matter. In this case, all of Taylor's alleged conduct is covered by the attorney-immunity defense because it was within the scope of her representation of Broome and within her attorney function. She is therefore immune from liability under the Texas wiretap statute.

This conclusion does not, however, compel the same outcome with respect to the federal wiretap statute, which must be construed according to its own terms and in light of how federal courts would resolve the immunity question.

## D. Federal Wiretap Statute

Taylor argues that Texas's common-law attorney-immunity defense applies to claims under the federal wiretap statute because "Congress legislates against a background of common-law adjudicatory principles,"[85] and courts should assume that Congress enacted the federal wiretap statute with the expectation that common-law

Taylor v. Tesbon-Tebbutt, 664 F.4d 123 (N.A. Cit ... 2023)

defenses will operate unless a statutory purpose to the contrary is evident.[86] We conclude that attorney immunity, as recognized and defined under Texas law, is not a defense under the federal wiretap statute because, quite simply, a state's common-law defense does not apply to federal statutes.[87] Further considerations that support our conclusion include (1) the federal statute's plain language, (2) federal authority declining to recognize extra-statutory defenses and immunities, and (3) Taylor's failure to identify a federal common-law defense that aligns with Texas's attorney-immunity defense that federal courts are likely to apply notwithstanding the statute's plain language.

[85] *Blevins v. Hudson & Keyse, Inc.* , 395 F. Supp. 2d 655, 659 (S.D. Ohio 2004).

[86] *E.g., Astoria Fed. Sav. & Loan Ass'n v. Solimino* , 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ("[W]here a common-law principle is well-established, ... the courts may take it as given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.' " (citations omitted) (quoting *Isbrandtsen Co. v. Johnson* , 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952) )).

[87] *Cf. Union Pac. R.R. Co. v. Nami* , 498 S.W.3d 890, 895 (Tex. 2016) (holding that a defense derived from general common law, not Texas common law, applied to the Federal Employers' Liability Act).

When interpreting a federal statute, including whether it has abrogated certain affirmative defenses, we endeavor to "anticipate how the U.S. Supreme Court would decide the issue," and " [t]his analysis often draws on the precedents of other federal courts ... to determine the appropriate answer."[88] In considering the existence or parameters of a common-law defense that may

apply to a federal statute, we also "look to the common law, not of Texas or any particular jurisdiction, but in general."[89]

[88] *In re Morgan Stanley & Co.* , 293 S.W.3d 182, 189 (Tex. 2009) ; *see also In re Facebook, Inc.* , 625 S.W.3d 80, 87 (Tex. 2021) ("When interpreting a federal statute, this Court generally follows the decisions of the U.S. Supreme Court.").

[89] *Nami* , 498 S.W.3d at 895.

Federal authority on the specific question of whether some version of attorney immunity applies to the federal wiretap statute is thin. Although federal courts have held that government attorneys are absolutely immune from suit under 42 U.S.C. § 1983,[90] we have not found another statutory civil action to which a federal court has applied any form of common-law attorney immunity.

[90] *Imbler v. Pachtman* , 424 U.S. 409, 423-24, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) ; *see Barrett v. United States* , 798 F.2d 565, 571-73 (2d Cir. 1986) (holding that absolute immunity also extends to state litigators in civil cases even if they are defending, rather than prosecuting, a case).

Moreover, when federal courts use the term "attorney immunity," they are not necessarily talking about Texas's particular brand of attorney immunity. Courts have assigned the "attorney immunity" appellation to defenses that substantively differ from one another.[91] In its most common usage, the immunity more or less equates to what is known in Texas as the judicial-proceedings privilege, which protects " [c]ommunications in the due course of a judicial proceeding" from "serv[ing] as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made."[92] The privilege's parameters are both broader and narrower than the attorney-immunity defense because the privilege covers "any statement made by the judge, jurors, counsel, parties[,] or

witnesses" and "attaches to all aspects of the proceedings,"[93] but it is also limited to "liability for spoken or written words" (as opposed to a broad category of "actions" or "conduct") and is inapplicable outside the judicial proceeding.[94] Nearly all states recognize this variety of "absolute immunity for lawyers … with 'very little variation' from state to state."[95] It is just known by other names in other states.[96] In the federal cases Robbins *655 cites as rejecting attorney immunity under the federal wiretap statute, the litigants had asked the court to adopt other states' versions of the judicial-proceedings privilege, referred to in those cases by variations on the phrase "attorney immunity."[97] But because, under Texas law, the judicial-proceedings privilege is distinct from attorney immunity, those cases are not strictly applicable here.[98]

91   *E.g., Nix v. O'Malley* , 160 F.3d 343, 352-53 (6th Cir. 1998) (using the term "attorney immunity" to refer to what Texas courts call the judicial-proceedings privilege—a substantively different defense).

92   *Landry's* , 631 S.W.3d at 46 (quoting *James v. Brown* , 637 S.W.2d 914, 916 (Tex. 1982) ); *see also* Restatement (Second) of Torts § 586 ( Am. L. Inst. 1977) ("An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.").

93   *James* , 637 S.W.2d at 916-17.

94   *Landry's* , 631 S.W.3d at 51.

95   T. Leigh Anenson, *Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers* , 31 Pepp. L. Rev. 915, 917-18 (2004) (quoting Paul T. Hayden, *Reconsidering the Litigator's Absolute*

*Privilege to Defame* , 54 Ohio St. L.J. 985, 991-92 n.37 (1993) ); *see Simms v. Seaman* , 308 Conn. 523, 69 A.3d 880, 886-87 (2013) ("The principle that defamatory statements by attorneys during judicial proceedings are absolutely privileged when they are pertinent and material to the controversy is now well established in American jurisprudence."); Restatement (Second) of Torts § 586 ( Am. L. Inst. 1977).

96   *See, e.g., Simms* , 69 A.3d at 881 & n.1 ("litigation privilege"); *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole* , 950 So. 2d 380, 380 & 383 (Fla. 2007) ("litigation privilege"); *Kirschstein v. Haynes* , 788 P.2d 941, 948-54 (Okla. 1990), *superseded on other grounds by rule* , Okla. Sup. Ct. R. 1.26 ("absolute privilege"); *Surace v. Wuliger* , 25 Ohio St.3d 229, 495 N.E.2d 939, 942-43 (1986) ("absolute privilege in judicial proceedings").

97   *E.g., Nix* , 160 F.3d at 352-53 ; *Babb* , 616 F. Supp. 2d at 1207-08 ; *see also Lewton v. Divingnzzo* , 772 F. Supp. 2d 1046, 1057 (D. Neb. 2011) (citing *Babb* , 616 F. Supp. 2d at 1207, and *Nix* , 160 F.3d at 352-53 ) ("[T]he court was unable to find any binding authority holding that an attorney who uses a communication intercepted in violation of the federal Wiretap Act is entitled to blanket immunity from Title III liability. The court did find persuasive authority to the contrary.").

98   "The 'judicial-proceedings privilege' and 'attorney immunity' are 'independent [defenses] serving independent purposes.' " *Landry's* , 631 S.W.3d at 46 (alteration in original) (quoting *Cantey Hanger* , 467 S.W.3d at 485 n.12 ); *see id.* at 46-47 (detailing the differences between the two defenses).

Even so, these cases, along with others, provide a strong basis for concluding that federal courts would be unlikely to apply Texas's attorney-

immunity defense to the federal wiretap statute. Although we have found nothing on point, federal courts are nearly uniform in declining to adopt extra-statutory exceptions and refusing to apply state common-law defenses, such as the judicial-proceedings privilege and interspousal immunity.[99] Admittedly, there are few cases on the topic, but the reasons the courts have offered are straightforward.

99 *Glazner v. Glazner* , 347 F.3d 1212, 1214-16 (11th Cir. 2003) ; *Kempf v. Kempf* , 868 F.2d 970, 972-73 (8th Cir. 1989) ; *Pritchard v. Pritchard* , 732 F.2d 372, 373-74 (4th Cir. 1984) ; *Lewton* , 772 F. Supp. 2d at 1057 ; *Babb* , 616 F. Supp. 2d at 1207-08 ; *Gill v. Willer* , 482 F. Supp. 776, 778 (W.D.N.Y. 1980) ; *Remington v. Remington* , 393 F. Supp. 898, 901-02 (E.D. Pa. 1975) ; *accord Ex parte O'Daniel* , 515 So. 2d 1250, 1253 (Ala. 1987) ; *see also United States v. Jones* , 542 F.2d 661, 667-73 (6th Cir. 1976) ; *Pyankovska v. Abid* , No. 2:16-CV-2942 JCM (PAL), 2017 WL 5505037, at *4 (D. Nev. Nov. 16, 2017) (applying *Babb* , 616 F. Supp. 2d at 1207 ); *compare Nix* , 160 F.3d at 350-53 (stating no implied statutory immunity "has a breadth equal to that of the common-law defamation privilege" and declining to adopt such immunity because (1) "th[e] proposed immunity contravenes the [statute's] plain language," which requires exceptions to be explicit and (2) the disclosures that occurred "exceed[ed] the boundaries of any attorney immunity because [they] were tangential to [the client's] defense," while at the same time (a) acknowledging that the circuit court had previously recognized "very narrow[ ]" "unwritten exceptions" and (b) adopting a narrow "defense exception" that offers defendants a limited privilege to use and disclose communications in defense of a wiretapping lawsuit).

First, the statute applies to "any person" "*[e]xcept as otherwise specifically provided* " in the statute.[100] This exclusivity language makes the terms of the federal statute materially different from the Texas statute. Based on this "plain and explicit" and "clear and unambiguous" language, federal courts have rejected exceptions and immunities that are not specifically enumerated in the statute.[101] Further, as federal courts have noted, the United *656 States Supreme Court has generally stated that "the purpose of the Act is to effectively prohibit 'all interceptions of oral and wire communications, except those specifically provided for[.]' "[102]

656

100 18 U.S.C. § 2511(1) (emphasis added).

101 *Kratz v. Kratz* , 477 F. Supp. 463, 467 (E.D. Pa. 1979) ("The clear and unambiguous meaning of [section] 2511(1)(a) is to prohibit the interception of All wire communications by Any person *except as Specifically provided by Congress.* " (emphasis added)); *see Heggy v. Heggy* , 944 F.2d 1537, 1540 (10th Cir. 1991) (concluding the federal wiretap statute does not exempt interspousal interception, use, or disclosure based on the statute's express language requiring an exception to be "specifically" articulated in the statute; *Nix* , 160 F.3d at 350-53 (declining to adopt the defamation privilege, in part, because "this proposed immunity contravenes [the statute's] plain language"); *Jones* , 542 F.2d at 666-67 (refusing to apply an interspousal-immunity privilege as a defense to prosecution based on the "straightforward and comprehensive" language of the statute, which "quite clearly expresses a blanket prohibition on all electronic surveillance except under circumstances specifically enumerated in the statute"); *Heyman v. Heyman* , 548 F. Supp. 1041, 1045-47 (N.D. Ill. 1982) (refusing to recognize an interspousal-immunity exception and declaring the statute's language "clear" and "unambiguous" in

prohibiting any exceptions "except as specifically provided in the statute").

At least one federal court has also refused to apply a different state common-law defense—interspousal tort immunity—to the federal wiretap statute because Congress did not include the defense in far-reaching amendments. *E.g., Heggy* , 944 F.2d at 1541. "[H]ad it been the intent of Congress to keep interspousal wiretapping beyond the reach of Title III, Congress could have expressly excluded [it] when it overhauled Title III in the Electronic Communications Privacy Act of 1986[.]" *Id.* But even though those "amendments touched nearly every section of Title III, Congress did not codify the judicially created exception for interspousal wiretapping[.]" *Id.* The choice not to codify the interspousal-immunity defense in an otherwise wide-ranging statutory overhaul has been interpreted as reflective of a congressional intent to deny the defense. *See id.*

102 *See Heyman* , 548 F. Supp. at 1045 (quoting *United States v. Giordano* , 416 U.S. 505, 514, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) ).

Second, courts have explained that state law cannot modify federal law. As the Tenth Circuit succinctly put it: "The short answer to the [state common-law] immunity defense is that [the federal wiretap statute] creates a federal cause of action that cannot be barred by any state law or policy."[103] This view generally accords with our analysis in *Union Pacific Railroad Co. v. Nami* , which looked to general common-law principles, rather than the common law of Texas or any particular jurisdiction, in determining that the common-law *ferae naturae* doctrine applies to claims under the Federal Employers' Liability Act.[104]

103 *Heggy* , 944 F.2d at 1541 n.8 (discussing the interspousal-immunity defense); *see Jones* , 542 F.2d at 672 (holding that the

federal wiretap statute contains no express or implied exception for interspousal wiretaps and noting "[t]here is also substantial doubt whether a doctrine of state tort law should have any influence in defining a cause of action expressly created by federal statute, particularly when Congress could have included a similar provision in the statute and failed to do so"); *Kratz* , 477 F. Supp. at 475 ("[T]he cause of action in this case is provided by federal law and cannot be subverted by any state law or policy.").

104 498 S.W.3d at 895-99.

While there is a dearth of federal cases on the precise issue presented, we think it unlikely that a federal court would apply Texas's common-law attorney-immunity defense to the federal wiretap statute if presented with the question today. Based on the statute's plain language, which requires exceptions to be explicit, we also find it unlikely that a federal court would apply a federal common-law version of our attorney-immunity defense, but to the extent that is a reasonable possibility, Taylor has not substantiated the existence or contours of any such defense. Accordingly, we hold that Taylor may not invoke Texas's attorney-immunity defense as a bar to liability under the federal wiretap statute.

## III. Conclusion

Taylor is entitled to summary judgment on Robbins's state wiretapping claims because *657 the kind of conduct alleged in support of those claims falls within the scope of the attorney-immunity defense. But Taylor is not entitled to summary judgment on Robbins's claims under the federal wiretap statute because we are not convinced that federal courts would apply Texas's common-law attorney-immunity defense to that statute. We thus affirm the court of appeals' judgment in part, reverse and render judgment in part, and remand the case to the trial court for further proceedings on the federal wiretap claims.

 casetext