## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

|                              |     |                             |
| ---------------------------- | --- | --------------------------- |
|                              | )   |                             |
| CONGHUA YAN,                 | )   |                             |
|                              | )   |                             |
| Plaintiff,                   | )   |                             |
|                              | )   |                             |
| v.                           | )   | Case No. [4:23-CV-00758-P-BJ] |
|                              | )   |                             |
| The State Bar of Texas et al, | )   |                             |
|                              | )   |                             |
| Defendant.                   | )   |                             |
| ———————————————————————————— | )   |                             |

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                                          2

INDEX OF AUTHORITIES                                                                                       3

I.      INTRODUCTION                                                                                        5

II.     STANDARD OF REVIEW                                                                                 5

III.    SUMMARY OF MOTION TO DISMISS                                                                       8

IV.     GENERAL ARGUMENTS AND AUTHORITIES                                                                  9

V.      SPECIFIC ARGUMENTS AND AUTHORITIES                                                               12

A.      Private right of action;                                                                          12

B.      Racketeering Activity;                                                                            12
   1.   Heightened pleading standard                                                                      12
   2.   U.S. Bank did violate § 664                                                                       13

C.      § 1983 under the color of law                                                                     17

D.      ERISA fiduciary breach                                                                            18
   1.   This is a void order;                                                                             18
   2.   This order is not QDRO;                                                                           20
   3.   Many flaws in Defendant's arguments;                                                              21
   4.   Plaintiff alleged a fiduciary duty breach in the determination of the "Qualified" clause, not the "alternate payee"
   clause;                                                                                                22
   5.   Not every court order is enforceable; U.S. Bank does not have an obligation;                      23
   6.   U.S. Bank failed to raise question;                                                               24
   7.   Plaintiff alleged procedure noncompliance; U.S. Bank waived the argument;                         26

E.      Dismiss with prejudice                                                                            26

F.      Other claims which U.S. Bank waived arguments                                                     28

VI.     CONCLUSION                                                                                         29

PRAYER FOR RELIEF                                                                                          29

CERTIFICATE OF SERVICE                                                                                     30

# INDEX OF AUTHORITIES

**CASES**

Araujo v. Araujo, 493 S.W.3d 232 (Tex. App. 2016) ........................................................................ 19

Bazile v. Fin. Sys. of Green Bay, Inc. 983 F.3d 274 (7th Cir. 2020) .................................................. 7

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) .......................................................... 5, 10, 11

Boggs v. Boggs, 520 U.S. 833 (1997) ............................................................................................... 26

Cicalese v. Univ. of Tex. Med Branch, 924 F.3d 762 (5th Cir. 2019) ................................................ 8

Clark v. Amoco Production Co., 794 F.2d 967 (5th Cir. 1986) ......................................................... 7

Dalton v. Dalton, 551 S.W.3d 126 (Tex. 2018) ......................................................................... 20, 24

Davis v. State, 956 S.W.2d 555 (Tex. Crim. App. 1997) .................................................................. 20

DeLoach v. Woodley, 405 F.2d 496 (5th Cir. 1968) .......................................................................... 6

Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594 (5th Cir. 1981) .................................................... 28

Firestone v. Firestone, 76 F.3d 1205 (D.C. Cir. 1996) ................................................................ 6, 27

Foman v. Davis, 371 U.S. 178 (1962) ......................................................................................... 6, 27

Gonzalez v. Firestone Tire Rubber Co., 610 F.2d 241 (5th Cir. 1980) ........................................... 27

Gray v. Fid. Acceptance Corp., 634 F.2d 226 (5th Cir. 1981). ....................................................... 27

Griffin v. Welch, No. 13-60886, 2 (5th Cir. 2014) ................................................................... 11, 29

H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989) ....................................... 16, 17

Henry v. Cullum Companies Inc., 891 S.W.2d 789 (Tex. App. 1995) ............................................. 18

Hill v. Astrue, CIVIL ACTION NO. 2:08-CV-43-P-A (N.D. Miss. Oct. 23, 2008) ................................ 5

Hitt v. City of Pasadena, 561, F.2d 606 (5th Cir. 1977) ............................................................. 6, 29

In re State ex rel. Wice, 668 S.W.3d 662 (Tex. Crim. App. 2023) ................................................... 20

KIDD v. HOWARD UNIVERSITY SCHOOL OF LAW, Case No. 06-CV-1853 (RBW) (D.D.C. Jun. 25, 2007) ..................................... 7

Kling v. Hebert, 60 F.4th 281 (5th Cir. 2023) .................................................................................. 8

Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993) ............................................. 8

Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383 (5th Cir. 2010) .......................... 8

Loring v. Nelson, No.: 3:19-cv-185 (E.D. Tenn. Dec. 19, 2019) ..................................................... 13

Lowery v. Texas A M University System, 117 F.3d 242 (5th Cir. 1997) ............................................ 5

Millan v. USAA General Indemnity Co., 546 F.3d 321 (5th Cir. 2008) ........................................... 27

Novotny v. Novotny, 665 S.W.2d 171, 173 (Tex. App. 1984) ......................................................... 19

Oki Semiconductor Co. v. Wells Fargo Bank, 298 F.3d 768 (9th Cir. 2002) .................................. 15

Ollie v. Plano Independent School Dist., 564 F.Supp.2d 658 (E.D. Tex. 2008) ................................ 5

Price v. McGlathery, 792 F.2d 472 (5th Cir. 1986). ....................................................................... 27

Priester v. Lowndes County, 354 F.3d 414 (5th Cir. 2004), ............................................................. 5

Rodriguez v. City of New York, 861 F. Supp. 1173 (S.D.N.Y. 1994) ................................................. 5

S & A Rest. Corp. v. Leal, 892 S.W.2d 855, 858 (Tex.1995) ........................................................... 19

Salinas v. United States, 522 U.S. 52 (1997) ............................................................................. 14, 17

*Salinas v. United States*, 522 U.S. 52, 64 (1997). ......................................................................... 26

Schueuer v. Rhodes, 416 U.S. 232 (1974) ........................................................................................ 5

Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985) .................................................................. 15, 16

Sparks v. Duval County Ranch Co., Inc., 604 F.2d 976 (5th Cir. 1979) ......................................... 18

Stein v. Stein, 868 S.W.2d 902, 903 n.1 (Tex. App. 1994) ............................................................. 19

U.S. v. Corrado, 227 F.3d 543 (6th Cir. 2000) ............................................................................... 15

U.S. v. Philip Morris USA Inc, 316 F. Supp. 2d 19 (D.D.C. 2004) .................................................... 15

United States ex rel. Bias v. Tangipahoa Parish School Board, 816 F.3d 315 (5th Cir. 2016) ................................. 11, 29

United States v. Turkette, 452 U.S. 576 (1981) ............................................................................... 16

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980) ......................................... 20

**STATUTES**

18 U.S.C. § 1341 ............................................................................................................................. 12

18 U.S.C. § 1343 ............................................................................................................................. 12

18 U.S.C. § 1961 ........................................................................................................................ 12, 16

18 U.S.C. § 1962(c) ................................................................................................................ 12, 17, 28

18 U.S.C. § 1962(d) .................................................................................................................... passim

18 U.S.C. § 1964 ............................................................................................................. 12, 14, 16, 28

18 U.S.C. § 2 .................................................................................................................................. 28

18 U.S.C. § 664 ......................................................................................................................... 13, 14

29 U.S.C. § 1056(d)(3)(H)(i) ........................................................................................................ 9, 23

42 U.S.C. § 1983 ......................................................................................................................... 9, 17

Rule 12(b)(1) .............................................................................................................................. 5, 8

Rule 12(b)(6) ............................................................................................................................. passim

Rule 12(e) ....................................................................................................................................... 7

Rule 15(a) ....................................................................................................................................... 6

Rule 8(a)(2) ............................................................................................................................... 8, 10

Rule 8(d) ........................................................................................................................................ 11

Rule 9(b) ......................................................................................................................................... 13

**RESPONSE/OBJECTION TO MOTION TO DISMISS**
**BY U.S. BANCORP**
**AND BRIEF IN SUPPORT**

TO THE HONORABLE JUDGE OF NORTHERN DISTRICT OF TEXAS:

COMES NOW, Plaintiff, Conghua Yan, respectfully submits this Response/Objection to Defendant's Motion to Dismiss by U.S. Bancorp, [ECF No. 126].

## I.    Introduction

1.         Defendants U.S. Bancorp (aka "U.S. Bank"), in this suit, submitted Motion to Dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(6). Unfortunately, it is a disfavored motion and is rarely granted pursuant to the Fifth Circuit's precedents.

## II.    Standard of Review

2.         The federal courts within the Fifth Circuit have held that,

> "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court **first** considers the Rule 12(b)(1) jurisdictional attack **before** addressing any attack on the merits. Ramming, 281 F.3d at 161. This requirement precludes a court without jurisdiction from dismissing a case with prejudice. Id. **A motion to dismiss under Rule 12(b)(6)** is **"viewed with disfavor and rarely granted."** *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004), citing *Lowery v. Texas A M University System*, 117 F.3d 242, 247 (5th Cir. 1997). **The complaint is liberally construed in the plaintiff's favor, and all well-pleaded facts in the complaint are taken as true**. Id. **The issue is whether the plaintiff is entitled to offer evidence to support her claim, not whether she will prevail on the claim**. Id. Although detailed factual allegations are not required, the plaintiff must supply the basis for its justification for relief. *Ollie v. Plano Independent School Dist.*, 564 F.Supp.2d 658, 660 (E.D. Tex. 2008), citing *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1969 (2007) ). Consequently, the court **will not dismiss** a claim **unless** the plaintiff will not be entitled to **any relief** under **any facts** or **possible theory** that the plaintiff could prove consistent with the allegations of the complaint. Priester, 354 F.3d at 418." *Hill v. Astrue*, CIVIL ACTION NO. 2:08-CV-43-P-A, 2-3 (N.D. Miss. Oct. 23, 2008).

3.         The federal courts within the other Circuits also have held that,

> "See *Schueuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (claim **should not be dismissed** without leave to amend **unless** it is **clear** that there is **no** basis for relief)." *Rodriguez v. City of New York*, 861 F. Supp. 1173, 1186 (S.D.N.Y. 1994).

4.     A complaint **should only be dismissed** under Federal Rule 12(b)(6) **after** affording **ample** opportunity for Plaintiff to state a claim upon which relief can be granted, **unless** it is clear amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Hitt v. City of Pasadena*, 561, F.2d 606, 608–09 (5th Cir. 1977); *DeLoach v. Woodley*, 405 F.2d 496–97 (5th Cir. 1968). Consequently, when it appears a more careful or detailed drafting might overcome the deficiencies on which dismissal is sought, a court **must allow** a plaintiff the opportunity to **amend** the Complaint. *Hitt*, 561 F.2d at 608–09. A court may appropriately dismiss an action with prejudice without giving an opportunity to amend if it finds Plaintiff alleged his best case or if amendment would be futile. *Foman*, 371 U.S. at 182; *DeLoach*, 405 F.2d at 496–97.

5.     This standard is concurred with by numerous federal courts within the other Circuits, which have stated that,

> "Rule 15(a) of the Federal Rules of Civil Procedure instructs that when permission to file a pleading must be obtained from the Court, "**leave shall be freely given when justice so requires**." (emphasis added). While the court has sole discretion to grant or deny a request for leave to amend, unless there is a reason for not doing so, such as undue delay, bad faith, dilatory tactics, repeated failure to cure deficiencies, or undue prejudice to the opposing party, "**the leave sought should . . . be 'freely given.'**" Foman v. Davis, 371 U.S. 178, 182 (1962) (quoting Fed.R.Civ.P. 15(a)); see also Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (acknowledging that **it is an abuse of discretion for a district court to deny leave to amend absent a sufficient reason**). The rationale behind this liberal granting of leave to amend a complaint is that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, [s]he ought to be afforded an opportunity to test h[er] claim on the merits." Foman, 371 U.S. at 182. Moreover, **consideration must be given to the fact that the plaintiff in this case is proceeding pro se**. The practice of freely giving leave to amend is particularly appropriate in the circumstance of pro se litigants. See Wyant v. Crittenden, 113 F.2d 170, 175 (D.C. Cir. 1940). "Pro se litigants are afforded more latitude than litigants represented by counsel to correct defects in . . . pleadings" and pro se litigants should be given at least minimal notice of the pleading requirements. Moore v. Agency for Int'l. Dev., 994 F.2d 874, 876-77 (D.C. Cir. 1993) (citing Haines v. Kerner, 404 U.S. 519, 520 (1972)); see also Lindsey v. United States, 448 F. Supp. 2d 37, 46-47 (D.D.C. 2006) (Walton, J.) (citing Moore and agreeing that district courts should provide pro se litigants with minimal notice of pleading requirements); Hisler v. Gallaudet Univ., 206 F.R.D. 11, 14 (D.D.C. 2002) (acknowledging **the policy that "an added measure of leniency is extended to pro se litigants [with respect to] procedural requirements**") (citations omitted). The principles set forth in Moore are instructive here. InMoore, the pro se plaintiff conceded that his complaint did not meet the heightened pleading requirement for overcoming a claim of qualified immunity, but argued that the district court should have alerted him to the defects and allowed him to amend his complaint. 994 F.2d at 876. The Circuit Court held that "[b]ecause **there is no indication that any of the defendants would have been prejudiced** . . ., the district court should have permitted Moore to amend his complaint." Id. at 877-78. Indeed, it is the

**Court's duty** to **inform** the plaintiff of the consequences of not adhering to procedural requirements, although the Court appreciates that this assistance does not permit a pro se plaintiff to ignore the Federal Rules of Civil Procedure. Moore, 944 F.2d at 876; see also Calloway v. Brownlee, 366 F. Supp. 2d 43, 55 (D.D.C. 2005) (Walton, J.) (holding that the Court "**must take pains** to **protect the rights of pro se parties against the consequences of technical errors**"); Hisler, 206 F.R.D. at 14." *KIDD v. HOWARD UNIVERSITY SCHOOL OF LAW*, Case No. 06-CV-1853 (RBW), 2-4 (D.D.C. Jun. 25, 2007).

6.      The Fifth Circuit emphasized this standard clearly again, stated that,

"[W]e **must** adhere to the rigid Rule 12(b)(6) standard. We **must** construe appellants' complaint in the light most favorable to them and take all the allegations contained therein as true. […] A case **should not** be dismissed pursuant to Rule 12(b)(6) "**unless** it appears **beyond doubt** that the plaintiff can prove **no set of facts in support of his claim which would entitle him to relief**." […] Although Rule 12(b)(6) is a powerful tool to use in expediting the judicial process and excising court calendars of cases in which there are no judicially cognizable claims, **it is a disfavored motion and is rarely granted**. Sosa v. Coleman, 646 F.2d 991, 993 (5th Cir. 1981). Rule 12(b)(6) **should not be used** as a substitute for a request for a more definite pleading within the meaning of Fed.R.Civ.P. 8 [**this is a typographical error, the ruling in Sisk says "the proper remedy is a motion for a more definite statement under Rule 12(e) rather than dismissal", Sisk did not mean Rule 8**]. Sisk v. Texas Parks Wildlife Dept., 644 F.2d 1056, 1059 (5th Cir. 1981). Nor is a Rule 12(b)(6) dismissal **warranted** because the district court **believes** the plaintiff **is unlikely to prevail** on the merits. Scheuer, 416 U.S. at 236, 94 S.Ct. at 1686. **Even if it seems** "almost a certainty to the court that the facts alleged cannot be proved to support the legal claim," **the claim may not be dismissed so long as the complaint states a claim.** Boudeloche v. Grow Chemical Coatings Corp., 728 F.2d 759, 762 (5th Cir. 1984). To qualify for dismissal under Rule 12(b)(6), a complaint **must** on its face show a **bar** to relief. United States v. Uvalde Consolidated Independent School District, 625 F.2d 547, 549 (5th Cir. 1980), cert. denied, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858 (1981)." (emphasis added and omitted), *Clark v. Amoco Production Co.*, 794 F.2d 967, 970 (5th Cir. 1986).

7.      To survive a Federal Rule 12(b)(6) motion,

"See Bell Atlantic v. Twombly , 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (A complaint "does not need detailed factual allegations" but rather "**enough fact** to raise a reasonable expectation that *discovery* will reveal evidence of [a necessary element].") True, her complaint didn't detail such an injury. But "[c]omplaints need not be elaborate." *Aker* , 854 F.3d at 399–400 (quoting S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc. , 274 F.3d 1168, 1171 (7th Cir. 2001) )." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274 (7th Cir. 2020).

8.      "Therefore, the Court's task is to identify the elements of a cause of action and then determine whether Plaintiff pled sufficient factual allegations in support of the asserted elements to

state a plausible claim, and thereby, survive a motion to dismiss." *Cicalese v. Univ. of Tex. Med Branch*, 924 F.3d 762, 766–67 (5th Cir. 2019).

9.       It was exactly in Tarrant County, 30 years ago, SCOTUS has ruled a landmarking opinion about what Rule 8(a)(2) stands in a pleading, "Rule 8(a)(2) requires that a complaint include **only** "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Conley v. Gibson*, 355 U.S. 41 (1957), we said in effect that **the Rule meant what it said**:

> "[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant *fair notice* of what Plaintiff's claim is and the grounds upon which it rests." *Id*., at 47 (footnote omitted)."
> *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163,

168 (1993).  Leatherman v. Tarrant County was citied 2000 times in various opinions.

10.       For purposes of deciding a motion to dismiss under Rule 12(b)(6) of the FRCP, the Court **must** assume that the facts alleged in the complaint are **true** and construe them **in the light most favorable to Plaintiff**. *Twombly,* 550 U.S. at 555. For its Rule 12(b)(6) review, the Court may examine the complaint, documents attached to the complaint, and documents attached to the motion to dismiss that are central to Plaintiff's claims and referenced in the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). A Rule 12(b)(1) factual attack on the court's subject matter jurisdiction may be based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Kling v. Hebert*, 60 F.4th 281, 284 (5th Cir. 2023).

### III.    Summary of Motion to Dismiss

11.       In the Motion to Dismiss, Defendant's counsel seeks dismissal under FRCP *Rule 12(b)(6)* dismissal for any of all of five reasons,

    A.  Rule 12(b)(6)

        1.  Criminal statute does not provide for a private right of action;

        2.  No factual basis constituting "Racketeering Activity";

            a.  Heightened pleading standard

      b.  U.S. Bank did not violate § 664

    3.  Failed to allege under the color of law;

    4.  Fails to state an ERISA fiduciary breach claim under 29 U.S.C. § 1056(d)(3)(H)(i);

    5.  Dismissed With Prejudice;

12.     Plaintiff will rebut Defendants' argument in following orders:

    General arguments

A.  Private right of action;

B.  Racketeering Activity;

    1.  Heightened pleading standard;

    2.  U.S. Bank did violate § 664;

C.  § 1983 under the color of law;

D.  ERISA fiduciary breach;

E.  Dismiss with prejudice;

F.  Other claims which U.S. Bank waived arguments.

### IV.    General Arguments and Authorities

13.     The Defendant's counsel seems to have some misunderstandings. The Motion to Dismiss under FRCP *Rule 12(b)(6)* should not be used as a substitute for a request for a More Definite pleading within the meaning of FRCP *Rule 12(e)*. Several of the arguments presented veer off track; the Defendant's counsel's argument points do not align with what Plaintiff alleged, and they have either intentionally or erroneously ignored the actual allegation. If the Defendant's counsel had difficulty understanding Plaintiff's writing, originating from a non-native English speaker and a first-time pro se litigant, they should have filed a motion for a more definite statement.

14.     The Defendant's counsel also seems to be confused between a motion to dismiss under FRCP *Rule 12(b)(6)* and a motion for summary judgement.

15.     At this pleading stage, the U.S. Supreme Court has emphasized that, "Federal Rule of Civil Procedure 8(a)(2) requires *only* "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant *fair notice* of what the . . . claim is and the grounds upon which it rests," Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99. [While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." (emphasis added) *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleading is for *fair notice* purpose, Plaintiff does not need to argue detailed factual allegations which is an action belongs to the post-discovery, and at motion for summary judgement stage.

16.     The Supreme Court of the United States emphasized the terms "only" and "fair notice" deliberately, as evidenced by their reiteration in a subsequent paragraph, stating that,

> "their main argument against the plausibility standard at the pleading stage is its ostensible *conflict with an early statement of ours construing Rule 8*. Justice Black's opinion for the Court in Conley v. Gibson spoke *not only of the need for **fair notice** of the grounds for entitlement to relief but* of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can *prove no set of facts* in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S. Ct. 99. This "*no set of facts*" language can be read in isolation as saying that *any* statement revealing the theory of the claim will *suffice* unless its factual impossibility may be shown from the face of the pleadings;[…] On such a focused and *literal reading* of Conley's "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss *whenever* the pleadings left open the *possibility* that a plaintiff *might* later establish some "set of [undisclosed] facts" to support recovery." (emphasis added and omitted)

> *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560-61 (2007).

17.     The Supreme Court of the United States further stated that, "once a claim for relief has been *stated*, a plaintiff "receives *the benefit of imagination*, so long as the hypotheses are consistent with the complaint"[…] Conley, then, described the ***breadth* of opportunity** to prove what an adequate complaint claims, *not the minimum standard* of adequate pleading to govern a complaint's survival)" (emphasis added), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007).

18.     To succeed in a motion to dismiss, U.S. Bank must meet the Rule 12(b)(6) requirements by proving that all allegations, under any possible theory, do not hold any merit, without missing a single allegation, relief or possible theory. U.S. Bank carries the burden to establish a heightened

impossibility standard to succeed their motion to dismiss. They merely asserted that their agreement points are more plausible, which is not true either.

19.     After all, ""Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"[…] A well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"." (emphasis added and omitted), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

20.     As the Fifth Circuit held that, "The court's inquiry should focus on the complaint **as a whole**, **regardless of how much** of it is discussed in the motion to dismiss. Dismissal is improper if the allegations support relief on **any possible theory**." *United States ex rel. Bias v. Tangipahoa Parish School Board*, 816 F.3d 315, 321 (5th Cir. 2016) (internal citations omitted).

21.     The Fifth Circuit applies following standard when reviewing motion to dismiss under *Rule 12(b)(6)*, "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" "Thus, the court should not dismiss [a] claim unless the plaintiff would not be entitled to relief **under any set of facts** or **any possible theory** that [it] could prove consistent with the allegations in the complaint." *Griffin v. Welch*, No. 13-60886, 2 (5th Cir. 2014).

22.     At the pleading state, U.S. Bank needs to prove that all of Plaintiff's pleading are impossible, not by merely arguing some of Plaintiff's pleading is not sufficiently plausible, but missed others. Plaintiff argues that Defendant's Motion to Dismiss is insufficient and ineffective.

23.     Defendant's counsel argued that "In fact, the Complaint claims that U.S. Bank was the victim—not the perpetrator—of a fraud allegedly committed by co-Defendants. See Compl. ¶¶ 73, 107". This argument is not sound, because FRCP *Rule 8(d)* allows alternative and/or inconsistency statement. U.S. Bank can be a victim or co-conspirator, but Plaintiff's claim does not have to be consistent.  Defendant's counsel should focus on the allegations in their client's own 5 pages claim.

24.     However, this argument highlights the essential need for antitrust action against the State Bar of Texas members, recognized as a RICO enterprise. Should their representation of clients be genuinely zealous and their belief in the client's victim role theory sincere, filing a cross-claim would naturally follow to align with their client's best interests? However, this was not the case, as their dual responsibilities - billing clients and shielding fellow union members - take precedence. The defense of "zealousness" conveniently arises only when they are implicated in fraudulent activities, never truly

benefiting the client. Ultimately, monetary gain is the primary motive. This inaction in filing a cross-claim against Barrows constitutes a tacit admission that their client is not innocent.

25.     It is implausible to Plaintiff that a leading U.S. firm would have overlooked this legal strategy. A fundamental, albeit unspoken, principle in Texas's legal sector is that lawyers safeguard their own.

## V.     Specific Arguments and Authorities

### A.  Private right of action;

26.     The allegations related to the U.S. Bank, "Nineth Claim for Relief", is merely 5 pages pleading. If Defendant's counsel read it thoroughly, they should see that Plaintiff sought relief under *18 U.S.C. § 1964*, and Plaintiff alleged "These acts constituted the contravention of *18 U.S.C. § 1962(c)(d)*." That is sufficient.

27.     Defendant's counsel should focus on what Plaintiff has alleged, instead of raising imaginary arguments about what Plaintiff never alleged. Plaintiff merely cited these acts as predicate criminal acts under *18 U.S.C. § 1961*, and never sought a civil cause of action separately.

28.     To succeed a Motion to Dismiss, Defendant's counsel should focus on essential allegation *§ 1961*, instead of making pointless argument.

29.     Plaintiff can survive this Motion to Dismiss, because his *§ 1964* civil cause of action arising from *§ 1961*. The Defendant waived the right to argue *§ 1961*, as it was never mentioned in their "Private Right of Action" argument section.

### B.  Racketeering Activity;

#### 1.  Heightened pleading standard

30.     Defendant argued that § 1341 and § 1343 are fraud-based predicate crimes, thus subject to a heightened pleading standard requiring the provision of the "who, what, when, where, and how" of the alleged fraud. Defendant pointed out that the statement "Between April and September 2022" falls short of satisfying this heightened standard. If this could be the deficiency, then Plaintiff can clearly amend the complaint to specify the dates by stating "On May 25, June 8, June 13, June 16, June 20, July 20, August 1, August 5, August 29, and August 30, U.S. Bank conspired with Leslie

Barrows to jointly commit their § 1341 and § 1343 offenses. Each wire communication they had served to further the § 664 predicate act." Plaintiff does not believe that U.S. Bank could have a sound argument position by stating "Any further amendment of Plaintiff's *third* amended pleading would be futile."

31.     Defendant further argued that "changed Plaintiff's marital status from 'married' to 'single' in their system" "was done in error." However, Plaintiff never alleged that it "was done in error." Plaintiff asserted that this change was made without his knowledge, and it was a sua sponte action undertaken in conspiracy. Whether it is post-divorce or pre-divorce is a key element in determining the lawfulness of the DRO, none of the garnishment orders mentioned that Plaintiff was divorced. After diverting funds from Plaintiff's 401(k) account, U.S. Bank became aware that the interlocutory order was unlawful. Consequently, it breached its fiduciary duty and engaged in further conspiratorial actions to conceal its tracks.

32.     "Rule 9(b)'s heightened pleading standard applies to RICO claims that involve allegations of fraud, but **Rule 8 notice pleading** remains the standard for **non-fraud RICO predicate offenses**. See, e.g., *Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017) (applying Rule 9(b) to predicate acts of **wire**, **mail**, and **bank fraud**); *Dowling v. Select Portfolio Servicing, Inc.*, No. 2:03-CV-049, 2006 WL 571895, at * 9 (S.D. Ohio Mar. 7, 2006) (**declining** to apply heightened pleading standard to **RICO conspiracy** claims); *Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002) (explaining the particularity requirement applies **only** to RICO acts predicated upon fraud)." *Loring v. Nelson*, No.: 3:19-cv-185, 3 (E.D. Tenn. Dec. 19, 2019). Plaintiff had alleged *§ 1962(d)* **RICO conspiracy** claims under predicate offense of *18 U.S.C. § 664*, Defendant has waived the argument.

33.     Plaintiff has **presented** all relevant email evidence and court orders as Exhibits to **sufficiently detail** the **time, place, and content** of the alleged fraudulent misrepresentations. Therefore, Plaintiff's allegations met the heightened pleading standard.

### 2.   U.S. Bank did violate § 664

34.     Defendant's counsel argued that "actions undertaken by U.S. Bank were required by the Plan's QDRO procedures. Supra § II, A. Complying with obligations under a lawful ERISA plan" "Fall Woefully Short Of Plausibly Alleging A Violation Of 18 U.S.C. § 664." Unfortunately, it is Defendant who falls woefully short of arguing the "unlawfully" element of the *18 U.S.C. § 664* offense.

35.     "[A]ctions undertaken by U.S. Bank were required by the Plan's QDRO procedures" only come into play when the prerequisites of a "QDRO" is met. If the order itself is unlawful, as ruled by the Texas Supreme Court, and if the order's deficiencies have been clearly pointed out by Plaintiff, then any further action undertaken by U.S. Bank meets the "unlawfully and willfully" element of the *18 U.S.C. § 664* offense.

36.     Plaintiff has presented arguments in section IV "General Arguments…Congress's Intention" of this document. SCOTUS has upheld several rulings based on Congress' intention, RICO is to "be liberally construed to **effectuate its remedial purposes**", "two predicates **would be necessary**", no "**narrower boundary**", no "**pinched construction** of RICO's provision for a private civil action, adopted by a **lower court**", **"**decision not explicitly to limit RICO's broad terms", "**no such narrow and fixed idea** of what constitutes a pattern", "**narrow readings would in effect eliminate § 1964(c)**", "**no room** in the statutory language for an additional, amorphous … requirement" Most importantly, SCOTUS stated, "**the plaintiff has a claim under § 1964(c)" "**to maintain a private action" with "**an** injury resulting from the predicate **acts** themselves."

37.     Plaintiff had an injury, resulting from the predicate acts (mail fraud, wire fraud and *18 U.S.C. § 664*, it is sufficient for Plaintiff to have a claim under § 1964(c) to maintain a private action.

38.     In *Salinas v. United States*, 522 U.S. 52, 61-66 (1997), the Supreme Court resolved a split in the circuits and held that there is **no requirement** that the defendant himself committed or agreed to commit the two predicate acts. Rather, the Court in *Salinas* stated that a conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of the substantive criminal offense. Id. at 63-65. The government or a private civil RICO plaintiff **need not** establish that each conspirator explicitly agreed with every other conspirator to commit the substantive offense; it is **only** required that the defendant know the general nature of the conspiracy and the conspiracy extends beyond his individual role. Under the rationale of *Salinas*, every circuit court to address the issue has stated that a defendant may be liable for a conspiracy to violate RICO even if he is not among the class of persons who could commit the substantive RICO offense.

39.     There are three types of concealments which are as follows:

- Active concealment: The non-disclosure by words or actions in a situation where there is a positive duty on the person to disclose something.

- Fraudulent concealment: The concealment where the person conceals something with the intent to deceive or defraud the other party.

- Passive concealment: The act of silence in a situation where the person had a duty to speak and disclose relevant information.

40.     Altering Plaintiff's marriage statue from "married" to "divorced" is active and fraudulent concealment. As of today, U.S. Bank's inaction of filing a cross-claim against Leslie Barrows constitutes a passive concealment. So did the inaction of Tarrant County DA office and the State Bar.

41.     SCOTIS has made it clear, "RICO takes aim at "racketeering activity," which it defines as **any act** "**chargeable**" under several generically described state criminal laws, **any act "indictable"** under numerous specific federal criminal provisions, including mail and wire fraud," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481 (1985).

42.     "**Every circuit in the country** that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires **imposition of joint and several liability** because all defendants participate in the enterprise responsible for the RICO violations. See *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 775 (9th Cir. 2002) ("[h]olding RICO conspirators jointly and severally liable for the acts of their co-conspirators reflects the notion that the damage wrought by the conspiracy is not to be judged by dismembering it and viewing its **separate parts**, but only by looking at it **as a whole**"); *U.S. v. Corrado*, 227 F.3d 543, 553 (6th Cir. 2000) (finding that "joint and several liability is **not only consistent** with the statutory scheme [of RICO] **but** in some cases will be **necessary** to achieve the aims of the legislation" because the "entire scheme would not have succeeded without the support of [the] enterprise")." *U.S. v. Philip Morris USA Inc*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004).

43.     Defendant's counsel argued that a "pattern of racketeering activity" requires demonstrating that the defendant engaged in at least "two or more predicate criminal acts." They contend that the actions of U.S. Bank do not constitute "racketeering activities." Defendant's counsel really needs to read the pleading thoroughly. U.S. Bank was alleged as a person, not an enterprise, therefore, U.S. Bank's separate predicate criminal acts are not viewed individually in a RICO scheme, they are considered collectively alongside the predicate criminal acts of other conspirators. The entire scheme would not have succeeded without the support of U.S. Bank.

44.     "RICO was an **aggressive** initiative to supplement old remedies and develop **new** methods for fighting crime." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985). "We **nonetheless recognize** that, in its **private** civil version, RICO is evolving into something quite

different from the original conception of its enactors." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 500 (1985). "The "extraordinary" uses to which civil RICO has been put appear to be primarily the result of the **breadth of the predicate offenses**, in particular the **inclusion of wire, mail**, and securities fraud." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 500 (1985) .

45.     "Instead of being used against mobsters and organized criminals, it has become a tool for **everyday fraud cases** brought against "**respected and legitimate** `enterprises.'" Ibid. Yet Congress **wanted to reach both** "**legitimate**" and "illegitimate" enterprises. United States v. Turkette, supra. The former enjoy **neither an inherent incapacity** for criminal activity **nor immunity** from its **consequences**. …"[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates **breadth**." Haroco, Inc. v. American National Bank Trust Co. of Chicago, supra, at 398." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985). "RICO is to be **read broadly**. This is the lesson not only of Congress' self-consciously expansive language and overall approach, see United States v. Turkette, 452 U.S. 576, 586-587 (1981), but also of its express admonition that RICO is to "be **liberally construed** to **effectuate its remedial purposes**," Pub.L. 91-452, § 904(a), 84 Stat. 947. The statute's "**remedial purposes**" are **nowhere more evident** than in the provision of a private action for those injured by racketeering activity. See also n. 10, supra. Far from effectuating these purposes, the **narrow readings** offered by the dissenters and the court below **would in effect eliminate § 1964(c)** from the statute." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985).

46.     "RICO provides for **drastic** remedies" *H. J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 233 (1989). Congress's intention is very clear, **a broad and drastic remedial purpose** defined in **§ 1964(c)** lead to civil actions. "Whether the predicates proved establish a threat of continued racketeering activity **depends on the specific facts of each case**." *H. J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989).

47.     "Section 1961(5) does indicate that Congress envisioned circumstances in which **no more than** two predicates **would be necessary** to establish a pattern of racketeering — **otherwise** it would have drawn a **narrower boundary** to RICO liability," *H. J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237 (1989).  "As this Court stressed in Sedima, in rejecting a **pinched construction** of RICO's provision for a private civil action, adopted by a **lower court**" *H. J. Inc. v. Northwestern Bell Telephone Co*., 492 U.S. 229, 249 (1989).  "Congress' decision not explicitly to limit RICO's broad terms **strongly implies** that Congress had in mind **no such narrow and fixed idea**

of what constitutes a pattern as that suggested by amici here." *H. J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 245 (1989).

48.     At last, "[t]he RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense in § 371. […] The relevant statutory phrase in § 1962(d) is "to conspire." […] The RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act;" (emphasis omitted) *Salinas v. United States*, 522 U.S. 52, 63-64 (1997).

49.     Plaintiff had alleged *§ 1962(c)* and *§ 1962(d)* claims, Defendant has waived the argument. Plaintiff argues that a Motion to Dismiss under Rule 12(b)(6) failed to thoroughly analyze specific facts of this case would be very disfavored and rare, which against Congress' intention.

### C. § 1983 under the color of law

50.     Defendant's counsel argued that, "The Complaint contains no allegations that U.S. Bank, a *private* entity, acted under the color of state law or otherwise on behalf of, or in concert with, a state or local government to deprive Plaintiff of any constitutional right." This argument is misleading. However, Defendant has admitted taking action that deprived Plaintiff of $25,000 under the State court's garnishment order. Plaintiff also made such allegation as well. As seen in [ECF No. 60. ¶409)].

> The Plaintiff alleges that an unidentified individual within U.S. Bank under his individual and **official capacity**, has violated *42 U.S.C. § 1983* by acting under the color of law to deprive the Plaintiff of rights protected under the Fourteenth Amendment and ERISA.

51.     "But in addition, the Court, discussing the elements of a section 1983 conspiracy between public officials and private persons, made clear that a party who **was not** an official of the state could be liable for damages under section 1983 by virtue of the fact that the private person himself acts under color of state law and fulfills the state action requirement of section 1983 actions so long as he *is involved in a conspiracy* with a state official. **The Court declared that a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983**. "Private persons, jointly engaged with state officials in the prohibited action, are acting `under color' of law for purposes of the statute. To act `under color' of law does not require that the accused be an officer of the State. It is enough that he is a **willful participant in joint activity** with the State or its agents. . . ." …By the same reasoning, coconspirators act under color of law and can be sued for damages in a section 1983 action when they **involve a judge in their plot**, **regardless of whether** the judge can be brought to justice for his part in the scheme…**The state action requirement for a**

**section 1983 suit is met, judicial immunity notwithstanding**." *Sparks v. Duval County Ranch Co.*, Inc., 604 F.2d 976, 982-83 (5th Cir. 1979). Lori DeAngelis was also sued under § 1983, because she ordered an unlawful interlocutory order, then Leslie Barrows act as officer of the court, altered and underwrite the court, and Judith Wells signed the order. U.S. Bank is a willful participant in joint activity to deprive of Plaintiff's Due Process clause and Property clause under Fourteen Amendment and Tex. Const. Art. I, Sec. 13 and 19, the state action requirement for a *§ 1983* suit is met.

### D.  ERISA fiduciary breach

#### 1.  This is a void order;

52.     The term "render" is defined in the Family Code: it "means the pronouncement by a judge of the court's ruling on a matter. The pronouncement may be made orally in the presence of the court reporter or in writing, including on the court's docket sheet or by a separate written instrument." Tex. Fam. Code Ann. § 101.026.

53.     "A judgment[order] routinely goes through three stages: rendition, reduction to writing and judicial signing, and entry." (emphasis added) *Henry v. Cullum Companies Inc.*, 891 S.W.2d 789 (Tex. App. 1995).

54.     "A judgment is "rendered" when the trial court's decision upon the matter submitted to it for resolution is officially announced either orally in open court or by memorandum filed with the clerk. Samples Exterminators v. Samples, 640 S.W.2d 873, 875 (Tex.1982) ; Henry, 891 S.W.2d at 792. The rendition of the trial court's decision, whether in open court or by official document of the court, is the critical moment when the judgment becomes effective. Henry, 891 S.W.2d at 792. "The signature of the trial court upon the writing is merely a ministerial act of the court conforming to the provision of Rule 306a(2) of the Texas Rules of Civil Procedure which calls for 'all judgments, decisions and orders of any kind to be reduced to writing and signed by the trial judge with the date of signing stated therein.' " Id. A judgment is "entered" when it is recorded in the minutes of the trial court by a purely ministerial act of the trial court's clerk, thereby providing enduring evidence of the judicial act. Id. Thus, entry of a written order is considered a ministerial act reflecting the trial court's action following the rendering of a judgment. See Dunn v. Dunn, 439 S.W.2d 830, 832–33 (Tex.1969) (holding oral rendition of divorce constituted final judgment even though judgment was not signed until after spouse's death); Bakali v. Bakali, 830 S.W.2d 251, 254 (Tex.App.—Dallas 1992, no writ) ;

Liberty Mut. Ins. Co. v. Woody, 640 S.W.2d 718, 721 (Tex.App.—Houston [1st Dist.] 1982, no writ)" *Araujo v. Araujo*, 493 S.W.3d 232 (Tex. App. 2016).

55.        "The judge's intention to render judgment in the future cannot be a present rendition of judgment. The rendition of judgment is a present act, either by spoken word or signed memorandum, which decides the issues upon which the ruling is made." *S & A Rest. Corp. v. Leal*, 892 S.W.2d 855, 858 (Tex.1995).

56.        "Associate judges were formerly called family law masters. The designation was changed effective August 26, 1991, TEX.GOV'T CODE ANN. § 54.019 (Vernon Supp. 1993), but portions of the Texas Government Code still retain the "master" terminology. TEX.GOV'T CODE ANN. §§ 54.001-54.019 (Vernon 1988 and Supp. 1993). We use the terms interchangeably." *Stein v. Stein*, 868 S.W.2d 902, 903 n.1 (Tex. App. 1994).

57.        "We hold that an associate judge of the family law court does not have the power to render judgment. Rendition occurs only when the referring court adopts the master's report, or if no report is generated, when the trial judge signs the final judgment." *Stein* at 904. For Plaintiff's instance, Lori DeAngelis' report was generated after the hearing, but the signature portion preserved for a referring court judge is blank.

58.        "It is axiomatic that consent to the judgment must exist at the time an agreed judgment is rendered. Buffalo Bag Co. v. Joachim,704 S.W.2d 482, 483 (Tex.App. — Houston [14th Dist.] 1986, writ ref'd n.r.e.). Therefore, a party may revoke its consent to a settlement agreement any time before judgment is rendered. Samples Exterminators v. Samples,640 S.W.2d 873, 874-75 (Tex. 1982); Burnaman v. Heaton,150 Tex. 333, 339, 240 S.W.2d 288, 291 (1951). Without consent, the judgment is void. Samples, 640 S.W.2d at 875." *Stein* at 903.

59.        "When issues are referred to and heard by a Master under Rule 171, the Master's report is conclusive on the issues considered by the Master in the absence of a proper objection. Cameron v. Cameron,601 S.W.2d 814 (Tex.Civ.App. — Dallas 1980, no writ). A party dissatisfied with the report has the burden to make specific objections before the report is adopted by the court. Cameron, supra. No objections to the Master's report were filed by either party to this cause of action prior to its adoption by the court." *Novotny v. Novotny*, 665 S.W.2d 171, 173 (Tex. App. 1984).

60.     "A judgment[order] rendered in violation of due process is **void in the rendering State** and **is not entitled to full faith and credit elsewhere**. Pennoyer v. Neff, 95 U.S. 714, 732-733 (1878)." (emphasis added) *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980).

61.     Defendant Leslie Barrows underwrote this questionable order at her own will, without the consent or knowledge of any litigant party involved. Regardless of who performed the ministerial act of signing it, that order was void in the rendering state ab initio. This court shall not dismiss U.S. Bank without addressing the legal question regarding the legitimacy of the order.

### 2.   This order is not QDRO;

62.     The Texas Supreme Court has held that,

> "The **only** power ERISA grants to a pension plan administrator is the power to review an existing order **to determine whether** it is a *qualified domestic relations order* under the Act. See 29 U.S.C. § 1056(d)(3)(G)(i)(II) ("[T]he plan administrator **shall determine whether** such an order is a **qualified** domestic relations order and **notify** the participant and each alternate payee of such **determination**."). Thus, any power the trial court had to enter the **post-divorce order must** come from state law. See Hogle v. Hogle , 732 N.E.2d 1278, 1284 (Ind. Ct. App. 2000) ("Since ERISA does not provide an enforcement mechanism for collecting judgments, state law methods for collecting money generally remain undisturbed by ERISA."). **If no state law authorizes the order, ERISA does not apply, and the trial court still lacked authority to enter the order at issue**."
> *Dalton v. Dalton*, 551 S.W.3d 126, 138 (Tex. 2018) .

63.     The garnishment is an enforcement mechanism. Currently Texas state law does not authorize interlocutory DRO, so it is not enforceable. U.S. Bank's arguments about their policy and procedures compliance are pointless. That DRO was not a post-divorce order. U.S Bank failed to determine, and ignored the obvious objection and/or question. U.S. Bank's ERISA procedure does not apply to enforce a non-qualified DRO. Since that order was not a QDRO, any subsequent QDRO operation that U.S. Bank did under the name of ERISA is unlawful.

64.     "In Texas, courts have **jurisdiction**—the power over the subject matter and person, while judges have **authority**—the power to preside over a case. See *Davis v. State*, 956 S.W.2d 555, 557–60 (Tex. Crim. App. 1997) ("While our case law has called the authority of the judge to preside a jurisdictional issue, we now **disavow that characterization**, because as we have explained, jurisdiction or judicial **power** is **vested in courts**, **not individuals**."" *In re State ex rel. Wice*, 668 S.W.3d 662, 672 n.43 (Tex. Crim. App. 2023).

65.     Defendant argued that:

> Notwithstanding Plaintiff's allegations that the proposed order was an "artifice," on May 26, 2022, Judge Wells entered an Order For Garnishment Of U.S. Bank 401(k) Savings Plan (the "Domestic Relations Order"). Compl. ¶¶ 97-98, 163. The face of the Domestic Relations Order stated that "this Court intends this order to be a Domestic Relations Order," and it "required"

66.     The Texas Supreme Court already said, "*the trial court still lacked authority to enter the order at issue.*" It is absurd how Texas legal professionals, including but not limited to counsels, the State Bar of Texas, and the Tarrant County District Attorney's Office, repeatedly manipulate the law and misrepresent this case, thereby enabling criminals to evade justice. This antitrust suit aims to highlight how legal professionals have manipulated this monopolized legal power to assist disgraced bar union comrades in embezzling money from the life savings of the middle class.

67.     If the trial court lacked the authority to issue the order in question, then Judith Wells also had no authority to enter the order. The Domestic Relations Order is unlawful on its face, regardless of how the evil legal community continue collusion to keep thousands of victims in the dark.

68.     Nobody can stop Plaintiff from exposing this impactful scandal case to the upper court.

### 3.  Many flaws in Defendant's arguments;

69.     The Defendant's counsel erroneously started their arguments by referring "[t]o *establish* a claimed breach of fiduciary duty, an ERISA plaintiff *must prove* a breach of a fiduciary duty and a prima facie case of loss to the plan." *McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir. 1995)*. However, that citation pertains to an appeal following a trial judgment. We are not at the trial stage yet, so there is no need for Plaintiff to *establish* a claim with *proof*. Plaintiff only needs to plead a plausible claim.

70.     Then, the Defendant's counsel made a misleading and conclusory statement by saying:

> "and then "determined that they should treated [sic] the 'domestic relations order' as 'qualified'" (id. ¶407). By Plaintiff's own admissions, U.S. Bank followed the Plan's QDRO procedures.

71.     In the fact, Plaintiff clearly stated that "U.S. Bank willfully, recklessly, and maliciously sent multiple deceptive emails and mails." As seen in [ECF No. 60. ¶408)].

72.     Later, the Defendant's counsel's argument becomes vexatious, by stating "Complaint *confirms* that the determination that the domestic relations order was a QDRO was correct" and "There

are no allegations contained in the Complaint from which the Court could plausibly conclude that U.S. Bank's QDRO determination was incorrect." Plaintiff needs remind Defendant's counsel to read [ECF No. 60, ¶394-397] once again. Is Defendant's counsel sure in all these paragraphs there was absolutely no allegation? To survive a motion to dismiss, Plaintiff only needs *one*, the Defendant's counsel needs to prove *all*.

### 4. Plaintiff alleged a fiduciary duty breach in the "determination" of the "Qualified" clause, not the "alternate payee" clause;

73.        In the argument section D.1, the Defendant's counsel erroneously defended "payable to the alternate payee" clause, which is irrelevant to Plaintiff's allegation. The only "alternate payee" allegation referred to by Plaintiff is that "*Defendant Leslie Starr Barrows* altered the 'alternate payee' and 'purpose' contexts from the original court order to circumvent EIRSA restrictions," as seen in [ECF No. 60, ¶72]. Plaintiff did not allege U.S Bank for the "alternate payee" clause.

74.        If Defendant's counsel actually read the section "STANDARD OF REVIEW" and [ECF No. 60, ¶407, 408], they should have known that Plaintiff alleged that the U.S. Bank has "fiduciary duty to make *determinations* that are warranted by *state statue*" and the U.S. Bank erroneously "comply with a 'signed order,' rather than complying with state statue." The U.S. Bank willfully, recklessly, and maliciously breached their fiduciary duty by determining that the "domestic relations order" as "qualified" despite the clear objections from Plaintiff.

75.        Exhibit 1 is an email sent on July 21, 2022, signed by Plaintiff and his attorney, to the U.S. Bank. This objection email clearly said,

> "The order at issue, dated April 13, 2022, was issued in connection with Ms. Wang's request for attorney's fees — not in connection with the provision of child support. Consequently, it is Mr.Yan's position that the proposed garnishment is NOT a QDRO."

76.        Exhibit 2 is another email sent on August 1, 2022, by the U.S. Bank. It clearly said,

> "Logic suggests that either the Associate Judge's Report is **in direct conflict** with the Order (in which case, the Order, as the later document, would seem to **supersede** the Associate Judge's report, or it serves as an order to Mr. Yan that is in addition to, and **separate** from,"

77.        This email provides clear evidence that the U.S. Bank had uncertainties when making their determination. They were unsure whether the order was superseding or separate, but they did not

seek further clarification from the Texas court. Furthermore, they admitted that they knew the order itself was in direct conflict with the Associate Judge's Report.

78.     U.S. Bank's fiduciary failure lies in the fact that neither a superseding order nor a separate order was made in accordance with Texas domestic relations law, as Plaintiff had repeatedly informed the U.S. Bank in multiple objection emails. It constitutes a violation of Due Process to deprive Plaintiff of his property without notice or a hearing using either a superseding order or a separate order.

79.     How could Defendant's counsel claim that "U.S. Bank Reviews The Domestic Relations Order In *Accordance* With The Plan's QDRO Procedures And *Determines* That It *Qualifies* As A QDRO?" As seen in [ECF No. 127 PageID 1844], while its own QDRO procedure says:

> 1.3. DRO Defined. A domestic relations order is any judgment, decree or order (including an approval of a property settlement agreement) which relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child or other dependent of a Participant and which is made **pursuant to a** state domestic relations law (including a community property law).

80.     It is obvious that an interlocutory order does not pursuant to any Texas law, Defendant U.S. Bank did not even adhere to their own QDRO policy/procedures.

81.     Plaintiff has alleged that "an interlocutory QDRO" is unlawful. In the fact, the U.S. Bank had waived to argue a position that "an interlocutory QDRO" is indeed made pursuant to Texas domestic relations law. Therefore, the U.S. Bank failed to make the required determination as stipulated by *29 U.S.C. § 1056(d)(3)(H)(i)* and its own QDRO procedures as Plaintiff alleged.

82.     Defendant U.S. Bank had made numerous arguments about their adherence to QDRO procedures after the determination. However, these arguments are irrelevant. The critical issue is that the U.S. Bank failed in their duty to make the correct *determination*, not in the after determination *execution* of procedures.

### 5.   Not every court order is enforceable; U.S. Bank does not have an obligation;

83.     Exhibit 3 is an opinion letter AO 90-46A, from U.S. Department of Labor Pension and Welfare Benefits Administration.

84.     This letter clearly said that "it is the opinion of the Department of Labor that the Court Order **is not** a "domestic relations order"." and "accordingly, it is the opinion of the Department of Labor that the Court Order is **unenforceable** against the Plan."

85.     On Sep 16, 2022, the U.S. Bank wrote an email to defraud Plaintiff by stating, "U.S. Bank is *obligated to comply with the order*, *regardless whether you believe it was obtained under false pretenses or as part of a conspiracy to commit fraud*." On that date, the U.S. Bank already knew that order was in direct conflict with the Associate Judge's Report. The U.S. Bank also knew there was no notice and hearing for that specified "superseding" or "separate" order they intended to comply.

86.     The U.S. Bank does not have any obligation to comply with an unlawful order if the order itself was not qualified. That interlocutory order is unenforceable against Plaintiff's plan. The Texas Supreme Court's ruling *Dalton v. Dalton* makes it very clear.

### 6.  U.S. Bank failed to raise question;

87.     Exhibit 4 is another opinion letter AO 1999-13AAO 90-46A, from U.S. Department of Labor Pension and Welfare Benefits Administration.

88.     This letter clearly said that:

> Nevertheless, a plan administrator who has received a document purporting to be a domestic relations order **must** carry out his or her **responsibilities** under section 206(d)(3) in a manner consistent with the general fiduciary duties in part 4 of title I of ERISA.
>
> For example, if the plan administrator has received evidence **calling into question** the validity of an order relating to marital property rights under State domestic relations law, the plan administrator **is not free to ignore** that information. Information indicating that **an order was fraudulently** obtained calls into question whether the order was issued pursuant to State domestic relations law, and therefore whether the order is a "domestic relations order" under section 206(d)(3)(C). When **made aware of such evidence**, the administrator **must take reasonable steps** to **determine its credibility**. If the administrator determines that the evidence is credible, the administrator **must decide how best to resolve the question of the validity of the order** without inappropriately spending plan assets or inappropriately involving the plan in the State domestic relations proceeding. The appropriate course of action will depend on the actual facts and circumstances of the particular case and may vary depending on the fiduciary's exercise of discretion. However, in these circumstances, we note that **appropriate action** could **include relaying the evidence of invalidity to the State court or agency that issued the order** and **informing the court or agency** that its resolution of the matter may affect the administrator's determination of whether the order is a QDRO under ERISA.[5] The plan administrator's ultimate treatment of the order could then be guided by the State court

or agency's response as to the validity of the order under State law. If, however, the administrator is unable to obtain a response from the court or agency within a reasonable time, the administrator may not independently determine that the order is not valid under State law and therefore is not a "domestic relations order" under section 206(d)(3)(C), but should rather proceed with the determination of whether the order is a QDRO.

89.      On Sep 16, 2022, the U.S. Bank wrote an email to defraud Plaintiff by stating, "If you want to challenge the order, **you will need to petition** the court either **on your own** or with the assistance of a new attorney. U.S. Bank is obligated to comply with the order, **regardless** whether you believe it was obtained under **false pretenses** or as part of a **conspiracy to commit fraud**. At this point, the **only** way to prevent your 401(k) funds from being transferred to your spouse is to **bring legal action** to rescind or amend the order."

90.      It is evidently clear that the U.S. Bank ignored information indicating that an order **was fraudulently obtained**. The Department of Labor, which oversees the operation of ERISA benefit plans, had clearly stated in its opinion that whenever a question arisen, a plan administrator must fulfill his or her responsibilities diligently.

91.      The objection letter, signed by Plaintiff and his attorney and accompanied by an Associate Judge's report in direct conflict, constituted credible evidence. The U.S Bank took no action to clarify the question through any validation effort. Instead, the U.S. Bank colluded with other co-conspirators to defraud Plaintiff. Additionally, Plaintiff does not believe that U.S. Bank has any authority under Texas legislation to self-create "superseding" or "separate" clauses, as the "superseding" or "separate" clauses the U.S. Bank determined to comply with are not found in any Texas statute.

92.      The key issue for the U.S. Bank is not only their failure to comply with Texas statute, but also that upon noticing a conflicting order and lack of due process, they invented their own statute to follow. Instead of adhering to the plan's QDRO provisions, which requiring pursuant to Texas domestic relations law, they assumed the role of a Texas legislator.

93.      Anyone with basic knowledge should have questioned the issuance of a defective order without notice or a hearing, fundamental elements of due process. An order lacking authority and violating due process is void, not merely voidable. U.S. Bank, rather than acting ethically, chose to disregard the plaintiff's interests. Congress explicitly stated that a fiduciary of an employee benefit plan under ERISA **must** act **solely** in the interests of participants and for the exclusive purpose of

providing benefits and defraying reasonable administrative expenses (29 U.S.C. 1104(a)(1)(A); see *Boggs v. Boggs*, 520 U.S. 833 (1997), at 845-847. This opinion letter clearly states that failing to question such issues constitutes a fiduciary breach due to not acting solely in the plaintiff's interest.

94.    As of today, U.S. Bank's continued willful inaction of relaying question of invalidity to the State court, despite full awareness, constitutes ongoing passive concealment and demonstrating full commitment to participating in this RICO scheme. U.S. Bank, as a co-conspirator, has shown no signs of termination, only bad faith, further reinforcing its stance. "the supporters are as guilty as the perpetrators." *Salinas* at 64. U.S. Bank appears to prefer defraying legal expense from the pension fund into this Court to avoid accountability rather than fulfilling its fiduciary duty in the State Court.

### 7.    Plaintiff alleged procedure noncompliance; U.S. Bank waived the argument;

95.    Plaintiff alleged procedure noncompliance, but the U.S. Bank waived the argument.

96.    Plaintiff alleged "Within four hours, the Plaintiff received a response stating that U.S. Bank had declined the Plaintiff's objection. According to U.S. Bank's own policy, the Benefits Administration Committee should review this objection and make a determination; however, the Plaintiff does not believe that the Benefits Administration Committee met and discussed this matter on the same day." As seen in [ECF No. 60, ¶407].

97.    U.S. Bank's own procedure 2.2.5 and 2.2.6 says, Plaintiff shall be afforded an appeal period of sixty days, and a final determination comes from the committee. Plaintiff had alleged that his objection was declined by a non-U.S. Bank committee.

98.    The U.S. Bank continued to make conclusory statement by saying that their actions complied with the procedures. However, this missed the point. The issue at hand is their failure to argue specific noncompliance allegations made by Plaintiff.

### E.  Dismiss with prejudice

99.    The Defendant pleads for the case to be dismissed with prejudice, not allowing leave to amend. This request is arbitrary and capricious.

100.    However, the Fifth Circuit has recognized that dismissal with prejudice "is an extreme sanction that deprives a litigant of the opportunity to pursue his claim."(*Gonzalez v. Firestone Tire*

*Rubber Co.*, 610 F.2d 241-247 (5th Cir. 1980)). Consequently, The Fifth Circuit has limited district courts' discretion to dismiss claims with prejudice. See *Price v. McGlathery*, 792 F.2d 472, 474 (5th Cir. 1986). Therefore, a district court's "dismissal with prejudice is warranted **only** where 'a clear record of delay or contumacious conduct by the plaintiff exists and a 'lesser sanction would not better serve the interests of justice.'" *Gray v. Fid. Acceptance Corp.*, 634 F.2d 226, 227 (5th Cir. 1981).

101.     Additionally, where this Court has affirmed dismissals with prejudice, it has generally found **at least one** of three aggravating factors: "(1) delay caused by [the] plaintiff himself and not his attorney; (2) actual prejudice to the defendant; or (3) delay caused by intentional conduct." See *Millan v. USAA General Indemnity Co.*, 546 F.3d 321, 326 (5th Cir. 2008).

102.     The Fifth Circuit also stated ""delay which warrants dismissal with prejudice **must** be longer than just a few months; instead, the delay must be characterized by 'significant periods of total inactivity.'"" *Millan v. USAA General Indemnity Co.*, 546 F.3d 321, 326-27 (5th Cir. 2008).

103.     "Leave to amend a complaint under Rule 15(a) "**shall** be freely given when **justice so requires**." Fed.R.Civ.P. 15(a); see Foman v. Davis,371 U.S. 178, 182 (1962). Although the grant or denial of leave to amend is committed to a district court's discretion, **it is an abuse of discretion** to deny leave to amend unless there is sufficient reason, such as "undue delay, bad faith or dilatory motive...repeated failure to cure deficiencies by [previous] amendments...[or] futility of amendment." Foman,371 U.S. at 182." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).

104.     "The **Supreme Court** stated in Foman that while the decision to grant or deny leave to amend is within the trial court's discretion, "**outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules**." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).

105.     "It evinces a bias in favor of granting leave to amend. The **policy** of the federal rules is to permit **liberal amendment** to facilitate determination of claims on the **merits** and to **prevent** litigation from becoming a **technical exercise** in the fine points of pleading. See, e. g., Foman v. Davis, 371 U.S. at 182, [] Thus, **unless** there is a **substantial** reason to deny leave to amend, the **discretion** of the district court **is not broad enough** to permit denial. That consideration arises **only if** there are substantial reasons to deny the amendment. Otherwise, rule 15(a) requires the trial judge to

grant leave to amend **whether or not** the movant shows prejudice." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981).

106.    Denying Plaintiff leave to amend is against the Fifth Circuit's policy of the federal rules and inconsistent with the spirit of the Federal Rules stated by the Supreme Court.

### F.  Other claims which U.S. Bank waived arguments

107.    In his short five pages claim against the U.S. Bank, Plaintiff clearly alleged Defendant for its violation of *18 U.S.C. § 1962(c)*, as seen in [ECF No. 60, ¶401, 406, 412]. Plaintiff also clearly alleged Defendant for its violation of *18 U.S.C. § 1962(d)*, as seen in [ECF No. 60, ¶401, 406].

108.    Amongst [ECF No. 60, ¶394-397], Plaintiff clearly stated that:

> Plaintiff incorporates by reference the sections "FACTUAL BACKGROUND OF THIS SUIT", "STANDARD OF REVIEW" and ""First Claim for Relief" as if fully set forth **herein**.
> Plaintiff refers to every paragraph **herein** as Plaintiff's allegation.
> Plaintiff refers to every paragraph **herein** where the name of a person or entity is mentioned and its attachment as factual statements.
> Plaintiff refers to every sentence **herein** where the U.S. Code is mentioned as an allegation to its related party.

109.    Plaintiff clearly stated that "Plaintiff is entitled to receive vicarious liability relief, pursuant to 18 U.S.C. § 1964.", as seen in [ECF No. 60, ¶414].

110.    Plaintiff clearly stated that "Defendant U.S Bank aided and abetted one another, other Defendants named, and other Defendants not named herein, in connection with committing the primary substantive contraventions of Federal law identified herein above and are therefore jointly and severally liable as principals pursuant to Title 18 U.S.C. § 2", as seen in [ECF No. 60, ¶415].

111.    It is indisputable that Plaintiff has sufficiently asserted his allegations under the private civil right of action, pursuant to *18 U.S.C. § 1964 and/or 18 U.S.C. § 2*. However, in their entire Motion to Dismiss, the Defendant has not made any arguments relating to either *18 U.S.C. § 1962(c)* or *18 U.S.C. § 1962(d)*.

112.    Therefore, Plaintiff asserts that Defendant has waived any arguments related to allegations under *18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d)* and/or *18 U.S.C. § 1964 and/or 18 U.S.C. § 2*. Plaintiff cannot see how the Defendant's Motion to Dismiss can succeed when they have already omitted key arguments.

## VI.    Conclusion

113.    To accept defense position in the argument section D.2, which claims "U.S. Bank Complied With The Plan's QDRO Procedures," this Court would have found that that order was a *Qualified* Domestic Relations Order (QDRO) first. Clearly, this is not a legally viable option.

114.    Even if Defendant's presented arguments are sound, which they are not, these arguments are still incomplete and partial argument from many aspects, missed arguing **all** reliefs, claims, and U.S.C. code citations. To succeed in a motion to dismiss, Defendant must meet the *Rule 12(b)(6)* requirements by proving that **all** allegations, under **any** possible theory, do not hold any merit, without missing a single allegation, relief or possible theory. It is an extremely high standard that hardly anyone can meet in an unbiased court of law. This is why the Fifth Circuit concluded that motions under *Rule 12(b)(6)* "is rarely granted."

115.    Ultimately, when considering Plaintiff's pleadings as a whole, it is implausible to believe that this Motion to Dismiss stands any chance of success, given the circumstance of waiving arguments on several key legal issues and allegations (specifically the void QDRO order and *§ 1962(d)*). This analysis is reinforced by the doctrine of stare decisis, with super precedents such as *United States ex rel. Bias v. Tangipahoa Parish School Board* and *Griffin v. Welch*.

### Prayer for Relief

116.    Based on the above, Plaintiff respectfully requests for the following relief:

117.    Plaintiff prays that Defendant's Motion to Dismiss be denied as moot.

118.    If not, "Consequently, when it appears a more careful or detailed drafting might overcome the deficiencies on which dismissal is sought, a court **must allow** a plaintiff the opportunity to **amend** the Complaint" *Hitt*, 561 F.2d at 608–09. Alternatively, Plaintiff prays that this Court grants Plaintiff leave of court for Amendment.

Respectfully submitted,

_____/s/ Conghua Yan_____
Conghua Yan, Pro Se Plaintiff
[Conghua Yan] [2140 E Southlake Blvd, Suite L-439] [Southlake, Texas 76092] [214-228-1886]
/[arnold200@gmail.com]

**CERTIFICATE OF SERVICE**

On (February 11th, 2024) I, Conghua Yan, hereby certify that I have served the forgoing document on all counsels and/or pro se parties of record in a manner authorized by Federal Rule of Civil Procedure 5(b)(2).


/s/ Conghua Yan

Conghua Yan, Pro Se Plaintiff

[Conghua Yan] [2140 E Southlake Blvd, Suite L-439] [Southlake, Texas 76092] [214-228-1886]

[arnold200@gmail.com]

# EXHIBIT 1

LAW OFFICES OF
# William A. Pigg PLLC

**WILLIAM A. PIGG** *
**Charles L. Woods**
* Licensed in Texas and Louisiana

10455 N. Central Expressway
Suite 109
Dallas, Texas 75231
(214) 551-9391
wapigg@pigglawfirm.com

July 21, 2022

**By Fax: 763-971-1285 and email: rachelle.lewis@usbank.com**
Ms. Rachelle E. Lewis
U.S. Bank EP-MN-R2BN
4000 West Broadway
Robbinsdale, MN 55422

Re: Domestic Relations Order for Conghua Yan and Fuyan Wang
    District Court, Tarrant County, Texas – Cause No. 325-707596-21
    U.S. Bank 401(k) Savings Plan

Dear Ms. Lewis:

In response to yours of July 12, 2022 to my client Conghua Yan, this is to advise that the proposed Order for Garnishment should NOT be deemed a qualified domestic relations order ("QDRO").

U.S. Bank defines a "DRO" as "any judgment, decree or order (including an approval of a property settlement agreement) which relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child or other dependent of a Participant and which is made pursuant to a state domestic relations law (including a community property law)."

The order at issue, dated April 13, 2022, was issued in connection with Ms. Wang's request for attorney's fees – not in connection with the provision of child support. Consequently, it is Mr. Yan's position that the proposed garnishment is NOT a QDRO. I attach hereto a copy of the Court's Order for your review.

After you have reviewed the attached, please advise. If you should have any questions or require additional information, please do not hesitate to contact me.

Sincerely,

WILLIAM A. PIGG, PLLC

William A. Pigg

Concur: _____
                Conghua Yan

WAP/bp

c.c. L. Barrows

## ASSOCIATE JUDGE'S REPORT

Cause No. 325- **707596 – 21**

*Conghua Yan*

*Fuyan Wang*

IN THE 325TH DISTRICT COURT

TARRANT COUNTY, TEXAS

FILED
TARRANT COUNTY
THOMAS A. WILLER
DISTRICT CLERK
22 APR 14  AM 9: 11

1. **APPEARANCES:**
   (✓) MOVANT IN PERSON & BY ATTORNEY
   (✓) RESPONDENT IN PERSON & BY ATTORNEY
   ( ) AMICUS ATTORNEY
   ( ) DOMESTIC RELATIONS OFFICE
   ( ) ATTORNEY GENERAL
   ( ) FAMILY COURT SERVICES

*William Pigg*
*Leslie Barrows*

2. ORDERS ~~OR AGREEMENT~~:

   Mr. Yan testified that he has $100,000.00 in a retirement account at U.S. Bank.

   Mr. Yan is ordered to withdraw or borrow $50,000 from his retirement account or as much as allowed. Each attorney is awarded $25,000.00 in fees. Mr. Yan is responsible for the cost of QDRO.

**SO ORDERED**

ASSOCIATE JUDGE
DATE: 4-13-2022

**APPROVED AND IT IS SO ORDERED**

PRESIDING JUDGE
DATE: _____

This recommendation/report is a standing order of the Court and will not be considered a final, appealable order until a typed order is signed by the District Judge. Failure to submit a typed order pursuant to this recommendation/report subjects this matter to being placed on the Court's DWOP docket. Counsel,_____is ORDERED to submit the typewritten order to the Court no later than the _____ day of _____, 20___.

Page ___ Z ___ of ___ 2 ___

# EXHIBIT 2



4000 W Broadway
EP-MN-R2BN
Robbinsdale, MN 55422
833.691.7958 Fax

usbank.com

August 1, 2022

William A. Pigg
10455 N. Central Expressway
Suite 109
Dallas, TX 75231

Re: Domestic Relations Order for Conghua Yan and Fuyan Wang

Dear Mr. Pigg,

I am responding to your letter dated July 21, 2022, in which you assert that the Order for Garnishment of U.S. Bank 401(k) Savings Plan, signed May 26, 2022 (Order) is intended to direct Mr. Conghua Yan's 401(k) funds to pay your and his former spouse's attorney's fees and is not intended to be treated as a Qualified Domestic Relations Order (QDRO). Those assertions are in direct contradiction with the express language of the Order.

The Order (a copy of which is enclosed) states, "this Court intends this order to be a Domestic Relations Order," and, "this order is being used to collect amounts owed as spousal support." These statements in the Order are the exact opposite of your assertions.

The Order directs the U.S. Bank 401(k) Savings Plan (Plan) to pay Ms. Wang $25,000 in spousal support from Conghua Yan's account under the Plan. Based on having received a document that we recognized as a potential QDRO (subject to review by the Plan to confirm), we placed a temporary hold on Mr. Yan's Plan account, prohibiting him from taking any withdrawals until this matter is resolved, in accordance with the Plan's QDRO procedures. The hold will prohibit Mr. Yan from making any withdrawals, including loans, from his Plan account for a period of up to 18 months. The hold can be released earlier if the Plan determines that it is a QDRO or if a court vacates or amends the Order. You provided the Associate Judge's Report, dated April 13, 2022, which states that, "Mr. Yan is ordered to withdraw or borrow $50,000 from his retirement account . . . [e]ach attorney is awarded $25,000 in fees. Mr. Yan is responsible for the cost of the QDRO." This report directs Mr. Yan, not the Plan, to take action. Your letter suggests that this shows the intent of the court with respect to the Order, and that this should somehow overrule the clear provisions of the Order that apply to the Plan.

The Plan cannot disregard a domestic relations order that, if a QDRO, requires it to act in accordance with clear instructions. Moreover, the Plan cannot disregard a QDRO in favor of an older document that does not even clearly apply to the same benefit amounts. ==Logic suggests th==at either the Associate Judge's Report is in ==direct conflict== with the Order (in which case, the Order, as the later document, would ==seem to supersede== the Associate Judge's Report), or it serves as an order to Mr. Yan that is ==in addition to, and separate from,== the Order with respect to the Plan (i.e., Ms. Wang receives $25,000 as spousal support and separately, Mr. Yan is required to withdraw $50,000 from his Plan account and pay each attorney $25,000, to satisfy the

costs of the QDRO or otherwise). Either way, the Plan cannot simply decide that a Judge's Report, which predates the Order and may concern different matters from the Order, overrides the clear provisions of the Order.

Although not relevant to the Plan's review of the Order, we note that the report from April 13 directs Mr. Yan to take a loan or distribution from his account. However, as there is a hold on Mr. Yan's Plan account due to the Plan's receipt of the Order, Mr. Yan is unable to take a loan or distribution at this time. Moreover, if the Order is determined to be qualified and $25,000 is assigned to Ms. Wang, Mr. Yan may still be unable to take a distribution or a $50,000 loan due to his being employed (which precludes a distribution) and because his post-assignment Plan account balance will be insufficient to permit a $50,000 loan. If you have any questions about the withdrawal options currently available to Mr. Yan, please contact me or Rachelle Lewis.

As previously stated, the hold will remain in place while the Plan reviews the Order in accordance with its procedures. To release the hold on Mr. Yan's account without making a payment to Ms. Wang, the Plan requires additional direction from the court showing the Order has been vacated or amended. Otherwise, if the Plan determines that the Order is a QDRO, $25,000 will be distributed from Mr. Yan's Plan account to Ms. Wang in accordance with the terms of the Order. Note that, to the extent an amended or new order is issued that seeks to direct the Plan to take action with respect to Mr. Yan's account, the amended or new order must satisfy the requirements of the Employee Retirement Income Security Act of 1974, as amended.

If you have any questions, please contact me or Ms. Lewis.

Regards,

Nicholas Benham
Vice President, Benefits Administration
U.S. Bank
nicholas.benham@usbank.com
763.971.1135

Cc: Leslie Starr Barrows

# EXHIBIT 3

**U.S. Department of Labor**     Pension and Welfare Benefits Administration
Washington, D.C. 20210



DEC 4 1990                                        AO 90-46A

Ms. Ellen O. Pfaff
Lane Powell Moss & Miller
3800 Rainier Bank Tower
Seattle, Washington 98101-2647

Dear Ms. Pfaff:

This responds to your request for an advisory opinion, on behalf of the trustee of the Bruce A. Nordstrom Self-Employed Retirement Plan (Plan), concerning the application of sections 514 and 206(d) of the Employee Retirement Income Security Act of 1974 (ERISA) with respect to the court order described below.[1] Your submission contains the following facts and representations.

The Plan is a tax-qualified retirement plan[2] under which benefits are payable upon the participant's retirement or death. The Plan provides that benefits may not be assigned or alienated except in the case of a "qualified domestic relations order." Bruce A. Nordstrom is a Plan participant whose benefit account is not in pay status.

Bruce Nordstrom's wife, Frances W. Nordstrom, died October 5, 1984. Her will was admitted to probate in the Superior Court for the State of Washington at King County (the Court). Subsequently, the estate of Frances Nordstrom (the Estate) filed a petition asking the Court to require the Plan to divide and segregate that portion of Bruce Nordstrom's benefits which represents the interest of the Estate. You indicate the request was made on the grounds that, <u>inter alia</u>, Frances Nordstrom owned at her death an undivided one-half community interest in Bruce Nordstrom's accrued benefits pursuant to the community property law of the State of Washington and that a court order for such division and segregation of benefits could issue in accordance with section 206(d)(3) of ERISA. The Court granted the petition and entered an order styled "Qualified Domestic Relations Order and Order Dividing Retirement Plan Benefits" (the Court Order).

You request the views of the Department of Labor concerning whether the community property law of the State of Washington is preempted by section 514 of ERISA and whether the Court Order falls within the scope of section 206(d)(3) of ERISA. Section 514(a) of ERISA generally preempts all state laws insofar as they relate to employee benefit plans covered by title I of ERISA. Therefore, a state community property law that considers the pension earned by a married spouse to be community property is preempted under this provision, unless some exception applies.

Section 514(b) of ERISA specifies certain exceptions from the broad preemptive effect of section 514(a). Of those exceptions, only that provided by section 514(b)(7) has relevance to community property laws. Section 514(b)(7) states that preemption under section 514(a) does not apply to "qualified domestic relations orders" within the meaning of ERISA section 206(d)(3)(B)(i).

---

[1] For convenience, this letter refers to the provisions of section 206(d) of ERISA rather than to the corresponding provisions in sections 401(a)(13)(B) and 414(p) of the Internal Revenue Code, to which your request refers.
[2] You indicated in a telephone conversation with a representative of this Office that the Plan has a number of participants and is covered by title I of ERISA.

Section 206(d)(1) of ERISA generally requires pension plans covered by title I of ERISA to provide that plan benefits may not be assigned or alienated. Section 206(d)(3)(A) of ERISA states that section 206(d)(1) applies to an assignment or alienation of benefits pursuant to a "domestic relations order," unless the order is determined to be a "qualified domestic relations order" (QDRO). Section 206(d)(3)(A) further provides that pension plans must provide for payment of benefits in accordance with the applicable requirements of any QDRO.

Section 206(d)(3)(B) of ERISA defines the terms "qualified domestic relations order" and "domestic relations order" for purposes of section 206(d)(3) as follows :

    (B)        For purposes of [section 206(d)(3)) --

      (i)     the term "qualified domestic relations order" means a domestic relations order--

          (I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

          (II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

      (ii)    the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which --

          (I)       relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

          (II)       is made pursuant to a State domestic relations law (including a <u>community property law</u>). (emphasis added)

The term "alternate payee" is defined by ERISA section 206(d)(3)(K) to mean "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant."

Sections 514(b)(7) and 206(d)(3) of ERISA were enacted as part of the Retirement Equity Act of 1984 (REA), which aimed primarily at assuring greater and more equitable opportunity for women working as employees or homemakers to receive private pension income. The legislative history of the QDRO provisions of REA contains numerous statements indicating that Congress was focusing on the division of pension benefits in marital dissolution or dependent support situations. For example, Congressman William Clay described the QDRO provisions during a House floor debate on the legislation as follows:

          Finally, women may be denied their rights to pension benefits by the dissolution of a marriage by divorce, regardless of how many years she served as an economic partner to a man covered by a pension plan. Even in cases in which the State domestic relations court is willing to consider the pension an asset of the marriage and award the ex-wife a share of it, her rights have been thwarted. Pension plans have refused to honor those court orders claiming that they required an impermissible assignment of benefits and were preempted by ERISA.

H.R. 4280 makes it clear that honoring a legitimate State court order awarding an ex-spouse some or all of a worker's pension does not violate the antiassignment clause of ERISA. In addition, the legislation creates an exception from ERISA's broad preemption of State laws for qualified domestic relations orders.[3]

Moreover, the report of the Senate Committee on Finance made specific mention of state community property laws in observing that "[s]everal cases have arisen in which courts have been required to determine whether the ERISA preemption and spendthrift provisions apply to family support obligations (e.g. alimony, separate maintenance, and child support obligations)."[4] The report noted "[t]here is a divergence of opinion among the courts as to whether ERISA preempts State community property laws insofar as they relate to the rights of a married couple to benefits under a pension, etc., plan,"[5] and cited two cases in which application of state community property law to pension benefits was at issue in the context of marital dissolution proceedings.[6]

It thus appears Congress generally intended that the QDRO provisions of ERISA would have application in those court proceedings conducted primarily to resolve domestic relations issues. With respect to ERISA section 206(d)(3)(B)(ii)(II), it is the view of the Department of Labor that Congress intended the QDRO provisions to encompass state community property laws only insofar as such laws would ordinarily be recognized by courts in determining alimony, property settlement and similar orders issued in domestic relations proceedings. We find no indication Congress contemplated that the QDRO provisions would serve as a mechanism in which a non-participant spouse's interest derived only from state property law could be enforced against a pension plan.

In the case at hand, the Court Order was issued in a probate proceeding and would recognize an interest in pension benefits of the surviving spouse solely on the basis of the state community property law. Consistent with the views discussed above, it is the opinion of the Department of Labor that the Court Order is not a "domestic relations order" within the meaning of section 206(d)(3)(B)(ii) of ERISA and, therefore, does not constitute a QDRO for purposes of sections 206(d)(3) and 514(b)(7) of ERISA. Accordingly, it is the opinion of the Department of Labor that the Court Order is unenforceable against the Plan.

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Section 10 of the procedure explains the effect of advisory opinions.

Sincerely,

Robert J. Doyle
Director of Regulations and Interpretations

---

[3] 130 Cong. Rec. 13327 (1984).
[4] S. Rep. No. 575, 98th Cong., 2d Sess. 18 (1984).
[5] Id. 19.
[6] The cases cited were Stone v. Stone, 632 F. 2d 740 (9th Cir. 1980) and Francis v. United Technology Corp., 458 F. Supp. 84 (N.D. Cal. 1978).

# EXHIBIT 4



**U.S. DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

# Advisory Opinion 1999-13A

September 29, 1999

1999-13A
206(d)(3)

Brian G. Belisle
Oppenheimer Wolff & Donnelly LLP
Plaza VII
45 South Seventh Street, Suite 3400
Minneapolis, Minnesota 55402-1609

Dear Mr. Belisle:

This is in response to your request on behalf of the UAL Corporation (UAL) and United Air Lines, Inc. (United) for an advisory opinion. Specifically, you ask how a plan administrator should treat domestic relations orders the plan administrator has reason to believe are "sham" or "questionable" in nature.[1]

UAL is a holding company. Its major wholly-owned subsidiary is United. You represent that employees of United participate in three pension plans-- an employee stock ownership plan (the ESOP); a 401(k) plan that is a profit sharing plan qualified under section 401(a) of the Code (the 401(k) Plan); and a defined benefit pension plan. The ESOP is a combination leveraged ESOP and non-leveraged stock bonus plan that is qualified under section 401(a) of the Code. Substantially all of the assets in the ESOP are invested in UAL stock.

You represent that the named plan administrator of the ESOP is UAL. UAL has assigned many of its administrative duties under the ESOP, including the duty to establish procedures for determining whether a domestic relations order constitutes a "qualified domestic relations order" (QDRO), to an ESOP Committee consisting of employees of United. The ESOP Committee has delegated to United's Pension Programs Department (Pension Programs) the responsibility of reviewing and determining whether a domestic relations order received by the ESOP Committee is a QDRO within the meaning of section 206(d)(3) of ERISA. Appeals of QDRO determinations are made to the ESOP Committee.

You further represent that the ESOP permits an alternate payee to request the immediate lump sum distribution of any benefits under the plan that are assigned pursuant to the terms of any domestic relations order that the ESOP Committee determines is a QDRO. The ESOP otherwise permits lump sum distributions only following a participant's termination of employment (including by way of the participant's death).

The named plan administrator of the 401(k) Plan is United. United has delegated the authority to control and manage the administration of the 401(k) Plan, including the duty to establish procedures for determining whether a domestic relations order constitutes a QDRO, to a Pension and Welfare Plans Administration Committee (PAWPAC) consisting of employees of United. PAWPAC in turn has delegated to Pension Programs the responsibility for reviewing and determining whether a domestic relations order applying to the 401(k) Plan is a QDRO. Appeals of a QDRO determination are made to PAWPAC. As with the ESOP, the 401(k) Plan permits the immediate distribution of benefits under the plan that are assigned pursuant to the terms of a QDRO. Although an alternate payee may thus receive an immediate lump sum distribution from the 401(k) Plan, participants or beneficiaries are entitled to distributions from the 401(k) plan only following termination of employment (including by way of the participant's death) or upon financial hardship.

You represent that Pension Programs currently has under review 16 domestic relations orders concerning benefits under the ESOP and the 401(k) Plan that Pension Programs believes may be "questionable" or "sham" in nature.[2]

You detail the grounds for Pension Programs suspicions as to the nature of these domestic relations orders as follows. Pension Programs received within a very short period of time five domestic relations orders from the same lawyer (two of the orders were mailed in the same envelope). Each order related to participants working in United's maintenance facility located in Indianapolis, Indiana. Each of the five orders identically provided for an assignment of 100 percent of the participant's benefit

Downloads    Yan - QDRO 05182023.pdf    100%  Clear

benefits in United's defined benefit pension plan. In each of the orders, the alternate payee and participant were shown as having the same address. Despite its suspicions, Pension Programs determined that each of the five orders was qualified because they satisfied the requirements of section 206(d)(3) of ERISA. In Pension Programs view, these orders differed from other domestic relations orders processed by Pension Programs in that they dealt only with the ESOP and the 401(k) Plan; they provided for assignment of 100 percent of the participant's benefit; and they showed the participant and alternate payee as having the same address.

After its determination that these five domestic relations orders were QDROs, Pension Programs received and reviewed 16 other orders that had unusual characteristics similar to those of the original five orders. These 16 similarly provided for a 100 percent assignment of benefits payable under the ESOP and/or the 401(k) Plan, made no mention of the defined benefit pension plan, and specified in most cases that the alternate payee and participant shared the same address. You represent that Pension Programs performed additional investigation in its review of these 16 domestic relations orders to determine whether they were qualified.[3] While these orders were pending review with Pension Programs, two participants from the Indiana facility called at different times to determine the status of the review of their orders. You indicate that, during those conversations, each participant asserted that his order was not one of the "fraudulent QDROs." You represent that these statements led Pension Programs to heighten its scrutiny of the 16 orders assigning 100 percent of the participant's right to the ESOP and 401(k) benefits.

You further represent that, after beginning its investigation of the 16 domestic relations orders in question, Pension Programs learned of a pamphlet entitled "Retirement Liberation Handbook" that was being distributed by at least one United employee in the Indianapolis, Indiana area.[4] The pamphlet advocated, as a method of acquiring a distribution of pension plan benefits before reaching retirement age, that participants and their spouses obtain a divorce for the sole purpose of securing a court order assigning pension plan benefits and then remarry. Such a "sham" divorce, according to the Liberation Handbook, would enable the participant to obtain direct control over the investment of the participant's pension benefit. The Liberation Handbook also suggested that single employees could go through a sham marriage and subsequent divorce, by paying an individual a percentage of the anticipated pension distribution as compensation for acting as spouse, or could instead quit employment in order to obtain a similar early distribution and later get rehired. The Handbook described in some detail how distributions from pension plans are handled for tax purposes and discussed various options for distributions and investments of the distributions.

After reviewing the Liberation Handbook, Pension Programs determined that all of the 16 orders in question, as well as the original five orders it had previously deemed qualified, had significant similarities to the specific format promoted by the Liberation Handbook. For example, two of the initial five orders requested that distribution be made to an inappropriate account named in the Liberation Handbook.

In addition, all of the orders identified by Pension Programs as questionable relate to the ESOP and 401(k) benefits of employees who, at the time of the order, resided in the Indianapolis area and were in related work groups, and all had a number of common characteristics not typically seen in Pension Programs' review of domestic relations orders. Included in these were rapid remarriage and continued use by the putative alternate payee of United's no-cost travel for spouses.

You represent that Pension Programs engaged local counsel in Indiana to determine whether and to what extent the questionable domestic relations orders might be valid under Indiana law. Indiana counsel opined that, if the orders had been obtained as promoted by the Liberation Handbook, (i) the participant and alternate payee would have committed perjury; (ii) the parties would be in contempt of court; (iii) the order would have been fraudulently obtained; and (iv) if the foregoing could be established to the satisfaction of a judge, the order likely would be vacated by the court.

You have asked for an advisory opinion as to whether, and if so when, a plan administrator may investigate or question a "domestic relations order" submitted for review to determine whether it is a valid "domestic relations order" under State law for purposes of section 206(d)(3)(B) of ERISA.

Section 206(d)(1) of ERISA generally requires pension plans covered by Title I of ERISA to provide that plan benefits may not be assigned or alienated. Section 206(d)(3)(A) of ERISA states that section 206(d)(1) applies to an assignment or alienation of benefits pursuant to a domestic relations order unless the order is determined to be a qualified domestic relations order (QDRO). Section 206(d)(3)(A) further provides that pension plans must provide for payment of benefits in accordance with the applicable requirements of any QDRO.

Section 206(d)(3)(B) of ERISA defines the terms qualified domestic relations order and domestic relations order for purposes of section 206(d)(3) as follows:

(B) For purposes of [section 206(d)(3)]

(i) the term qualified "domestic relations order" means a domestic relations order--

(I) which creates or recognizes the existence of an alternate payees' right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

Section 206(d)(3)(C) requires that in order for a domestic relations order to be qualified such order must clearly specify (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order; (ii) the amount or percentage of the participants' benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined; (iii) the number of payments or period to which such order applies; and (iv) each plan to which the order applies.

Section 206(d)(3)(D) specifies that a domestic relations order is qualified only if such order does not require (i) the plan to provide any type of benefit, or any option, not otherwise provided by the plan; (ii) the plan to provide increased benefits (determined on the basis of actuarial value); and (iii) the payment of benefits to an alternate payee that are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

Section 206(d)(3)(G) of ERISA requires the plan administrator to determine the qualified status of domestic relations orders received by the plan and to administer distributions under such qualified orders, pursuant to reasonable procedures established by the plan. In administering QDROs, plan administrators must follow the plan's reasonable procedures, as required under section 206(d)(3)(G), and must assure that the plan pays only reasonable expenses of administering the plan, as required by sections 403(c)(1) and 404(a)(1)(A) of ERISA. In this regard, plan fiduciaries must take appropriate steps to ensure that plan procedures are designed to be cost effective and to minimize expenses associated with the administration of domestic relations orders. See Advisory Opinion 94-32A (Aug. 4, 1994).

When a pension plan receives an order requiring that all or a part of the benefits payable with respect to a participant be paid to an alternate payee, the plan administrator must determine that the judgment, decree or order is a "domestic relations order" within the meaning of section 206(d)(3)(B)(ii) of ERISA-- i.e., that it relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child or other dependent of the participant and that it is made pursuant to State domestic relations law by a State authority with jurisdiction over such matters. Additionally, the plan administrator must determine that the order is qualified under the requirements of section 206(d)(3) of ERISA. It is the view of the Department that the plan administrator is not required by section 206(d)(3) or any other provision of Title I to review the correctness of a determination by a competent State authority pursuant to State domestic relations law that the parties are entitled to a judgment of divorce. See Advisory Opinion 92-17A (Aug. 21, 1992). Nevertheless, a plan administrator who has received a document purporting to be a domestic relations order must carry out his or her responsibilities under section 206(d)(3) in a manner consistent with the general fiduciary duties in part 4 of title I of ERISA.

For example, if the plan administrator has received evidence calling into question the validity of an order relating to marital property rights under State domestic relations law, the plan administrator is not free to ignore that information. Information indicating that an order was fraudulently obtained calls into question whether the order was issued pursuant to State domestic relations law, and therefore whether the order is a "domestic relations order" under section 206(d)(3)(C). When made aware of such evidence, the administrator must take reasonable steps to determine its credibility. If the administrator determines that the evidence is credible, the administrator must decide how best to resolve the question of the validity of the order without inappropriately spending plan assets or inappropriately involving the plan in the State domestic relations proceeding. The appropriate course of action will depend on the actual facts and circumstances of the particular case and may vary depending on the fiduciary's exercise of discretion. However, in these circumstances, we note that appropriate action could include relaying the evidence of invalidity to the State court or agency that issued the order and informing the court or agency that its resolution of the matter may affect the administrator's determination of whether the order is a QDRO under ERISA.[5] The plan

Downloads    Yan - QDRO 05182023.pdf      100%   Clear

of the order under State law. If, however, the administrator is unable to obtain a response from the court or agency within a reasonable time, the administrator may not independently determine that the order is not valid under State law and therefore is not a "domestic relations order" under section 206(d)(3)(C), but should rather proceed with the determination of whether the order is a QDRO.

This letter constitutes an advisory opinion under ERISA Procedure 76-1, 41 Fed. Reg. 36281 (1976). Accordingly, this letter is issued subject to the provisions of that procedure, including section 10 thereof, relating to the effect of advisory opinions.

**Sincerely,**

Susan G. Lahne

Acting Chief, Division of Fiduciary Interpretations

Office of Regulations and Interpretations

---

# Footnotes

1. You do not ask and we do not opine as to whether any of the individual domestic relations orders at issue is "qualified" pursuant to section 206(d)(3) of the Employee Retirement Income Security Act of 1974, as amended (ERISA) and section 414(p) of the Internal Revenue Code (Code).

2. Pension Programs processes between approximately 200 and 300 domestic relations orders per year for all of its qualified retirement plans.

3. You represent that United pays all expenses related to the administration of domestic relations orders and QDROs, including all of the investigative efforts relating to any questionable QDROs and all legal expenses. You state that no plan assets of either the ESOP or the 401(k) Plan have been used directly or indirectly to pay for the expenses of investigating the QDROs at issue here.

4. The Liberation Handbook apparently first appeared in the classified section of a local advertising exchange.

5. Appropriate action could take other forms, depending on the circumstances and the fiduciary's assessment of the relative costs and benefits, including actual intervention in or initiation of legal proceedings in State court

---

| Topics | Workers | Employers and Advisers | Resources | Laws and Regulations | About | Contact Us | Español |
|--------|---------|------------------------|-----------|----------------------|-------|------------|---------|

**FEDERAL GOVERNMENT** ⊞

White House

Benefits.gov

Coronavirus Resources

Disaster Recovery Assistance

DisasterAssistance.gov

USA.gov

Notification of EEO Violations

No Fear Act Data

U.S. Office of Special Counsel

**LABOR DEPARTMENT** ⊞

About DOL

Guidance Search

Español

Office of Inspector General

Subscribe to the DOL Newsletter

Read the DOL Newsletter

Emergency Accountability Status Link

A to Z Index

**ABOUT THE SITE** ⊞

Freedom of Information Act

Disclaimers

Plug-Ins Used on DOL.gov

Accessibility Statement

**Employee Benefits Security Administration**

An agency within the U.S. Department of Labor

200 Constitution Ave NW Washington, DC 20210

1-866-4-USA-DOL

1-866-487-2365

www.dol.gov

Connect With DOL



Site Map  |  Important Website Notices  |  Privacy & Security Statement