**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| CONGHUA YAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:23-cv-00758-P-BJ |
| | ) |
| THE STATE BAR OF TEXAS, a public corporation, | ) |
| THE BARROWS FIRM, a private company, | ) |
| LESLIE STARR BARROWS, in individual capacity, | ) |
| WILLIAM ALBERT PIGG in individual capacity, | ) |
| SAMANTHA YBARRA, in individual capacity, | ) |
| LUIS JESUS MARIN in individual capacity, | ) |
| and official capacity as Assistant Disciplinary | ) |
| Counsel for the Office of the CDC, | ) |
| DANIEL EULALIO MARTINEZ | ) |
| in individual capacity, | ) |
| and official capacity as Assistant Disciplinary | ) |
| Counsel for the Office of the CDC, | ) |
| RACHEL ANN CRAIG in individual capacity, | ) |
| and official capacity as Assistant Disciplinary | ) |
| Counsel for the Office of the CDC, | ) |
| LORI L. DEANGELIS in individual and official capacities | ) |
| as former officeholder of associate judge's court, | ) |
| 325th district, Tarrant County, Texas | ) |
| WILLIAM WREN "BILL" HARRIS, in his official | ) |
| capacity as a substitute for district judge Cynthia | ) |
| Terry by assignment in 360th district court, | ) |
| Tarrant County, Texas | ) |
| DAVID L. EVANS, in his official capacity as Presiding | ) |
| Judge of the 8th Administrative Judicial Region | ) |
| TOM WILDER in individual and official capacities | ) |
| as District Clerk, Tarrant County, Texas | ) |
| TARRANT COUNTY, a municipal entity, | ) |
| U.S. BANK, a public corporation, | ) |
| Defendants. | ) |
| _____ | ) |

**CERTIFICATE REGARDING USE OF GENERATIVE ARTIFICIAL INTELLIGENCE**

I, Conghua Yan, pro se plaintiff in the above-captioned matter, hereby certify as follows regarding the use of generative artificial intelligence (AI) in the preparation of the accompanying filing:

The initial drafting of the substantive legal content, arguments, and factual allegations in this filing was performed solely by me, **a human being**, without the use of any generative artificial intelligence tools.

Generative AI was used solely for a second-round validation purpose, including review for typographical errors, grammatical improvements, formatting consistency, and general readability.

All content, whether originally drafted by me or suggested/modified during the AI-assisted validation, was subsequently reviewed, edited, and verified by me in a **third**-round human review to ensure accuracy, completeness, and compliance with applicable law and rules.

Any illustrations, diagrams, flowcharts, or visual aids included in this filing (if any) were generated with the assistance of generative artificial intelligence tools.

I understand that this filing is subject to the requirements of *Fed. R. Civ. P. 11* and all applicable local rules of the United States District Court for the Northern District of Texas, and I affirm that the representations above are true and correct to the best of my knowledge.

Dated: December 28, 2025

*/s/ Conghua Yan*

Conghua Yan, Pro Se

2140 E Southlake Blvd, Suite L-439

Southlake, Texas 76092

Tel: 214-228-1886

Email: arnold200@gmail.com

The following illustration is for educational purposes only. A picture is worth a thousand words.





## CONTENTS

CERTIFICATE REGARDING USE OF GENERATIVE ARTIFICIAL INTELLIGENCE ................................ 2

CONTENTS .................................................................................................................................. 4

PRELIMINARY STATEMENT ........................................................................................................ 8

JURISDICTION AND VENUE ...................................................................................................... 10

PARTIES .................................................................................................................................... 10

FACTUAL ALLEGATIONS ........................................................................................................... 12

    *A.*   *The Divorce Proceeding and Initial Orders* ...................................................... 12

    *B.*   *The Fraudulent Motion and QDRO Scheme* ..................................................... 14

    *C.*   *The Fraudulent Garnishment Orders* ............................................................... 16

    *D.*   *The Smoking Gun Email* .................................................................................. 19

    *E.*   *Pigg's Concealment and Deception* .................................................................. 20

    *F.*   *U.S. Bank's Complicity* .................................................................................... 21

    *G.*   *The State Bar Cover-Up* ................................................................................... 22

    *H.*   *Continuing State-Court Enforcement and Collateral Use of Federal Proceedings (2024–present)* ........ 24

    *I.*   *Pattern and Continuity* .................................................................................... 28

    *J.*   *Ongoing Facilitation, Damage Control and Obstruction (2024-2025)* ..................... 33

    *K.*   *Anticipated Discovery* ..................................................................................... 35

SUMMARY OF CLAIMS (Provided for Convenience Only; Operative Allegations are in the Claims for Relief) ............................................................................................................................... 36

ENTERPRISE STRUCTURE (Provided for Convenience Only; Operative Allegations are in the Claims for Relief) ................................................................................................................... 36

    *1.*   *Association-in-Fact Enterprise: "Texas Family Court ERISA-Fund Extraction Enterprise"* ................ 37

    *2.*   *Predicate Acts Against Plaintiff Conghua Yan, Cause No. 325-707596-21* ............................ 37

    *3.*   *Pattern Predicates Establishing Continuity Under H.J. Inc. v. Northwestern Bell, 492 U.S. 229 (1989)* 38

    *4.*   *Relatedness (H.J. Inc. Factors)* ........................................................................ 38

    *5.*   *Continuity* ....................................................................................................... 38

    *6.*   *Joint and Several Liability* ............................................................................... 39

CLAIMS FOR RELIEF ................................................................................................................. 39

COUNT ONE: Civil RICO — 18 U.S.C. § 1962(c) ........................................................................ 39

    *A.*   *Texas Family Court ERISA-Fund Extraction Enterprise* ..................................... 39

    *B.*   *RICO Persons Who Conducted Enterprise Affairs* ............................................. 43

    *C.*   *Predicate Acts (Pattern of Racketeering Activity)* ............................................. 44

    *D.*   *Plaintiff's Direct and Continuing Injury* ......................................................... 48

COUNT TWO: RICO Conspiracy — 18 U.S.C. § 1962(d) ................................................................ 49

*A.*    *The Agreement — Direct Evidence* ......................................................................... 49

*B.*    *Knowing Membership and Roles in Furtherance Phase One (October 2021 - December 2022) Original ERISA Extraction Scheme* ........................................................................................... 49

*C.*    *Knowing Membership and Roles in Furtherance Phase Two (2024 - Present): Obstruction and Cover-Up* 50

*D.*    *Knowledge and Intent* ........................................................................................... 51

*E.*    *Relief Requested.* ................................................................................................ 53

COUNT THREE: Sherman Act Monopolization — 15 U.S.C. § 2 .......................................... 53

*A.*    *Elements of Monopolization* ..................................................................................... 54

*B.*    *Unlawful Tying Arrangement* .................................................................................... 56

*C.*    *State Bar's Unilateral Maintenance of the SAAP/SACP Tie* ................................................ 59

*D.*    *Judicial Campaign Contributions and Financial Alignment* ............................................... 60

*E.*    *Antitrust Injury, Interstate Commerce, and State-Action Immunity* ....................................... 60

*F.*    *Commercial Revenue Model and Compulsory Fee-Extraction Affecting Interstate Commerce* ............... 61

*G.*    *Monopoly Abuse Through the SACP Collection Mechanism* ................................................. 61

*H.*    *Preemption of Civil Remedies and Closed-Loop Dispute Resolution* ....................................... 62

*I.*    *Predatory and Unlawful Fee-Collection Practices; Documentary Record* ................................... 64

*J.*    *Market-wide Effects* .............................................................................................. 64

*K.*    Concrete Example: Plaintiff's Case ............................................................................ 64

*L.*    *Fee Front-Loading as Monopoly Maintenance; Statewide Victims* .......................................... 64

*M.*    *Relief* ............................................................................................................. 64

COUNT FOUR: 42 U.S.C. § 1983 — Due Process and Equal Protection ................................. 65

*A.*    *Claims Against DeAngelis* ....................................................................................... 65

*B.*    *Structural Due Process Violations* ............................................................................. 65

*C.*    *Federal Entitlement and Procedural Due Process Framework* .............................................. 68

*D.*    *Claims Against Marin, Martinez, and Craig* ................................................................. 69

*E.*    *Claims Against Tom Wilder (District Clerk)* ................................................................. 70

*F.*    *Claims Against U.S. Bank as § 1983 Conspirator* .......................................................... 72

*G.*    *Claims Against Barrows, Ybarra, and Pigg as § 1983 Conspirators* ...................................... 73

*H.*    *Claims Against Tarrant County for the official capacity of Wilder* ....................................... 74

COUNT FIVE: ERISA Fiduciary Breach — 29 U.S.C. § 1132(a) (2) and (a)(3) .......................... 74

*A.*    *Claims Against U.S. Bank (Fiduciary)* ....................................................................... 75

*B.*    *Claims Against the Barrows Firm and Barrows (Non-Fiduciary Transferees; Knowing Participants)* .. 75

*C.*    *Claims Against Pigg (Non-Fiduciary Knowing Participant)* ................................................. 77

*D.*    *Claims Against Ybarra (Non-Fiduciary Transferees; Knowing Participant)* ................................ 77

| | | |
|---|---|---|
| E. | *Claims Against Wilder (Non-Fiduciary Knowing Participant)* | 78 |
| F. | *Claims Against Tarrant County (Entity — Policy/Infrastructure Knowing Participant)* | 79 |
| G. | *Claims Against State Bar of Texas (Entity Knowing Participant in Ongoing Violations)* | 80 |
| H. | *Claims Against Marin, Martinez, and Craig (Knowing Participants in Ongoing Violations)* | 80 |
| I. | *Claims Against DeAngelis (Knowing Participant — Individual Capacity)* | 81 |
| J. | *Claims Against Harris (Knowing Participants in Ongoing Violations)* | 81 |
| K. | *Claims Against Evans (Knowing Participants in Ongoing Violations)* | 82 |
| L. | *Joint and Several Liability* | 83 |
| M. | *Relief Requested* | 83 |

COUNT SIX: Minnesota Civil Theft — Minn. Stat. § 604.14 ............................................ 83

COUNT SEVEN: Minnesota Common Law Fraud ...................................................... 85

COUNT EIGHT: Texas Legal Malpractice ............................................................ 86

PRAYER FOR RELIEF .................................................................................. 88

| | | |
|---|---|---|
| A. | Compensatory Damages | 88 |
| B. | Statutory and Treble Damages | 88 |
| C. | Punitive Damages | 88 |
| D. | Emotional Distress Damages | 89 |
| E. | ERISA Equitable Relief (29 U.S.C. § 1132(a)(2) and (a)(3)) | 89 |
| F. | Prospective Injunctive and Other Equitable Relief | 90 |
| G. | Declaratory Relief (Declaratory Judgment Act, 28 U.S.C. § 2201): | 93 |
| H. | Further Relief (28 U.S.C. § 2202): | 94 |
| I. | Fee Disgorgement | 94 |
| J. | Attorney Fees and Costs | 94 |
| K. | Interest | 94 |
| L. | Agency Referrals | 95 |
| M. | No Double Recovery | 95 |
| N. | Total Relief Demanded | 95 |

JURY DEMAND ........................................................................................ 96

INDEX of EXHIBITS ................................................................................... 97

Cases

*Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620 (5th Cir. 2002) .......................................... 54

*Board of Regents v. Roth*, 408 U.S. 564 (1972) ................................................................ 68, 70

*Boyle v. United States,* 556 U.S. 938 (2009) ................................................................ 42

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................................................................ 54

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ................................................................ 66

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) ................................................................ 44

*CIGNA Corp. v. Amara*, 563 U.S. 421 (2011) ................................................................ 74, 77

*Connecticut v. Doehr*, 501 U.S. 1 (1991) ................................................................ 68, 70

*Dennis v. Sparks*, 449 U.S. 24 (1980) ................................................................ 22, 72, 73

*Ex parte Young*, 209 U.S. 123 (1908) ................................................................ 11, 74, 83

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ................................................................ 68, 70

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ................................................................ 66

*Grannis v. Ordean*, 234 U.S. 385 (1914) ................................................................ 65

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) ................................................................ 30, 38, 39, 47

*Hafer v. Melo*, 502 U.S. 21 (1991) ................................................................ 72

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000) ................................................................ 74, 77

*Hudson v. Palmer*, 468 U.S. 517 (1984) ................................................................ 69

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ................................................................ 72

Mahoney & Hagberg v. Newgard, 729 N.W.2d 302 (Minn. 2007) ................................................................ 85

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ................................................................ 68, 70, 71

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ................................................................ 72

*North Carolina State Board of Dental Examiners v. FTC*, 574 U.S. 494 (2015) ................................................................ 60

*North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975) ................................................................ 62, 68, 70, 73

*Parker v. Brown*, 317 U.S. 341 (1943) ................................................................ 60

*Parratt v. Taylor*, 451 U.S. 527 (1981) ................................................................ 63, 68

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ................................................................ 54

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ................................................................ 43

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ................................................................ 39

*Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969) ................................................................ 68, 70

*Tumey v. Ohio*, 273 U.S. 510 (1927) ................................................................ 66

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ................................................................ 56

*United States v. Pungitore*, 910 F.2d 1084 (3d Cir. 1990) ................................................................ 52

*United States v. Turkette*, 452 U.S. 576 (1981) ................................................................ 42

*Wyatt v. Cole*, 504 U.S. 158 (1992) ................................................................ 74

*Zinermon v. Burch*, 494 U.S. 113 (1990) ................................................................ 63, 68, 72

**FOURTH AMENDED COMPLAINT FOR CIVIL RICO, AND ANTITRUST ETC.,
DEMAND DECLARATORY RELIEF, INJUNCTIVE RELIEF, DAMAGE RELIEF,
AND JURY DEMAND**

**PRELIMINARY STATEMENT**

1.    This action arises from a calculated and fraudulent scheme to extract attorney-fee money from Plaintiff's ERISA-protected retirement account by:

(a)  first obtaining an Associate Judge Report that purported to award $50,000 in "attorney's fees" ($25,000 to each side's counsel) from Plaintiff's 401(k); then

(b)  fraudulently misclassifying the payment stream as a "spousal support" domestic relations order to intentionally subvert ERISA's anti-alienation provision; and

(c)  executing the illicit artifice through two constructive prejudgment writs issued, each at $25,000, and served without the ordinary procedural safeguards. These acts were carried out through an ongoing "Family Court Enterprise" and constitute a pattern of racketeering activity as alleged in the Counts, including embezzlement/abstraction of ERISA plan assets (*18 U.S.C. § 664*) and the use of interstate wires and mails to implement and conceal the scheme (*18 U.S.C. §§ 1341, 1343*), causing concrete injury to Plaintiff's property.

2.    After the April 13, 2022 hearing, a Texas Associate Judge report purported to require Plaintiff to pay $25,000 to Defendant Barrows and $25,000 to Defendant Pigg from Plaintiff's Minnesota 401(k). Barrows then learned from the plan administrator that ERISA does not permit direct payment of interim attorney's fees through a Qualified Domestic Relations Order ("QDRO") type device. Rather than complying with the law, Barrows conspired with Pigg to proceed anyway by fabricating a "spousal support" label for the withdrawals, payable through Plaintiff's spouse, so the same $25,000 fee objective could be achieved through deceit. This agreement and coordinated conduct support Plaintiff's allegations that Defendants knowingly joined and participated in the Enterprise's affairs through racketeering (*18 U.S.C. § 1962(c)*) and further agreed to the overall unlawful objective and its execution (*18 U.S.C. § 1962(d)*).

3.    To consummate this fraudulent subterfuge, Defendants prepared and submitted multiple sham "spousal support" instruments and then caused two prejudgment writs to issue and be served on U.S. Bank and/or U.S. Bancorp in June and July 2022. This was done without a filed writ *application*, without the required supporting *affidavit*, and without any *bond* filing, relying entirely on the fraudulently altered "spousal support" paperwork as the false predicate. These repeated, related acts, separated in time and involving multiple filings/communications, are pleaded as the "pattern" component required by *18 U.S.C. § 1961(5)* and demonstrate both relatedness and continuity as alleged elsewhere in this Complaint.

4.

5.  In July 2022, U.S. Bank contacted Plaintiff seeking consent/release in response to the court instrument; Plaintiff objected because the court had neither heard nor ordered spousal support, exposing the falsity of the instrument. Plaintiff alleges this objection placed Defendants and the plan on notice that the "spousal support" label was disputed and materially false, yet Defendants persisted in the same course of conduct to obtain and/or enforce plan distributions.

6.  Plaintiff alleges his own counsel Pigg, engaged in active concealment by falsely portraying himself as uninvolved and aligned with Plaintiff's objection, while concealing that he had already signed the underlying fraudulent "spousal support" instruments. Barrows's August 5, 2022 email confirms the specific intent to defraud: "In order for us to obtain our attorney's fee, we must say the order is for spousal support… there is no way around it." Plaintiff alleges this communication is direct evidence of knowing intent and shared purpose—i.e., that Defendants chose a false label as the necessary means to obtain attorney-fee money from ERISA-protected funds—and thus supports the requisite mens rea for the pleaded racketeering predicates and the *§ 1962(d)* conspiracy agreement.

7.  Plaintiff alleges that the fees referenced in the email included fees owed to Samantha Ybarra for her representation of Plaintiff's then-spouse, Fuyan Wang, in a separate criminal proceeding in the Municipal Court of the City of Southlake, Texas, Cause No. E0129990-1, as well as fees owed to Barrows in the divorce proceeding, further evidence that the "spousal support" label was a material misrepresentation of the debt's true nature. Plaintiff alleges the objective was payment of attorneys' fees to State Bar-licensed lawyers, not adjudicated spousal support, reinforcing the materiality of the misclassification and the intent to subvert ERISA's protections.

8.  Plaintiff further alleges that he did not learn the full existence/sequence of the clerk-issued writ entries and related Domestic Relations Order "DRO" substitute processing until obtaining the District Clerk's "All Transactions" history in August 2024, because docket access was constrained and Pigg's July–August 2022 communications calculatedly concealed the filed instruments and writ mechanics. When Plaintiff filed grievances, State Bar officials dismissed them despite documentary evidence, perpetuating the cover-up. Plaintiff pleads these facts as concealment in furtherance of the Enterprise's operation and as part of the racketeering pattern, including to delay detection and accountability.

9.  This lawsuit exposes decades-long RICO schemes within Texas family courts, where attorneys weaponize court domestic relations orders to illegally drain federally protected retirement funds for the purpose of paying legal services, with the State Bar's self-regulated disciplinary system providing cover for these criminal enterprises. Plaintiff seeks, among other relief, forward-looking declaratory and injunctive remedies to halt continued use of sham domestic-relations labels and writ mechanisms to reach ERISA-protected assets, in addition to damages against the non-immune RICO persons as pleaded in the Counts.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under *28 U.S.C. § 1331* (federal question) because Plaintiff's claims arise under *18 U.S.C. §§ 1961-1968* (RICO), *15 U.S.C. § 2* (Sherman Act), *29 U.S.C. § 1132* (ERISA), and *42 U.S.C. § 1983*.

11. This Court has supplemental jurisdiction over Plaintiff's Minnesota and Texas state law claims under *28 U.S.C. § 1367(a)*, as those claims form part of the same case or controversy and arise from the same nucleus of operative facts.

12. Minnesota substantive law applies to Plaintiff's state law claims against Defendant Barrows and Pigg because: (a) they directed fraudulent communications to Minnesota; (b) the injury occurred to Minnesota-based assets; (c) the abstracted funds were located in Minnesota; and (d) Minnesota has the most significant relationship to the fraud claims.

13. Venue is proper in the Northern District of Texas under *28 U.S.C. § 1391(b)*, *18 U.S.C. § 1965*, and *15 U.S.C. § 22* because Plaintiff resides in Tarrant County, Defendant Barrows resides in Tarrant County, and a substantial part of the events giving rise to the claims occurred in this District.

14. Personal Jurisdiction (U.S. Bank). This Court has specific personal jurisdiction over U.S. Bank because U.S. Bank purposefully directed suit-related conduct to Texas, administering Plaintiff's plan account and communicating plan determinations to Plaintiff in Texas, and Plaintiff's claims arise out of or relate to that conduct. Jurisdiction is authorized by the Texas long-arm statute, *Tex. Civ. Prac. & Rem. Code § 17.042*, and comports with due process.

## PARTIES

### *Plaintiff*

15. Plaintiff Conghua Yan is a natural person and resident of Tarrant County, Texas. Plaintiff is a professional IT expert in the banking sector with no criminal record.

### *Defendants*

16. **The State Bar of Texas** ("SBOT") (EIN: 746000148) is a public corporation and an administrative agency of the judicial department of the Texas government that licenses attorneys to practice law in Texas. The entity of SBOT is identified as a RICO enterprise under *18 U.S.C. § 1961(4)*, but is NOT sued as a RICO person under *§ 1961(3)*. The State Bar is separately sued for monopolization under *15 U.S.C. § 2*.

17. **The Barrows Firm** ("Barrows Firm") is a Texas law firm and identified as an entity component of a RICO association-in-fact enterprise under *18 U.S.C. § 1961(4)*, but is NOT sued as a RICO person under *§ 1961(3)*.

18. **Leslie Starr Barrows** ("Barrows") (Bar No. 24048343) is an attorney and member of the State Bar of Texas, sued in her individual capacity. Former Board Director of Tarrant Bar Association.

19. **William Albert Pigg** ("Pigg") (Bar No. 24057009) is an attorney who represented Plaintiff, sued in his individual capacity.

20. **Samantha Ybarra** ("Ybarra") (Bar No. 24104627) is an attorney at The Barrows Firm, sued in her individual capacity.

21. **Luis Jesus Marin** ("Marin") (Bar No. 24108702) is Assistant Disciplinary Counsel for the State Bar, sued in official and individual capacity. Official capacity claims are brought under the *ultra vires* doctrine.

22. **Daniel Eulalio Martinez** ("Martinez") (Bar No. 24120994) is Assistant Disciplinary Counsel for the State Bar, sued in official and individual capacity. Official capacity claims are brought under the *ultra vires* doctrine.

23. **Rachel Ann Craig** ("Craig") (Bar No. 24090049) is Assistant Disciplinary Counsel for the State Bar, sued in official and individual capacity. Official capacity claims are brought under the *ultra vires* doctrine.

24. **Lori L. DeAngelis** ("DeAngelis") (Bar No. 05624250) served as former office holder of associate judge's court, 325th District, sued in official and individual capacity under the *ultra vires* doctrine for actions in clear absence of jurisdiction.

    (a) DeAngelis was former office holder of associate judge's court, 325th District, moved to 324th District. Therefore, pursuant to *Fed. R. Civ. P. 25(d)*, any successor of her official capacity **automatically substituted**; Tarrant County Criminal District Office has been defending all claims against the office of associate judge's court, 325th District since 2023.

    (b) Any successor of DeAngelis has authority over the ongoing writ of garnishment (signed and served on U.S. Bank) in Cause No. 325-707596-21, such that prospective injunctive and declaratory relief is available under *Ex parte Young*.

25. **David L. Evans** ("Evans") (Bar No. 06713080) is the Presiding Judge of the 8th Administrative Judicial Region of Texas**.** In this capacity, Evans has administrative authority under Texas Government Code *§ 74.054* to assign cases between district courts within the region, which includes Tarrant County. Defendant Evans is sued solely for prospective injunctive and declaratory relief. No monetary damages are sought against him. Former President of Tarrant Bar Association.

26. **Tom Wilder** ("Wilder") is employed by the enterprise as District Clerk of Tarrant County (through the District Clerk's Office that processes filings and issues writs in the 325th District Court, an

enterprise component), sued in official and individual capacity. Official capacity claims are brought under the *ultra vires* doctrine for actions contrary to Texas law, rules and regulations.

27. **William Wren 'Bill' Harris** ("Harris") (Bar No. 09097100) is a retired judge sitting by assignment pursuant to Chapter 74 of the Texas Government Code and is sued in his official capacity in that role. He is the substituted presiding district judge currently assigned to Cause No. 325-707596-21 (relabeled as Cause No. 360-707596-21 following transfer). Defendant Harris is sued solely for prospective injunctive and declaratory relief. No monetary damages are sought against him.

28. **Tarrant County** ("County") is named as a defendant because it is a knowing participant and because Defendant Tom Wilder is sued in his official capacity as District Clerk of Tarrant County. An official-capacity claim against Wilder is a claim against the County. Plaintiff alleges that Wilder, acting through the District Clerk's Office, implemented and maintained a County custom/policy of issuing and processing prejudgment writs (including writs of garnishment) without verifying mandatory prerequisites required by Texas Rule of Civil Procedure 658, i.e., without a filed application, without the required supporting affidavit, without any bond, and without collection/verification of the mandatory application filing fee, thereby causing unconstitutional deprivation of Plaintiff's property without due process and creating an ongoing risk of repetition absent prospective injunctive relief.

29. **U.S. Bank** (properly known as U.S. Bank National Association, "US Bank" or "U.S. Bank"), an American national banking association headquartered in Minneapolis, Minnesota, which served as administrator and fiduciary of Plaintiff's 401(k) plan, identified as a RICO person under *18 U.S.C. § 1961(3)*.

## FACTUAL ALLEGATIONS

*In this Factual Allegations section, descriptive or evaluative terms (including adjectives and adverbs) are used only to describe the observed effects of the events alleged, or reasonable inferences drawn from those events, and not as standalone legal conclusions. To the extent a term could be read as a legal conclusion, Plaintiff intends it as shorthand for the supporting factual allegations stated in this section and the specific elements pleaded in the Counts below. Plaintiffs allege the following facts for purposes of this Complaint, based on personal knowledge, review of court records, and, where specifically indicated, information and belief. (Incorporated by reference into all Counts)*

*A.    The Divorce Proceeding and Initial Orders*

30. On October 15, 2021, Plaintiff filed for divorce in the 325th District Court, Tarrant County (Case No. 325-707596-21). The presiding Judge was Judith G. Wells, and Associate Judge Lori L. DeAngelis presided over hearings.

31.  On October 27, 2021, DeAngelis publicly thanked Barrows for hosting a campaign fundraising event at The Barrows Firm, posting photos on her official judicial campaign social media. In one of the photos, an award frame with the words "Top Attorney" was visible. DeAngelis solicited business for Barrows using her official campaign's social media accounts on Facebook and Twitter.

32.  By the end of October 2021, Plaintiff was represented by Anita Krosby Cutrer ("Cutrer") (Bar No. 00787861). Plaintiff's soon-to-be-ex-spouse, Fuyan Wang ("Wang"), a Southlake resident requiring a Mandarin interpreter, was represented by Eun Hyuk "Nathan" Yi (Bar No. 24033489), an attorney who speaks Chinese Mandarin.

33.  On November 1, 2021, the initial hearing for Plaintiff's **Temporary Restraining/ Injunctive Order against Wang** was scheduled. Mr. Yi appeared and requested rescheduling to November 8, 2021, which was granted.

34.  On November 4, 2021, Barrows replaced Plaintiff's spouse's prior attorney Yi, despite a language barrier (Plaintiff's spouse required a Mandarin interpreter and consistently claimed inability to communicate in English). Yi, who spoke Chinese, had never provided any court services before that day. Barrows, an English-speaking attorney, quickly persuaded Plaintiff's spouse to retain her services.

35.  On November 8-9, 2021, DeAngelis conducted hearings exhibiting bias against Plaintiff, refusing evidence of domestic violence while crediting Plaintiff's spouse's testimony. DeAngelis refused every photo and video evidence Plaintiff's attorney attempted to submit, dismissing evidence under the pretext that she could not understand the few words of Chinese Mandarin spoken in videos. DeAngelis disregarded Plaintiff's testimony, presuming every word from Plaintiff's spouse as truthful, despite Plaintiff having no criminal history while Plaintiff's spouse had two prior temporary restraining orders and two arrests for family violence. The most recent temporary restraining order against Plaintiff's spouse was issued by the 324th family court in 2020.

36.  DeAngelis ruled that Plaintiff must <u>move out</u> of the house, continue <u>paying the mortgage</u> despite <u>not</u> <u>living</u> there, <u>lost primary child custody</u>, and was ordered to <u>pay child support</u>. When Plaintiff questioned why he was ordered to move out while his spouse Wang with a history of family violence remained with primary custody, DeAngelis sneered and replied, "You <u>asked for protection</u>, so I order you to move out <u>to protect you</u>."

37.  On November 10, 2021, without any pleading or hearing on attorney's fees, DeAngelis issued a report, seeking Plaintiff to pay $10,000 ($5,000 to each party's attorney). No evidence was submitted; the *only* fact considered was Plaintiff's account <u>balance showing $10,000 available</u>. The **amount** Plaintiff had **available** in his account was the <u>sole factual basis</u> DeAngelis used in her ruling, how much Plaintiff had was how much DeAngelis determined she could take to award her family law affiliates. DeAngelis voluntarily advocated for legal fees *advanced* payment without any solicitation from either party, as both parties had already paid retainers before appearing in

court. Plaintiff filed a de novo request, that subject matter of Plaintiff's Temporary Restraining/Injunctive Order was appealed and moved to Judge Wells; district court.

38.  Between December 2021 and February 2022, Wang was charged by Southlake DFPS and tried for assault with contact and family violence in criminal case number E0129990-1 in the municipal court of the city of Southlake. She was represented by Defendant Ybarra, who worked at The Barrows Firm with Defendant Barrows. This criminal case is attached hereto as Exhibit 6.

39.  By November 2021, Plaintiff had already made prior payments of approximately $5,000 to Barrows through his spouse. Despite these prior payments, Barrows subsequently filed a motion claiming $19,300 in fees without deducting the payment received, and asserting her client was "unable to make these payments," a double-dipping effort to extract additional funds from Plaintiff.

B.   *The Fraudulent Motion and QDRO Scheme*

40.  Chronology Summary (Core Sequence):

   (a) On April 13, 2022, the Associate Judge process produced a report that purported to award $25,000 in fees to Barrows and $25,000 in fees to Pigg from Plaintiff's 401(k). (APP-062)

   (b) Afterward, Barrows learned the plan administrator would not lawfully process interim attorney-fee payments through a QDRO-type instrument because attorneys are not "alternate payees."

   (c) Barrows then coordinated with Pigg to relabel the payment stream as "spousal support" so plan assets could be released through Plaintiff's spouse and used to satisfy the same $25,000 fee objective.

   (d) Defendants then advanced the plan by submitting multiple "spousal support" instruments without Plaintiff's knowledge and by causing two prejudgment writs to be issued, $25,000 each, and served in June and July 2022 without a filed writ *application*, without the required *affidavit*, and without any *bond* filing.

   (e) Plaintiff first learned the clerk-issued writ entries and related fee/processing anomalies after obtaining the District Clerk's "All Transactions" history in August 2024, because docket access was constrained and Pigg's July, August 2022 communications concealed the existence and mechanics of the filed instruments and writs.

41.  On March 3, 2022, Barrows, acting through The Barrows Firm, filed a Motion for Interim Attorney's Fees with a false affidavit. The affidavit claimed $19,300 in fees for the family court case. Barrows, serving as witness for this petition, submitted an affidavit stating the bills recorded in exhibits were for attorney's fees in the family court case. This motion is attached hereto as Exhibit 3.

42.  However, billing records in the affidavit showed multiple charges related to the Southlake Police's criminal case number E0129990-1 in the municipal court. One record dated February 1, 2022,

showed a 2-hour charge totaling $500 for attending a hearing in municipal court. These charges were not attorney's fees in the family court case. Barrows made a false statement by claiming all fees were in the family court case, thereby committing wire fraud under *18 U.S.C. § 1343* and aggravated perjury under *Texas Penal Code 37.03*. Samantha Ybarra was included as a recipient in this telecommunication and knew the affidavit was not true but chose to support this act as a conspirator under *18 U.S.C. § 1349*. This affidavit is attached hereto as Exhibit 5.

43. On April 13, 2022, a hearing for the Motion of Interim Attorney's Fees was held in DeAngelis's Associate Judge Court. Barrows testified under oath that her affidavit was true, despite knowing it included charges from the criminal case. By personally affirming this affidavit in court, Barrows committed another act of aggravated perjury under *Texas Penal Code 37.03*. Both Ybarra and Pigg appeared in court but neither reported Barrows' misconduct to the State Bar of Texas. Ybarra knew this testimony was not true but chose to support this act as a conspirator under *18 U.S.C. § 1349*.

44. Plaintiff testified on the stand, claiming the fees listed were incurred in another criminal case, not the family court case. All Defendants in court, including DeAngelis, chose to commit official oppression under *Texas Penal Code 39.03(a)(2)*, disregarding Plaintiff's testimony.

45. Despite knowing no funds were available for withdrawal from Plaintiff's bank accounts, and that $100,000 remained in Plaintiff's out-of-state retirement account, DeAngelis opted to draw money from Plaintiff's 401(k) to support her political campaign contributor, Barrows.

46. Barrows' own billing records showed she had received approximately $5,000 in prior payments from Plaintiff through his spouse. The March 3, 2022 affidavit claimed $19,300 in total fees. After subtracting the $5,000 already paid, the amount actually owed would have been approximately $14,300. However, the billing records included charges from the criminal case (municipal court case E0129990-1), which were not family court fees. Excluding these criminal case charges, Barrows was owed approximately **$11,000** at most. Despite this, DeAngelis awarded **$25,000** to Barrows, more than <span style="color:red">double</span> what was actually owed even under Barrows' fraudulent calculation, and more than Barrows had even requested. This demonstrates DeAngelis' pattern of awarding attorney fees based solely on available account balances rather than actual amounts owed or reasonable attorney fee calculations.

47. An Associate Judge report was written after the hearing. Both Barrows and Pigg consented to this unlawful proposed order. The report ordered Plaintiff to pay fees for drafting a QDRO and to directly pay Barrows and Pigg $25,000 each from his out-of-state 401(k) account. This report/order is attached hereto as Exhibit 7. (APP-062)

48. On April 13, 2022, DeAngelis ordered Plaintiff to pay $50,000 from his 401(k) ($25,000 to each attorney) via QDRO, despite: (a) Texas Family Code prohibiting interlocutory QDROs; (b) ERISA prohibiting distributions to attorneys. Under Texas family law and constitution, Plaintiff asserts that the association judge's court is not vested jurisdiction to divide ERISA fund and issue DRO, only

district court possess that trial and post-judgment jurisdiction. DeAngelis's order is *ultra vires* act in the absence of all jurisdiction.

49. Pigg was Plaintiff's attorney expected to advocate for Plaintiff's interests. He had not advocated for attorney's fees, nor provided any testimony or evidence about his fees. Yet DeAngelis advocated for Pigg's interests and granted him $25,000 in the absence of any evidence or pleading, despite having no authority to do so. As an incentive for Pigg not to appeal this unlawful order, DeAngelis offered him $25,000 in exchange for his cooperation.

50. Defendant DeAngelis's report violated multiple provisions of ERISA's QDRO requirements. First, *29 U.S.C. § 1056(d)(3)(B)(ii)(II)* requires that a QDRO be issued "pursuant to a State domestic relations law (including a community property law)." *Texas Family Code Chapter 9, Subchapter B* presupposes a final decree of divorce or annulment (or other final property-division order). Under *§ 9.101*, the court that rendered the final decree retains continuing, exclusive jurisdiction to render a QDRO, and *§ 9.102* authorizes a QDRO petition only by a party to a decree, meaning an interlocutory order cannot qualify as a valid QDRO under Texas law. Second, the order violated *29 U.S.C. § 1056(d)(3)(B)(i)(I)*, which requires that a QDRO "create or recognize the existence of an alternate payee's right to receive all or a portion of the benefits." Attorneys are not "alternate payees" under the statutory definition. Third, the order violated *29 U.S.C. § 1056(d)(3)(C)(ii)*, which requires that a QDRO "clearly specify the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee." Because attorneys cannot be alternate payees, DeAngelis's order directing payment to Barrows and Pigg was facially defective and could never qualify as a valid QDRO.

51. After the hearing, Barrows contacted Plaintiff's 401(k) administrator, U.S. Bank, located in Minnesota. Barrows learned that Federal ERISA law prohibits a QDRO order from dispensing funds to anyone other than an "alternate payee" as defined in *29 U.S.C. § 1056*. An attorney is not defined as an alternate payee. Barrows also learned that *29 U.S.C. § 1056* prohibits dispensing funds for interim attorney's fees.

52. Barrows then contacted/pressured Pigg to proceed anyway, and Plaintiff alleges that Barrows and Pigg jointly chose to relabel the same $25,000 fee objective as "spousal support" payable through Plaintiff's spouse (Wang), so the plan could release ERISA-protected funds despite the attorney-payee prohibition.

53. Not wanting to lose the opportunity to secure payment, Barrows devised a scheme to circumvent *29 U.S.C. § 1056* by falsely labeling the distribution as "spousal support."

*C.*   ***The Fraudulent Garnishment Orders***

54. **Implementation of the "Spousal Support" Relabeling Sequence.** Plaintiff alleges Defendants prepared and submitted three successive "spousal support" instruments dated April 26, May 26, and

June 16, 2022, each stating (in substance) that spousal support had been requested/heard/ordered on April 13, 2022. Plaintiff alleges these instruments were signed/submitted without Plaintiff's knowledge or notice and were used as the asserted predicate paperwork to obtain prejudgment writs directed at freezing and extracting two separate $25,000 disbursements from Plaintiff's 401(k).

55.    **April 26, 2022 transmission and signature**. Plaintiff alleges that on or about April 26, 2022, Barrows sent a proposed garnishment/spousal-support order to Pigg by electronic communication for signature; Pigg signed it and returned/transmitted the signed version for filing. Plaintiff alleges Ybarra was copied on these communications.

56.    Plaintiff alleges Pigg did not disclose this April 26 order to Plaintiff and Plaintiff was not notified of the submission/signing activity; and a copy is attached as Exhibit 8.

57.    **Content of the April 26 order**; lack of spousal-support record predicate. Plaintiff alleges the April 26 order contained statements including: "On April 13, 2022, the Court heard Respondent's request for Spousal Support …" and "Yan was ordered/required to pay spousal support." Plaintiff alleges these statements were false because the court record contained no motion, hearing, or order for spousal support on April 13, 2022. Plaintiff alleges Judge Judith G. Wells signed the order notwithstanding the absence of a spousal-support motion/hearing/order in the record. Plaintiff further alleges, on information and belief, that Barrows was a political campaign contributor to Judge Wells.

58.    **May 26, 2022 revised order**. Plaintiff alleges that on or about May 26, 2022, Barrows transmitted a revised garnishment/spousal-support order to Pigg for signature; Pigg signed it and transmitted/submitted it for filing; and Judge Wells signed it. Plaintiff alleges Ybarra was copied on these communications.

59.    Plaintiff alleges Pigg did not disclose this revised May 26 order to Plaintiff and Plaintiff was not notified.

60.    **June 16, 2022 writ paperwork and transmission**. Plaintiff alleges that on or about June 16, 2022, Barrows transmitted writ-related garnishment paperwork (including spousal-support assertions) to Pigg for signature; Pigg signed and returned/transmitted it for filing; and Judge Wells signed it. Plaintiff alleges Ybarra was copied on these communications.

61.    Plaintiff alleges the writ paperwork (or related packet) was then sent to U.S. Bank in Minnesota. Plaintiff alleges Pigg did not disclose this June 16 writ to Plaintiff and Plaintiff was not notified.

62.    **July 12, 2022 order—different judicial signature.** Plaintiff alleges that the July 12, 2022 "spousal support" instrument referenced in the Facts and used in the July 2022 writ sequence was not signed by District Judge Judith G. Wells, but instead bears the signature of DeAngelis. Defendant Wilder, Barrows, and Pigg nevertheless treated the July 12 instrument as valid controlling authority for subsequent writ steps, including the July 12, 2022 writ issuance and service. On information and belief, because District Judge Wells had already signed the May 26, 2022 order, the later July 12, 2022 associate-judge signature could not operate as a new or superseding final district-court order.

Plaintiff alleges DeAngelis lacked authority to sign a supplemental or superseding final order after the district judge had signed the controlling order, and that DeAngelis' act was ultra vires and void for want of jurisdiction. Plaintiff further alleges Defendants Wilder, Barrows, and Pigg nevertheless relied on the July 12 instrument as if it were controlling to pursue the July 2022 second-writ sequence; that misuse rendered the second writ void or voidable; and it evidences Defendants' knowledge of falsity.

63. **"Purpose/alternate payee" reframing and the August 5 email**. Plaintiff alleges the spousal-support instruments/writ paperwork reframed the stated "purpose" and payee pathway compared to the initial attorney-fee objective, in order to route funds through Plaintiff's spouse. Plaintiff alleges that an email from Barrows reflects this intent, including statements to the effect that describing the order as "spousal support" was necessary to obtain attorney-fee payment.

64. **Communications with U.S. Bank and execution outcome**. Plaintiff alleges that between April and September 2022, Barrows communicated with U.S. Bank and/or its counsel about releasing funds and responding to Plaintiff's objections. Plaintiff alleges that a $25,000 distribution was ultimately obtained in late 2022 with cooperation by other participants.

65. **Two writs issued;** no application/no bond alleged. Plaintiff alleges that in June and July 2022, two Writs of Garnishment Before Judgment were issued by the Tarrant County District Clerk and served on U.S. Bank and/or U.S. Bancorp in the 325 Case. The District Clerk "All Transactions" history reflects: (1) "WRIT GARN-ISSUED ON US BANCORP" on June 16, 2022 (with "PAYMENT RECEIVED" trans. #103), and (2) "WRIT GARN-ISSUED ON US BANK" on July 14, 2022 (with "PAYMENT RECEIVED" trans. #119). Plaintiff alleges these writs were issued without any filed application for writ of garnishment, without any supporting affidavit, without any judge-signed writ findings being sought/obtained, and without any bond filing. Plaintiff further alleges he did not learn of these clerk-issued writ entries until obtaining the "All Transactions" history in August 2024 because docket access was constrained and Pigg's July–August 2022 communications concealed the writ sequence.

66. **July 14, 2022 writ language**. Plaintiff alleges that a writ dated July 14, 2022 contains the same spousal-support assertions as the June 16, 2022 writ, including statements that: "On April 13, 2022, the Court heard Respondent's request for Spousal Support" and "Yan was ordered/required to pay spousal support." Plaintiff alleges a copy is attached as Exhibit 20.

67. **Execution Status**. The June 16, 2022 writ of garnishment was executed, resulting in a $25,000 distribution from Plaintiff's 401(k) account in September 2022 to Plaintiff's then-spouse, Fuyan Wang, labeled as spousal support. Those funds were subsequently paid to Barrows, the Barrows Firm, and Ybarra in satisfaction of attorney fees. A portion of the funds compensated Barrows for her services in the divorce proceeding (Cause No. 325-707596-21), a portion compensated Ybarra for her services in the separate criminal proceeding against Fuyan Wang (Municipal Court of the City of Southlake, Texas, Cause No. E0129990-1), (APP-051) and a portion compensated for the

Barrows Firm's administrative charge. The July 14, 2022 writ of garnishment was served on U.S. Bank but remained unexecuted as of the filing of this Fourth Amended Complaint.

68. **Continuing restraint and practical effects as alleged**. Plaintiff alleges that because the July 14, 2022 writ was served and remained pending, it has functioned as a continuing possession of $25,000 property right and restraint/encumbrance on Plaintiff's remaining 401(k) benefits, impairing Plaintiff's ability to access or manage those assets and creating ongoing uncertainty regarding further restraint or distribution.

69. **Continuing injury as alleged**. Plaintiff alleges the unexecuted writ's continued pendency has caused continuing economic harm (including lost investment opportunity) and ongoing stress associated with the possibility of execution.

70. **Ongoing threat characterization** (factual). Plaintiff alleges the July 14, 2022 writ can be executed without additional warning, and that its continued existence creates a non-speculative risk of a second $25,000 restraint/distribution.

71. **Interstate transmission facts**. Plaintiff alleges the writ and related communications were transmitted/served to U.S. Bank outside Texas and included the same spousal-support assertions described above.

72. **Duration allegation**. Plaintiff alleges he has been denied practical access to affected retirement funds from July 14, 2022 to the present due to the served writ remaining pending.

73. **Pattern description (factual only)**. Plaintiff alleges the conduct described above began in April 2022 and continued through at least late 2022, and that the July 14, 2022 writ remained pending thereafter.

74. **Standing/injury framing (factual only)**. Plaintiff alleges his injury is ongoing because the served writ remains outstanding and continues to impair access to and control over retirement assets.

75. **Withdrawal and fee-loss allegations**. Plaintiff alleges that after communications concerning Plaintiff's objections and discovery of the writ sequence, Barrows, Pigg, and Ybarra withdrew from Plaintiff's family-court case in late 2022. Plaintiff alleges he paid substantial attorney fees and incurred related losses, which he estimates at approximately $50,000 to $100,000.

*D.* ***The Smoking Gun Email***

76. After learning that Plaintiff was notified by U.S. Bank in July 2022 seeking Plaintiff's consent/release in response to the served instrument, Pigg chose to keep concealing the truth from Plaintiff by sending a telecommunication email requiring Plaintiff to sign an objection letter to U.S. Bank. Plaintiff objected because no spousal support had been requested/heard/ordered on April 13, 2022. Even though Pigg admitted that Plaintiff was not ordered to pay spousal support. Pigg gave Plaintiff the false impression that he did not sign the order, suggesting it was Barrows who did so and that he was trying to stop her attempt. Pigg represented (in substance) that "it is all Leslie" and that he would cooperate with Plaintiff's objection, while concealing that he had already signed the

underlying instruments. Plaintiff further alleges that despite these representations, Pigg later communicated consent/authorization to U.S. Bank to release the funds anyway, aligning with Barrows's instruction that cooperation was required "for us to obtain our attorney's fee. (APP-008)

77. On August 5, 2022, after learning that Plaintiff had signed an objection letter, Barrows sent a private email to Pigg (co-authored by Ybarra), constituting criminal solicitation and attempted RICO conspiracy under *18 U.S.C. § 1962(d)*. In the email, Barrows and Ybarra co-authored and solicited Pigg to refrain from objecting to her fraudulent court order, stating: "In order for us to obtain our attorney's fee, we must say the order is for spousal support..." and "there is no way around it." (APP-005) Barrows knew *29 U.S.C. § 1056* prohibited her from obtaining attorney's fees, but she still wanted to unlawfully and willfully abstract the 401(k) for her own use. Ybarra co-authored the email as a co-partner of "we" knew these acts were RICO racketeering activities under 18 U.S.C. § 1961(1) but chose to support them as a RICO conspirator under *18 U.S.C. § 1962(d)*.

> *"In order for us to obtain our attorney's fee, we must say the*
> *order is for spousal support... there is no way around it."*

78. This email establishes: (a) knowledge that the order was false; (b) intent to deceive; (c) conspiracy among multiple defendants; and (d) motive ("our attorney's fee").

79. Barrows and Ybarra co-authored and openly solicited Pigg, stating "for us to obtain our attorney's fee," providing undeniable evidence of conspiracy solicitation among members of the State Bar of Texas. The terms used were not "me" and "my," but "us" and "our." Each individual who co-authored or received this email chose to consent, thereby becoming a RICO conspirator under *18 U.S.C. § 1962(d)*.

### E. Pigg's Concealment and Deception

80. In August 2022, Pigg presumed Plaintiff did not know the true copies of prior fraudulent court orders, as he never disclosed them. Pigg sent multiple telecommunication emails trying to deceive Plaintiff, saying: "I did not sign off on that QDRO because it would not be true and I'm not going to sign a court document that is not true," (APP-006) "In that case, the legal issue is that we either have to lie and accept the QDRO," (APP-007) and "I am not going to put myself in a position where I'm taking money in a non-truthful way." (APP-007) These emails are attached hereto as Exhibit 1. (APP-002)

81. These statements were false. Pigg had already signed the fraudulent orders. Based on these lies, Plaintiff paid Pigg $25,000.

82. In September 2022, upon realizing Plaintiff had caught onto their Federal crimes and RICO racketeering activities and had begun collecting evidence, Barrows and Pigg suddenly attempted to force Plaintiff to sign a divorce settlement. When Plaintiff declined, pointing out that Pigg hadn't

finished financial information discovery on Plaintiff's spouse's side, Pigg pulled out a withdrawal petition stating he had withdrawn from the case. Despite objections from Plaintiff due to this unexpected movement, Pigg submitted his withdrawal within 48 hours. Pigg was evidently desperate to extricate himself from being held accountable for his participation in RICO racketeering activities.

83. Another noteworthy fact is that Plaintiff's soon-to-be-ex-spouse, Wang, failed to produce or submit any personal income tax reports and related business records by the end of 2022. Barrows managed to evade accountability for concealing her client's financial information in the court presided over by DeAngelis.

84. The plain truth is that Plaintiff did not have a hearing on April 13, 2022, regarding spousal support. Therefore, according to the Fourteenth Amendment, states are prohibited from depriving any person of life, liberty, or property without Due Process of law. The outcome was that Plaintiff lost $25,000 from his interstate employment retirement fund in Minnesota and lost access to his employment retirement fund from August 2022 until present. Both the $25,000 property and the liberty of accessing one's property are elements protected by the Fourteenth Amendment. Plaintiff's constitutional rights were stripped away without Due Process.

## F. *U.S. Bank's Complicity*

85. During the same period, Barrows made several telecommunications to U.S. Bank, the administrator of Plaintiff's 401(k) in Minnesota. Utilizing her status as an attorney and member of the State Bar of Texas, Barrows managed to mislead U.S. Bank that although the QDRO directly contradicted the Associate Judge's original court report (the actual hearing results), the QDRO superseded the prior associate judge's report. Barrows did not inform U.S. Bank of the truthful bounds of the law that, according to Texas law, "A QDRO is a final, appealable order" and "A QDRO is a species of post-divorce enforcement or clarification order," Texas law does not permit issuance of an interlocutory QDRO order during divorce proceedings, and the concept of "Superseded Order" is not defined in Texas Family Code. The Texas attorney license granted to Barrows by the State Bar of Texas provided her with unique standing to misinterpret Texas law to third parties, allowing her to deceive an out-of-state 401(k) administration, thereby facilitating execution of her RICO scheme.

86. U.S. Bank received the fraudulent WRIT and admitted in writing that it "appeared in direct conflict" with the associate judge's factual order.

87. Despite this acknowledged conflict, and despite Plaintiff's formal objection, U.S. Bank distributed $25,000 to Barrows. U.S. Bank did not merely acknowledge a conflict; its written response stated the WRIT 'appeared in DIRECT CONFLICT' with the Associate Judge's report. This language demonstrates U.S. Bank knew the orders were contradictory and facially invalid. Despite this actual knowledge of fraud, U.S. Bank chose to become a willful participant in the constitutional deprivation.

88. U.S. Bank rejected Plaintiff's objection within four hours, without convening the Benefits Administration Committee as required by its own policies. U.S. Bank rejected Plaintiff's objection within four hours, an impossibly short timeframe that proves U.S. Bank predetermined its decision to distribute funds to Barrows regardless of Plaintiff's evidence. U.S. Bank never convened the Benefits Administration Committee as required by its own policies, demonstrating its joint action with the state court defendants to deprive Plaintiff of property without due process. This was not neutral compliance with a court order, it was active conspiracy to enforce an order U.S. Bank knew was fraudulent.

89. To conceal the improper distribution, U.S. Bank unilaterally changed Plaintiff's marital status from "married" to "single" without any divorce decree, falsely suggesting a post-judgment QDRO had been received.

90. U.S. Bank's conspiracy liability under *Dennis v. Sparks*, 449 U.S. 24 (1980), is established by:

   (a) U.S. Bank's acknowledgment of the conflict proves it acted with knowledge of the constitutional violation;

   (b) U.S. Bank's four-hour rejection without committee review proves predetermined outcome coordinated with state actors;

   (c) U.S. Bank's falsification of marital status proves consciousness of wrongdoing and active concealment of the deprivation;

   (d) U.S. Bank's status as ERISA fiduciary gave it independent duty to reject facially invalid orders, by distributing despite this duty, U.S. Bank became an active co-conspirator, not a neutral ministerial agent;

   (e) U.S. Bank's status as ERISA fiduciary gave it independent duty to reject facially invalid orders, by distributing despite this duty, U.S. Bank became an active co-conspirator, not a neutral ministerial agent;

91. Pigg accepted Barrows' RICO conspiracy solicitation and consented to U.S. Bank dispensing funds. Barrows obtained her attorney's fees by committing an act under *18 U.S.C. § 664*, a RICO racketeering activity defined in *18 U.S.C. § 1961(1)*. Pigg concealed his consent from Plaintiff. Plaintiff was not informed about his consent act.

92. Plaintiff notified U.S. Bank that he intended to seek legal action against RICO Culpable Persons and requested preservation of all communications between U.S. Bank and the RICO Culpable Persons. It is Plaintiff's belief that U.S. Bank has not preserved ALL communications as requested.

## G.    *The State Bar Cover-Up*

93. In October 2022, Plaintiff initiated disciplinary proceedings against Barrows by filing Grievance No. 202206760 with the Office of the Chief Disciplinary Counsel. In support of this filing, Plaintiff

proffered a comprehensive evidentiary record, comprising judicial orders, and contemporaneous emails, that substantively corroborated the allegations. Notwithstanding this probative evidence, Defendant Marin, acting in both official and individual capacities and with actual knowledge of the documented misconduct, summarily dismissed the matter. His assertion that the conduct did not violate disciplinary rules constituted a knowing and willful ratification of Barrows' conduct; by consciously disregarding the incontrovertible evidence, Marin's dismissal served to intentionally conceal the underlying criminal acts and provided official sanction for the ongoing RICO enterprise.

94. Subsequently, in January 2023, Plaintiff filed Grievance No. 202300469 against Defendant Pigg, predicated upon the explicit admissions contained in the August 5, 2022, email and corroborating court records. Defendant Martinez, possessing full knowledge of these admissions, knowingly dismissed the grievance at the preliminary screening stage. Like Marin, Martinez's dismissal was not a mere administrative error but an intentional act to suppress evidence of the racketeering scheme.

*95.* Marin reviewed the correspondence in which Barrows expressly solicited participation in the RICO racketeering conspiracy, specifically the statement: "In order for us to obtain our attorney's fee, we must say the order is for spousal support..." and "There is no way around it." Marin knowingly accepted this solicitation, motivated by the fact that the collection of "our attorney's fee" represents a common pecuniary interest among members of the State Bar of Texas. Despite actual knowledge of this clear criminal evidence, Marin willfully chose to involve himself in the concealment of these activities, thereby knowingly joining the conspiracy as a RICO co-conspirator pursuant to *18 U.S.C. § 1962(d)*.

96. Similarly, Martinez reviewed the August 5, 2022, email in which Defendant Pigg admitted to the scheme. Martinez knowingly accepted Pigg's solicitation to conceal these acts, driven by the same common interest in protecting the revenue streams ("attorney's fees") of Bar members. By refusing to advance the grievance despite the facial validity of the admission, Martinez willfully participated in the cover-up, thereby knowingly joining the enterprise as a RICO co-conspirator under *18 U.S.C. § 1962(d)*.

97. In December 2022, Plaintiff filed a criminal complaint with the Tarrant County Sheriff's Department regarding the conduct described in this Complaint. The Tarrant County Criminal District Attorney's Office did not pursue an investigation and the criminal complaint was closed. The decision is attached hereto as Exhibit 4.

98. The Board of Disciplinary Appeals granted Plaintiff's appeal and ordered an investigation (case number 67344 in January 2023).

99. On or around May 17, 2023, Defendant Craig reviewed the evidentiary record concerning **both** the Barrows and Pigg grievances. Despite possessing actual knowledge of the documentary evidence— including Barrows' solicitation of the fee conspiracy and Pigg's August 5, 2022, email admission— Craig determined there was "No Just Cause" for disciplinary action in either matter. This official

statement issued by the State Bar of Texas served as an explicit endorsement and consent for the RICO racketeering activities of both Barrows and Pigg. Craig willfully chose to support these activities, using her "No Just Cause" decision to affirmatively conceal the criminal acts, thereby knowingly joining the enterprise as a RICO co-conspirator under *18 U.S.C. § 1962(d)*.

100. Subsequently, these matters were dismissed by the Summary Disposition Panel. This decision demonstrated that the alleged three Defendant counsel from State Bar of Texas, functioning as a entity "person" under the RICO statute, was capable of, and actively engaged in, supporting its members' racketeering activities by knowingly disposing of valid grievances within its self-regulated disciplinary process. By refusing to act on the incontrovertible proof of fraud and extortion, the alleged three Defendant counsel from State Bar of Texas assisted in the concealment of these RICO racketeering activities. True and correct copies of the grievance dismissals, appeal determinations, "No Just Cause" decisions, and related orders are attached hereto as Exhibit 2.

H.  ***Continuing State-Court Enforcement and Collateral Use of Federal Proceedings (2024–present)***

101. After the July 2022 writ sequence, Plaintiff alleges that participants and aligned counsel continued to treat Plaintiff's ERISA-protected retirement benefits as a practical funding source for litigation costs in the 325th District Court proceedings, including by seeking or obtaining rulings that treated ERISA benefits as available to satisfy court costs or other monetary obligations.

102. **Emergency Motion to Vacate Due to Fraud (March 12, 2024).** On or about March 12, 2024, Plaintiff filed an "Opposed Emergency Motion to Vacate Prior Order Due to Fraud" (Filemark #214) in the 325 Case, seeking to vacate the 2022 orders that Plaintiff alleged were procured through fraud, specifically, the conversion of attorney-fee awards into false "spousal support" instruments to circumvent ERISA's anti-alienation protections. This motion put Judge Terry on direct notice of the alleged fraud, forgery and ERISA circumvention scheme.

103. **Fraud dispute presented in state court.** Plaintiff pleaded and litigated in the 325 Case that Defendants Barrows and Pigg materially altered the court's interim-fee directive by converting an attorney-fee/QDRO-type award into a "spousal support" label (and related paperwork) to reach Plaintiff's ERISA-protected retirement assets, and that the "spousal support" label was false because the court did not hear or order spousal support on April 13, 2022.

104. **On-the-record "Associate Judge report" statement and jurisdictional refusal (March 27, 2024).** Plaintiff alleges that on or about March 27, 2024, in response to Plaintiff's Emergency Motion to Vacate (Filemark #214), Judge Cynthia Terry stated on the record that the challenged QDRO/DRO-substitute instruments were "exactly the same as the associate judge report" and denied that there was forgery or alteration. On the same day, Judge Terry also stated that her court lacked jurisdiction to void these temporary orders, despite presiding over the very case in which the orders were entered. Plaintiff alleges these statements were false and deceptive: (i) the instruments were not "exactly the same" because they contained false "spousal support" language that did not

appear in the April 13, 2022 associate judge report; and (ii) the court plainly had jurisdiction to correct its own void or fraudulently-procured orders under Texas law. Plaintiff alleges these statements discouraged examination of whether any instrument qualified as a valid QDRO under ERISA and shielded the fraud from correction.

105. **Emergency Motion for Declaratory Relief on Writ (May 28, 2024).** On or about May 28, 2024, Plaintiff filed an "Opposed Emergency Motion for Voiding or Declaratory of Writ and Contempt with Sanctions" (Filemark #260) in the 325 Case, seeking declaratory relief that the served-but-unexecuted July 14, 2022 Writ of Garnishment was void and unenforceable due to (i) ERISA preemption, (ii) the absence of the mandatory writ application, affidavit, and bond required by TRCP 658, and (iii) its foundation on fraudulently-procured orders. **Judge Terry refused to grant relief and deceptively claimed her court lacked jurisdiction to void or correct the outstanding writ—despite the writ having been issued by that very court and remaining an active threat to Plaintiff's ERISA-protected retirement account.** Plaintiff alleges this refusal was part of a continuing pattern to shield the 2022 scheme from judicial correction and to preserve the writ as ongoing leverage against Plaintiff.

106. **Awareness of this federal action.** Plaintiff alleges that by the time of these proceedings, the state court and opposing counsel was aware Plaintiff had filed this federal action challenging the ERISA-fund extraction method, yet the state proceedings continued in a manner that treated ERISA benefits as reachable for costs.

107. **Fraudulent Use of Non-Final Federal Ruling.** Plaintiff alleges that opposing counsel, Erika Patino, acted in bad faith by submitting this Court's March 2024 dismissal order to the state court as proof that Plaintiff's claims were "frivolous." In doing so, she intentionally omitted that the dismissal was not a final judgment and was still pending in the Fifth Circuit. This Court knows this case was vacated and remanded by the Fifth Circuit Court of Appeals. Plaintiff alleges the state court relied on this misrepresented, non-final federal ruling to deny Plaintiff's state-level remedies.

108. **Timely request for written factual findings on the alteration issue**. Plaintiff timely filed a request for findings of fact and conclusions of law (and, where applicable, a notice of past-due findings) in the 325 Case, on or around October 21, 2024, expressly requesting that the court make and issue a written factual finding answering whether the operative order(s) were altered as Plaintiff alleged (i.e., whether the attorney-fee directive was converted into "spousal support," and whether any such conversion was reflected in the text of the order(s) submitted/entered).

109. **Refusal to issue findings after trial**. Judge Terry did not issue the requested findings of fact and conclusions of law within the required time, and Plaintiff received no written factual determination addressing whether the order(s) were altered.

110. **Default/nonappearance + indigency sequence.** On or about November 6, 2024, without any assignment notice, retired judge Randy Catterton conducted an *ex parte* hearing in Plaintiff's state

case. The hearing proceeded in Plaintiff's absence under circumstances that made nonappearance predictable, including inadequate notice practices and/or *ex parte* scheduling **that** Plaintiff alleges **was** arranged to produce a "no-show" outcome. Plaintiff alleges the court then issued rulings adverse to Plaintiff's indigency request and/or ability to proceed without costs, by default or nonappearance, despite the court's awareness from the record that Plaintiff could not afford costs.

111. **Costs opacity and appeal-rights impact**. Plaintiff alleges the state court did not provide Plaintiff a clear, itemized statement of costs (and/or otherwise failed to provide notice sufficient to allow payment, challenge, or compliance), and that the combined use of (i) a nonappearance/default ruling on indigency and (ii) unclear or withheld cost information operated to block or permanently impair Plaintiff's ability to pursue appellate review in the state system.

112. **Sworn "$500,000" statement.** At that hearing (or a related hearing), Plaintiff alleges Erika Patino acted as third party's witness, stated under oath that Plaintiff had "half million" in ERISA retirement funds. Plaintiff alleges this statement was false and was used to influence the court's assessment of Plaintiff's ability to pay costs and the perceived availability of retirement funds.

113. **Costs ruling treating ERISA funds as reachable.** Plaintiff alleges that following the nonappearance hearing, the state court entered a ruling (including by default) that treated Plaintiff's ERISA-protected retirement benefits as available to pay court costs, notwithstanding ERISA's anti-alienation rule and the limited QDRO exception.

114. **Appellate order compelling findings**. Plaintiff moved the state appellate court to compel Judge Terry to issue the requested findings. Plaintiff alleges the appellate court granted the request and issued an order directing Judge Terry to issue findings of fact on or around January 6, 2025.

115. **Continued refusal despite appellate directive**. Plaintiff alleges that even after the appellate court's directive, Judge Terry still did not issue the compelled written findings of fact on the alteration/fraud dispute.

116. **Strategic transfer and "recusal" without a record order.** Plaintiff alleges that, on or about May 7, 2025, Presiding Judge Evans sua sponte transferred the 325 Case to a different court, stating that Judge Terry had "recused herself," despite the absence of any filed written recusal order. The transfer—combined with the absence of a filed recusal order—effectively ensured that Judge Terry would never issue the compelled written findings of fact ordered by the appellate court, thereby leaving the alteration/fraud dispute unresolved and depriving Plaintiff of the written factual determinations necessary to support appellate review.

117. **Thing-of-value allegation (coordinator).** Plaintiff further alleges, on information and belief, that opposing counsel Erika Patino provided or arranged a new vehicle for at least one Tarrant County family-court coordinator associated with the Plaintiff's Case in August 2025, creating an

undisclosed financial relationship that would reasonably call into question the neutrality of certain notice/scheduling or administrative handling practices.

118. On July 25, 2025, Judge Evans handpicked and assigned retired judge, Defendant Harris, who is Defendant DeAngelis's lifetime best friend—to sit in Plaintiff's **underlying** state case. On October 5, 2025, Plaintiff executed a Verified Motion to Recuse or Disqualify Defendant Harris due to his relation with Defendant DeAngelis. Judge Evans ruled that opposing counsel Erika Patino should file a motion to respond and seek sanction against Plaintiff, subsequently Evans handpicked another judge Wallace to hear the sanction request and sanctioned $5,468.75 from Plaintiff Yan.

119. **Evans's Transfer as Overt Act to Shield Terry and Perpetuate Cover-Up.** Plaintiff alleges that Defendant Evans's May 7, 2025 transfer was not a neutral administrative act but an overt act in furtherance of the RICO conspiracy, specifically designed to:

(a) Shield Terry from accountability. By transferring the case, Evans ensured Terry would no longer be the "sitting judge" subject to official-capacity claims or prospective injunctive relief in this federal action;

(b) Make the appellate order unenforceable. The state appellate court had ordered Terry to issue findings of fact on the alteration/fraud issue. By removing Terry from the case, Evans ensured she could never comply—and no written factual record would ever exist;

(c) Install a complicit replacement. Evans then assigned Defendant Harris to preside over the case, ensuring the cover-up would continue under a judge with personal loyalty to Defendant DeAngelis;

(d) Create a "jurisdictional shell game." The combined effect of Terry's false statements, Evans's transfer, and Harris's assignment was to foreclose all remedies: Terry blocked the record, Evans made her unreachable, and Harris closed the case. Plaintiff was left with no state-court remedy and faces the argument that Terry cannot be sued because she no longer controls the case.

120. **Coordinated Cover-Up Eliminating All Remedies.** Plaintiff alleges these acts were not isolated procedural moves, but a coordinated effort to erect insurmountable barriers to review:

(a) **Procedural Barrier:** As detailed above, the transfer cemented the suppression of the record, rendering the state appellate order moot.

(b) **Financial Barrier:** Simultaneously, the coordinated unit utilized a default judgment based on false testimony to deny Plaintiff's indigency status. This mandated prohibitive costs as a condition of appeal, effectively barring Plaintiff—who is indigent under Texas law—from accessing the appellate court to challenge the underlying fraud.

121. **Ongoing threat.** Plaintiff alleges that, to the present, the state proceedings continue to treat Plaintiff's retirement benefits as available for court costs, using this court's overt dismissal in furtherance of their ongoing ERISA funds embezzlement scheme, thereby creating a non-speculative threat of additional restraint or attempted abstraction from Plaintiff's retirement account, including through the unexecuted writ sequence pleaded above.

122. **Prospective harm.** Plaintiff alleges Defendants and aligned counsel invoke federal procedural outcomes and characterization language in state court to continue the ERISA-fund extraction method, and Plaintiff faces a concrete risk that any federal dismissal or adverse ruling will be presented in state court as "proof" that ERISA-preemption objections lack merit, perpetuating ongoing injury.

*I.    Pattern and Continuity*

123. Plaintiff holds additional court record evidence dating back nine years, relating to further family-court victims. One example is In the Matter of the Marriage of [caption redacted in Exhibit 9], Cause No. 360-549246-13, pending in the 360th District Court, Tarrant County, Texas (the "360 Case"). In that matter, the court entered an Associate Judge's Report / order dated April 21, 2014 that directed (or enabled) a $12,000 withdrawal from a 401(k), with $6,000 to the other spouse and $6,000 to be held in counsel's IOLTA pending the attorney-fee request. A subsequent interlocutory DRO was issued on August 12, 2014 without commencing a QDRO petition as Texas law provided. This demonstrates that the practice of family court participants using interlocutory QDRO orders to obtain interim attorney fees from federally protected retirement funds, sometimes in prepayment form, is a deeply entrenched, widespread, and statewide scandal spanning at least nine years. A true and correct copy of that order is attached as Exhibit 9.

124. Plaintiff holds additional court record evidence showing that some family court litigants had to face the consequences of insufficient funds in their later stages of divorce proceedings when their funds were unlawfully depleted in the earlier stages. Some were incarcerated due to failure to pay child support, even though their retirement funds were supposed to be preserved until then for this very purpose under ERISA.

125. The State Bar's refusal to investigate, combined with continued licensing of the perpetrators, enables this scheme to continue against future victims.

126. Plaintiff has obtained court records establishing that the pre-judgment QDRO practice dates back at least to 2009 and spans multiple Texas counties, demonstrating a statewide, decade-and-a-half-long pattern of racketeering activity. Plaintiff further alleges that the court records attached as Exhibits 14–20 identify additional attorneys and judicial officers by name who, in other Texas family-court matters over the last decade-plus, filed, drafted, presented, signed, or enforced temporary orders/QDRO/DRO-substitute instruments seeking or enabling interim attorney-fee withdrawals from ERISA-protected retirement plans. Plaintiff identifies those individuals by name solely as record-based examples of the Enterprise's continuity and operational method across courts

and years; Plaintiff does not name those individuals as defendants in this action and does not allege they caused Plaintiff's injury in this case.

127. On June 16, 2009, in the 53rd District Court, Travis County, Texas (Cause No. D-1-FM-08-005770), counsel filed a Proposed Order on Respondent's Motion for Additional Temporary Orders and Interim Attorney's Fees seeking 401(k)-sourced interim fees—demonstrating the practice was already established in Texas family courts by 2009. A true and correct copy is attached as Exhibit 14.

128. On March 16, 2011, in the 360th District Court, Tarrant County, Texas (Cause No. 360-479099-10), counsel filed a Motion to Release Funds for Attorney's Fees and Personal Living Expenses requesting release of $30,000 from an American Airlines SuperSaver 401(k) plan for attorney fees. This motion establishes that the practice of seeking pre-judgment access to ERISA-protected retirement funds for attorney fees was active in Tarrant County by early 2011. A true and correct copy is attached as Exhibit 15.

129. On January 5, 2012, in the same 360th District Court case (Cause No. 360-479099-10), the court entered an Order to Withdraw American Airlines Super Saver 401(k) Plan appointing a receiver and authorizing withdrawal of $61,700 from the ERISA-protected 401(k) account—prior to any final judgment. This order demonstrates judicial authorization of substantial ERISA-fund abstraction through pre-judgment orders, a hallmark of the scheme alleged herein. A true and correct copy is attached as Exhibit 16.

130. Another order for disbursement of funds was entered on March 12, 2012. On May 8, 2012, in the same 360th District Court case (Cause No. 360-479099-10), the court entered an Order Confirming Payments from 401(k) that directed 100% of the 401(k) proceeds to attorney fees. This order demonstrates that the scheme operated to channel the entirety of abstracted ERISA funds to State Bar of Texas members, leaving the plan participant with nothing from their own retirement account. A true and correct copy is attached as Exhibit 17.

131. On February 6, 2014, in the 322nd District Court, Tarrant County, Texas (Cause No. 322-547540-13), counsel filed a Motion to Equalize Attorney's Fees requesting fees from marital assets or 401(k) accounts. This motion from a different Tarrant County family court demonstrates that the practice was not isolated to a single court or judge but was widespread across the Tarrant County family court system. A true and correct copy is attached as Exhibit 18.

132. On July 11, 2014, in the 360th District Court, Tarrant County, Texas (Cause No. 360-479099-10), the court entered a Qualified Domestic Relations Order (QDRO). This exhibit illustrates that the proper QDRO practice under Texas law is a post-decree order entered after final judgment, in contrast to the pre-judgment orders used in the scheme alleged herein. The contrast between this lawful post-judgment QDRO and the unlawful pre-judgment orders demonstrates that Defendants knew or should have known the proper procedure and deliberately circumvented it. A true and correct copy is attached as Exhibit 19.

133. Collectively, these exhibits from 2009 (Travis County), 2011-2012 (Tarrant County 360th District Court), and 2014 (Tarrant County 322nd and 360th District Courts) establish:

    (a) the pre-judgment QDRO practice has existed in Texas family courts for at least fifteen years;

    (b) the practice spans multiple counties (Travis, Tarrant, Comal) and multiple district courts within those counties;

    (c) the practice involves substantial sums ($30,000, $61,700, and more);

    (d) the practice systematically channels ERISA-protected retirement funds to State Bar of Texas members as attorney fees; and

    (e) participants in the scheme knew the proper QDRO procedure (post-judgment) but deliberately used improper pre-judgment orders to circumvent ERISA protections. This evidence establishes the "pattern of racketeering activity" and "continuity" elements required under 18 U.S.C. §§ 1961-1962 and *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989).

134. Plaintiff submits newly obtained evidence demonstrating that the pre-judgment QDRO practice continues as of December 2024. On December 2, 2024, the 466th Judicial District Court, Comal County, Texas, entered an Order on Interim Attorney Fees in Cause No. C2022-0409A (In the Matter of the Marriage of Angelia Dedek-Christon and R.D. Christon) that directed a 401(k) plan loan to fund interim attorney fees prior to any final judgment. This order demonstrates: (i) a RICO predicate under 18 U.S.C. § 664 (embezzlement from employee benefit plan); (ii) an ERISA anti-alienation violation under 29 U.S.C. § 1056(d)(1); and (iii) open-ended continuity of a statewide, decade-long racketeering scheme under H.*J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989). A true and correct copy is attached as Exhibit 10.

135. As further alleged in subsection (Continuing State-Court Enforcement and Collateral Use of Federal Proceedings (2024–present)), the same participants and aligned counsel have continued to treat Plaintiff's ERISA-protected retirement benefits as a practical funding source for litigation costs and have invoked subsequent state-court enforcement and collateral use of federal procedural outcomes to perpetuate the method. Those post-2022 acts and enforcement posture demonstrate a continuing threat of repetition and therefore open-ended continuity.

136. Plaintiff continues to suffer ongoing injury as of the filing of this Complaint:

    (a) the $25,000 distribution/abstraction from Plaintiff's ERISA-protected account pleaded above;

    (b) continuing possession of $25,000 property right and restraint with a non-speculative threat of additional attempted abstraction arising from the July 2022 writ sequence pleaded above; and

    (c) continuing economic and reputational harm from the challenged state-court records and enforcement posture remaining operative and being invoked to justify renewed cost-related

demands and retirement-fund reach attempts, as alleged in subsection (Continuing State-Court Enforcement and Collateral Use of Federal Proceedings (2024–present)).

137. These allegations support closed-ended continuity (predicate-related conduct spanning October 2021 through the present, i.e., over four years) and open-ended continuity (an active method with continuing enforcement posture and a continuing threat of repetition).

138. Official Texas Office of Court Administration ("OCA") publications establish that a "Petition for Qualified Domestic Relations Order (QDRO)" is treated as an original filing requiring: (a) payment of the $350 consolidated new-case filing fee ($213 local + $137 state); (b) a new cause number under Tex. R. Civ. P. 22-23; and (c) Rule 99 citation and service to confer personal jurisdiction. See District Court Civil Cases and Actions (effective Jan. 1, 2022) (Exhibit 11); District Court Civil Filing Fees (effective Jan. 1, 2022) (Exhibit 12). The OCA schedules distinguish post-judgment QDRO petitions from "subsequent filings" in existing causes. Any temporary order purporting to affect retirement benefits before judgment, entered without a new petition, the required filing fee, a new case number, and Rule 99 service, is procedurally defective under Tex. Fam. Code § 9.102, Tex. R. Civ. P. 22-23 and 99, and is void as to any party not served.

139. An affidavit executed by Fuyan Wang on October 18, 2025, confirms that counsel Leslie Barrows filed a motion for interim attorney fees on Wang's behalf; that Wang attended a hearing on that motion; that the judge awarded $50,000 from Plaintiff's 401(k) to pay attorney's fees to counsel for both parties (Barrows and Pigg, $25,000 each); and that Wang paid Barrows' attorney's fees accordingly after receiving a check issued by U.S. Bank. This corroborating testimony was not previously available and conclusively establishes that Barrows received ERISA plan assets as attorney's fees through the scheme alleged herein. A true and correct copy is attached as Exhibit 13.

140. The "loan-label" tactic presents an ongoing risk to ERISA plan participants. ERISA's anti-alienation rule, 29 U.S.C. § 1056(d)(1), bars assignment or alienation of plan benefits, yet nominally permissible plan loans, pretextually styled as "spousal support" or "living expenses," are used to fund forbidden purposes (e.g., attorney's fees), thereby sidestepping that protection. Because money is fungible, counsel prioritize fee collection over a client's subsistence. Other service industries (e.g., healthcare, higher education) cannot siphon ERISA assets by relabeling collectible obligations as "basic living expenses." The State Bar of Texas, acting through its licensed members who serve as family court judges, has utilized family-court temporary orders—typically not directly appealable—as the vehicle for this relabeling and unlawful abstraction of ERISA-protected assets.

141. The OCA filing-fee schedules confirm that each temporary order purporting to affect retirement benefits before judgment (not a QDRO) issued by a Texas family court evades the $350 mandatory filing fee owed to the State of Texas treasury. To the extent Tex. Penal Code § 31.04 applies to

judicial services, Defendants' conduct may constitute theft of service: they intentionally or knowingly secured performance of court services by

(a) styling the request as a "motion for interim attorney fees" inside the existing case;

(b) obtaining QDRO-type relief through temporary order;

(c) omitting any new-case filing and citation; and (d) directing or permitting the clerk to process and the court to act without collecting the required fee. Harms to the State of Texas are pleaded solely to evidence enterprise, scheme, and pattern; Plaintiff seeks relief only for Plaintiff's injuries proximately caused by Defendants.

142. From the District Clerk office, Plaintiff obtained a transaction summary sheet for Cause No. 325-707596-21 (All Transactions report dated Aug. 20, 2024) which reflects that Defendant Wilder, acting through the Tarrant County District Clerk's Office, issued a writ of garnishment on Jun. 16, 2022 (US Bancorp) and collected an $8 issuance fee (payment received trans. #103), and issued a second writ of garnishment on Jul. 14, 2022 (US Bank) and collected another $8 issuance fee (payment received trans. #119), totaling $16 in writ-issuance fees.

143. Plaintiff alleges that these clerk-collected writ-issuance fees constituted County revenue generated from the same retirement-fund garnishment sequence that Plaintiff alleges resulted in ERISA-prohibited taking/embezzlement of protected plan assets.

144. Plaintiff further alleges that the same transaction history contains no line-item reflecting collection of the mandatory $350 QDRO-petition "original filing" fee for three QDRO / DRO-substitute instruments processed in this cause.

145. Plaintiff alleges that the County's processing of those QDRO/DRO-substitute instruments without charging the $350 original-fee operated as a financial subsidy (fee waiver) that reduced the ordinary cost-and-procedure barriers to deploying the challenged instruments, thereby facilitating the alleged retirement-fund garnishment/distribution sequence while the County simultaneously collected writ-related revenue from that sequence.

146. Plaintiff further alleges, upon information and belief, that Tarrant County also provided financial support to protect and sustain the same challenged retirement-fund garnishment/distribution scheme by authorizing and funding the legal defense of Defendants (including DeAngelis) for acts arising from or connected to the alleged ERISA-prohibited taking/embezzlement predicate conduct, thereby externalizing defense costs onto County funds while County offices generated fee revenue tied to the garnishment sequence.

147. Plaintiff also alleges, upon information and belief, that in June 2025, Defendant Wilder instructed his staff personnel, name unknown to Plaintiff to delete a substantial volume of original records

from the 325th District Court case file (Cause No. 325-707596-21), as damage control to conceal the enterprise's record trail and impede Plaintiff's access to evidence.

*J.*    ***Ongoing Facilitation, Damage Control and Obstruction (2024-2025)***

148.    The allegations in this subsection concern conduct by judicial officials that occurred AFTER the original RICO scheme (2021-2022) and AFTER Plaintiff filed this federal action challenging that scheme. These officials are alleged to have known about the original 2021-2022 racketeering activity through Judge Terry and this case's federal filings accepted into the state case records. Plaintiff alleges they subsequently took official actions that facilitated continuation of the scheme's effects and obstructed Plaintiff's efforts to obtain relief.

149.    **Discovery of the Scheme (2023-2024).** By no later than March 2024, when Plaintiff filed his Third Amended Complaint in this Court, the following facts were publicly documented in federal court records:

(a)    The April 13, 2022 order directed attorney-fee payments from Plaintiff's ERISA-protected 401(k);

(b)    Attorneys are not "alternate payees" under 29 U.S.C. § 1056(d)(3)(K);

(c)    The subsequent "spousal support" orders were used to circumvent ERISA's prohibition;

(d)    The August 5, 2022 email explicitly stated the need to falsely characterize the order as "spousal support";

(e)    Two prejudgment writs were issued without required applications, affidavits, or bonds;

(f)    The July 14, 2022 writ remained served and unexecuted, threatening Plaintiff's retirement account.

150.    **Judicial Notice of Federal Litigation.** Plaintiff alleges, on information and belief, that by mid-2024, state court officials with authority over Cause No. 325-707596-21 were aware of this federal litigation and the ERISA-preemption challenges raised herein, through:

(a)    Court filings and records indicating the pendency of federal proceedings;

(b)    Representations by opposing counsel citing this Court's orders;

(c)    The inherent visibility of federal constitutional challenges to state court orders.

151.    **Evans's Conduct (2025).** After acquiring knowledge of the ERISA violations and federal challenges, Defendant Evans took the following actions in his capacity as Presiding Judge:

(a)    **Strategic Transfer to Obstruct Factual Record (May 7, 2025).** On or about May 7, 2025, Evans ordered the transfer of Cause No. 325-707596-21 from the 325th District Court to a different venue, asserting that Judge Cynthia Terry had "recused herself," despite:

    i.    No written recusal order appearing in the court file;

    ii.    ii. The timing occurring immediately after Plaintiff moved to compel Judge Terry to issue written findings of fact on whether the operative orders were altered/fraudulent as Plaintiff alleged;

    iii.    iii. An appellate court having ordered Judge Terry to issue said findings;

    iv.    iv. The transfer having the practical effect of preventing Judge Terry from complying with the appellate directive and ensuring no written factual record would be created on the alteration issue.

(b) **Assignment to Obstruct Relief (July 25, 2025). On July 25, 2025,** Evans assigned retired Judge William Wren "Bill" Harris to preside over Plaintiff's case, despite:

    i.    Harris being identified as Associate Judge DeAngelis's "lifetime best friend";

    ii.    DeAngelis being a named defendant in this federal action;

    iii.    The assignment creating an obvious appearance of bias and conflict of interest;

    iv.    The assignment occurring after Plaintiff's ERISA-preemption challenges were publicly documented in federal court.

(c) **Facilitation of Sanctions and Case Closure.** Evans subsequently directed or permitted proceedings that resulted in:

    i.    Sanctions of $5,468.75 against Plaintiff for seeking Harris's recusal;

    ii.    Maintenance of the cost-barrier rulings that treated Plaintiff's ERISA-protected assets as available for court costs;

    iii.    Preservation of the July 2022 writ as an ongoing enforcement threat.

152. **Harris's Conduct (2025-Present).** After being assigned to Plaintiff's case with actual or constructive knowledge of the federal ERISA challenges, Defendant Harris took the following actions:

(a) **Maintenance of Void Orders.** Harris treated the challenged QDRO/DRO-substitute instruments and fee-payment orders as valid and enforceable, despite their facial invalidity under ERISA and Texas law, and despite the pending federal constitutional challenges.

(b) **Preservation of Outstanding Writ.** Harris maintained the July 14, 2022 Writ of Garnishment as an active, enforceable instrument, despite:

    i.    Plaintiff's documented objections;

    ii.    The writ's facial defects (no application, no affidavit, no bond);

    iii.    The writ's explicit violation of ERISA's anti-alienation provision;

    iv.    The federal court challenge to the writ's validity.

(c) **Denial of Relief and Access Obstruction.** Harris denied Plaintiff's motions seeking correction of the ERISA violations and instead:

    i.   Imposed additional sanctions;

    ii.   Maintained cost rulings treating ERISA assets as reachable;

    iii.   Closed the case, foreclosing Plaintiff's state-court remedies while the federal challenge remained pending.

(d) **Coordination with Evans.** Harris's actions occurred in coordination with Evans's assignment authority and the broader pattern of obstruction alleged above.

153. **Knowledge and Intent.** Plaintiff alleges that Evans and Harris acted with knowledge of the underlying ERISA violations and with intent to:

(a) Prevent creation of a factual record that would support Plaintiff's federal claims;

(b) Obstruct Plaintiff's access to state-court remedies for the constitutional violations;

(c) Maintain the enforceability of void orders as leverage against Plaintiff;

(d) Preserve the benefits obtained by original scheme participants;

(e) Shield fellow State Bar members from accountability;

(f) Retaliate against Plaintiff for pursuing federal civil rights claims.

154. **Facilitation of Ongoing Harm**. As a direct result of Evans's and Harris's post-discovery conduct, Plaintiff continues to suffer:

(a) Ongoing possession of $25,000 property right and restraint of his ERISA-protected retirement account by the unexecuted writ;

(b) Inability to obtain state-court correction of the constitutional violations;

(c) Deprivation of the factual record necessary to support his federal claims;

(d) Financial harm from sanctions and cost rulings;

(e) Continuing threat of execution of the void writ at any time without notice.

## K.  *Anticipated Discovery*

155. Plaintiff alleges, upon information and belief, that discovery will reveal:

(a) **Order-Drafting Chain**: Metadata from Word documents and PDF files will show who drafted each proposed order, when drafts were circulated, who edited and approved each version before filing/signature, and email attachments showing the drafting process among Barrows, Pigg, and Ybarra.

(b) **E-Filing Records:** The Texas e-filing system maintains records of each filing's submission ID, filer account, payment method, fee waivers/deferrals, rejection/resubmission history, and clerk acceptance timestamps, which will demonstrate irregularities in the fraudulent filings.

(c) **U.S. Bank Internal Records:** U.S. Bank's internal files will contain the plan's QDRO "qualification determination" notices, internal escalation notes, counsel communications, and

exact disbursement ledger showing payee, date, amount, and instrument—documenting how U.S. Bank processed the conflicting orders.

(d) **Campaign Contribution Specifics:** Public records and discovery will reveal the specific amounts and dates of Barrows' contributions to DeAngelis's campaign, fundraiser sponsorship invoices, invite lists, and whether any litigant-facing transactions overlapped the fundraising window.

(e) **State Bar Handling Records:** The Office of Chief Disciplinary Counsel maintains grievance intake records, screening notes, assignment logs, internal emails, and "dismissal rationale" templates that will demonstrate the pattern of dismissing meritorious complaints against family law attorneys.

**SUMMARY OF CLAIMS (Provided for Convenience Only; Operative Allegations are in the Claims for Relief)**

| # | Claim | Defendants | Enterprise Role | Damages |
|---|---|---|---|---|
| 1 | RICO § 1962(c) | Barrows, Pigg | Texas Family Law Enterprise / RICO Persons | Treble |
| 2 | RICO § 1962(d) | Barrows, Ybarra, DeAngelis, Marin, Martinez, Pigg, Craig, Wilder, U.S. Bank, Evans*, Harris* | Texas Family Law Enterprise / Conspirators | Treble** |
| 3 | Sherman Act § 2 | State Bar of Texas | Monopolist | Treble + fees |
| 4 | 42 U.S.C. § 1983 | DeAngelis, Marin, Martinez, Craig, Wilder, Barrows, Ybarra, Pigg, Tarrant County, U.S. Bank | State actors + conspirators | Comp + punitive |
| 5 | ERISA § 1132(a)(2)/(a)(3) | U.S. Bank; Barrows Firm, Barrows, Pigg, Ybarra; DeAngelis, Marin, Martinez, Craig, Wilder, Tarrant County, State Bar, Evans*, Harris* | Fiduciary + knowing participants | Make-whole + equitable |
| 6 | MN Civil Theft | Barrows | Transferee | Comp + punitive |
| 7 | MN Common Law Fraud | Barrows, Ybarra, Pigg | Fraudfeasors | Comp + punitive per *Minn. Stat. § 549.191* |
| 8 | TX Legal Malpractice | Pigg | Attorney | Compensatory |

*Evans and Harris are named for prospective declaratory/injunctive relief only; no monetary damages sought.

**Except Evans, Harris — prospective relief only.

**ENTERPRISE STRUCTURE (Provided for Convenience Only; Operative Allegations are in the Claims for Relief)**

*1. Association-in-Fact Enterprise: "Texas Family Court ERISA-Fund Extraction Enterprise"*

| Component Type | Component | Role in Enterprise |
|---|---|---|
| RICO Person | Leslie Starr Barrows | Coordinator; drafter of fraudulent instruments; primary beneficiary |
| RICO Person | William Albert Pigg | Inside counsel; signer of instruments; concealment |
| Operational Participant | Samantha Ybarra | Co-author of solicitation; receipt of funds |
| Operational Participant (Non-Defendant) | Attorneys in Cause No. D-1-FM-08-005770 (Travis County, 2009); Cause No. 360-479099-10 (Tarrant County, 2011-2012); Cause No. 322-547540-13 (Tarrant County, 2014); Cause No. 360-549246-13 (Tarrant County, 2014); Cause No. C2022-0409A (Comal County, 2024) | Drafted proposed order seeking 401(k)-sourced interim attorney fees; Filed Motion to Release Funds; obtained receiver appointment; extracted $61,700 from ERISA account; Filed Motion to Equalize Attorney's Fees seeking 401(k) funds; Obtained Associate Judge's Report directing $12,000 from 401(k); procured interlocutory DRO; Obtained order directing 401(k) plan loan for interim attorney fees |
| Infrastructure | The Barrows Firm | Filing vehicle; IOLTA account; email systems; employee coordination |
| Structural Component | 325th District Court | Forum for order entry, writ issuance, enforcement mechanisms |
| Structural Component | 360th District Court (Tarrant County); 53rd District Court (Travis County); 322nd District Court (Tarrant County); 466th District Court (Comal County) | Forum for historical pattern predicates (2011-2024) |
| Non-Member Custodian | U.S. Bank | Third-party plan administrator; execution channel |

*2. Predicate Acts Against Plaintiff Conghua Yan, Cause No. 325-707596-21*

| Date | Statute(s) | Actor(s) | Description |
|---|---|---|---|
| 3/3/2022 | *§ 1343* | Barrows | Wire Fraud: False affidavit claiming criminal case fees were family court fees; transmitted electronically |
| 4/13/2022 | *§ 664* | Barrows, Pigg, DeAngelis | ERISA Theft: Associate Judge report directing $50,000 from ERISA 401(k) to attorneys who are not "alternate payees" |
| 4/26/2022 | *§ 1343* | Barrows, Pigg | Wire Fraud: Fraudulent "spousal support" order transmitted electronically; false statement that spousal support was heard/ordered on 4/13/22 |
| 5/26/2022 | *§ 1343* | Barrows, Pigg | Wire Fraud: Revised fraudulent "spousal support" order transmitted electronically |
| 6/16/2022 | *§§ 1341, 1343* | Barrows, Pigg | Mail/Wire Fraud: First Writ of Garnishment issued and served on US Bancorp in Minnesota; false "spousal support" predicate |
| 7/12/2022 | *§ 1343* | Barrows, Pigg, DeAngelis | Wire Fraud: "Spousal support" instrument signed by DeAngelis; transmitted for writ sequence |
| 7/14/2022 | *§§ 1341, 1343* | Barrows, Pigg | Mail/Wire Fraud: Second Writ of Garnishment issued and served on U.S. Bank in Minnesota; false "spousal support" predicate; REMAINS UNEXECUTED |
| 8/5/2022 | *§ 1343; § 1962(d)* | Barrows, Ybarra | Wire Fraud/Conspiracy: "Smoking gun" email: "In order for us to obtain our attorney's fee, we must say the order is for spousal support... there is no way around it" |

| Date | Statute(s) | Actor(s) | Description |
|------|-----------|----------|-------------|
| 9/2022 | § 664 | Barrows, U.S. Bank | ERISA Theft: $25,000 distribution from Plaintiff's 401(k) to Wang, then to Barrows/Ybarra/Barrows Firm as "attorney fees" |

### 3. Pattern Predicates Establishing Continuity Under H.J. Inc. v. Northwestern Bell, 492 U.S. 229 (1989)[1]

| Date | Court / Cause No. | Statute(s) | Description |
|------|-------------------|-----------|-------------|
| 6/16/2009 | 53rd District Court, Travis County (D-1-FM-08-005770) | §§ 664, 1343 | Proposed Order seeking 401(k)-sourced interim attorney fees |
| 3/16/2011 | 360th District Court, Tarrant County (360-479099-10) | §§ 664, 1343 | Motion to Release Funds requesting $30,000 from American Airlines SuperSaver 401(k) |
| 1/5/2012 | 360th District Court, Tarrant County (360-479099-10) | §§ 664, 1343 | Order to Withdraw — receiver appointed; $61,700 authorized from ERISA account pre-judgment |
| 3/12/2012 | 360th District Court, Tarrant County (360-479099-10) | §§ 664, 1343 | Order for disbursement of funds from 401(k) |
| 5/8/2012 | 360th District Court, Tarrant County (360-479099-10) | §§ 664, 1343 | Order Confirming Payments from 401(k) — 100% of proceeds directed to attorney fees |
| 2/6/2014 | 322nd District Court, Tarrant County (322-547540-13) | §§ 664, 1343 | Motion to Equalize Attorney's Fees requesting fees from 401(k) accounts |
| 4/21/2014 | 360th District Court, Tarrant County (360-549246-13) | §§ 664, 1343 | Associate Judge's Report directing $12,000 from 401(k); $6,000 to spouse, $6,000 to attorney IOLTA |
| 8/12/2014 | 360th District Court, Tarrant County (360-549246-13) | §§ 664, 1343 | Interlocutory DRO issued without commencing QDRO petition as Texas law provides |
| 12/2/2024 | 466th District Court, Comal County (C2022-0409A) | §§ 664, 1343 | Order on Interim Attorney Fees directing 401(k) plan loan for interim fees — ONGOING SCHEME |

### 4. Relatedness (H.J. Inc. Factors)

| Factor | How Satisfied |
|--------|---------------|
| Same Purpose | All predicates share purpose of extracting attorney fees from ERISA-protected retirement accounts |
| Similar Participants | State Bar-licensed attorneys; Texas family court judges; plan administrators |
| Similar Victims | ERISA plan participants in Texas family court proceedings |
| Same Methods | (1) Interlocutory orders directing retirement fund access; (2) False "spousal support" or "living expenses" labels; (3) Pre-judgment QDRO/DRO-substitute instruments; (4) Writ-based enforcement |
| Geographic Scope | Statewide: Travis County (2009), Tarrant County (2011–2022), Comal County (2024) |

### 5. Continuity

| Type | How Satisfied |
|------|---------------|
| Closed-Ended | Predicate acts span October 2021 – present (4+ years); multiple victims; substantial financial harm |

---

[1] Note: These historical predicates are pleaded solely to establish the "pattern of racketeering activity" element (continuity and relatedness). Plaintiff does not seek damages for these acts and does not name the participants as defendants.

| Type | How Satisfied |
|------|---------------|
| Open-Ended | (1) July 14, 2022 writ remains served but unexecuted — imminent ongoing threat; (2) December 2024 Comal County order proves method remains active; (3) Enterprise's operational method continues statewide |

*6.  Joint and Several Liability*

| Category | Jointly and Severally Liable Defendants | Basis |
|----------|------------------------------------------|-------|
| RICO § 1962(c) damages | Barrows, Pigg | Count 1 |
| RICO § 1962(d) damages | Barrows, Pigg, Ybarra, DeAngelis, Marin, Martinez, Craig, Wilder, U.S. Bank | Count 2 |
| ERISA equitable restoration | U.S. Bank, Barrows, Barrows Firm, Pigg, Ybarra, Tarrant County, State Bar of Texas, DeAngelis, Wilder, | Count 5 |
| Minnesota fraud damages | Barrows, Ybarra, Pigg | Count 7 |

*Note: Plaintiff seeks recovery of each dollar only once. Joint and several liability ensures collection, not duplicative recovery.*

**CLAIMS FOR RELIEF**

**COUNT ONE: Civil RICO — 18 U.S.C. § 1962(c)**

*(Against Barrows, Pigg)*

156.  Plaintiff incorporates by reference all factual allegations.

157.  Defendants Barrows, Pigg violate *18 U.S.C. § 1962(c)*.

**RICO Standing and Pattern Framework**

158.  Under *18 U.S.C. § 1964(c)*, Plaintiff has standing to bring this civil RICO claim because Plaintiff suffered property injury "by reason of" a violation of *18 U.S.C. § 1962*. Plaintiff's injury includes (i) the $25,000 distribution taken from Plaintiff's ERISA retirement account in September 2022, (ii) the continuing possession of $25,000 property right and restraint with imminent threat of a second $25,000 loss caused by the July 14, 2022 writ that remains served but unexecuted, and (iii) $25,000 direct payment to Pigg. See *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The historical predicate acts documented herein (2009, 2011, 2012, 2014, and 2024) involving other victims are pleaded solely to establish the "pattern of racketeering activity" element, specifically, the "continuity" and "relatedness" requirements of *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989).

*A.  Texas Family Court ERISA-Fund Extraction Enterprise*

159.  **Enterprise** (Primary — Association-in-Fact). The "Texas Family Court ERISA-Fund Extraction Enterprise" (the "Enterprise") is an association-in-fact enterprise within the meaning of *18 U.S.C. § 1961(4)*, consisting of interrelated structural components and individual participants that function as a continuing unit with the common purpose of extracting ERISA-protected retirement funds

through the use of non-appealable temporary orders, QDRO/DRO-substitute instruments, and related writ/garnishment processes.

160. **Structural / Passive Enterprise Components** (used to show the unit exists and how it functions).

(a) Tarrant County (**Enterprise Component only**), through:

> i. **Its District Clerk's Office and the County's domestic-relations court administration infrastructure,** including the employment of associate judges; processing and docketing practices; writ-issuance mechanics; and fee collection and other revenue intake—including, as alleged in Factual Section C, I, Count 2, 4 and 5, that the District Clerk's Office (under Tom Wilder) issued two prejudgment Writs of Garnishment (June 16, 2022 and July 14, 2022) without the required application, affidavit, or bond; collected writ-issuance fees tied to those writ steps; and failed to collect otherwise-mandatory QDRO-petition filing fees for multiple DRO/QDRO-substitute instruments processed in the same cause, together with record custody and control (including alleged instruction to delete records) and County-funded defense for acts arising from the challenged sequence, in furtherance of the operational scheme.

> ii. **Its Criminal District Attorney's Office.** On information and belief, the Tarrant County Criminal District Attorney's Office is an institutional member of the Tarrant County Bar Association. As alleged in Factual Section G, Count 2 and 4, the Bar Association functioned as a Fort Worth coordination hub and continuity channel linking local Enterprise participants, and as a source of institutional cover under the guise of prosecutorial discretion when predicate acts were reported or petitioned, in furtherance of the operational scheme.

(b) The 325th District Court, Tarrant County, Texas (**Enterprise Component**), as alleged in Factual Sections A through J, Count 2, 4 and 5, as the forum in which the relevant temporary orders / instruments were processed and used to support the writ/garnishment sequence.

(c) The State Bar of Texas (**Enterprise Component**), as alleged in Factual Section G, Count 2, 4 and 5, as the statewide attorney-licensing and discipline infrastructure through which Enterprise participants obtain and retain the credential required to appear in Texas family courts, and through which grievances are routed and resolved. Plaintiff alleges the Enterprise's continuity is aided when that self-regulatory channel declines to act on documented misconduct connected to the challenged ERISA-fund extraction sequence, thereby reducing deterrence and enabling repeat use of the same QDRO/DRO-substitute and writ mechanisms. Additionally, the SBOT

license served as a vehicle that enabled the participants to draft and submit fraudulent artifices to fellow members without scrutiny.

(d) U.S. Bank National Association (**Non-member custodian / channel**), as alleged in Factual Section F, Count 2, 4 and 5, as the third-party retirement-plan custodian/administrator to whom Defendants directed the challenged writ/service communications; Plaintiff does not plead U.S. Bank as a "member" or "component" sharing the Enterprise's common purpose for Count One.

161. **Operational Participants** (individuals and private entities who acted through, used, or coordinated across the Enterprise components).

(a) The Barrows Firm: a Texas law firm that drafted and circulated the challenged instruments and coordinated execution steps across court/clerical channels.

(b) Individual participants named herein: Defendant Barrows (former board director of *Tarrant County Bar Association*) and Pigg as to Count One, and Defendants Ybarra, DeAngelis, Marin, Martinez, Craig, Wilder, Evans (former president of *Tarrant County Bar Association*), and Harris as to Count Two only, for their post-exposure conduct demonstrating conspiracy continuity as alleged in Fact Section A-J, together with other presently-unknown participants who, as alleged in the Facts, played roles including drafting, filing, processing, record-control, communications, and damage-control/cover functions.

(c) Judge Judith G. Wells: former presiding judge who signed the April 26 and May 26, 2022 orders; Her Associate Judge DeAngelis signed the July 12, 2022 "spousal support" instrument. Wells is not named as Defendant as of now.

(d) Judge Cynthia Terry: presiding judge whose false statements and refusal to correct void orders are alleged in Fact Section H. Not named as Defendant as of now.

(e) Erika Patino: witness who falsely testified under oath that Plaintiff possessed approximately $500,000 in ERISA funds (false), at a hearing Plaintiff alleges was engineered as a "no-show" proceeding, resulting in a default ruling treating ERISA funds as available for court costs. Not named as Defendant as of now.

(f) Plaintiff further alleges that other Texas attorneys and judicial officers are identified by name in the decade-spanning pattern exhibits solely as continuity examples, and are not named as defendants and are not alleged to have caused Plaintiff's injury in this case.

162. **Alternative Enterprises (pleaded in the alternative under Rule 8(d)).** In the alternative, if the Court finds the statewide enterprise insufficiently established, Plaintiff pleads two county-specific enterprises under *Fed. R. Civ. P. 8(d)(2)*: Plaintiff pleads: (a) the "325th Court ERISA-Fund Extraction Enterprise," consisting of the 325th District Court's court-administration system and

related clerk-processing channels; and (b) the "360th Court ERISA-Fund Extraction Enterprise," consisting of the 360th District Court's court-administration system and related clerk-processing channels. Each alternative enterprise, together with participating private actors (including the Barrows Firm and individual participants identified above), functioned as a continuing unit for the same common purpose of extracting ERISA-protected retirement funds through temporary orders, QDRO/DRO-substitute instruments, and related writ/garnishment processes.

163. **Enterprise Structure and Common Purpose** (*Turkette*/*Boyle*). As alleged in Factual Sections A through J, the Enterprise functioned as an ongoing organization with the structural features described in *United States v. Turkette*, 452 U.S. 576 (1981) and *Boyle v. United States,* 556 U.S. 938 (2009), including:

(a) **Common Purpose**. The extraction of retirement-plan funds alleged to be protected by ERISA by using temporary orders, DRO-substitute instruments, and related writ/garnishment processes to cause ERISA plan distributions that would not occur absent the challenged relabeling and enforcement steps, resulting in non-appealable interim attorney-fee payments and related financial benefits to participating attorneys.

(b) **Relationships Among Participants.** Plaintiff alleges the Enterprise operated through recurring, mutually reinforcing relationships among **State Bar–licensed private counsel** (drafting, relabeling, circulating, and filing the challenged fee/support instruments and coordinating related communications), **State Bar–licensed judicial officers** (district-court and associate-judge functions used to receive, approve, sign, and deploy those instruments), and **court-administration channels** (clerk processing/docketing, writ-issuance mechanics, fee collection/revenue intake, and record custody/control, including alleged irregular writ issuance and related fee practices). Plaintiff further alleges these channels were reinforced by **the plan administrator and/or its counsel** (communications and plan action culminating in distribution despite an acknowledged conflict), and **law-enforcement/prosecutorial channels** (receipt of a criminal complaint without follow-through, including involvement of State Bar–licensed prosecutors), **the State Bar licensing/grievance apparatus** (disciplinary intake/review processes allegedly resulting in "no action" outcomes). Plaintiff alleges the same relationship network later supported **continuity and "damage control"** through case-administration/assignment mechanisms and rulings that maintained the challenged sequence and foreclosed fact-finding

(c) **Longevity.** The Enterprise's method is alleged to have persisted over multiple years, including the sequence alleged in Plaintiff's case (2021–present) and additional decade-spanning examples reflected in the pattern exhibits from other Texas counties/courts, indicating sufficient longevity to pursue the common purpose described above.

(d) **Ongoing Organization / Continuing Threat.** Plaintiff alleges the Enterprise remains operational because (i) the July 2022 writ deprived of Plaintiff's property right, remains served but unexecuted and can be executed without further warning, and (ii) the December 2024 Comal County episode alleged in the pattern exhibits reflects continued use of the same operational method beyond Plaintiff's matter. (iii) The member of operational participants have been purging court records from state case.

*B.*    ***RICO Persons Who Conducted Enterprise Affairs***

164. **RICO "Persons" (§ 1962(c))**. For Count One, Defendants Barrows and Pigg are RICO "persons" under *18 U.S.C. § 1961(3)* who, as alleged below, were employed by or associated with the Enterprise and conducted or participated in the Enterprise's affairs through the commission of predicate acts.

165. **Association with the Enterprise**. Barrows and Pigg were associated with the Enterprise within the meaning of *§ 1962(c)* because they acted as State Bar-licensed attorneys using Enterprise components (including The Barrows Firm, court-administration channels in the 325th proceedings, and related clerk/writ mechanisms) to draft, transmit, file, and implement the challenged QDRO/DRO-substitute instruments and writ/garnishment steps alleged in the Facts.

166. **Conduct/Participation (Reves)[2].** As alleged in Factual Sections A through J, Barrows and Pigg conducted or participated, directly or indirectly, in the Enterprise's affairs within the meaning of *§ 1962(c) and Reves v. Ernst & Young*, 507 U.S. 170 (1993), by making and implementing key operational decisions and execution steps in the charged sequence:

(a) **Barrows**. Drafted, circulated, and filed the challenged "spousal support" QDRO/DRO-substitute instruments; coordinated execution steps to obtain prejudgment writs and serve them on U.S. Bank and/or U.S. Bancorp; communicated with or through U.S. Bank regarding release of plan funds; and coordinated the steps culminating in the $25,000 distribution alleged in the Facts.

(b) **Pigg**. Signed and returned the challenged instruments drafted by Barrows; participated in communications relating to Plaintiff's objections and the bank's release process; and, as alleged in the Facts, aligned with Barrows's "spousal support" framing to implement the same writ-based extraction sequence.

167. **Judicial-signature step caused by Barrows and Pigg (factual attribution)[3]:** Plaintiff alleges that Judge Wells served as presiding judge of the 325th District Court during the relevant period and signed the April 26, 2022 and May 26, 2022 orders; the July 12, 2022 "spousal support" instrument referenced in the Facts bears the signature of Associate Judge Lori L. DeAngelis, not Judge Wells. Barrows drafted the challenged April 26, May 26, 2022 and July 12, 2022 instruments containing

---

[2] Including, without limitation, the facts set forth below. See the Factual Allegations for details.
[3] Including, without limitation, the facts set forth below. See the Factual Allegations for details.

the "spousal support" representations, Pigg signed and returned them, and Barrows presented/submitted them for judicial signature. Plaintiff alleges that the resulting judicial signatures occurred because Defendants placed the drafted/signed instruments before the court as part of the execution sequence described in the Facts. Plaintiff pleads the predicate conduct for Count One as Defendants' drafting, signing, transmission, filing, and service/use of those instruments and related writ steps, not as the court's act of signing.

168. **Distinctness Requirement Satisfied:** Each RICO person is distinct from the Texas Family Court ERISA-Fund Extraction Enterprise. The enterprise is an association-in-fact consisting of multiple legal entities and individuals; the RICO persons are the individuals who conducted the enterprise's affairs through racketeering. See *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). No individual defendant is the enterprise; rather, each is a "person" who operated through the enterprise.

169. **Interstate Commerce:** The Texas Family Court ERISA-Fund Extraction Enterprise is "engaged in, and its activities affect, interstate and foreign commerce" within the meaning of *18 U.S.C. § 1962(c)* through: (a) wire and mail communications with U.S. Bank in Minnesota; (b) abstraction of funds from Minnesota-based ERISA retirement accounts; (c) transmission of fraudulent court orders across state lines; (d) the State Bar's licensing of attorneys who represent out-of-state clients and abstract out-of-state assets.

C. *Predicate Acts (Pattern of Racketeering Activity)[4]*

170. **Definition of Racketeering Activity:** Each predicate act alleged herein constitutes "racketeering activity" within the meaning of *18 U.S.C. § 1961(1)*, which includes "any act which is indictable under" the following provisions: *18 U.S.C. § 1341* (mail fraud), *18 U.S.C. § 1343* (wire fraud), and *18 U.S.C. § 664* (theft from employee benefit plan).

171. **Definition of Employee Pension Benefit Plan:** Plaintiff's 401(k) account, administered by U.S. Bank and located in Minnesota, is an "employee pension benefit plan" within the meaning of *29 U.S.C. § 1002(2)(A)*, which defines such plan as "any plan, fund, or program... established or maintained by an employer... to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program... provides retirement income to employees." Plaintiff's 401(k) is therefore protected under ERISA and subject to the anti-alienation provisions of *29 U.S.C. § 1056(d)(1)* and the QDRO requirements of *29 U.S.C. § 1056(d)(3)*.

172. **Statutory Elements of Predicate Offenses:**

**Elements of Wire Fraud (18 U.S.C. § 1343):** (1) a scheme to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to defraud.

---

[4] Including, without limitation, the facts set forth below. See the Factual Allegations for details.

**Elements of Mail Fraud (18 U.S.C. § 1341):** (1) a scheme to defraud; (2) use of the United States mails in furtherance of the scheme; and (3) intent to defraud.

**Elements of ERISA Theft (18 U.S.C. § 664):** (1) embezzlement, theft, or unlawful and willful abstraction or conversion; (2) of moneys, funds, or assets; (3) of an employee pension benefit plan; (4) to the defendant's own use.

173. **Predicate Acts Against Plaintiff (2022)[5] (Barrows/Pigg — Count One)[6]:** The following predicate acts were committed by Defendants Barrows and/or Pigg against Plaintiff in connection with Cause No. 325-707596-21. Plaintiff alleges each listed act is indictable under the identified statute(s):

| Date | Statute(s) | Actor(s) | Description |
|------|-----------|----------|-------------|
| 3/3/2022 | § 1343 | Barrows | Wire fraud: false affidavit claiming criminal case fees were family court fees |
| 4/26/2022 | § 1343 | Barrows, Pigg | Wire fraud: fraudulent garnishment order falsely claiming "spousal support" |
| 5/26/2022 | § 1343 | Barrows, Pigg | Wire fraud: revised fraudulent garnishment order |
| 6/16/2022 | §§ 1341, 1343 | Barrows, Pigg | Mail fraud: mailed fraudulent WRIT to U.S. Bank in Minnesota |
| 7/12/2022 | §§ 1341, 1343 | Pigg, DeAngelis | Wire Fraud: "Spousal support" instrument signed by DeAngelis; transmitted for writ sequence |
| 7/14/2022 | §§ 1341, 1343 | Barrows, Pigg | Second Writ — see detailed analysis below |
| 8/5/2022 | § 1343; § 1962(d) | Barrows | Conspiracy email — see detailed analysis below |
| 9/2022 | § 664 | Barrows | ERISA theft — see detailed analysis below |

### *Detailed Element Analysis — Key Predicate Acts[7]*

174. **August 5, 2022 — Barrows and Ybarra co-authored Conspiracy Solicitation Email (18 U.S.C. § 1343):** This predicate act is the "smoking gun" that proves intent and knowledge:

**Scheme to defraud:** Barrows transmitted an email to Pigg (co-authored by Ybarra) explicitly stating: *"In order for us to obtain our attorney's fee, we must say the order is for spousal support... there is no way around it."* This email proves Barrows devised a scheme to defraud Plaintiff and U.S. Bank by making false statements about "spousal support" to circumvent ERISA.

**Use of wires:** Email transmitted via interstate wire communications from Texas.

---

[5] Including, without limitation, the facts set forth below. See the Factual Allegations for details.

[6] Including, without limitation, the facts set forth below. See the Factual Allegations for details.

[7] Including, without limitation, the facts set forth below. See the Factual Allegations for details.

**Intent to defraud:** The email demonstrates explicit intent — Barrows acknowledged the statements were false ("we must say") and that the purpose was to circumvent ERISA's prohibition on attorney fee distributions ("no way around it"). This is direct evidence of *mens rea*.

175. **September 2022 — Barrows' Receipt of ERISA Funds (18 U.S.C. § 664):** This predicate act is the actual theft:

**Unlawful and willful abstraction:** Barrows unlawfully and willfully abstracted funds from Plaintiff's 401(k) account by causing U.S. Bank to distribute $25,000 based on the fraudulent WRIT containing false "spousal support" statements.

**Moneys/assets:** $25,000 in cash.

**Employee pension benefit plan:** Plaintiff's 401(k) account is an "employee pension benefit plan" under *29 U.S.C. § 1002(2)(A)*, protected by ERISA's anti-alienation provisions.

**To own use:** Barrows received and retained the $25,000 as purported "attorney fees" — not as an "alternate payee" under a valid QDRO, but as a direct beneficiary of the fraud.

176. **July 14, 2022 to present — Writ of Garnishment (Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343):** This predicate act consists of Defendants causing a writ, dated July 14, 2022, to be issued and transmitted to U.S. Bank, repeating the same false "spousal support" representations used to induce restraint or release of ERISA-protected assets.

177. **Scheme to defraud.** The July 14, 2022 writ represented that Yan was ordered to pay "spousal support" based on an April 13, 2022 hearing, and was used to induce the plan custodian to restrain or release ERISA-protected assets based on that false framing. Defendants represented, expressly or by submission, that the July 12, 2022 instrument was a valid controlling basis for the July 14, 2022 writ and related restraint/release demands.

178. **Use of the mails and wires.** The writ was transmitted to U.S. Bank through service and related interstate communications; if mailed, the mailing constitutes use of the mails, and any electronic transmission or service-related communications constitute use of interstate wires.

179. **Procedural Defects.** Plaintiff further alleges that these prejudgment writ steps were pursued and obtained without any filed writ application supported by affidavit and without any bond being filed during the April 13, 2022 to July 14, 2022 period, as alleged in Plaintiff's summary-judgment briefing and reflected by the docket record.

180. **Resulting injury and open-ended continuity.** Although unexecuted as of filing, the served writ remains pending and continues to restrain Plaintiff's retirement assets and threatens a second unlawful distribution without further notice, supporting continuing injury and open-ended continuity.

181. **No "daily predicate" theory.** Plaintiff pleads the issuance, transmission, and service of the writ as the predicate act, and pleads the writ's continuing pendency as the ongoing effect and injury, not as a separate racketeering offense accruing anew each day.

182. **Historical Predicate Acts (Pattern Evidence)[8]:** The following acts—documented by certified court records—are pleaded solely as pattern evidence showing the enterprise's ~15-year duration and statewide scope. Plaintiff alleges no personal injury from these acts. Each constitutes "racketeering activity," *18 U.S.C. § 1961(1)*, predicated on violations of *18 U.S.C. §§ 664* (theft/embezzlement from an ERISA plan) and *1343* (wire fraud), and is pleaded to satisfy the "pattern" requirement, id. *§ 1961(5)*, and continuity, see *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989):

    (a) June 2009—Travis Cnty. (53d Dist. Ct.)— proposed order seeking interim attorney fees sourced from a 401(k).

    (b) Mar. 2011—Tarrant Cnty. (360th Dist. Ct.)— motion to release $30,000 from an American Airlines SuperSaver 401(k).

    (c) Jan. 2012—Tarrant Cnty. (360th Dist. Ct.)— order authorizing a receiver to withdraw $61,700 from a 401(k).

    (d) May 2012—Tarrant Cnty. (360th Dist. Ct.)— order directing 100% of 401(k) proceeds to attorney fees.

    (e) Feb. 2014—Tarrant Cnty. (322nd Dist. Ct.)— motion to "equalize" attorney fees from a 401(k).

    (f) Apr. 2014—Tarrant Cnty. (360th Dist. Ct.)— $12,000 401(k) withdrawal, with $6,000 to attorney IOLTA.

    (g) Dec. 2024—Comal Cnty. (466th Dist. Ct.)— order compelling a 401(k) loan for interim attorney fees, alleged to show the scheme's ongoing nature.

183. **Pattern — Relatedness:** Under *H.J. Inc.*, predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 492 U.S. at 239.

184. **Relatedness Established**. All predicate acts alleged herein are related because they share:

    (a) same purpose — obtaining attorney fees through fraud and circumventing ERISA;

    (b) similar participants — State Bar members, family court judges, and the State Bar disciplinary apparatus;

---

[8] Including, without limitation, the facts set forth below. See the Factual Allegations for details.

(c) similar victims — ERISA plan participants in Texas family court proceedings;

(d) same methods — false statements in court filings, fraudulent "spousal support" characterizations, interlocutory DROs prohibited by Texas law, and grievance dismissals to shield perpetrators.

185. **Pattern — Continuity:** Under *H.J. Inc.*, 492 U.S. at 241–42, "continuity" may be established by showing either a "closed-ended" pattern (predicate acts extending over a substantial period) or an "open-ended" pattern (a threat of continued criminal activity). Plaintiff alleges the predicate acts satisfy both.

186. **Closed-ended continuity (alternative):** The challenged scheme against Plaintiff began no later than October 2021 (when the underlying case was filed) and has continued through the present (a period exceeding three years), including multiple alleged predicate acts within that period. Plaintiff further alleges multiple victims beyond Plaintiff, including a Comal County victim and additional historical victims reflected in the decade-spanning exhibits, showing the same method across courts over time.

187. **Open-ended continuity (primary):** Plaintiff alleges a present, non-speculative threat of continued activity because:

(a) the July 2022 writ remains served but unexecuted, and Plaintiff alleges it can be executed at any moment, creating an imminent, ongoing threat;

(b) the December 2024 Comal County predicate act evidences that the same operational method remains active beyond Plaintiff's case; and

(c) the enterprise's alleged use of DRO-substitute instruments and writ/garnishment processes reflects an ongoing operational method—i.e., a regular way of doing business—supported by the multi-year, multi-county history alleged in the exhibits.

D.   *Plaintiff's Direct and Continuing Injury*

188. **Injury.** Plaintiff suffered direct and continuing injury to his business or property within the meaning of *18 U.S.C. § 1964(c)*:

(a) Direct property injury: $25,000 abstracted from Plaintiff's ERISA-protected 401(k) by Barrows (September 2022); $25,000 paid to Pigg based on fraudulent misrepresentations;

(b) Continuing injury: The July 2022 writ deprived of Plaintiff's property right, remains served but unexecuted, creating ongoing possession of $25,000 property right and restraint with imminent threat of a second unlawful distribution;

(c) Consequential damages: Lost investment returns from September 2022 to present.

(d) These injuries were proximately caused by Defendants' racketeering activity and constitute the basis for Plaintiff's standing.

189. Plaintiff is entitled to treble damages under *18 U.S.C. § 1964(c)*.

## COUNT TWO: RICO Conspiracy — 18 U.S.C. § 1962(d)

*(Against Barrows, Pigg, Ybarra, DeAngelis, Marin, Martinez, Craig, Wilder, U.S. Bank, Evans, and Harris) Conspiracy to Violate § 1962 (c)*

190. Plaintiff incorporates by reference all factual allegations and Count One.

191. Defendants Barrows, Pigg, Ybarra, DeAngelis, Marin, Martinez, Craig, Wilder, U.S. Bank, Evans, and Harris conspired to violate *18 U.S.C. § 1962(c)*, in violation of *18 U.S.C. § 1962(d)*, by knowingly agreeing that one or more members of the Enterprise would commit a pattern of racketeering activity as alleged. Plaintiff seeks treble damages under *18 U.S.C. § 1964(c)* against the all Defendants named in this Count except Harris and Evans. Defendants Harris and Evans are included in this Count solely as alleged participants whose post-exposure official acts demonstrate continuity and to support the prospective declaratory and injunctive relief requested under Count Two to halt continuing and threatened enforcement of the July 2022 writ and related ERISA-prohibited enforcement mechanisms, as further specified in the Prayer for Relief.

*A.*  ***The Agreement — Direct Evidence***

192. The August 5, 2022 email from Barrows to Pigg (co-authored by Ybarra) is direct evidence of an agreement to use a false "spousal support" framing to obtain attorney-fee payment from Plaintiff's ERISA-protected retirement plan:

> **"In order for US to obtain OUR attorney's fee, we must say the order is for spousal support... there is no way around it."**

193. This email plausibly alleges (i) a shared objective ("for us … obtain our attorney's fee"), (ii) knowledge the representation was false ("we must say"), (iii) intent to induce the plan custodian to act, and (iv) solicitation of Pigg and Ybarra to join execution of the scheme.

*B.*  ***Knowing Membership and Roles in Furtherance Phase One (October 2021 - December 2022) Original ERISA Extraction Scheme***

194. As alleged in Factual Sections A through G, the Phase One Scheme is a combination of Conspirators: Barrows, Pigg, Ybarra, DeAngelis, Marin, Martinez, Craig, Wilder, U.S. Bank; Predicate Acts: Mail fraud, wire fraud, ERISA theft (as alleged in Count One, Section C (Predicate Acts)) and

Objective: Extract attorney fees from Plaintiff's ERISA-protected 401(k) by circumventing *29 U.S.C. § 1056* through false "spousal support" labeling and void prejudgment writs.

195. **Core execution conspirators**. As alleged in Factual Sections A through G, Barrows drafted and transmitted the challenged instruments and writ packets and pursued plan release; Pigg signed and returned the instruments and later aligned with the release process; and Ybarra was copied on key communications and participated in the attorney group's coordinated steps alleged in the Facts. Pigg sent multiple emails to defraud Plaintiff. Pigg and Barrows sent multiple emails to defraud U.S. Bank.

196. **Judicial-signature and July 12 instrument misuse**. As alleged in Factual Sections A through G, after District Judge Wells signed the April 26, 2022 and May 26, 2022 orders, the July 14, 2022 "spousal support" instrument used in the July 2022 writ sequence bore Associate Judge DeAngelis's signature. Plaintiff alleges Defendants nevertheless treated the July 12 instrument as valid controlling authority for the July 14, 2022 writ steps even though, on information and belief, it was not a final, enforceable district-court order and did not lawfully supersede the May 26 order or authorize a new prejudgment writ, and Defendants used that mismatch to keep a second writ-based restraint/distribution attempt alive.

197. **Cover / damage-control conspirators**. Plaintiff alleges that after evidence of the scheme (including the August 5 email) was presented through State Bar grievance materials, Defendants Marin, Martinez, and Craig used State Bar channels to dismiss or shut down grievances and thereby reduce detection and discipline risk, facilitating continuation of the Enterprise's method.

198. **Clerk-channel facilitation**. Plaintiff alleges Wilder, acting through District Clerk channels, processed the June/July 2022 prejudgment writ issuance entries and related record/notice practices alleged in the Facts, enabling interstate service and restraint steps central to the scheme.

199. **Plan-custodian execution and concealment.** Plaintiff alleges the conspirators directed the challenged writ/order packet and related communications to U.S. Bank in Minnesota to effect restraint/release of ERISA-protected plan assets. Plaintiff further alleges U.S. Bank acknowledged in writing that the writ "appeared in direct conflict" with the associate-judge report, yet—despite Plaintiff's formal objection, processed the distribution that culminated in the September 2022 $25,000 payment alleged in Count One, and rejected Plaintiff's objection within hours, reflecting the scheme's execution phase through the plan-custodian channel.

C. *Knowing Membership and Roles in Furtherance Phase Two (2024 - Present): Obstruction and Cover-Up*

200. As alleged in Factual Section G to J, the Phase Two Scheme is a combination of Conspirators: Evans, Harris (joining existing conspiracy) Additional Conspirators: Marin, Martinez, Craig (continuing from Phase One into Phase Two) Predicate Acts: Obstruction of justice *(§ 1503)*,

obstruction of official proceedings *(§ 1512)*, wire fraud *(§ 1343)* (as alleged in Factual Section J (Ongoing Facilitation)) Objective: After learning of Phase One crimes through federal litigation, obstruct Plaintiff's pursuit of remedies, preserve benefits obtained in Phase One, and shield original conspirators from accountability.

201. **Terry's Cover-Up and Subsequent Ratification.** As alleged in Factual Section H, Judge Terry made knowingly false statements and refused to comply with an appellate order compelling findings, acts that constitute obstruction of justice *(18 U.S.C. §§ 1503, 1512)*. Defendant Evans's May 7, 2025 transfer was designed to shield Terry from accountability for these acts and ensure she could never comply with the appellate directive (the "jurisdictional shell game"). Defendant Harris then ratified Terry's cover-up by maintaining the void orders, preserving the outstanding writ, and closing the case. Although Terry cannot be sued due to the transfer, this coordinated conduct demonstrates the knowing participation of Evans and Harris in perpetuating the conspiracy's continuity.

*D.    Knowledge and Intent*

202. Each conspirator knew the general nature of the Enterprise's objective (to obtain attorney-fee payment by falsely labeling ERISA-protected distributions as "spousal support" and using prejudgment writ mechanisms) and knowingly agreed to further an endeavor which, if completed, would satisfy § 1962(c), as evidenced by the August 5 email, the coordinated drafting/signing/filing/service of the spousal-support instruments and writs, the September 2022 $25,000 distribution, and the alleged post-exposure damage-control conduct.

203. Tacit Agreement Inferred from Conduct. As alleged in the Facts, the agreement may be tacit and may be inferred from concerted action and surrounding circumstances, including:

(a) Barrows (drafting and circulating the "spousal support" instruments and writ packets and pursuing release);

(b) Pigg (signing and transmitting instruments and writ paperwork for filing/service);

(c) Ybarra (co-authoring the August 5 email and participating in the communications/workflow tied to the writ sequence);

(d) DeAngelis (signing the July 12, 2022 instrument referenced in the Facts);

(e) Marin, Martinez, and Craig (State Bar grievance screening/dismissal actions alleged as cover/damage-control after the scheme was presented in grievance materials), and;

(f) Wilder (District Clerk-channel processing/issuance entries and record/notice practices alleged to enable the June/July 2022 writ issuance and interstate service steps), including the transmission/service steps directed to the plan custodian, the deletion of original court records from the 325th case;

(g) U.S. Bank in Minnesota, as described in the incorporated Facts

(h) Evans and Harris: Continuing enforcement and record-control conduct, as described in Factual Section H.

204. Plaintiff further alleges that this inference is also supported by member of Tarrant County Bar Association, District Judge Cynthia Favila Terry's conduct (mentioned for factual statement only; her official role is substituted by Harris), as alleged in Factual Section H.

205. These coordinated steps, including the alleged post-exposure cover/damage-control conduct, were intended to prevent detection and correction of the racketeering scheme and to preserve its benefits and ongoing effects, including the continuing possession of $25,000 property right and restraint and imminent threat posed by the served but unexecuted July 14, 2022 writ.

206. (Evans, Harris) did not participate in Phase One and did not know about Phase One while it was occurring. However, after learning of the Phase One crimes through this federal litigation (by mid-2024), in order to cover up for Barrow, the former board director of Tarrant County Bar Association, the former president of Tarrant County Bar Association, Evans and Harris knowingly agreed to:

      (a) Obstruct federal proceedings challenging Phase One crimes;

      (b) Prevent creation of factual record supporting Plaintiff's claims;

      (c) Maintain void writ as ongoing threat to Plaintiff's ERISA account;

      (d) Foreclose Plaintiff's access to remedies;

      (e) Preserve benefits obtained by Phase One conspirators.

207. This knowing agreement to obstruct justice and shield Phase One conspirators constitutes agreement to participate in the same RICO conspiracy. See *United States v. Pungitore*, 910 F.2d 1084, 1105 (3d Cir. 1990) (defendants who join ongoing conspiracy after some predicate acts have occurred are liable for entire conspiracy).

208. By reason of this conspiracy, Plaintiff suffered injury that Phase One Conspirators directly caused:

(a) $25,000 distribution from ERISA account (September 2022)

(b) Issuance and service of July 14, 2022 writ creating ongoing threat

209. By reason of this conspiracy, Plaintiff suffered injury that Phase Two Conspirators directly caused:

(a) Continued possession of $25,000 property right and restraint and threat from unvacated writ (2024-present)

(b) $5,468.75 in sanctions

(c) Foreclosure of state-court remedies

(d) Inability to obtain factual record for federal claims

E.    ***Relief Requested.***

210.  Plaintiff seeks treble damages under *18 U.S.C. § 1964(c)* from all defendants named in Count Two except Harris and Evans, jointly and severally, for:

(a) Phase One injuries caused by extraction scheme;

(b) Phase Two injuries caused by obstruction and cover-up;

(c) Continuing injury from ongoing writ threat.

211.  The total injury is a unified harm caused by a single, ongoing conspiracy, even though different conspirators caused different components of that harm at different times.

## COUNT THREE: Sherman Act Monopolization — 15 U.S.C. § 2

*(Against the State Bar of Texas)*

212.  This Count does not challenge any ruling in Plaintiff's divorce proceeding. Plaintiff does not seek review of marital property division, custody, or any spouse-versus-spouse determination properly before the family court.

213.  This Count challenges a separate commercial wrong: the extraction of money from Plaintiff, a consumer of legal services, by his own service provider, through a court order entered without the provider ever filing suit against Plaintiff, without pleading, without opportunity for Plaintiff to assert contract defenses, and without the evidentiary showing required of any other creditor seeking to collect a debt.

214.  Texas family courts have jurisdiction over disputes between spouses regarding marital property, custody, and support. *Tex. Fam. Code § 6.406* (property division); *Tex. Fam. Code § 106.002* (suits affecting parent-child relationship). They do not have independent jurisdiction to adjudicate or enforce attorney-client commercial fee disputes—claims by attorneys against their own clients for payment under a service contract under *Tex. Civ. Prac. & Rem. Code § 38.001* et seq. Yet this is what occurred, and what occurs systematically through the mechanism challenged herein.

215.  Plaintiff brings this independent federal action challenging the State Bar of Texas's maintenance of this fee-extraction mechanism as unlawful monopolization under *15 U.S.C. § 2.*

216.  Plaintiff does not seek damages from any judicial officer in Count 3. Plaintiff challenges the State Bar's institutional conduct in maintaining, ratifying, and profiting from a system that enables fee extraction through judicial orders entered without jurisdiction over the underlying attorney-client commercial dispute.

217. Plaintiff further alleges that no Texas state court tribunal satisfies the appearance of neutrality standard required to adjudicate this claim. All Texas state court judges are required to be licensed attorneys and dues-paying members of the Defendant State Bar of Texas. Adjudication of these claims by a state court judge would require a member of the Defendant organization to pass judgment on the organization's own conduct, where the organization possesses the <u>exclusive</u> disciplinary mechanism adversely over that judge, thereby creating a structural conflict of interest.

218. Plaintiff acknowledges that certain federal judges and magistrate judges in Texas may also hold State Bar membership. However, federal judges appointed under Article III of the U.S. Constitution are not subject to State Bar disciplinary authority, do not depend on the State Bar for their continued authority to serve, and enjoy life tenure that insulates them from Bar influence. The structural conflict is therefore materially reduced, though not eliminated, in federal court. Plaintiff respectfully requests that any federal judge or magistrate judge who is an active member of the State Bar of Texas consider whether recusal is appropriate.

*A.* ***Elements of Monopolization***

219. Plaintiff incorporates by reference all preceding paragraphs.

220. **Relevant Market:** The relevant product market is the market for consumer legal services in Texas family-court proceedings, including representation, and associated advocacy services (appearance, motion practice, hearings, and negotiated dispositions) purchased by consumers. The relevant geographic market is Texas, because consumers seeking representation in Texas family courts can practicably turn only to providers authorized to appear and practice in Texas courts for such services. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 626 (5th Cir. 2002). Under Texas law, only persons licensed to practice law in Texas and enrolled in the State Bar may provide in-court legal representation to third-party clients. *Tex. Gov't Code § 81.051*; *Tex. Gov't Code ch. 83*.

221. **Standing:** Plaintiff seeks treble damages under Clayton Act *§ 4, 15 U.S.C. § 15*, and injunctive relief under Clayton Act *§ 16, 15 U.S.C. § 26*, for the alleged violation of § 2 of the Sherman Act. In *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979), the Court held that a retail consumer is injured in "property" within the meaning of Clayton Act *§ 4* when the price of goods or services is artificially inflated by anticompetitive conduct: "A consumer whose money has been diminished by reason of an antitrust violation has been injured 'in his … property' within the meaning of *§ 4*." *Id*. at 339–40. Plaintiff therefore has a damages remedy under *§ 4*, and seeks injunctive relief under *§ 16*, which authorizes injunctive relief against threatened loss or damage by a violation of the antitrust laws.

222. **Attorney-as-Creditor Collection Mechanism**. As alleged in Factual Sections A through E, Plaintiff further alleges that in Texas family-law proceedings, a State Bar member acting as a judicial officer may enter an interlocutory order awarding fees to be paid by a consumer directly to

their own service provider, fellow State Bar members, and a pre-judgment order for such service provider's fees may be enforced in these service provider's own name by any means available for enforcement of a judgment for debt. *Tex. Fam. Code §§ 106.002(a)–(b), 9.014.*

223. **Monopoly Power:** Plaintiff further alleges that the State Bar of Texas possesses monopoly power over access to the Texas family law legal services market through its exclusive licensing authority. This monopoly power is exploited through the Bar's refusal to discipline members who extract fees through court orders entered without jurisdiction over attorney-client commercial fee disputes, and through CLE programming that normalizes such practices. These practices—the attorney-as-creditor collection mechanism—enable State Bar members acting as judicial officers to enter non-appealable, court-backed fee orders that override private contracting, raise consumer costs, increase switching costs, and eliminate consumer bargaining power. When a represented litigant is ordered to pay substantial fees without voluntary agreement, the monopolist's control forces consumers into supra-competitive payments with no market alternative.

224. **Willful Maintenance Through Anticompetitive Conduct:** Plaintiff further alleges that The State Bar willfully maintains its monopoly through the following exclusionary conduct, none of which has legitimate justification:

(a) Maintaining and profiting from a mandatory membership gate that confers exclusive access to paid in-court representation, combined with recurring paid requirements and monetized channels tied to maintaining market access, as alleged herein;

(b) Enabling and economically reinforcing a fee-front-loading system in which State Bar members obtain court orders, leveraging the 1949 mandate that district court judges be licensed attorneys, to convert disputed or unpleaded fee demands into compelled transfers, including advance or interim payments, as alleged herein;

(c) The dual-role structure alleged herein, in which State Bar members serve in positions that can enter fee orders benefiting fellow members, creating aligned financial incentives that predictably favor compelled fee extraction over market bargaining, as further evidenced by the judicial campaign contribution structure alleged herein;

(d) Facilitating coordination among member attorneys to seek, secure, and divide court-ordered fees through recurring compelled-payment practices alleged herein;

(e) Unlawfully tying the sale of legal representation services to the compelled-prepayment mechanism, as alleged herein, such that consumers cannot purchase legal services without also being subjected to court-ordered fee extraction that overrides private contracting;

(f) Refusing to discipline State Bar members who engage in the compelled-prepayment practices alleged herein, thereby ratifying and perpetuating the exclusionary tying arrangement, as alleged herein;

(g) This institutional conduct is pleaded as "commercial" conduct by active market participants. It would make no economic sense but for its tendency to eliminate or lessen competition by raising consumers' costs and entrenching forced reliance on State Bar members' service.

(h) Plaintiff alleges this conduct is 'exclusionary' within the meaning of *§ 2* because it harms the competitive *process* and thereby harms consumers, not merely individual competitors. Plaintiff further alleges that, under the *§ 2* framework articulated in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), exclusionary conduct is evaluated by its anticompetitive effects and any asserted procompetitive justifications, and liability turns on whether the conduct is, on balance, anticompetitive.

## B.    *Unlawful Tying Arrangement*

225. **Two Separate Service Product**. As alleged in Factual Sections A through E, Plaintiff further alleges that *'Service as Agreed-Payment'* (hereafter, "SAAP") legal representation and *'Service as Compelled-Prepayment'* (hereafter, "SACP") legal representation are two separate products that would be offered independently in a competitive market. The tying product is SAAP legal representation in Texas family-court proceedings. The tied product is SACP legal representation, through which State Bar members acting as judicial officers issue court orders that override private commercial SAAP agreements. These orders compel SACP without pleading or evidentiary support, converting SAAP legal representation into hybrid SAAP/SACP legal representation via immediately enforceable judgments.

226. **Separate Demand**. As alleged in Factual Sections A through E, Plaintiff further alleges that separate consumer demand exists in family-court proceedings for SAAP legal representation, independent of SACP legal representation. In a competitive market, consumers would purchase legal representation under privately negotiated retainer agreements, with fee disputes resolved through ordinary contract remedies. Consumers do not voluntarily demand court-ordered SACP legal representation that overrides their private terms, depletes their assets, and eliminates their bargaining power.

227. **Distinct Products**. As alleged in Factual Sections A through E, Plaintiff further alleges that SACP legal representation is functionally distinct from SAAP legal representation. Legal services, like other professional services, consist of various distinct products defined by their payment and delivery models (e.g., hourly rate vs. flat rate; pay-as-you-go vs. pay-in-advance). By analogy, a Microsoft Office lifetime license (pay-in-advance) and a Microsoft Office subscription (pay-as-you-go) are two distinct products: a lifetime license limits the hardware on which it can be installed, while a subscription allows portability between machines. Similarly, SACP legal representation is

a distinct product that bundles collection and enforcement services, securing payment through judicial orders rather than through voluntary contract performance. Other professional service providers, including medical providers, accountants, architects, and engineers—provide their services without access to any comparable SACP product. The bundling of these two distinct products is unique to State Bar members practicing in Texas family courts.

228. **Economic Value of Tied Product**. As alleged in Factual Sections A through E, Plaintiff further alleges that the SACP legal representation has independent economic value to State Bar members. It guarantees payment regardless of client satisfaction. It accelerates cash flow through prepayment before services are rendered. It eliminates collection risk. It overrides unfavorable retainer terms. It prioritizes attorney claims above competing creditors. These economic benefits are separate from and additional to the value of providing legal representation services.

229. **Tying Coercion Through Monopoly Power**. As alleged in Factual Sections A through E, Plaintiff further alleges that the State Bar of Texas, through its monopoly control over attorney licensing, has structured the market so that consumers cannot purchase SAAP legal representation without also being subjected to SACP legal representation. Because only State Bar members may provide in-court representation, and because all members have access to the SACP mechanism through fellow members acting as judicial officers, consumers are powerless to reject SACP services imposed via non-appealable interlocutory orders. Compounding this institutional misconduct is the lack of notice: like other consumers of legal services, Plaintiff was subjected to this mechanism without prior pleading or briefing, effectively blindsided by the order. The tie is thus imposed by a monopolized market structure, not by individual contract terms.

230. **No Consumer Choice**. As alleged in Factual Sections A through E, Plaintiff alleges that no State Bar member provides SAAP without conditioning that service on SACP. Consumers cannot contract around this tie; the SACP is a unique product, imposed exclusively by other SBOT members presiding over family courts using interlocutory orders. Because these judicial orders systematically override private contract terms (including fee caps and mutual consent clauses), consumers are forced to accept a bundled product with no unbundled alternative available in the marketplace.

231. **Mechanism of Coerced SAAP/SACP Bundling**. As alleged in Factual Sections A through E, Plaintiff further alleges that the tying coercion operates through a structural mechanism that forces consumers who seek SAAP legal representation in Texas family-court proceedings to accept the bundled SACP component, as follows:

(a) **Mandatory State Bar Channel.** A consumer who seeks in-court family-law representation must retain a State Bar member because non-members cannot provide in-court representation;

(b) **Submission to SBOT-Controlled Adjudication**. Once a consumer retains a State Bar member under a private SAAP retainer agreement, the consumer is necessarily brought before family courts staffed by other State Bar members acting as judicial officers;

(c) **Override of Private SAAP Terms.** State Bar members acting as judicial officers issue interlocutory fee orders that override private SAAP terms (including negotiated caps and mutual-consent clauses), compelling **prepayment** and converting SAAP representation into a hybrid SAAP/SACP arrangement;

(d) **Immediate Enforcement Through Judicial Power**. These fee orders are immediately enforceable through court power, including contempt-backed enforcement and other collection tools, without the ordinary pleading, evidentiary support, or contract-remedy process that would govern a voluntary SAAP transaction in a competitive market;

(e) **Systemwide Imposition.** The tie cannot be avoided through provider choice because all available in-court providers are State Bar members and the SACP mechanism is available systemwide through fellow members acting as judicial officers.

232. **Resulting Consumer Restraints and Monopoly Entrenchment.** As alleged in Factual Sections A through E, Plaintiff further alleges that this structural tie protects and entrenches the State Bar's monopoly in the tying-product market by converting privately negotiated SAAP relationships into coerced hybrid SAAP/SACP relationships and by imposing the following consumer-facing restraints:

(a) **Raised Consumer Costs.** Consumers are forced into compelled prepayment that exceeds, contradicts, or disregards negotiated SAAP payment terms.

(b) **Prepayment Lock-In.** Compelled prepayments are not practically recoverable, creating lock-in and discouraging counsel changes even when performance is unsatisfactory.

(c) **Practical Foreclosure of Pro Se.** The compelled-prepayment mechanism depletes consumer resources, materially narrowing the practical availability of self-representation.

(d) **Penalty for Resistance.** Consumers are deterred from contesting compelled-prepayment orders because contesting increases procedural burden and exposure to additional compelled-prepayment demands and enforcement measures.

(e) **Elimination of Bargaining Power.** Consumers lose bargaining power because negotiated SAAP retainer terms, including fee caps and mutual-consent provisions, are not enforceable in practice once overridden. Plaintiff alleges these restraints are anticompetitive effects because they distort price, choice, and mobility in the market for legal services and thereby injure consumers.

233. **No Legitimate Business Justification**. As alleged in Factual Sections A through E, Plaintiff further alleges that the tying arrangement lacks any legitimate procompetitive justification. The compelled-prepayment mechanism does not enhance the quality of legal services, reduce consumer costs, or increase consumer choice or access to justice. Instead, Plaintiff alleges that its operative function is to guarantee revenue for State Bar members through compelled prepayment enforced by judicial power and to displace the market discipline that would otherwise constrain fee demands and collection practices in a competitive, contract-based SAAP market. Plaintiff further alleges that these restraints harm the competitive process by impairing substitution and mobility (switching), foreclosing unbundled SAAP-only contracting, and replacing ordinary market/contract collection with a privileged, court-backed compelled-payment channel. Plaintiff further alleges that any claimed justification is pretextual or, even if credited, does not offset the anticompetitive effects described above, and that the challenged conduct is, on balance, anticompetitive.

C. *State Bar's Unilateral Maintenance of the SAAP/SACP Tie*

234. **Refusal to Discipline as Exclusionary Conduct.** As alleged in Factual Section G, Plaintiff further alleges that the State Bar of Texas ("SBOT") unilaterally creates and maintains the SAAP/SACP tie through its exclusive control over attorney discipline. Plaintiff filed a disciplinary complaint documenting the compelled-prepayment (SACP) practices alleged herein, including fee orders issued without jurisdiction, without pleading, and without evidentiary support, that overrode Plaintiff's private SAAP retainer and compelled prepayment to Plaintiff's own counsel.

235. **Disciplinary Denial as Ratification.** As alleged in Factual Section G, Plaintiff further alleges that SBOT denied Plaintiff's disciplinary complaint, thereby (a) exercising exclusive disciplinary authority; (b) affirmatively treating the challenged SACP practices as non-violations of professional conduct rules; (c) ratifying and perpetuating the fee-extraction mechanism; (d) signaling to members that SACP practices will not be disciplined; and (e) foreclosing the only practical consumer remedy short of costly appellate litigation.

236. **Pattern of Non-Enforcement.** As alleged in Factual Section G, Plaintiff further alleges, on information and belief, that SBOT's denial is part of a broader pattern of refusing to discipline attorneys for the SACP practices alleged herein, and that this non-enforcement is unilateral conduct that perpetuates the SAAP/SACP tie.

237. **Additional SBOT Maintenance Conduct.** As alleged in Factual Section G, Plaintiff further alleges SBOT maintains the SAAP/SACP tie by: (a) failing to adopt rules barring attorneys from seeking fee orders that override SAAP retainer terms without client consent; (b) failing to adopt rules barring compelled-prepayment requests without proper pleading or evidentiary support; (c) offering CLE that teaches or normalizes court-ordered fee collection as standard practice; and (d) financially benefiting through increased member revenues that translate into increased dues and CLE purchases.

238. **Commercial Conduct by an Active Market Participant.** As alleged in Factual Section G, Plaintiff further alleges SBOT's disciplinary choices and omissions are market-facing, self-interested commercial conduct that protects dues-paying members' revenue (including revenue produced by SACP), not neutral regulation, and is subject to antitrust scrutiny absent active state supervision.

D.  *Judicial Campaign Contributions and Financial Alignment*

239. As alleged in Factual Section A, Plaintiff further alleges Texas family-court judges are elected officials whose campaigns are funded primarily by SBOT members—including family-law attorneys who appear before them and benefit from compelled-prepayment fee orders.

240. As alleged in Factual Sections A–E, Plaintiff further alleges documentary evidence (including court orders and campaign finance records) is consistent with a pattern in which judges receiving substantial attorney contributions disproportionately award advance or interim fee payments to contributors and their colleagues.

241. **Feedback Loop.** Plaintiff further alleges the contribution structure creates a cycle: attorneys contribute → judges award advance/interim fees → attorneys' increased revenue funds more contributions → judges receive continued financial support, aligning judge/attorney financial interests against consumers and reinforcing SACP.

242. **Lack of Oversight.** Plaintiff further alleges this alignment is evidence the compelled-prepayment system functions as financially interested, market-participant conduct rather than neutral adjudication, and that the campaign-fee cycle operates without meaningful state oversight.

E.  *Antitrust Injury, Interstate Commerce, and State-Action Immunity*

243. **Antitrust Injury.** Plaintiff further alleges antitrust injury from the SAAP/SACP tie and related restraints, including: compelled payment of approximately $60,000; loss of contractual freedom and market choice; coerced acceptance of SACP; overpayment via unsupported prepayment; loss of bargaining power; increased switching costs; and practical foreclosure of pro se by resource depletion.

244. **Interstate Commerce.** Plaintiff further alleges SBOT's monopoly affects interstate commerce through out-of-state clients, fee extraction from out-of-state assets, and communications with out-of-state financial institutions.

245. **No State-Action Immunity for Market-Facing Restraints.** Plaintiff further alleges the challenged conduct is not entitled to state-action immunity under *Parker v. Brown*, 317 U.S. 341 (1943). Under *North Carolina State Board of Dental Examiners v. FTC*, 574 U.S. 494 (2015), an entity controlled by active market participants must demonstrate active state supervision to claim

immunity. The State Bar of Texas is controlled by licensed attorneys who are active market participants in the legal services market. The Bar's Board of Directors consists predominantly of licensed attorneys who directly benefit from the fee-extraction practices alleged herein. Plaintiff alleges that no disinterested state office placeholder who sworn under oath, actively supervises the Bar's disciplinary decisions, its refusal to adopt rules restricting compelled-prepayment practices, or its CLE programming that normalizes such practices.

F.    ***Commercial Revenue Model and Compulsory Fee-Extraction Affecting Interstate Commerce***

246. Plaintiff further alleges SBOT sells licenses and CLE, holds substantial assets, derives major revenue from licensing dues and CLE, and its members—exclusive in-court providers—sell legal services including to out-of-state consumers and in matters involving out-of-state assets.

247. Plaintiff further alleges SBOT licensing confers exclusive access to occupy judge/prosecutor roles and supports monopoly control that prioritizes members' commercial interests over consumers.

248. Plaintiff further alleges SBOT has, for decades, enforced and perpetuated compulsory fee-collection practices—including the SAAP/SACP tie—through court orders that compel advance/interim fees without voluntary consent or arm's-length bargaining, without consumer notice, and with a predictable "lose-lose" dynamic in which contesting increases costs and risk.

249. Plaintiff further alleges the unlawful ordering of fee shifting occurred less frequently when litigants were lawyers, supporting that SBOT members knew legal limits; and that in Plaintiff's case, both attorneys were incentivized and did not appeal, despite the absence of "reasonable" fee support under lodestar principles.

G.    ***Monopoly Abuse Through the SACP Collection Mechanism***

250. Plaintiff further alleges that, unlike ordinary professionals who must rely on voluntary payment or contract remedies, Texas family-law attorneys obtain court orders to compel payment—including prepayment—leveraging judicial power to secure revenue against their own client; and that this routine compelled-prepayment practice is the tied SACP product.

251. Plaintiff further alleges that family courts lack jurisdiction to adjudicate or enforce attorney-client commercial fee disputes as stand-alone matters, especially absent any pleading by the attorney requesting such relief. The family court thus lacked jurisdiction to compel Plaintiff to pay his own attorney in prepayment form.

252. Plaintiff further alleges that in Plaintiff's case the billing record reflected approximately $11,000 owed to Barrows as of March 2, 2022, yet the court awarded $25,000 to each side; and that when SBOT members acting as judicial officers impose prepayment without pleading, the judge functions

as an advocate for more advantageous terms for fellow SBOT members—using the fee order as the tying condition and compelled transfer.

253. Plaintiff further alleges the compelled-prepayment system deprives litigants of property, coerces contract-term modification, is reinforced by campaign-contribution incentives, is normalized through CLE, persists for decades, and is used to collect or secure advance payment without pleading, often divided among attorneys on both sides.

*H.*    ***Preemption of Civil Remedies and Closed-Loop Dispute Resolution***

254. **Attorneys as Privileged Creditors — Bypassing Pre-Deprivation Process.** Plaintiff further alleges that the compelled-prepayment mechanism grants State Bar members a privileged creditor status unavailable to any other service profession. When an attorney's fees are embedded in a family court decree, whether interlocutory or final, the decree operates as an immediately enforceable judgment. The attorney need not file a separate breach-of-contract action, pay a filing fee, serve process, prove the debt, or face the consumer's contract defenses. This privileged creditor channel bypasses the pre-deprivation procedural safeguards that would apply to any other creditor, and that are constitutionally required for pre-judgment seizure of property. See *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975). Only State Bar members practicing in Texas family courts possess this privileged collection mechanism; doctors, accountants, architects, contractors, and all other professionals must pursue civil court remedies to collect disputed fees.

255. **Preemption of Civil Defense Actions — Foreclosing Post-Deprivation Remedy.** Plaintiff further alleges that embedding attorney fees in family court decrees preempts the consumer's right to bring civil claims challenging those fees. Once fees are incorporated into a divorce decree, res judicata principles bar the consumer from later suing the attorney for breach of contract, fraud, overcharging, or breach of fiduciary duty in a separate civil action. The fee has been "adjudicated"—even though no separate pleading was filed, no contract defenses were raised, and no evidentiary showing was made. This preclusion forecloses both:

(a) the normal market for attorney-client fee dispute resolution (the antitrust harm), and

(b) the post-deprivation civil remedy that would otherwise satisfy due process (the constitutional harm). The consumer's only remaining options are interlocutory appeal (costly, discretionary, deferential) or post-judgment motion before the same judge—neither of which provides adequate remedy for property already taken.

256. **Channeling to In-House Discipline — Inadequate Remedy Proves *Zinermon* Applies.** Plaintiff further alleges that when consumers are foreclosed from civil court, they are channeled into the Bar's in-house disciplinary process. Bar discipline is controlled entirely by State Bar members—attorneys who benefit from the same fee-extraction practices. As alleged in Factual Section G, the Bar dismissed Plaintiff's disciplinary complaint documenting the compelled-prepayment practices, thereby ratifying those practices and signaling to members that such conduct will not be sanctioned.

This in-house process is not an adequate post-deprivation remedy under *Parratt v. Taylor*, 451 U.S. 527 (1981), because it is controlled by the very market participants who benefit from the deprivation. Under *Zinermon v. Burch*, 494 U.S. 113 (1990), when post-deprivation remedies are inadequate by design, pre-deprivation process is constitutionally required.

257. **The Closed-Loop as Both Antitrust Violation and Due Process Violation.** Plaintiff further alleges that no other service profession possesses this three-part closed-loop structure:

(a) privileged access to judicial fee orders that bypass civil collection and pre-deprivation safeguards;

(b) *res judicata* preclusion of consumer civil claims that forecloses post-deprivation remedy; and

(c) in-house dispute resolution controlled by market participants that is inadequate under *Zinermon*. This closed-loop structure is unique to State Bar members, has no legitimate procompetitive justification, and functions to:

    i.   entrench attorney pricing power and eliminate consumer bargaining (the antitrust harm); and

    ii.   deprive consumers of property without constitutionally adequate process (the due process harm). The same institutional design that constitutes exclusionary conduct under *15 U.S.C. § 2* simultaneously constitutes denial of due process under the Fourteenth Amendment.

258. **Structural Absence of Adversarial System.** Plaintiff further alleges that the SACP mechanism creates an irreparable structural defect: the complete absence of an adversarial system for adjudicating attorney fee disputes. In the compelled-prepayment mechanism, the consumer's own attorney is the beneficiary of the fee award. The consumer cannot effectively advocate against their own attorney while simultaneously needing that attorney's representation in the underlying divorce. No one advocates for the consumer's interest:

(a) The consumer's own attorney will not object—they receive the money;

(b) The opposing spouse has no incentive to object—it is not their money;

(c) The opposing attorney has no incentive to object—they also receive fees from the same mechanism;

(d) The judge is a Bar member with structural alignment to fellow Bar members, reinforced by campaign contributions from attorneys who appear before them.

This structural defect cannot be cured by additional procedural safeguards. Even with notice, hearing, and opportunity to be heard, the consumer has no advocate. The adversarial system that produces fair results is absent by design. This is not a procedural violation, it is a structural impossibility of fair adjudication that forecloses meaningful consumer protection and constitutes the mechanism by which the closed-loop maintains the Bar's monopoly.

*I.    Predatory and Unlawful Fee-Collection Practices; Documentary Record*

259.  Plaintiff further alleges the compulsory system includes:

   (a)  collecting/ securing payment without pleading;

   (b)  advance/interim payments without pleading or jurisdiction;

   (c)  perjury-related conduct for additional revenue;

   (d)  fraudulent QDRO use to circumvent ERISA anti-alienation;

   (e)  fabricated labels (child/spousal support) to obtain fees; and

   (f)  SBOT refusal to discipline such conduct.

260.  Plaintiff further alleges a fifteen-year, multi-county documentary record demonstrating a systematic statewide restraint, including tactics that create a collection advantage unique to SBOT members, front-load uncapped fees, increase switching costs, and make pro se financially impracticable; and pleads harm to other creditors as collateral effect evidence, not a separate market.

*J.    Market-wide Effects*

261.  Plaintiff further alleges market-wide normalization of compelled fee-front-loading shifts pricing and contracting from SAAP bargaining into court-backed compelled transfers, raising consumer costs, reducing consumer choice, deterring switching, and foreclosing practical alternatives (including pro se) through early liquidity depletion and increased risk.

*K.    Concrete Example: Plaintiff's Case*

262.  Plaintiff further alleges that despite being represented, Plaintiff was ordered by Defendant DeAngelis, without discussion, pleading, or lodestar evidence, to pay $10,000 at the initial hearing, and then $50,000 through an interlocutory DRO from his 401(k), imposing supra-competitive costs and overriding SAAP terms; Plaintiff then filed a disciplinary complaint documenting these SACP practices, and Defendant SBOT through its counsel, denied it, ratifying and perpetuating the tie.

*L.    Fee Front-Loading as Monopoly Maintenance; Statewide Victims*

263.  Plaintiff further alleges a systematic pattern of front-loading uncapped interim fees early in proceedings as exclusionary conduct lacking legitimate justification, producing financial exhaustion, pressured settlements, reduced bargaining power, and market distortion; that this pattern is commercial conduct subject to antitrust scrutiny; and that other victims statewide suffered similar injuries.

*M.    Relief*

264. Plaintiff is entitled to treble damages and a reasonable attorney's fee under *15 U.S.C. § 15(a),* and injunctive relief under *15 U.S.C. § 26.*

## COUNT FOUR: 42 U.S.C. § 1983 — Due Process and Equal Protection

*(Against DeAngelis, Marin, Martinez, Craig, Wilder, Barrows, Ybarra, Pigg, Tarrant County, and U.S. Bank)*

265. Plaintiff incorporates by reference all preceding paragraphs.

### A.   *Claims Against DeAngelis*

266. **State Action:** DeAngelis acted under color of state law as Associate Judge of the 325th District Court.

267. **Due Process Violation:** DeAngelis deprived Plaintiff of property without due process by:

• Ordering $10,000 in attorney fee payments without any pleading or hearing (November 10, 2021) despite both parties having already paid retainers, and with no evidence of billable hours or rates.

• Ordering $50,000 ERISA fund distribution not authorized by Texas Family Code. (April 13, 2022).

• Issuing third interlocutory DRO without jurisdiction (July 14, 2022).

268. **Ultra Vires:** DeAngelis exceeded her jurisdiction by ordering ERISA fund distribution  and issuing interlocutory DRO without legal authority, in clear absence of all jurisdiction.

### B.  *Structural Due Process Violations*

269. **No Proceeding Exists — Counsel Is Not a Party**. Plaintiff further alleges that the SACP mechanism violates due process at the most fundamental level: no proceeding exists for the attorney-client fee dispute. Due process presupposes a proceeding in which notice and an opportunity to be heard can occur. Here, no such proceeding exists. The divorce case has two parties: Spouse A (Fuyan Wang) and Spouse B (Plaintiff/Consumer). Plaintiff's own counsel (Pigg and Cutrer) is not a party to the divorce case. Opposing counsel (Barrows and Ybarra) is not a party to the divorce case. Yet the court awarded $50,000 to these non-parties—$25,000 to each side's attorneys. Pigg never filed any claim against Plaintiff. There was no complaint to answer. There were no defenses to raise. There was no proceeding in which Plaintiff could be heard on the fee dispute—because no fee dispute proceeding existed. The court "adjudicated" an attorney-client commercial fee dispute in a case where the attorney was not a party. This is not a failure of procedural safeguards within a proceeding—it is the complete absence of any proceeding. Due process cannot be satisfied when no process exists. See *Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ("The fundamental requisite of due process of law is the opportunity to be

heard."). There can be no opportunity to be heard when there is no proceeding in which to be heard.

270.    **Irreparable Tribunal — No Adversarial System.** Even if a proceeding existed, the SACP mechanism would still violate due process because the tribunal is structurally incapable of fair adjudication. Due process requires not merely procedural safeguards, but a tribunal structurally capable of producing fair results. See *Tumey v. Ohio*, 273 U.S. 510 (1927); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). The SACP mechanism is structurally incapable of fair adjudication because no adversarial system exists:

> (a) Consumer cannot advocate against own attorney. In the attorney-client relationship, the attorney is the consumer's fiduciary and advocate. When the judge sua sponte awards fees to that attorney, the consumer cannot effectively oppose the award while simultaneously depending on that attorney for representation in the underlying divorce.

> (b) No substitute advocate available. If the consumer fires the attorney to contest the fee, the consumer loses representation in the divorce proceeding. Any replacement attorney is subject to the same SACP mechanism and has the same potential conflict.

> (c) No party has incentive to oppose. The consumer's attorney benefits from the award. The opposing spouse is not harmed. The opposing attorney also benefits. No one present has any incentive to advocate for the consumer's interest.

> (d) Judge has structural bias. The presiding judge is a Bar member whose professional colleagues benefit from the fee award, and whose campaign is funded by attorneys who appear before them and benefit from SACP practices.

271.    **Structural Defect Cannot Be Cured.** This is an "irreparable tribunal"—a structural defect that cannot be cured by additional procedural safeguards. Even with full notice, a formal hearing, and an opportunity to be heard, the consumer has no advocate. The adversarial system that due process assumes—and that *Goldberg v. Kelly*, 397 U.S. 254 (1970), held constitutionally required—is absent. This structural due process violation is independent of, and in addition to, the procedural due process violations alleged herein. See below, illustrating that counsel is not a party to the divorce proceeding and no proceeding exists for the fee dispute.

## STRUCTURAL DUE PROCESS VIOLATIONS

Two Independent Grounds — Each Sufficient to Establish Violation



**ARGUMENT 1: NO PROCEEDING EXISTS — COUNSEL IS NOT A PARTY**

**THE DIVORCE CASE (The Only Proceeding That Exists)**

**PARTY**
Spouse A (Ex-wife)

**VS.**

**PARTY**
Spouse B (Consumer)

**NON-PARTIES WHO RECEIVED MONEY:**

$25,000                $25,000

**Barrows and Ybarra**
(Opposing Counsel)
**NOT A PARTY**

**Pigg and Cutrer**
(Consumer's Own Counsel)
**NOT A PARTY**

No claim filed. No complaint to answer. No defenses raised. NO PROCEEDING FOR FEE DISPUTE.
*Grannis v. Ordean: "The fundamental requisite of due process is the opportunity to be heard."*



**ARGUMENT 2: IRREPARABLE TRIBUNAL — NO ADVERSARIAL SYSTEM**

Even if a proceeding existed, the tribunal is structurally incapable of fair adjudication:

**(a) CONSUMER CANNOT ADVOCATE AGAINST OWN ATTORNEY**

Attorney is consumer's fiduciary and advocate

**(b) NO SUBSTITUTE ADVOCATE AVAILABLE**

Fire attorney = lose representation in divorce.
New attorney = same conflict.

**(c) NO PARTY HAS INCENTIVE TO OPPOSE**

Consumer's attorney benefits.
Opposing spouse not harmed.
Opposing attorney benefits.

**(d) JUDGE HAS STRUCTURAL BIAS**

Bar member whose colleagues benefit;
campaign $ from attorneys.

**NO ADVERSARIAL SYSTEM = STRUCTURALLY UNFAIR TRIBUNAL**
*Tumey v. Ohio; Caperton v. Massey; Goldberg v. Kelly — structural fairness required*

+

## DUE PROCESS IMPOSSIBLE

No proceeding exists for the fee dispute (counsel is not a party)

AND even if one existed, no adversarial system is possible (irreparable tribunal)

**KEY: Pigg never filed any claim against Consumer.**
**Yet Consumer was ordered to pay Pigg — with no proceeding and no advocate.**

C.    *Federal Entitlement and Procedural Due Process Framework*

272.    **Federal Entitlement to ERISA-Protected Retirement Benefits**. Plaintiff's 401(k) retirement account is a federal entitlement created and protected by ERISA. ERISA creates a vested property right (*29 U.S.C. § 1053*), protects it from alienation (*29 U.S.C. § 1056(d)(1)*), and specifies that distributions may be made only to the participant or to an "alternate payee" through a QDRO (*29 U.S.C. § 1056(d)(3)(K)*). Attorneys are not alternate payees. This federal entitlement is protected by the Due Process Clause. See *Board of Regents v. Roth*, 408 U.S. 564 (1972); *Mathews v. Eldridge*, 424 U.S. 319 (1976).

273.    **The Closed-Loop Structure Violates Due Process**. As alleged in Count Three, Section H, the State Bar of Texas has constructed a three-part closed-loop structure for attorney fee collection in family court. That same structure that constitutes exclusionary antitrust conduct also constitutes denial of due process:

    (a)    **Part 1 — Privileged Collection Channel Bypasses Pre-Deprivation Process.** The compelled-prepayment mechanism allows attorneys to obtain fee orders without filing any pleading, without the consumer receiving notice, without opportunity to be heard, without evidentiary showing, without bond, and without any showing of exigent circumstances. This bypasses every procedural safeguard the Supreme Court has held constitutionally required for pre-judgment seizure of property. *Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969) ; *Fuentes v. Shevin*, 407 U.S. 67 (1972); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975); *Connecticut v. Doehr*, 501 U.S. 1 (1991).

    (b)    **Part 2 — Res Judicata Preclusion Forecloses Post-Deprivation Civil Remedy.** Once fees are embedded in the decree, res judicata bars the consumer from challenging those fees in a separate civil action. The post-deprivation remedy of suing for breach of contract, fraud, or overcharging—available to consumers of every other profession—is foreclosed.

    (c)    **Part 3 — In-House Discipline Is Inadequate Remedy.** The only remaining avenue is Bar discipline, controlled entirely by Bar members who benefit from the same practices. The Bar dismissed Plaintiff's complaint. This is not an adequate post-deprivation remedy under *Parratt v. Taylor*, 451 U.S. 527 (1981).

274.    ***Zinermon* Requires Pre-Deprivation Process.** Because the closed-loop structure forecloses adequate post-deprivation remedies by design, pre-deprivation process was constitutionally required. *Zinermon v. Burch*, 494 U.S. 113, 126 (1990) ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy."). Pre-deprivation process was not only feasible

here—it was expressly required by TRCP 658 and *Texas Civil Practice & Remedies Code § 63.001*. The *Parratt*/*Hudson* [9] doctrine does not apply because the Bar's institutional design has foreclosed the post-deprivation remedies that doctrine assumes.

275. **DeAngelis Provided No Pre-Deprivation Process.** DeAngelis ordered the deprivation of Plaintiff's ERISA-protected retirement funds without any constitutionally required safeguards:

(a) No pleading: No attorney filed any pleading requesting fees from Plaintiff's 401(k).

(b) No notice: Plaintiff received no prior notice that his retirement account would be distributed to pay attorney fees.

(c) No opportunity to be heard: Plaintiff had no opportunity to contest the fee amount, raise contract defenses, challenge jurisdiction, or assert ERISA protections.

(d) No evidentiary showing: No lodestar analysis, no billing records, no evidence of reasonableness. The court awarded $25,000 to each side when billing showed only $11,000 owed.

(e) No bond: No bond protected Plaintiff from erroneous deprivation.

(f) No exigent circumstances: No showing of necessity justified bypassing procedural protections.

276. **Diversion to Counsel — The SACP Mechanism.** The deprivation was not merely procedurally deficient, it was the compelled-prepayment (SACP) mechanism in action. ERISA prohibits distributions except to participants or alternate payees. Attorneys are not alternate payees. DeAngelis ordered Plaintiff's federal entitlement property diverted to his own counsel through the privileged creditor channel alleged in Count Three. The fraudulent "spousal support" labels used to accomplish this are how the SACP tie is imposed. This due process violation is not incidental—it is how the anticompetitive closed-loop structure operates.

### D. *Claims Against Marin, Martinez, and Craig*

277. **State Action:** These Defendants acted under color of state law as employees of the State Bar performing quasi-prosecutorial functions delegated by the Texas Supreme Court.

278. **Equal Protection Violation:** These Defendants engaged in selective enforcement by:

• Dismissing Plaintiff's grievances despite documentary evidence of fraud.

• Pursuing disciplinary action against Attorney General Ken Paxton for alleged "dishonest statements" while refusing to act on identical conduct by Barrows and Pigg supported by concrete evidence.

---

[9] *Hudson v. Palmer*, 468 U.S. 517 (1984)

279. **Due Process Violation:** Arbitrary decision-making without rational basis; ignoring clear evidence of misconduct.

280. **Ultra Vires:** These Defendants exceeded their authority by using the grievance system to conceal crimes rather than discipline misconduct.

### E.    Claims Against Tom Wilder (District Clerk)

281. **State Action:** Tom Wilder acted under color of state law as District Clerk of Tarrant County, an elected county official exercising governmental authority over court records and processes.

282. **Protected Property Interest:** Plaintiff's ERISA-protected 401(k) retirement account constitutes a property interest protected by the Due Process Clause of the Fourteenth Amendment. A vested pension benefit is a property interest that cannot be deprived without due process. See *Board of Regents v. Roth*, 408 U.S. 564 (1972) (property interests are created by rules or understandings that secure certain benefits and support claims of entitlement to those benefits); *Mathews v. Eldridge*, 424 U.S. 319 (1976).

283. **Mandatory Procedural Safeguards Under Texas Law:** Texas Rule of Civil Procedure 658, together with Texas Civil Practice and Remedies Code § 63.001, establishes mandatory procedural safeguards before any writ of pre-judgment garnishment may issue. These safeguards require: (1) a written application for writ of garnishment; (2) a supporting affidavit stating the statutory grounds; and (3) the posting of an adequate bond. "No writ shall issue before final judgment except upon written order of the court after a hearing." TRCP 658.

284. **Constitutional Foundation.** The Supreme Court has repeatedly held that pre-judgment seizure of property requires strict procedural compliance:

  (a) *Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969), the Court held that pre-judgment wage garnishment without notice and hearing violates due process;

  (b) *Fuentes v. Shevin*, 407 U.S. 67 (1972), the Court held that pre-judgment seizure requires prior notice and opportunity to be heard. Most directly on point;

  (c) *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975), the Court struck down a garnishment statute because it lacked: (a) participation by a judicial officer, (b) requirement for a bond, and (c) opportunity for early hearing—the same defects present here;

  (d) *Connecticut* v. *Doehr*, 501 U.S. 1 (1991) (holding pre-judgment attachment without prior notice, hearing, bond, or showing of exigent circumstances violates due process).

285. Texas codified these constitutional requirements in TRCP 658 and Texas Civil Practice & Remedies Code § 63.001. These procedures are not mere formalities—they are constitutionally

required pre-deprivation safeguards that protect property owners from erroneous or wrongful seizure of their assets.

286. **Procedural Due Process Violation:** Defendant Wilder, acting through the Tarrant County District Clerk's Office, deprived Plaintiff of his protected property interest without constitutionally required procedural safeguards by:

1) Issuing the June 16, 2022 Writ of Garnishment (Docket #103) and serving it on US Bancorp on June 16, 2022, without any filed application for writ of garnishment in the case file;

2) Issuing the July 14, 2022 Writ of Garnishment (Docket #119) and serving it on US Bank on July 14, 2022, without any filed application for writ of garnishment;

3) Issuing both writs without any supporting affidavit stating the statutory grounds for garnishment as required by TRCP 658;

4) Issuing both writs without any bond filing to protect Plaintiff from wrongful garnishment as required by Texas law;

5) Collecting $8 writ-issuance fees for each writ (totaling $16 in revenue) while failing to verify that the mandatory procedural prerequisites had been satisfied.

6) Failing to collect the mandatory $80 application filing fee — the docket shows only $8 writ-issuance fees with no corresponding $80 application fees, proving no applications were ever filed.

7) Issuing writs in violation of the mandatory TRCP 658 sequence — which requires: (a) written application filed, (b) court hearing on application, (c) written order deciding the application, and only then (d) issuance of writ. Wilder bypassed this entire sequence and issued writs directly without any filed application or court order deciding an application.

287. **Foreseeability of Procedural Safeguards:** The procedural protections required by TRCP 658 and Texas Civil Practice and Remedies Code § 63.001 are not random or unpredictable requirements. They are clearly established, mandatory safeguards designed precisely to prevent the type of injury Plaintiff suffered. A District Clerk is required to verify that these procedural prerequisites are satisfied before issuing any writ of pre-judgment garnishment. The risk of erroneous deprivation of property is high when writs issue without applications, affidavits, and bonds—these safeguards exist specifically because pre-judgment seizure carries significant risk of harm to property owners. See *Mathews v. Eldridge*, 424 U.S. 319 (1976) (weighing the private interest affected, risk of erroneous deprivation, and value of additional safeguards).

288. **Not a Random, Unauthorized Act (Parratt/Hudson Inapplicable):** The Parratt/Hudson doctrine does not bar this claim because: (a) Wilder's conduct was not "random and unauthorized"—he issued writs through official channels using his governmental authority as District Clerk; (b) pre-deprivation process was not only practicable but was expressly required by TRCP 658 and *Texas Civil Practice & Remedies Code § 63.001*; (c) Wilder issued two separate writs on two separate dates (June 16 and July 14, 2022), each time bypassing the same mandatory

procedures—demonstrating a pattern, not an isolated mistake; and (d) established state procedures existed that would have provided adequate pre-deprivation safeguards had Wilder followed them. See *Zinermon v. Burch*, 494 U.S. 113 (1990) (holding that when state procedures make pre-deprivation safeguards practicable, failure to provide them violates procedural due process regardless of post-deprivation remedies).

289.    Individual Capacity Liability Does Not Require Pattern: Unlike municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which requires proof of a policy or custom, individual capacity § 1983 claims require only that the defendant personally caused the constitutional deprivation. Wilder personally authorized and issued the writs that seized Plaintiff's property without due process. Even a single constitutional violation by an individual state actor is actionable under § 1983. See *Hafer v. Melo*, 502 U.S. 21 (1991). Nonetheless, Wilder's conduct here was not a single violation—he issued two writs, on two dates, each time deliberately bypassing the required procedures.

290.    **Clearly Established Law (Qualified Immunity Inapplicable):** The constitutional requirement of pre-deprivation procedural safeguards for pre-judgment garnishment was clearly established by 1975 at the latest. *North Georgia Finishing*, 419 U.S. at 606-07, held that a garnishment statute lacking bond requirements, proper affidavits, and judicial participation violated due process. TRCP 658 codifies these exact requirements. Any reasonable District Clerk would know that issuing pre-judgment garnishment writs without verifying compliance with these mandatory prerequisites violates clearly established constitutional law. Wilder cannot claim qualified immunity for conduct that violates a half-century of Supreme Court precedent.

291.    **Ultra Vires:** Defendant Wilder acted ultra vires by issuing writs of garnishment without the statutorily required application, affidavit, and bond. A District Clerk has no authority under Texas law to issue writs of pre-judgment garnishment absent these mandatory prerequisites. The writs are void ab initio.

292.    Plaintiff is entitled to compensatory damages, punitive damages, and attorney fees under 42 U.S.C. § 1988.

F.    *Claims Against U.S. Bank as § 1983 Conspirator*

293.    Defendant U.S. Bank, though a private entity, is liable under *42 U.S.C. § 1983* for conspiring with state actors to deprive Plaintiff of property without due process. See *Dennis v. Sparks*, 449 U.S. 24 (1980).

294.    **Joint Action:** U.S. Bank served as the enforcement mechanism for Texas state court orders, engaging in joint action with state judicial officials. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

295.   **Willful Participation:** U.S. Bank knowingly participated in the constitutional violation by:

•   Acknowledging the order "appeared in direct conflict" with the associate judge's factual report, yet distributing funds anyway

•   Rejecting Plaintiff's objection within four hours without proper committee review

•   Falsifying Plaintiff's marital status to conceal the improper distribution

•   Distributing funds under the false label of "spousal support" to Plaintiff's spouse, when no spousal support was ever pleaded, heard, or ordered, as a scheme to circumvent ERISA's prohibition on distributions to attorneys who are not "alternate payees"

296.   Plaintiff is entitled to compensatory damages, punitive damages, and attorney fees under 42 U.S.C. § 1988.

### G.   *Claims Against Barrows, Ybarra, and Pigg as § 1983 Conspirators*

297.   Defendants Barrows, Ybarra and Pigg, though private attorneys, are liable under *42 U.S.C. § 1983* for conspiring with state actors to deprive Plaintiff of property without due process. See *Dennis v. Sparks*, 449 U.S. 24 (1980) (holding private parties who corrupt or conspire to corrupt judicial proceedings are liable under § 1983).

298.   Conspiracy with State Actors: Barrows and Pigg, together with Ybarra, conspired with DeAngelis (who issued the fraudulent orders) and Wilder (who issued the writs) to deprive Plaintiff of his ERISA-protected retirement funds without constitutionally required procedural safeguards. The August 5, 2022 email stating "In order for us to obtain our attorney's fee, we must say the order is for spousal support… there is no way around it" is direct evidence of the conspiracy to circumvent both ERISA protections and state procedural requirements. Ybarra was the co-author on the August 5, 2022 email, participated in the April 13, 2022 hearing, and received direct financial benefit from the fraudulent extraction scheme, supporting her knowing agreement to and participation in the conspiracy.

299.   Causing Pre-Judgment Seizure Without Required Safeguards: Barrows and Pigg caused Wilder to issue pre-judgment writs of garnishment without filing any application, without posting any bond, and without any supporting affidavit, in direct violation of TRCP 658 and the procedural safeguards required by *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975). The docket shows no $80 application fees were collected, proving no applications were ever filed. Barrows and Pigg knowingly bypassed these mandatory constitutional procedures to seize Plaintiff's property without due process, and Ybarra knowingly joined and benefited from the same extraction scheme.

300.   Joint Action with State Officials: Barrows and Pigg were jointly engaged with state officials in the constitutional deprivation. They prepared and submitted the fraudulent "spousal support" orders to

DeAngelis for signature; they caused writs to be issued through Wilder's office without required applications; and they directed U.S. Bank to execute the seizure. Ybarra, while a private attorney, was contemporaneously informed of the plan (co-authored the August 5, 2022 email), participated in the April 13, 2022 hearing, and received direct financial benefit from the extraction, thereby joining the joint action that produced the constitutional deprivation. "Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983." *Dennis v. Sparks*, 449 U.S. at 27–28.

301. No Qualified Immunity for Private Conspirators: Unlike government officials, private parties who conspire with state actors to violate constitutional rights are not entitled to qualified immunity. *Wyatt v. Cole*, 504 U.S. 158 (1992). Barrows, Pigg, and Ybarra cannot invoke qualified immunity to shield their conspiracy to deprive Plaintiff of property without due process.

*302. Plaintiff is entitled to compensatory damages, punitive damages, and attorney fees under 42 U.S.C. § 1988.*

### H.    *Claims Against Tarrant County for the official capacity of Wilder*

303. Tarrant County through official capacity of Wilder, maintained a policy, practice, or custom of issuing pre-judgment writs of garnishment without verifying TRCP 658 prerequisites, and of processing DRO-substitute instruments without collecting required filing fees, which caused the constitutional violations alleged herein."

### COUNT FIVE: ERISA Fiduciary Breach — 29 U.S.C. § 1132(a) (2) and (a)(3)

*(Against U.S. Bank, The Barrows Firm, DeAngelis, Marin, Martinez, Craig, Wilder, Barrows, Pigg, Ybarra, Evans, Harris, State Bar of Texas, Tarrant County,)*

304. Plaintiff incorporates by reference all preceding paragraphs.

305. **Losses.** Plaintiff alleges that, as a direct result of U.S. Bank's breaches of fiduciary duty, Plaintiff's ERISA-governed 401(k) plan suffered losses consisting of (i) the $25,000 distribution made in 2022 and (ii) foregone investment returns on that amount from September 2022 through judgment.

306. **Statutory Bases.** Plaintiff asserts this claim under *29 U.S.C. § 1132(a)(2)* and *§ 1109(a)* (fiduciary liability to restore plan losses). In addition, or in the alternative, Plaintiff seeks "appropriate equitable relief" under *29 U.S.C. § 1132(a)(3)*, including against non-fiduciary knowing participants and transferees. *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000); *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011).

307. **Prospective-only judicial defendants**. Plaintiff includes Defendants Evans and Harris in Count Five solely for prospective declaratory and injunctive relief under *29 U.S.C. § 1132(a)(3)* and *Ex parte Young*, 209 U.S. 123 (1908), based on their alleged ongoing official-role participation in

preserving, facilitating, or enabling continuation of the pleaded ERISA circumvention and writ-driven restraint/threat. Plaintiff seeks no monetary damages or attorney fees from Evans or Harris under Count Five.

A.  ***Claims Against U.S. Bank (Fiduciary)***

308.  **ERISA Plan:** Plaintiff's 401(k) is an employee pension benefit plan covered by ERISA, *29 U.S.C. § 1002(2)*.

309.  **Fiduciary Status and Duties:** Plaintiff alleges that U.S. Bank is a fiduciary within the meaning of *29 U.S.C. § 1002(21)(A)* and owed duties of loyalty and prudence under *29 U.S.C. § 1104*, including compliance with plan documents.

310.  **QDRO Limits.** Under *29 U.S.C. § 1056(d)(3)*, a QDRO may direct payment only to an "alternate payee" (spouse, child, or dependent). Attorneys are not "alternate payees," and QDRO is a post-judgment statutory vehicle issued after new petition in Texas.

311.  **Breaches: U.S. Bank** breached its fiduciary duties by:

   (a) Distributing $25,000 under a "spousal support" label when spousal support was not pleaded, heard, or ordered, and when U.S. Bank knew or should have known the label was used as a pretext to reach attorney-fee objectives prohibited by ERISA's alternate-payee limits;

   (b) Processing an interlocutory order during a pending divorce proceeding despite obvious facial defects and disputed record inconsistency;

   (c) Proceeding on an order U.S. Bank acknowledged conflicted with the underlying court record;

   (d) Changing Plaintiff's marital status from "married" to "single" without a divorce decree;

   (e) Rejecting Plaintiff's objection within hours without convening the Benefits Administration Committee; and

   (f) Failing to act prudently in light of the order's facial defects and Plaintiff's objection.

B.  ***Claims Against the Barrows Firm and Barrows (Non-Fiduciary Transferees; Knowing Participants)***

312.  **ERISA "Person."** The Barrows Firm is a "person" under ERISA. *29 U.S.C. § 1002(9)*. Plaintiff seeks equitable relief under *§ 1132(a)(3)* against (i) the Barrows Firm and (ii) Barrows individually as transferees and knowing participants.

313.  **Transferee Status.** Plaintiff alleges that the September 2022 distribution resulted in $25,000 in ERISA-protected plan assets being improperly transferred from Plaintiff's 401(k) account through

Plaintiff's spouse (Fuyan Wang) and ultimately used to satisfy attorney-fee demands of The Barrows Firm. Defendant Barrows and the Barrows Firm received and retained the benefit of these funds in an account under their name, which were paid to that Barrows and the Barrows Firm as purported attorney fees. Neither Barrows or the Barrows Firm was an "alternate payee" under 29 U.S.C. § 1056(d)(3)(K) and had no lawful right to receive any distribution from Plaintiff's ERISA plan. Because the distribution was accomplished through the fraudulent "spousal support" relabeling scheme alleged herein, Barrows and the Barrows Firm are transferees of improperly distributed plan assets within the meaning of *Harris Trust*, 530 U.S. 238.

314. **Knowing Participation.** Plaintiff alleges The Barrows Firm and Barrows knowingly participated in U.S. Bank's fiduciary breach and in the ERISA-circumvention scheme by:

(a) Filing a March 3, 2022 motion for interim attorney's fees supported by an affidavit Plaintiff alleges was false because it included billing entries from a separate municipal criminal case while representing the charges as family-court fees;

(b) Testifying on April 13, 2022 that the affidavit was true despite knowledge of the non-family charges;

(c) Consenting to the April 13, 2022 Associate Judge report/order directing $25,000 to Barrows and $25,000 to Pigg from Plaintiff's 401(k), including fees for drafting a QDRO;

(d) Contacting U.S. Bank after April 13, 2022 to pursue plan distribution and learning that ERISA does not permit direct interim attorney-fee payments because attorneys are not "alternate payees";

(e) Coordinating with Pigg to proceed anyway by relabeling the same $25,000 objective as "spousal support" payable through Plaintiff's spouse;

(f) Preparing, transmitting, and causing to be filed multiple "spousal support" instruments (including paperwork dated April 26, May 26, June 16, and July 12, 2022) that Plaintiff alleges falsely stated spousal support had been heard or ordered on April 13, 2022;

(g) Causing a prejudgment writ sequence to issue and be served in June and July 2022 without a filed writ application, without a supporting affidavit, and without any bond filing;

(h) Communicating with U.S. Bank and/or its counsel regarding release of funds and Plaintiff's objections, and obtaining the $25,000 distribution routed through Plaintiff's spouse; and

(i) Sending the August 5, 2022 email to Pigg (co-authored by Ybarra) stating that describing the order as "spousal support" was necessary to obtain attorney's fees, which Plaintiff alleges evidences knowledge and intent.

315. **Equitable Relief Available.** Plaintiff seeks appropriate equitable relief under *29 U.S.C. § 1132(a)(3)*, including:

   (a) **Constructive trust** over funds received by The Barrows Firm and/or Barrows (or traceable proceeds), with disgorgement and restoration to the plan;

   (b) **Equitable lien** to secure restoration of improperly distributed plan assets; and;

   (c) **Surcharge** in an amount sufficient to make the plan whole, including $25,000 plus lost investment earnings attributable to the alleged wrongful distribution.

C.  *Claims Against Pigg (Non-Fiduciary Knowing Participant)*

316. Plaintiff alleges Pigg is liable under 29 U.S.C. § 1132(a)(3) as a knowing participant in U.S. Bank's fiduciary breach. *Harris Trust*, 530 U.S. 238.

317. Knowing Participation. Plaintiff alleges Pigg knowingly participated by:

   (a) Receiving the August 5, 2022 email and agreeing to the "spousal support" relabeling approach;
   (b) Signing or transmitting the "spousal support" instruments identified in this Complaint that were used to induce plan action;
   (c) Consenting to U.S. Bank's release of funds while concealing that consent from Plaintiff;
   (d) Misrepresenting to Plaintiff that he opposed the distribution while facilitating it; and

   (e) Participating in drafting, filing, or service of writ instruments directed at Plaintiff's ERISA account, including the July 14, 2022 writ alleged to remain outstanding.

318. **Ongoing Violation** — Outstanding Writ. The July 14, 2022 Writ of Garnishment Before Judgment, which Pigg knowingly concealed procure, remains served on U.S. Bank but unexecuted. This outstanding writ continues to threaten Plaintiff's ERISA-protected account and constitutes an ongoing violation. Pigg's knowing participation extends to enabling this continuing threat.

319. **Equitable Relief.** Plaintiff seeks equitable relief under *§ 1132(a)(3)* in forms available against a knowing participant, including surcharge in an amount reflecting Pigg's proportionate responsibility for plan losses and appropriate injunctive relief to prevent future ERISA violations.

D.  *Claims Against Ybarra (Non-Fiduciary Transferees; Knowing Participant)*

320. Liability (Non-Fiduciary Transferee; Knowing Participant). Plaintiff alleges Ybarra is liable under *29 U.S.C. § 1132(a)(3)* as a transferee of improperly distributed plan assets and as a knowing participant in U.S. Bank's fiduciary breach. *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000); *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011). Plaintiff alleges Ybarra knowingly participated by:

(a) Co-authoring the August 5, 2022 email containing Barrows' solicitation to participate in the fraudulent relabeling scheme;

(b) Participating in the April 13, 2022 hearing when fraudulent testimony was given;

(c) Being copied on communications regarding the April 26, May 26, June 16, and July 12, 2022 orders and the writ sequence;

(d) Knowing that the "spousal support" label was false and designed to circumvent ERISA;

(e) Consenting to the scheme through silence and failing to report known fraud.

321. **Transferee Status**. Plaintiff alleges the September 2022 distribution resulted in ERISA-protected plan assets being transferred from Plaintiff's 401(k) account through Plaintiff's spouse (Fuyan Wang) and used, in whole or in part, to satisfy Ybarra's attorney-fee demand, including fees incurred in a separate criminal matter. Plaintiff alleges Ybarra received and retained the benefit of those funds as purported attorney's fees even though she was not an "alternate payee" under *29 U.S.C. § 1056(d)(3)(K)* and had no lawful right to receive any distribution from Plaintiff's ERISA plan. Accordingly, Plaintiff alleges Ybarra is a transferee of improperly distributed plan assets within the meaning of *Harris Trust*.

322. **Equitable Relief.** Plaintiff is entitled to:

(a) Constructive trust over funds received by Ybarra (or traceable proceeds), with disgorgement and restoration to the plan;

(b) Equitable lien to secure restoration of improperly distributed plan assets; and

(c) Surcharge in an amount sufficient to make the plan whole as to Ybarra's receipt/benefit, including the amount of plan assets she received (directly or indirectly) plus lost investment earnings attributable to that amount from September 2022 through restoration.

(d) Injunctive relief prohibiting Ybarra from seeking, accepting, or retaining any distribution or payment sourced from Plaintiff's ERISA plan absent a valid QDRO and lawful plan review.

E. *Claims Against Wilder (Non-Fiduciary Knowing Participant)*

323. Liability (Non-Fiduciary Knowing Participant; Fee Transferee). Plaintiff realleges the Parties section (Wilder), Factual Section I (Pattern and Continuity), and Count Two, Section B. Wilder is liable under *29 U.S.C. § 1132(a)(3)* as a knowing participant in the pleaded ERISA circumvention and the fiduciary breach described above, and to the extent the District Clerk's office issued writ process and collected issuance fees tied to the wrongful restraint and distribution efforts, as a

transferee of tainted proceeds traceable to the plan. *Harris Trust*, 530 U.S. 238; *Amara*, 563 U.S. 421.

324. Knowing Participation. Plaintiff alleges Wilder knowingly participated by:

    (a) issuing and causing service of the June 2022 and July 2022 "Writ of Garnishment Before Judgment" instruments directed at Plaintiff's ERISA-governed 401(k), in the same sequence used to obtain and maintain restraint over the account;

    (b) doing so in the absence of the ordinary statutory prerequisites alleged above (including a filed writ application, supporting affidavit, and bond), thereby enabling an end-run around ERISA's anti-alienation protection except as permitted by a valid QDRO;

    (c) collecting and retaining writ-issuance fees in connection with the writs while the file lacked the mandatory predicate filings; and

    (d) maintaining the writ-driven restraint mechanism after notice of the ERISA defect and the false "spousal support" pretext alleged above, thereby prolonging the ongoing threat to the plan.

325. Equitable Relief. Plaintiff seeks appropriate equitable relief under *§ 1132(a)(3)* against Wilder, including: (i) disgorgement and restoration to the plan of any fees or proceeds received in connection with the writ issuance and service; and (ii) injunctive relief requiring withdrawal, cancellation, or written release of any outstanding writ restraint directed to the plan administrator or recordkeeper, and prohibiting further writ-based process against the ERISA plan absent a valid QDRO and lawful predicate filings.

### F.   *Claims Against Tarrant County (Entity — Policy/Infrastructure Knowing Participant)*

326. Liability (Entity Knowing Participant; Fee Transferee). Plaintiff realleges Factual Section I (Pattern and Continuity) and Count Two, Section B. Tarrant County is liable under *§ 1132(a)(3)* to the extent County policy, practice, and fee-driven writ infrastructure (implemented through the District Clerk) enabled and profited from the writ sequence directed at Plaintiff's ERISA plan, and to the extent the County received writ-issuance fees that are traceable to the wrongful restraint and distribution scheme. *Harris Trust*, 530 U.S. 238; *Amara*, 563 U.S. 421.

327. Knowing Participation. Plaintiff alleges Tarrant County knowingly participated by:

    (a) operating and monetizing the writ-issuance process that was used as the enforcement vehicle against Plaintiff's ERISA account;

    (b) accepting and processing writ issuance in the challenged sequence without ensuring the predicate filings and safeguards existed in the case file, as alleged above; and

    (c) retaining the resulting issuance-fee revenue while the writs continued to restrain and threaten ERISA-protected assets.

328. Equitable Relief. Plaintiff seeks appropriate equitable relief under *§ 1132(a)(3)* against Tarrant County, including disgorgement of fees traceable to the writ process used against the plan and injunctive relief prohibiting further writ issuance and service against ERISA plan assets absent a valid QDRO and full statutory prerequisites.

G. ***Claims Against State Bar of Texas (Entity Knowing Participant in Ongoing Violations)***

329. Liability (Entity Knowing Participant in Ongoing Violations). Plaintiff realleges Factual Section G (The State Bar Cover-Up) and Count One, Section C (Predicate Acts).The State Bar of Texas is liable under *§ 1132(a)(3)* to the extent its disciplinary and supervisory apparatus, after receiving notice of the ERISA circumvention and the outstanding writ-based threat alleged above, ratified, protected, or enabled continuation of the challenged conduct, thereby contributing to ongoing exposure of the plan to further abstraction. *Harris Trust*, 530 U.S. 238; Amara, 563 U.S. 421.

330. Knowing Participation. Plaintiff alleges the State Bar knowingly participated by:

   (a) receiving notice and supporting materials describing the use of "spousal support" relabeling and prejudgment writ process to reach ERISA-protected assets; and
   (b) through its policymaking and supervisory control over the Office of Chief Disciplinary Counsel, taking or maintaining positions and practices that insulated the attorney participants and permitted continued enforcement pressure through the outstanding writ sequence.

331. Equitable Relief. Plaintiff seeks appropriate equitable relief under *§ 1132(a)(3)* against the State Bar, including injunctive relief prohibiting further official facilitation, ratification, or protection of attorney conduct that uses false DRO labeling or writ process to reach ERISA-protected plan assets outside a valid QDRO.

H. ***Claims Against Marin, Martinez, and Craig (Knowing Participants in Ongoing Violations)***

332. Liability (Knowing Participants; Official and Individual Capacities as Pleaded). Plaintiff realleges Factual Section G (The State Bar Cover-Up) and Section I (Pattern and Continuity). Marin, Martinez, and Craig are liable under *§ 1132(a)(3)* as knowing participants to the extent, after receiving notice of the pleaded ERISA circumvention and the outstanding writ threat, they used their disciplinary-authority roles to shield, ratify, or perpetuate the ongoing violations, rather than taking corrective action. *Harris Trust*, 530 U.S. 238; *Amara*, 563 U.S. 421.

333. Knowing Participation. Plaintiff alleges the Marin, Martinez, and Craig knowingly participated by:

   (a) receiving complaints and supporting materials describing the fraudulent "spousal support" relabeling and writ-based mechanism directed at an ERISA plan;

(b) acting under color of their disciplinary roles to dismiss, close, or neutralize those complaints, thereby protecting the attorney participants and preserving the coercive leverage of an outstanding writ served on the plan; and

(c) continuing those positions after notice that the writ restraint and distribution objective were unlawful under ERISA absent a valid QDRO.

334. Equitable Relief. Plaintiff seeks appropriate equitable relief under *§ 1132(a)(3)*, including injunctive relief prohibiting further official acts that facilitate, ratify, or enable continuation of the pleaded ERISA circumvention and requiring corrective steps reasonably necessary to terminate ongoing exposure of the plan to the outstanding writ mechanism.

I. ***Claims Against DeAngelis (Knowing Participant — Individual Capacity)***

335. **Liability (Knowing Participant; Individual Capacity).** Plaintiff realleges Factual Section B (The Fraudulent Motion and QDRO Scheme). DeAngelis is liable under *§ 1132(a)(3)* as a knowing participant because she authored, signed, and issued the April 13, 2022 Associate Judge's Report that directed Plaintiff to withdraw or borrow $50,000 from the ERISA plan and awarded $25,000 to each attorney, setting the predicate for the later relabeling and enforcement sequence aimed at inducing plan action. *Harris Trust*, 530 U.S. 238; *Amara*, 563 U.S. 421.

336. Knowing Participation. Plaintiff alleges DeAngelis knowingly participated by:

(a) issuing the Associate Judge's Report that awarded attorney-fee amounts from the ERISA-governed account and directed a plan withdrawal or loan, despite attorneys not being "alternate payees" under ERISA's QDRO limits; and

(b) enabling the downstream "spousal support" relabeling and writ-based enforcement sequence by generating the initial fee-from-plan directive used to pressure plan administration and induce distribution.

337. Equitable Relief. Plaintiff seeks appropriate equitable relief under *§ 1132(a)(3)* against DeAngelis, including surcharge in an amount reflecting her proportionate responsibility for plan losses and injunctive relief sufficient to prevent repetition of the same ERISA-circumvention mechanism.

J. ***Claims Against Harris (Knowing Participants in Ongoing Violations)***

338. Liability (Supervisory Knowing Participant in Ongoing Violations). Plaintiff realleges Factual Section J (Ongoing Facilitation) and Section G (The State Bar Cover-Up). Harris is liable under *§ 1132(a)(3)* as a knowing participant to the extent, in the supervisory and policymaking role alleged above, Harris ratified, directed, or maintained the challenged disciplinary and enforcement posture that preserved the outstanding writ-driven threat to Plaintiff's ERISA plan after notice of the ERISA defect. *Harris Trust*, 530 U.S. 238; *Amara*, 563 U.S. 421.

339. Knowing Participation. Plaintiff alleges Harris knowingly participated by:

   (a) receiving notice of the ERISA circumvention and outstanding writ mechanism; and

   (b) approving, maintaining, or failing to reverse subordinate actions that shielded the attorney participants and allowed the ongoing possession of $25,000 property right and restraint and collection pressure to persist.

   (c) treating the challenged fee-payment instruments and writ-based restraint as valid despite ERISA's anti-alienation and QDRO limits; and

   (d) denying, delaying, or foreclosing relief that would have removed the restraint and ended the continuing exposure of the plan to the outstanding writ mechanism.

   (e) ratifying Judge Terry's prior false statements and cover-up conduct, including her false claims that the court lacked jurisdiction to void the orders and writ, by treating those void instruments as valid and enforceable after assuming the case; and

   (f) closing the state case (December 2025) to eliminate all state-court remedies and foreclose any correction of the ERISA circumvention.

340. Equitable Relief. Plaintiff seeks appropriate equitable relief under *§ 1132(a)(3)* against Harris, including injunctive relief prohibiting further ratification or maintenance of policies or decisions that facilitate the pleaded ERISA circumvention and requiring corrective action to terminate ongoing plan exposure to the outstanding writ mechanism.

### K.  *Claims Against Evans (Knowing Participants in Ongoing Violations)*

341. Liability (Supervisory Knowing Participant in Ongoing Violations). Plaintiff realleges Factual Section J (Ongoing Facilitation) and Section H (Continuing State-Court Enforcement). Evans is liable under *§ 1132(a)(3)* as a knowing participant to the extent, in the supervisory and policymaking role alleged above, Evans ratified, directed, or maintained the challenged posture that preserved the outstanding writ-driven threat and permitted continuation of the ERISA circumvention after notice.

342. Knowing Participation. Plaintiff alleges Evans knowingly participated by:

   (a) ordering the May 7, 2025 transfer that shielded Judge Terry from accountability, made the appellate order unenforceable, and created a jurisdictional structure that foreclosed all remedies;

   (b) on July 25, 2025, assigning Defendant Harris to sit by assignment in Plaintiff's underlying state case and directing the ensuing response/sanction posture described in Fact Section H, actions

Plaintiff alleges maintained or ratified the continuing enforcement posture that treats Plaintiff's ERISA plan assets as reachable for costs/fees and preserves the outstanding writ-driven threat.

343. **Equitable Relief.** Plaintiff seeks appropriate equitable relief under *§ 1132(a)(3)* against Evans, including injunctive relief sufficient to stop ongoing facilitation and to terminate continuing exposure of the plan to the outstanding writ mechanism.

## L.    *Joint and Several Liability*

344. Defendants U.S. Bank, the Barrows Firm, Barrows, and Ybarra are jointly and severally liable for restoration of Plaintiff's ERISA plan assets to the status quo ante. Plaintiff seeks restoration of a total of $25,000 plus lost earnings distributed in September 2022 (not $75,000), as the same funds flowed from U.S. Bank through Wang to Barrows. The fiduciary (U.S. Bank) and the transferees Barrows are each liable for the full amount, but Plaintiff shall recover each dollar only once.

## M.    *Relief Requested*

345. Plaintiff is entitled to:

(a) Make-whole relief under *29 U.S.C. § 1109(a)* (as against U.S. Bank) and surcharge and other appropriate equitable relief under *§ 1132(a)(3)* (as against non-fiduciary knowing participants and transferees);

(b) Constructive trust and equitable lien under *29 U.S.C. § 1132(a)(3)*;

(c) Restoration of Plaintiff's 401(k) account to the status quo ante;

(d) Lost investment earnings from September 2022 to the date of restoration;

(e) Discretionary attorney fees under *29 U.S.C. § 1132(g)* excluding Evans and Harris.

(f) Prospective declaratory and injunctive relief under *29 U.S.C. § 1132(a)(3)* and *Ex parte Young* against Defendants Evans and Harris in their official capacities, including (a) prohibiting enforcement of the July 2022 writ and any future order treating Plaintiff's ERISA plan assets as reachable for costs/fees absent a valid QDRO, and (b) prohibiting strategic transfer/assignment maneuvers designed to obstruct creation of a factual record or to evade implementation of this Court's prospective relief;

### COUNT SIX: Minnesota Civil Theft — Minn. Stat. § 604.14

*(Against Barrows)*

346. Plaintiff incorporates by reference all preceding paragraphs.

347. **Minnesota Substantive Law Applies.** Minnesota substantive law applies because: (a) the injury occurred in Minnesota, where Plaintiff's retirement funds were located and from which they were physically transferred; (b) Barrows directed fraudulent communications to U.S. Bank in Minnesota for the purpose of inducing transfer of Minnesota-based property; (c) U.S. Bank administered Plaintiff's account from Minnesota and issued the distribution check from Minnesota; (d) Minnesota has the most significant relationship to the theft under Restatement (Second) of Conflict of Laws § 145; and (e) this theft claim is based on Barrows's extra-judicial communications and submissions directed to U.S. Bank in Minnesota to induce a distribution, not merely statements made to a Texas court.

348. **Personal Jurisdiction.** This Court has personal jurisdiction over Barrows because: (a) Barrows resides in Texas (¶13); (b) Barrows is subject to personal jurisdiction under Texas's long-arm statute, *Tex. Civ. Prac. & Rem. Code § 17.042*, because she committed tortious acts in Texas that caused injury to property located outside Texas; and (c) Barrows is subject to this Court's jurisdiction through the federal claims alleged in Counts One through Five, and this Court exercises supplemental jurisdiction over this state law claim under *28 U.S.C. § 1367(a)*.

349. **Personal Property (Movable Property).** The stolen property consisted of $25,000 in funds held in Plaintiff's 401(k) account administered by U.S. Bank in Minnesota. These funds constituted personal property within the meaning of Minn. Stat. § 604.14 and movable property obtained by deception within the meaning of Minn. Stat. § 609.52. U.S. Bank physically transferred the funds from Minnesota by issuing and mailing a check from Minnesota to Texas pursuant to Barrows' fraudulent scheme.

350. **Statutory Elements:** Under Minn. Stat. § 604.14, Barrows stole personal property from Plaintiff by obtaining property by deception, Minn. Stat. § 609.52, subd. 2(a)(3), as follows:

(a) **Taking:** Barrows obtained $25,000 from Plaintiff's 401(k) account by fraudulently inducing U.S. Bank to transfer the funds from Minnesota to Texas, where Barrows received and retained them as purported attorney fees. Barrows caused the taking by submitting fraudulent court orders to U.S. Bank falsely representing that the court had ordered "spousal support" when no such order existed. Barrows intended U.S. Bank to rely on those misrepresentations, and U.S. Bank did rely.

(b) **Without Consent:** Plaintiff formally objected to the distribution.

(c) **Intent:** Barrows intended to permanently deprive Plaintiff, as evidenced by her August 5, 2022 email. Barrows acted with intent to defraud by using false representations as the means to obtain plan funds to which she had no lawful entitlement.

(d) **Not Returned:** Barrows has not returned the property.

(e) **Theft**, Not Mere Conversion: Barrows' conduct constitutes theft rather than conversion because: (i) Barrows obtained the property through fraud and false pretenses, not through a good-faith fee dispute; (ii) Barrows knew she had no lawful right to the funds because attorneys cannot be "alternate payees" under ERISA; (iii) Barrows explicitly acknowledged the need to make false statements ("we must say the order is for spousal support") to obtain the funds; and (iv) Barrows' August 5, 2022 email demonstrates intent to permanently deprive Plaintiff of his property through deliberate fraud.

(f) Means: Barrows stole the property by means of false representation and false pretenses, specifically by: (i) representing to U.S. Bank that a court order required payment for "spousal support"; (ii) representing that Plaintiff had been "ordered" to pay spousal support on April 13, 2022; (iii) submitting court orders containing these false representations; and (iv) obtaining the funds based on these false pretenses.

351. Damages (Minn. Stat. § 604.14). Because the property has not been returned, Plaintiff is entitled to recover the value of the property when stolen ($25,000) plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater. Plaintiff seeks punitive damages at 100 percent of value ($25,000). Accordingly, Plaintiff seeks total damages of up to $50,000 under Minn. Stat. § 604.14, plus prejudgment and post-judgment interest as allowed by law.

## COUNT SEVEN: Minnesota Common Law Fraud

### *(Against Barrows, Ybarra, and Pigg)*

352. Plaintiff incorporates by reference all preceding paragraphs.

353. Judicial-Proceedings Privilege Not Applicable. This claim is based on Defendants' extra-judicial misrepresentations and deceptive submissions directed to U.S. Bank in Minnesota to induce a plan distribution, and the Minnesota judicial-proceedings privilege, at minimum, is framed as shielding statements in judicial proceedings from civil liability for claims sounding in defamation. *Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302, 306, 310 (Minn. 2007). The fraudulent representations at issue were directed to a third-party financial institution, not made in judicial proceedings.

354. Barrows' Fraud:

(a) False Representation: Barrows caused false "spousal support" representations to be transmitted to U.S. Bank, including through the orders and related transmittals, falsely stating that the court "heard Respondent's request for Spousal Support" and that "Yan was ordered to pay spousal support," when no such spousal-support adjudication occurred.

(b) Knowledge: Barrows drafted the orders and knew no spousal support hearing occurred.

(c) Intent: "We must say the order is for spousal support."

(d) Reliance: Barrows made the misrepresentations with the intention to induce action in reliance, and the misrepresentations caused U.S. Bank to act in reliance by processing and distributing plan assets. Plaintiff further alleges the misrepresentation was communicated to Plaintiff by U.S. Bank (including as the stated basis for the distribution), and Plaintiff was thereby induced to act and refrain from action in justifiable reliance while Defendants' scheme proceeded, resulting in the challenged transfer.

(e) Damages: $25,000 plus investment returns.

355. Ybarra's Fraud: Ybarra knowingly participated in and furthered Barrows' fraudulent representations directed to U.S. Bank in Minnesota, including by being copied on and knowingly joining the August 5, 2022 email instructing that the order "must say" it was for spousal support, participating in the April 13, 2022 hearing, and receiving a financial benefit traceable to the September 2022 distribution. Ybarra's participation was knowing and substantial, and she is liable for the fraud as a joint actor in the misrepresentation and the inducement of U.S. Bank's reliance. U.S. Bank relied on the spousal-support misrepresentation in making the distribution, causing damages as alleged above.

356. Pigg's Fraud: Pigg falsely represented to Plaintiff that he did not sign the fraudulent orders, inducing Plaintiff to pay Pigg $25,000. Pigg made the misrepresentation while acting as Plaintiff's attorney, with the intent to induce Plaintiff's reliance, and Plaintiff relied by paying Pigg $25,000 and by being diverted from timely and effective efforts to halt or unwind the distribution scheme.

357. Punitive Damages: Defendants' conduct demonstrates deliberate disregard for Plaintiff's rights, warranting punitive damages under Minn. Stat. *§ 549.20*. Pursuant to Minn. Stat. *§ 549.191*, Plaintiff seeks leave to amend to plead punitive damages upon the required prima facie showing.

## COUNT EIGHT: Texas Legal Malpractice

*(Against Pigg)*

358. Plaintiff incorporates by reference all preceding paragraphs.

359. Attorney-Client Relationship: Pigg represented Plaintiff in divorce proceedings.

360. Breach of Duty: Pigg breached his duties by:

(a) Signing fraudulent garnishment orders adverse to Plaintiff's interests without client consent. Specifically, Pigg signed, approved, or otherwise adopted the challenged "spousal support" and enforcement instruments that were later presented to the court and transmitted to U.S. Bank, thereby creating the appearance that Plaintiff assented to, or waived objections to, the extraction of funds from Plaintiff's ERISA-protected 401(k).

(b) Concealing court activities from Plaintiff. Pigg failed to timely inform Plaintiff of the submission, signing, filing, and service of the challenged orders and writ-based enforcement steps, and failed to provide Plaintiff copies promptly, preventing Plaintiff from taking immediate steps to object, seek emergency relief, or notify U.S. Bank to stop distribution.

(c) Lying to Plaintiff about whether he signed the orders. After Plaintiff discovered the "spousal support" order language, Pigg falsely denied that he had signed or participated in the documents, which diverted Plaintiff from pursuing prompt corrective relief and from timely challenging the authenticity and enforceability of the instruments presented to the plan administrator.

(d) Abandoning representation after exposure. Upon Plaintiff confronting him about the signed instruments and the ERISA consequences, Pigg materially reduced communication and withdrew, or effectively ceased providing services, without taking corrective steps to protect Plaintiff's property interests.

(e) Failing to appeal unlawful orders. Pigg failed to pursue timely and available review and corrective measures, including motions to vacate, strike, withdraw, or clarify the challenged instruments, and failed to pursue available extraordinary relief (including mandamus, as applicable) to halt enforcement and prevent distribution.

361. Causation: Pigg's breaches were a proximate cause of Plaintiff's losses. But for Pigg's signing, concealment, and misrepresentations, Plaintiff would have timely objected and sought emergency relief, and U.S. Bank would not have processed the challenged distribution based on facially regular, attorney-endorsed "spousal support" instruments. Pigg's conduct was a substantial factor in enabling the false "spousal support" narrative to be presented as procedurally valid, enabling writ-based enforcement pressure, and depriving Plaintiff of the opportunity to prevent or unwind the September 2022 distribution.

362. Damages: As a direct and foreseeable result of Pigg's malpractice, Plaintiff suffered the following damages, among others: (i) $25,000 distributed from Plaintiff's 401(k) in September 2022, plus lost investment earnings attributable to that amount from the date of distribution through restoration; (ii) $25,000 in fees paid to Pigg that were induced by Pigg's misrepresentations and rendered worthless or harmful by Pigg's conflicted conduct; (iii) additional attorney fees and costs Plaintiff paid to replace work Pigg abandoned and to mitigate the harm caused by the challenged instruments; and (iv) consequential damages from loss of access to retirement funds and the resulting disruption to Plaintiff's financial planning and retirement security.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff Conghua Yan respectfully requests that this Court enter judgment against Defendants as follows:

## A. Compensatory Damages

i. **Direct Property Loss:** $25,000 abstracted from Plaintiff's 401(k) account (September 2022).

ii. **Fraudulently Induced Payment:** $25,000 paid to Pigg based on misrepresentations.

iii. **Court-Ordered Fees Without Due Process:** $10,000 ordered without pleading or hearing (November 10, 2021).

iv. **Lost Investment Returns:** From September 2022 to date of judgment, estimated at $15,000.

v. **Sabotaged Legal Work:** Fees paid for legal services that were abandoned or performed adversely to Plaintiff's interests, estimated at $50,000.

**Subtotal Direct Compensatory Damages: $125,000**

## B. Statutory and Treble Damages

i. **RICO (18 U.S.C. § 1964(c)):** Treble damages against Barrows, Pigg, and all Count Two defendants permitted by law: $125,000 × 3 = **$375,000**

ii. **Sherman Act (15 U.S.C. § 15(a)):** Treble damages against State Bar of Texas: $60,000 × 3 = **$180,000**

iii. **Minnesota Civil Theft (Minn. Stat. § 604.14):** Against Barrows: $25,000 = **$25,000**

**Subtotal Statutory and Treble Damages: $580,000**

## C. Punitive Damages

Pursuant to 42 U.S.C. § 1983 and Minn. Stat. § 549.20:

| Defendant | Basis | Amount |
|---|---|---|
| Barrows | Fraud, willful ERISA circumvention, RICO | $250,000 |
| Pigg | Fraud against own client, betrayal of fiduciary duty | $250,000 |
| Ybarra | Knowing participation, receipt of ERISA funds | $100,000 |
| DeAngelis | Constitutional violations, ultra vires acts | $250,000 |
| Wilder | Willful TRCP 658 violations, due process violations | $250,000 |
| Marin, Martinez, Craig | Cover-up, selective enforcement | $150,000 |
| U.S. Bank | Willful ERISA breach despite acknowledged conflict | $250,000 |

| Defendant | Basis | Amount |
|-----------|-------|--------|
| **SUBTOTAL** | | **$1,500,000** |

### D. Emotional Distress Damages

i.   **Section 1983 (Count 4):** $150,000

ii.  **Minnesota Fraud (Count 7):** $100,000

iii. **Texas Malpractice (Count 8):** $150,000

**Subtotal Emotional Distress: $400,000**

### E. ERISA Equitable Relief (29 U.S.C. § 1132(a)(2) and (a)(3))

*Note: ERISA equitable relief under § 502(a)(3) is limited to relief concerning the ERISA plan fund itself. It does not authorize broader injunctive relief outside the plan-fund injury context. For broader injunctive relief against private defendants, see Section F.3 (RICO).*

<u>**Against U.S. Bank (Fiduciary):**</u>

i.   Make-whole relief: $25,000 plus lost investment returns.

ii.  Surcharge for breach of fiduciary duty.

iii. Restoration of Plaintiff's full account access.

iv.  Correction of marital status records.

<u>**Against Barrows, Ybarra, Barrows Firm (Transferees/Knowing Participants):**</u>

i.   Constructive trust over $25,000 (or traceable proceeds).

ii.  Equitable lien to secure restoration.

iii. Disgorgement and return to Plaintiff's 401(k).

<u>**Against Pigg (Knowing Participant):**</u>

i.   Surcharge for proportionate responsibility.

ii.  Injunctive relief preventing future ERISA violations.

<u>**Joint and Several Liability:**</u>

U.S. Bank, Barrows, Ybarra, and the Barrows Firm are jointly and severally liable for restoration of $25,000 plus lost earnings. Plaintiff seeks recovery of each dollar only once.

**F. Prospective Injunctive and Other Equitable Relief**

**1) Antitrust Injunctive Relief (Clayton Act § 16, 15 U.S.C. § 26)**

**a) <u>Against State Bar of Texas:</u>**

i. Enjoin SBOT from maintaining, enforcing, or facilitating the pleaded SAAP/SACP tying arrangement, including through disciplinary non-enforcement that allows compelled-prepayment orders and related collection mechanisms to override private SAAP fee agreements.

ii. Require SBOT to adopt and enforce disciplinary rules prohibiting SBOT members from requesting, accepting, collecting, or enforcing (including via contempt-backed mechanisms) any interlocutory/temporary fee order that compels a lawyer's own client to prepay/advance fees in a manner that overrides an existing written SAAP fee agreement, absent (a) a specific fee-claim pleading, (b) advance notice, and (c) the client's written informed consent to depart from the contract; and prohibiting the use of any pre-judgment QDRO/DRO substitute scheme to obtain or secure attorney payment from ERISA-protected plan assets.

iii. Require SBOT to issue statewide guidance (a) clarifying that compelled-prepayment orders against a lawyer's own client are not a substitute for ordinary fee-collection/contract remedies and may constitute the prohibited SACP mechanism when used to override SAAP terms, and (b) clarifying that attorneys are not "alternate payees" and may not use QDRO/DRO instruments to divert ERISA plan assets to satisfy attorney-fee demands. Enjoin SBOT from penalizing, retaliating against, or disadvantaging attorneys who decline to seek compelled-prepayment orders or pre-judgment ERISA-diversion devices.

iv. Require SBOT to revise CLE curriculum to remove content that normalizes compelled-prepayment against a lawyer's own client or ERISA-violative collection practices, and to provide mandatory training and member notice regarding compliance with ERISA anti-alienation limits and the injunction's prohibitions.

v. Require SBOT to implement an enforcement protocol (intake, tracking, investigation, disposition) for complaints alleging SAAP→SACP compelled-prepayment conduct and/or pre-judgment ERISA-diversion schemes, and to publish annual aggregate compliance metrics sufficient to deter recurrence.

2) **Constitutional/Section 1983 Injunctive Relief (42 U.S.C. § 1983; 28 U.S.C. § 2202)**

The following relief is requested against government defendants acting under color of state law:

a) <u>**Against Tarrant County and Wilder (prospective compliance relief):**</u>

   i.   Implement TRCP 658 compliance procedures for writ issuance as pleaded, including document-verification checkpoints.

   ii.   Require verification of a filed application, supporting affidavit, bond (if required), and a valid court order authorizing the writ before issuance/serving of any writ against plan assets.

   iii.   Audit and remediate any systemic noncompliance patterns in family-court writ/QDRO processing practices for the period pleaded (2014–present), including issuance/fee-collection practices.

3) **RICO Injunctive Relief (18 U.S.C. § 1964(a) and/or § 1964(c))**

*Note: RICO provides the PRIMARY and NECESSARY statutory basis for broad injunctive relief against private defendants (Barrows, Pigg, Ybarra, U.S. Bank, Barrows Firm), who are not reachable under antitrust (limited to SBOT) or § 1983 (requires state action), and for whom ERISA § 502(a)(3) provides only narrow plan-fund relief.*

a) <u>**Primary RICO Basis — Against Private Defendants (Barrows, Pigg, Ybarra, U.S. Bank, Barrows Firm):**</u>

Plaintiff requests the following injunctive relief under *18 U.S.C. § 1964(a) and/or § 1964(c)* to prevent and restrain ongoing and threatened violations. This relief reaches conduct beyond the narrow ERISA plan-fund injury and is not available under other statutory bases against these private parties:

   i.   Enjoin execution/enforcement of the served writ and substantially similar process. Enjoin Defendants from executing, enforcing, reissuing, renewing, or causing execution or enforcement of the July 14, 2022 writ and any substantially similar writ/process/turnover mechanism directed to Plaintiff's ERISA plan account, including any substitute process that seeks the same result through relabeling or procedural variants.

   ii.   Enjoin further use of the pleaded "collection-through-judicial-process" channel against Plaintiff's plan assets. Enjoin Defendants from drafting, submitting, transmitting, or causing to be transmitted to any plan

custodian/administrator any instrument or communication that seeks payment of attorneys' fees (or functionally equivalent fee payments) from Plaintiff's ERISA plan assets absent a valid, lawful QDRO process and lawful plan review, as pleaded.

iii.   **Affirmative corrective steps to neutralize ongoing threat.** Order Defendants who caused or facilitated the complained-of process to take reasonable corrective steps directed to the threatened execution risk, including: (i) written withdrawal/retraction of any outstanding demand/instruction that seeks execution of the challenged writ/process against the plan; and (ii) written notice to any recipient(s) of the challenged process (including any plan custodian/administrator served) that Defendants will not seek execution/enforcement of that process during the pendency of this action and thereafter to the extent enjoined.

iv.   **Accounting + divestiture/restrictions to prevent recurrence.** Order an accounting of proceeds and interests obtained through the pleaded racketeering scheme and impose reasonable restrictions on Defendants' future activities/investments that are necessary to prevent recurrence of the pleaded method (including restrictions on using or facilitating substantially similar fee-extraction/process-abuse mechanisms), and where applicable divestiture of any direct or indirect interest in the pleaded enterprise/enterprise-components, consistent with § 1964(a).

v.   **Compliance and record-preservation measures (party-directed).** Order reasonable, Defendant-specific compliance measures designed to prevent repetition of the pleaded method (e.g., preservation of records relating to the challenged writ/process, communications to plan custodians, and related enforcement steps; and adoption of written controls prohibiting Defendants' personnel/agents from repeating the restrained conduct).

b)   **Alternative/Supplemental RICO Basis — Against Government Defendants:**

To the extent any government defendant (DeAngelis, Marin, Martinez, Craig, Wilder, Harris, Evans) is not adequately reached by the § 1983 injunctive provisions set forth in Section F.2 above—or to the extent this Court determines that RICO provides more appropriate or complete relief—Plaintiff requests the same categories of injunctive relief set forth in Section F.3(a) above against such defendants under 18 U.S.C. § 1964.

**Enforcement Limitation:**

Plaintiff seeks appropriate orders to prevent and restrain ongoing and threatened violations of 18 U.S.C. § 1962, including reasonable restrictions and compliance measures. Any injunction entered under this RICO provision shall be enforced consistent with Fed. R. Civ. P. 65(d)(2) and shall bind only Defendants and persons with actual notice who act in active concert or participation with them. See Fed. R. Civ. P. 65(d)(2); Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14 (1945).

### 4) Relief Regarding Outstanding July 14, 2022 Writ

Plaintiff requests the following relief regarding the outstanding July 14, 2022 writ, supported by the applicable statutory bases identified above:

i. Declare the writ void and unenforceable as preempted and/or inconsistent with ERISA's anti-alienation requirements as pleaded.

ii. Order vacatur and expungement of the writ from the case record to prevent future enforcement.

iii. Enjoin all Defendants and persons acting in concert with them from executing, re-serving, reissuing, renewing, or facilitating execution of the writ or any functionally equivalent process against Plaintiff's plan account.

iv. Order U.S. Bank to release any restraint, hold, or encumbrance placed on Plaintiff's account in reliance on the writ.

## G. Declaratory Relief (Declaratory Judgment Act, 28 U.S.C. § 2201):

Plaintiff requests declarations that:

### 1) Antitrust Declarations (Against State Bar of Texas):

i. The State Bar's pleaded SAAP/SACP tying arrangement violates Sherman Act § 2.

### 2) Constitutional/Section 1983 Declarations (Against Official Capacity):

i. DeAngelis, Marin, Martinez, and Craig acted *ultra vires* as pleaded.

ii. Pre-judgment writs issued without TRCP 658 compliance are *void ab initio*.

### 3) ERISA Declarations (Against All Relevant Defendants):

i. Interlocutory orders directing payment to attorneys violate ERISA as pleaded.

ii. Attorneys are not "alternate payees" under ERISA/QDRO requirements as pleaded.

     iii.    Orders using "spousal support" labels as pretext for attorney fees are fraudulent and void.

**4) Specific Instrument Declarations:**

     i.    The April 13, 2022; April 26, 2022; May 26, 2022; July 12, 2022 orders and June 16, 2022 and July 14, 2022 writs are void and unenforceable as pleaded.

**5) RICO Declarations:**

     i.    Defendants Barrows, Pigg, violated RICO, *18 U.S.C. § 1962(c)-(d)*; Ybarra, DeAngelis, Marin, Martinez, Craig, Wilder, U.S. Bank, Evans, and Harris violated RICO, *18 U.S.C. § 1962 (d)*, as pleaded.

## H. Further Relief (28 U.S.C. § 2202):

Plaintiff requests all further necessary or proper relief to implement the foregoing declarations, including the injunctions and compliance directives in Section F.

## I. Fee Disgorgement

**<u>Against Barrows:</u>**

Disgorge all fees received in connection with Plaintiff's divorce, including the $25,000 from Plaintiff's 401(k).

**<u>Against Pigg:</u>**

Return all fees paid by Plaintiff, including the $25,000 direct payment.

## J. Attorney Fees and Costs

Plaintiff is entitled to attorney fees under:

     i.    18 U.S.C. § 1964(c) (RICO) — mandatory.

     ii.    15 U.S.C. § 15(a) (Sherman Act) — mandatory.

     iii.    42 U.S.C. § 1988 (§ 1983) — discretionary.

     iv.    29 U.S.C. § 1132(g) (ERISA) — discretionary.

## K. Interest

Pre-judgment interest from the date of each unlawful taking; post-judgment interest at the legal rate until paid.

**L. Agency Referrals**

   i.   **U.S. Department of Labor:** Referral for investigation of systematic ERISA violations.

   ii.   **Texas Attorney General:** Referral for *parens patriae* action.

   iii.   **Texas Supreme Court:** Notification regarding disciplinary rule amendments.

**M. No Double Recovery**

To the extent damages overlap, Plaintiff seeks recovery of each dollar only once. Treble damages and punitive damages shall be calculated to avoid duplication while ensuring full compensation.

**N. Total Relief Demanded**

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally where applicable, in the total amount of not less than **TWO MILLION DOLLARS ($2,000,000)**, consisting of:

   i.   Compensatory damages.

   ii.   RICO treble damages (*18 U.S.C. § 1964(c)*).

   iii.   Sherman Act treble damages (*15 U.S.C. § 15(a)*).

   iv.   Minnesota Civil Theft damages (*Minn. Stat. § 604.14*).

   v.   Punitive damages (*42 U.S.C. § 1983*; *Minn. Stat. § 549.20*).

   vi.   Emotional distress and consequential damages.

   vii.   ERISA make-whole relief.

   viii.   Pre-judgment and post-judgment interest.

   ix.   Attorney fees and costs.

   x.   Such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Conghua Yan*
Conghua Yan, Pro Se
2140 E Southlake Blvd, Suite L-439
Southlake, Texas 76092
Tel: 214-228-1886
Email: arnold200@gmail.com

### INDEX of EXHIBITS

| Exhibit # | Description | Date / Context |
|---|---|---|
| **Exhibit 1** | Emails from William Albert Pigg regarding QDRO signature and truthfulness. | August 2022 |
| **Exhibit 2** | Grievance dismissals, appeal determinations, and "No Just Cause" decisions from the State Bar of Texas. | 2022–2023 |
| **Exhibit 3** | Motion for Interim Attorney's Fees filed by The Barrows Firm. | March 3, 2022 |
| **Exhibit 4** | Decision by Tarrant County Criminal District Attorney's Office closing the criminal complaint. | December 2022 |
| **Exhibit 5** | Affidavit of Leslie Starr Barrows claiming fees (alleged false affidavit). | March 3, 2022 |
| **Exhibit 6** | Criminal case records (Southlake municipal court case E0129990-1). | Dec 2021 – Feb 2022 |
| **Exhibit 7** | Associate Judge Report/Order awarding fees from Plaintiff's 401(k). | April 13, 2022 |
| **Exhibit 8** | Garnishment/spousal-support order signed by Pigg. | April 26, 2022 |
| **Exhibit 9** | Order from In the Matter of the Marriage of [Redacted] (Cause No. 360-549246-13). | April 21, 2014 |
| **Exhibit 10** | Order on Interim Attorney Fees, Comal County (Cause No. C2022-0409A). | December 2, 2024 |
| **Exhibit 11** | Official Schedule: District Court Civil Cases and Actions. | Effective Jan 1, 2022 |
| **Exhibit 12** | Official Schedule: District Court Civil Filing Fees. | Effective Jan 1, 2022 |
| **Exhibit 13** | Affidavit executed by Fuyan Wang regarding fee payments. | October 18, 2025 |
| **Exhibit 14** | Proposed Order, 53rd District Court, Travis County (Cause No. D-1-FM-08-005770). | June 16, 2009 |
| **Exhibit 15** | Motion to Release Funds for Attorney's Fees, 360th District Court (Cause No. 360-479099-10). | March 16, 2011 |
| **Exhibit 16** | Order to Withdraw American Airlines Super Saver 401(k) Plan (Cause No. 360-479099-10). | January 5, 2012 |
| **Exhibit 17** | Order Confirming Payments from 401(k) (Cause No. 360-479099-10). | May 8, 2012 |
| **Exhibit 18** | Motion to Equalize Attorney's Fees, 322nd District Court (Cause No. 322-547540-13). | February 6, 2014 |
| **Exhibit 19** | Qualified Domestic Relations Order (QDRO), 360th District Court (Cause No. 360-479099-10). | July 11, 2014 |
| **Exhibit 20** | Writ of Garnishment containing "spousal support" assertions. | July 14, 2022 |